NO. 25-6132

In The

# United States Court of Appeals
For The Fourth Circuit

UNITED STATES OF AMERICA

Plaintiff/Appellee,

v.

JONATHAN GIANNONE

Defendant/Appellant,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE  DISTRICT OF SOUTH CAROLINA          AT COLUMBIA

OPENING BRIEF OF APPELLANT

Joshua Snow Kendrick
KENDRICK & LEONARD, P.C.
Post Office Box 6938
Greenville, South Carolina 29606
(864) 760-4000

Counsel for Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................. 1

I. STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION................................................................. 2

A. BASIS FOR SUBJECT MATTER JURISDICTION IN THE DISTRICT COURT................................................................. 2

B. BASIS FOR JURISDICTION IN THE COURT OF APPEALS................ 2

II. STATEMENT OF ISSUES PRESENTED FOR REVIEW....................... 3

III. STATEMENT OF THE CASE................................................. 3

1. How the case began................................................. 3

   a. Arrest of Brett Johnson................................................. 3

   b. Brett Johnson's work as a Secret Service informant: continued illegal activity and a computer hack................................................. 4

2. Jonathan Giannone is arrested................................................. 5

3. Giannone's jury trial................................................. 6

   a. Testimony of Bradley Smith................................................. 6

   b. Testimony of Bobby Kirby................................................. 6

   c. Closing arguments................................................. 9

   d. Jury verdict and sentencing................................................. 9

4. Post-conviction proceedings relevant to this appeal........................... 9

   a. Motion for a new trial................................................. 9

   b. FOIA Litigation................................................. 10

IV. SUMMARY OF THE ARGUMENT....................................... 11

V. ARGUMENT................................................. 12

1. THE DISTRICT COURT SHOULD HAVE GRANTED GIANNONE'S PETITION FOR A WRIT OF CORAM NOBIS.............................................. 12

Standard of Review............................................................................. 12

Argument............................................................................................ 13

a. The law of coram nobis in the Fourth Circuit................................ 13

b. The evidence withheld from Giannone at his trial was material....... 14

   i. "Trap and trace" records............................................................ 14

   ii. The hack of the Secret Service computer.................................. 17

   iii. Travel records......................................................................... 20

   iv. Bank records and ATM withdrawal.......................................... 21

c. The Brady violations in this case are fundamental violations............. 22

d. The timeliness of Giannone's petition does not warrant its dismissal 24

CONCLUSION...................................................................................... 25

STATEMENT REGARDING ORAL ARGUMENT..................................... 25

# TABLE OF AUTHORITIES

**Cases**

*America Online, Inc. v. Huang*, 106 F. Supp. 2d 848, 851 (E. D. Va. July 13, 2000). .................................................................................17

*Brady v. Maryland.* 373 U.S. 83 (1963) .....................................................14

*Carlisle v. United States*, 517 U.S. 416, 429 (1996) ..................................15

*United States v. Akinsade,* 686 F.3d 248, 252-53 (4th Cir. 2012). .............15

*United States v. Barrington*, 648 F.3d 1178, 1184 n.2 (11th Cir. 2011)....24

*United States v. Bartko*, 728 F.3d 327, 339 (4th Cir. 2013). ......................28

*United States v. Henry*, 673 F.3d 285, 291 (4th Cir. 2012).........................13

*United States v. Lesane*, 40 F.4th 191, 198 (4th Cir. 2022)............ 15, 24, 31

*United States v. McDaniel*, 85 F.4th 176, 182 (4th Cir. 2023) ...................13

*United States v. Nosal*, 676 F.3d 854, 857 (9th Cir. 2021). ........................20

*United States v. Parker,* 790 F.3d 550, 558 (4th Cir. 2015) ................. 14, 28

**Statutes**

18 U.S.C. § 1028A(a)(1) ...............................................................................2

18 U.S.C. § 1343 ...........................................................................................2

18 U.S.C. § 3127(4) .....................................................................................17

28 U.S.C. § 1291 ...........................................................................................2

5 U.S.C. § 552(b)(6)-(7) .............................................................................19

**Other Authorities**

*Collins English Dictionary, Unabridged (10th ed. 2009* ...........................24

## I. STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

### A. BASIS FOR SUBJECT MATTER JURISDICTION IN THE DISTRICT COURT

On September 20, 2006, the United States Attorney for the District of South Carolina filed an indictment against Appellant Jonathan Giannone.

The indictment alleged five counts. Counts 1, 3, and 4 alleged wire fraud in violation of 18 U.S.C. § 1343. Counts 2 and 5 alleged identity theft in relation to wire fraud, in violation of 18 U.S.C. § 1028A(a)(1). JA35.

After significant post-conviction litigation, Giannone filed a writ of coram nobis in the United States District Court on August 28, 2024. DE405.[1]

Pursuant to the indictment and the cited code sections as well as the subsequent petition for a writ of coram nobis that is the subject of this appeal, the district court had jurisdiction over this case.

### B. BASIS FOR JURISDICTION IN THE COURT OF APPEALS

28 U.S.C. § 1291 authorizes this Court to review final decisions of the federal district courts.

An order dismissing the petition for a writ of coram nobis was filed on February 11, 2025. JA458. A notice of appeal was filed on February 21, 2025. JA473. Based on the final judgment of the district court in this case and a proper and timely notice of appeal, this Court has jurisdiction over this matter.

## II. STATEMENT OF ISSUES PRESENTED FOR REVIEW

---

[1] Cites to "DE" refer to entries on the district court docket in *United States v. Jonathan Giannone*, 3:06-cr-01011-CMC-1 (District of South Carolina).

1.    THE DISTRICT COURT SHOULD HAVE GRANTED GIANNONE'S PETITION FOR A WRIT OF CORAM NOBIS.

### III.   STATEMENT OF THE CASE

This case involves evidence that was never turned over to the defense and would have had a critical impact on the trial of this matter, as well as the numerous post-conviction proceedings.[2]

### 1.    How the case began.

#### a.    *Arrest of Brett Johnson*

Long before the Government put Giannone in its crosshairs, the case began in February of 2005, in Charleston, South Carolina, Brett Johnson was arrested on state fraud charges. Johnson had a long history as a hacker and had become skillful in various internet fraud schemes. JS375.

After his wife left him, Johnson began a volatile relationship with a cocaine-addicted stripper. JA44-47. He spent his entire savings on her and turned back to computer fraud to make money. Johnson was purchasing counterfeit cashier's checks and using them to obtain goods he then sold. JA47. He was arrested by state authorities on February 8, 2005, in Charleston. Johnson immediately confessed. JA48.

Shortly after his arrest, Johnson was approached by agents of the United States Secret Service who wanted him to become an informant. He agreed and the Secret Service assisted in lowering his bond so he could be

---

[2] Because of the complicated history and issues, counsel has tried to limit the facts to those that best help contextualize the petition below and this appeal. To that end, some proceedings or information have been left out if not relevant to the issues this Court must consider.

released from jail. JA48. He was released from jail and moved to Columbia, South Carolina, to work as an informant for the Secret Service. A previous addict, Johnson quickly relapsed and began using cocaine during his time as an informant with the Secret Service. JA49.

### b. Brett Johnson's work as a Secret Service informant: continued illegal activity and a computer hack.

In a letter sent to the district court right after Giannone's conviction, Johnson explained the strange circumstances of his work as an informant. JA42. Brett Johnson described an adversarial relationship with his supervising agents. JA49. Having relapsed into cocaine addiction, Johnson returned to computer fraud to fund his addiction. He filed false tax returns under the nose of the Secret Service, which would later claim it was diligently tracking his actions. JA49.

Three months after beginning work as an informant for the Secret Service, the computer Johnson was using to assist in the investigation of computer fraud was hacked. JA50. He was exposed as an informant and both his and his girlfriend's personal information was published on the internet within the community on which he had been providing undercover information. Johnson's description of this hack is different than another hack described later and never disclosed to Giannone. At the very least, it appears there were multiple hacks of Johnson's Secret Service computer, which is directly at odds with the Government's trial argument that the computer was secure and "unimpeachable."

4

Johnson's drug use increased, and he continued filing fraudulent tax returns to finance his activities. JA50. All of this happened under the supposedly watchful eye of the United States Secret Service, who would repeatedly testify about the security of the computer Johnson was using and the operation the Secret Service was running with him.

Johnson failed a polygraph related to his communications with others regarding his undercover work and was taken back to the Charleston County Detention Center. JA51-52. Secret Service agents searched his apartment in Columbia and discovered evidence of his fraudulent activities, which had taken place while he was working for them as an informant. JA52.

Johnson's bond was reinstated, and he fled, becoming a fugitive. After a nationwide cocaine-fueled fraud spree, he was eventually arrested in Florida. All of Johnson's undercover work was on a computer. He monitored websites and online forums dedicated to numerous fraudulent schemes carried out on the internet. In addition to purchasing bank account information, fraudulent bank cards, and financial and identity information, Johnson conducted online chat conversations with various individuals related to fraudulent schemes. JA53.

## 2.    Jonathan Giannone is arrested.

For a short period of time in May and June of 2005, Johnson used online messenger services to talk with two individuals using the online handles of "Pit Boss 2600" and "CIA INTEL." JA65-66. He purchased stolen Bank of America debit card information for $600. Johnson was instructed to deposit $600 in a Bank of America business account. JA200. Secret Service

obtained information from the bank that the account in question was associated with a bank account owned by Giannone, based on a common phone number linked to the account into which the $600 was deposited and a personal account owned by Giannone. JA201.

On August 16, 2006, based on the information described above, Giannone was arrested for wire fraud. JA5. Giannone was indicted in September of 2006 for three counts of wire fraud and two counts of aggravated identity theft. JA35. As trial approached, discovery became a frequent issue in pretrial hearings. Specifically, the defense questioned whether Johnson, who had recently been arrested, would testify at trial. Johnson did not testify at trial, likely because the Secret Service and the Government knew he was not credible. JA112-113.

### 3.    Giannone's jury trial.

Giannone's trial began on March 5, 2007. JA61. Giannone's trial was unique in that the primary witness against him was not an actual witness. Rather, the Government used Brett Johnson's chat transcripts to prove its allegations without actually calling Johnson as a witness.

#### a.    *Testimony of Bradley Smith*

Secret Service Agent Bradley Smith testified about Johnson's work as an informant for the agency. JA74. He described Johnson as a known fraudster who was used by the Secret Service for 11 months to uncover internet fraud and other individuals involved in those frauds. JA86-87. Smith testified that Johnson had shared operational details with other

individuals and had committed new crimes while working for the Secret Service, resulting in his termination as an informant. JA87-88.

### b. *Testimony of Bobby Kirby*

Secret Service Agent Bobby Kirby testified about online conversations between Johnson (who identified himself on the internet as "Gollumfun") and an individual identified as "CIA INTEL." JA150-151. Kirby and the Assistant United States Attorney prosecuting the cases went through the online conversations in front of the jury and attempted to link those conversations to real world events through various financial records. JA164.

For example, in one of the conversations, CIA INTEL referenced making travel arrangements through "CC Suppliers." JA220. On the same day, American Express records reflected Giannone purchased a plane ticket from JFK airport in New York to Dulles Airport. JA221. There was a conversation in July of 2006 that Agent Kirby testified was supposed to be in 2005. JA222. The conversation referenced a trip to California and Kirby testified about a Thrifty Car Rental in the name of Giannone in Santa Ana, California from June 30, 2005, to July 4, 2005. JA223. Additional records show that Giannone was in California during these dates. JA224-225.

Kirby also testified about a conversation on September 25, 2005, between Gollumfun and CIA INTEL regarding CIA INTEL being in Washington, DC, in a hotel on the same street as the White House. JA228-229. He also testified about a receipt from Dollar Thrifty Car Rental at the Baltimore airport from September 15, 2005, through October 13, 2005. JA229. Kirby then testified American Express records reflected a card in

7

Giannone's name had been used to stay at the Washington, DC Marriott hotel from June 23, 2005, to September 24, 2005. JA229-230. Kirby did not explain why these dates did not match up and did not make sense in light of the Government's theory. The "real world events" did not necessarily match up with the online conversations, which casts doubt on whether the Government had the right person on trial. This would, like much of the Government's case, become critical in light of evidence discovered many years later.

A November 8, 2005, online conversation reflected CIA INTEL talking about an impending trip to Hawaii the following day, where he was flying first class and staying for four nights at a Hyatt hotel. JA232. Kirby then testified to records reflecting Giannone travelled from New York to Hawaii on November 9, 2005. JA232-233. A car rental statement from Dollar Thrifty Car Rental reflected a car rented in Giannone's name from November 9, 2005, to November 14, 2005, in Honolulu, Hawaii. JA233. There was no explanation why the number of nights in Hawaii did not match the claims made by CIA INTEL nor was there an attempt to match the price of the trip ($2300) to the amount spent in Giannone's name. Again, these inconsistencies conflicted with the Government's theory of the case but were never explained. They clearly cast doubt on the Government's attempts to match real world events with online chats.

On cross-examination, Kirby testified as though there was no way to determine the location of the parties to the online conversations. He specifically told the jury that the only identifying information was the "ICQ"

name or number. JA247. This testimony would become material to the petition for a writ of coram nobis considering information Giannone discovered much later after prevailing in a Freedom of Information Act ("FOIA") case against the Government. Contrary to Kirby's sworn testimony, not only was it possible to determine the location of parties to online conversations, but the Government was also in possession of this location information and failed to disclose it. JA392-393.

Kirby also admitted that there was nothing in any of the online conversations that mentioned the names "Brett Johnson" or "Jonathan Giannone" and that anyone with the password and user identification for "Pitboss 2600" could send messages under that identity. JA248-249.

Kirby was confronted with the fact that Giannone had made multiple travel arrangements under his own name, with his own credit card, and with no attempt to hide his identity. JA278-279. Because most people involved in computer fraud concealed their identity, Kirby claimed Giannone's failure to conceal his identity must have been a mistake. JA279.

Kirby was questioned about other usernames that appeared in the chat transcript. JA280-283. He testified he did not investigate those names or try to identify the people behind them. Kirby told the jury that it would be hard to investigate further when he had nothing more than a screen name. JA281. This is contradicted by later discovered evidence that the Secret Service was in possession of further identifying information. They had locations related to the messages sent, which demonstrates there was a way to identify users through locations.

Kirby was also questioned about whether the Secret Service learned any username's passwords during the investigation and used those. While giving vague answers about whether that ever happened, Kirby conceded they would keep a record of a password if they learned of it in an investigation. JA283-284.

Kirby testified Confidential Informant Johnson also talked with others over ICQ, a form of instant messaging through computers. While the number of people he could chat with was over 50 people, Kirby testified the Secret Service would not be able to keep track of who those people were. JA287-288.

Kirby was questioned about technical aspects of the investigation, including the ability to "wiretap" modem lines. JA293. He admitted he was not an expert but also stated he could not answer whether experts were involved in the investigation of the case. JA294. On re-direct, he again relayed that Johnson, a cooperating informant who did not appear at trial, was "fluent in the language that was used by people in this undercover investigation..." JA341. Kirby was able to convey credibility by referring to Johnson, who clearly was not credible based on his repeated inability to follow the law, even while acting as a confidential informant.

### c.    *Closing arguments*

The Government extensively addressed Brett Johnson in its closing, the informant who was central to the prosecution but never testified. JA353-355. Critical to this appeal, the Government continued its insistence that

Johnson's reliability was not important to the investigation because the Secret Service was so diligent in monitoring the operation. JA356.

### d.    *Jury verdict and sentencing*

The jury found Giannone guilty of all counts of the indictment on March 8, 2007. DE 83. He was sentenced on August 22, 2007, to 65 months in prison. DE 103.

## 4.    Post-conviction proceedings relevant to this appeal.

### a.    *Motion for a new trial*

Giannone filed a notice of appeal on August 28, 2007 and began his direct appeal in this Court, but also filed a pro se motion for a new trial. This Court granted a motion to hold his appeal in abeyance pending the outcome of his motion for a new trial.

The motion for a new trial was primarily based on newly discovered evidence and *Brady* violations by the Government. The district court denied the motion, citing five areas of evidence raised by Giannone, two of which are relevant here. Two letters were written to the district court by Brett Johnson. The Court found the letters were not *Brady* violations because the Government was not aware of the evidence and that the letters did not constitute new evidence. JA378-388. The district court found the arguments related to false testimony and representations were meritless. JA389.

As part of its response to the motion, the Government submitted an affidavit from Agent Kirby in which he described the hack of the Secret Service's computer, though later evidence reveals he did not provide all the

11

details in possession of the Government both at the time of the trial and the motion for a new trial. JA382.

### b.   *FOIA Litigation*

Giannone filed FOIA cases against both the Secret Service and the United States Attorney's Office.[3] Both of those cases were ultimately resolved by the Government turning over thousands of documents years after Giannone's conviction. The documents were important, as detailed in the argument section. They supported many of the arguments Giannone had been making since his conviction. They directly refuted many of the counterarguments the Government had made over the years.

Based on Giannone's federal incarceration, attempts to rebuild his life, and limited resources after being released from prison, his efforts at pursuing further relief were delayed. Not only did he need to review thousands of pages of evidence without counsel, but he also needed to understand the relevancy of that evidence to his case. After finally discovering material information that had been withheld from his defense, Giannone located counsel and able to file the petition below. His grounds and the district court's ruling on them are discussed below.

The district court denied the petition and this appeal follows.

### IV.   SUMMARY OF THE ARGUMENT

---

[3] See *Jonathan Giannone v. United States Secret Service,* 1:08-cv-01713-RBW (filed in the District Court for the District of Columbia); *Jonathan Giannone v. Executive Office of the U.S. Attorney,* 1:14-cv-00542-RMC (also filed in the District Court for the District of Columbia).

Appellant John Giannone was prosecuted in a unique way. The informant who helped catch him never testified in court. Instead, the Government presented transcripts of chat logs from an internet messaging service. The Government repeatedly argued these logs were accurate. It turns out there was significant information to dispute this claim. The computer had been hacked by a notorious hacker, and that information was never disclosed to Giannone.

Additional evidence was discovered long after Giannone's conviction including travel information, bank information, and IP addresses, all of which were never disclosed before trial. Giannone filed a petition for a writ of coram nobis. The district court denied the petition based on timeliness and a belief the evidence discovered post-conviction was not material or favorable.

## V.    ARGUMENT

1.    THE DISTRICT COURT SHOULD HAVE GRANTED GIANNONE'S PETITION FOR A WRIT OF CORAM NOBIS.

### **Standard of Review**

The denial of a writ of coram nobis is reviewed in this Court for abuse of discretion. *United States v. McDaniel*, 85 F.4th 176, 182 (4th Cir. 2023). A district court abuses its discretion when it fails to consider judicially-recognized factors limiting discretion, or when it relies on incorrect factual or legal premises. *Id.* (citing *United States v. Henry*, 673 F.3d 285, 291 (4th Cir. 2012)).

Factual findings are reviewed for clear errors and legal conclusions are reviewed de novo. *Id.* The standard of review in this case requires this Court to answer two questions as they relate to the narrow circumstances presented by Giannone.

The underlying petition was based on the Government's failure to disclose information to the defense, implicating the well-settled and familiar standard in *Brady v. Maryland.* 373 U.S. 83 (1963). The Court must first consider whether the Government violated its *Brady* obligations. To establish such a violation, Giannone must establish: "(1) that the undisclosed information was favorable, either because it was exculpatory or because it was impeaching; (2) that the information was material; and (3) that the prosecution knew about the evidence and failed to disclose it." *United States v. Parker,* 790 F.3d 550, 558 (4th Cir. 2015). If the withheld information is enough to undermine confidence in the result of the trial, this Court should find a *Brady* violation.

Once such a violation is established, the Court must then determine whether this is such a fundamental violation that the petition for a writ of coram nobis should be granted and the underlying conviction of Giannone vacated.

### Argument

1.  THE DISTRICT COURT SHOULD HAVE GRANTED GIANNONE'S PETITION FOR A WRIT OF CORAM NOBIS.

**a.     The law of coram nobis in the Fourth Circuit.**

14

Though petitions for writs of coram nobis are not commonly filed, the law in this Circuit on those petitions is well-developed. There are four prongs to the framework for considering such a petition: (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) the conviction has created adverse consequences sufficient to satisfy Article III's case or controversy requirement; and (4) the error is of the most fundamental character. *United States v. Lesane*, 40 F.4th 191, 198 (4th Cir. 2022).

In the district court's order, it cited cases that lay out the extraordinary nature of a petition for a writ of coram nobis. JA460-461. But "extraordinary" does not equate to "impossible." It simply applies to the unique case where the Court's intervention is required to do justice, but there are none of the usual avenues of relief left to ensure that justice is done. While the writ is not used frequently, this Court has never hesitated to grant the writ to correct an injustice. For example, this Court granted a writ of coram nobis in *United States v. Akinsade* in a case that could be considered a routine claim of ineffective assistance of counsel. *United States v. Akinsade,* 686 F.3d 248, 252-53 (4th Cir. 2012). The fundamental nature of the mistake in *Akinsade*, along with the severe consequences of the mistake, required the Court to step in and take action to correct an injustice.

The United States Supreme Court has opined it is hard to imagine a circumstance where it a writ of coram nobis would be necessary or appropriate. *Carlisle v. United States*, 517 U.S. 416, 429 (1996). That statement holds procedural value, but the unique nature of this case

demonstrates why it is a point of discussion, not a holding. While it is true there are numerous vehicles within the Federal Rules and federal law that can allow the Court to correct errors, it is equally true there will always be cases where the unique nature of the violation can only be corrected by the equally unique relief from a writ of coram nobis.

This is such a case. A failure to provide all information, especially when that information does not support the Government's theory, calls into question the validity of a conviction. But concealment, by its very nature, is hard to uncover. It takes time, effort, and often careful consideration. Giannone experienced just that. It was years after his conviction he found material information that was in the possession of the Government at the time of his trial and never disclosed.

Giannone meets each prong of the test for coram nobis relief. However, the district court's order reflected the Government's concession below that the only two prongs at issue were the timeliness of the petition and the fundamental nature of the claimed error. JA464.

## b.   The evidence withheld from Giannone at his trial was material.

There were four pieces of evidence withheld from Giannone at his trial. While each piece of evidence is individually material and undermines confidence in the verdict, in combination they easily meet the standard of creating a reasonable probability the trial would have turned out differently if the information had been disclosed.

### i. *"Trap and trace" records*

First, the Government was in possession of "trap and trace" records that were never disclosed to the defense. JA392-393. In the district court, there was a dispute over whether those records showed outgoing or incoming communications with an instant messenger service. JA465-466. The district court used the federal statutory definition of a trap and trace to find the trap and trace identified incoming signals, as opposed to outgoing signals. 18 U.S.C. § 3127(4). JA466.

This is correct, but the Court's factual findings related to that definition were incorrect. While a trap and trace on a phone would record incoming calls and have little relevance to the receiving phone beyond who called it, a trap and trace related to IP addresses on a messaging service captures different information.[4]

Internet messaging works differently than a telephone.[5] Signals are not sent directly from the originator to the receiver. They are routed through a server. A trap and trace on a server would collect the incoming signals to the server, as opposed to the incoming signals to the message's receiver. In this

---

[4] An "IP address" is the "Internet Protocol address" and is a numerical address that is a computer's unique identity on the Internet. *America Online, Inc. v. Huang*, 106 F. Supp. 2d 848, 851 (E. D. Va. July 13, 2000). IP addresses today are less reliable for identification because they can change. At the time of this investigation, they were more likely to be static.

[5] To the extent the Court is unfamiliar with the history of instant messaging, which has evolved significantly since the time of this case, the following article explains the basics of these services and their development. The description of how ICQ works, which was not explained in detail during the trial, is taken from this article to give the Court appropriate background for this argument: https://computer.howstuffworks.com/e-mail-messaging/instant-messaging.htm (last accessed September 19, 2025).

case, the trap and trace would more likely be collecting addresses of those accessing the server to send messages.

This was critical to the defense, because the Government's case relied on messaging logs. The case agent in Giannone's case testified there was no way to determine where parties to any particular internet messaging conversation were located. That is inconsistent with the trap and trace records located by Giannone long after his conviction. There are clearly locations noted for each IP address captured by the trap and trace.

The simplest explanation for this withheld evidence is that the locations captured by the trap and trace were the locations of the IP address logging into the server. This would have allowed Giannone to show that he was not in those particular locations at the time of the communications. [1] The lack of times and dates in the list discovered by Giannone does not change the value of the evidence, as there were several locations he had never been to at any time. But had he known about the information, he could have requested the specific times and dates, further allowing him to defend himself against the Government's "unimpeachable" messaging records.

Even if the district court was correct that it was unclear whether the trap and trace was capturing incoming or outgoing signals, this decision disregards the importance of communications to the Government's case. The prosecution repeatedly cited the "unimpeachable" nature of messaging logs. But obviously if Giannone had been in possession of location information related to messages allegedly sent by him, regardless of whether it was the location of the originating message or the receiver, he would have been able

18

to dispute the Government's evidence purporting to link him to various messages sent over the messaging service.

Perhaps most importantly, the evidence Giannone discovered directly refuted the Government's testimony that there was no way to determine the location of the parties to the messages. The existence of a trap and trace that identified IP addresses clearly shows that not only could the Government determine locations, they *were* determining locations and never disclosed the information to the defense.

The district court's opinion on this issue compounds the problem with the withheld evidence. The district court notes the information discovered in the FOIA litigation does not clarify the direction the signals were travelling or whose ICQ was being traced. But none of the information could be discovered if it was never disclosed to Giannone at trial. It is unlikely that the directions of the signals mattered, because regardless of the material information that could have been discovered if the information was disclosed at trial as required, the information standing alone is relevant. It refutes Government testimony that location information was unavailable. It further refutes the Government's attempts to match Giannone's physical location with locations described in the messages.

Further compounding the problem is the lack of disclosed evidence related to the trap and trace records. In addition to the trap and trace list, there are numerous redactions under the Freedom of Information Act in the disclosed documents based on privacy matters or ongoing law enforcement investigations. 5 U.S.C. § 552(b)(6)-(7). These redactions would not have

19

been appropriate in criminal proceedings and the relevant evidence would have been disclosed.

### ii. *The hack of the Secret Service computer.*

Second, Giannone argued to the district court evidence of a computer hack was material to his defense. "Hacking" for simplicity is access by someone to unauthorized data or files on a computer. *United States v. Nosal*, 676 F.3d 854, 857 (9th Cir. 2021).

Shortly after the verdict in his case, informant Brett Johnson wrote the district court a letter detailing his involvement in this case and misconduct that occurred during his time acting as an undercover informant for the Secret Service. JA42. He described the hacking of the computer he was using in the Secret Service's undercover operation. Based in part on that letter, Giannone moved shortly after his verdict for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

In response to that motion, the Government disputed the scope of the hacking. An affidavit was filed by Secret Service Special Agent Bobby Kirby purporting to describe the hack. According to Kirby, the described hacking of the computer used in the undercover investigation was limited. He claimed it took place over two months after the alleged interactions with Giannone. JA382.

Agent Kirby stated an individual named "deuce" (aka "deus" and "Manus Dei") accessed two email accounts used in the investigation with third-party service providers. JA383. During a later chat, it appears "deuce" accessed an online monetary account used in the undercover investigation.

20

The Government's response to the motion for a new trial argued it was not the computer used to record the chats that was compromised. However, the report related to this subject appears to dispute that description.

In August of 2006, federal agents interviewed the individual responsible for the hack and Giannone ultimately obtained that report. JA408. It stated the hacker had installed a keylogger on the undercover computer. JA406-407. Importantly, this hacker claimed to engage in scams as a way of warning the potential victims. JA406. In other words, he was able to not just access computers but take over the computers and use them.

The name of this hacker was Yevgeniy Likhtenshteyn, the same name as the father of a notorious hacker responsible for billions of dollars in losses.[6] In addition to none of this information being disclosed to Giannone, despite being in the Government's possession at the time of the trial, the affidavit filed by Kirby does not accurately describe the hack. He clearly downplays the scope of the hack by telling the Court it was just related to a third-party vendor used for some payment. Kirby leaves the Court with the implication the hack would not have affected the integrity of the computer. Second, the affidavit suggests the computer could not have been hacked and was secure. Both assertions are wrong, and the documents disclosed long after the trial prove that.

---

[6] The documentary transcript in the JA was accepted by the district court and is properly in the record of this case. The specific description of Likhtenshteyn's hacking related to this case is described. JA425-426.

21

Agent Kirby claimed the hack took place months after the contacts with Giannone and only related to gaining access to email accounts. JA383-384. There are multiple problems with this sworn testimony.

First, the arrest and interview of "deuce" does not state a date for when he installed a keylogger device on the undercover computer. JA406-407. Instead, he tells law enforcement he became interested in fraudulent schemes in 2004, which is well before the alleged contact between Giannone and the CI. He did not simply gain access to accounts, he installed a keylogger device which would have allowed him to control the entire computer. He then used that information to "expose" the computer user but also admitted he gained access to bank accounts.

Giannone never knew this happened. He only learned of the hacking from a letter from Brett Johnson sent to this Court. Agent Kirby does not accurately describe the hacking and significantly downplays the amount of access the hacker gained to the computer. The Government's reliance on Kirby's claimed date of the hacking misapprehends the importance of this evidence as it related to the trial.

This was clear evidence the computer used by the confidential informant for the Secret Service was not as secure as the prosecution represented to the jury. This case was prosecuted in a unique manner. As the Government stated in its opening argument: "...we truly have a star witness in this case, and the star witness in this case is the records of those chats, the written words on a piece of paper." JA67. In referring to its "star witness" the Government at trial represented the security of the chat transcripts (the "star

witness") was unassailable, so they could be believed as an accurate statement of what was said. By linking the events described in the transcripts to acts by Giannone in the real world, the Government argued it had proven Giannone's guilt beyond a reasonable doubt.[7] JA360-363.

The report received from the Secret Service in the FOIA case disputes the security of this "star witness" by showing that the computer used to convict Giannone was not secure. And that computer is primarily what was used to convict Giannone. The Government introduced chat transcripts which could not be cross-examined. The only way to test their credibility was to test their source. Despite multiple claims the source (the undercover computer) was unimpeachable, it turns out the opposite was true. The computer was not secure and had been hacked by the hackers Brett Johnson was communicating with, not Giannone. This critical evidence would have significantly undermined the "star witness" in this case.

Imagine if the Government rested its case on a human "star witness" and it repeatedly told both the jury and the Court that the "star witness" was completely unimpeachable. Further imagine the defendant later learned the "star witness" was compromised in such a serious manner that it completely refuted the Government's claims on which the defendant's conviction rested. There is little question, consistent with the Fourth Circuit's directive that justice and accuracy should prevail over finality, that such a

---

[7] The Government never explained why these events did not perfectly match up and were often off by days.

misrepresentation would be corrected. *United States v. Lesane*, 40 F.4th 191, 198 (4th Cir. 2022).

This case is no different. Faced with an impeachable confidential informant, the Government elected to introduce his work product, but not him. Adding to the problem, the Government repeatedly told the jury that this witness (the chat logs) was secure and reliable. Later, Giannone's FOIA litigation revealed that this was not the case. Instead, one of the best hackers in the world gained access to the confidential informant's computer. Contrary to the Government's oft-repeated position and the Secret Service affidavit filed with this Court, the access was not minor. A keylogger would have given the hacker knowledge of everything the confidential informant did on the computer.[8]

In addition to the evidence Giannone discovered in the FOIA litigation, Brett Johnson publicly described the hack in the Netflix documentary *Biggest Heist Ever*[9]:

---

[8] A keylogger, also referred to as a keystroke logger, captures every key depression, or keystroke, made on a computer. PCMAG.com. "Keylogging," the practice of covertly recording and monitoring keystrokes made on a computer, is typically accomplished through use of a dedicated software application or piece of implanted hardware. *Collins English Dictionary, Unabridged (10th ed. 2009). United States v. Barrington*, 648 F.3d 1178, 1184 n.2 (11th Cir. 2011).

**Brett Johnson** [00:48:14] Deuce doesn't know that I was an informant, and he tells me that he'd hacked into the First National Bank of Indiana. But he says, I can't cash out. Can you help me do that? And one day I walk into the office and I'm getting things set up and I've got my laptop in front of me. As I'm opening that up, my burner phone rings and I'm sitting there going, That's odd. No one should have this number. And the individual on the other end of the line was Deuce. What he says is, I know who you are. I know where you are.

**John Giannone** [00:48:59] Deuce hacked into Brett's computer and he discovered that Brett was an informant.

**Brett Johnson** [00:49:05] My impression of Deuce was that he was an apex predator, but I wasn't able to identify this guy.

JA425. This is the first time since the letter was sent to the Court that Johnson has spoken publicly and widely about the hacking of his computer. The documentary corroborates Giannone's arguments that the hacking of the computer was a critical piece of information for his defense.

Johnson and Giannone described the discovery of the documents related to the hack:

25

**John Giannone** [00:49:13] Many years later, I was considering writing a book and I put in a blanket request for any documents related to ShadowCrew. Ultimately, I received 1100 documents from the Secret Service, and some of those documents discussed this hack that Brett had mentioned to me.

**Brett Johnson** [00:49:32] John Giannone, he contacts me. He says he knows who hacked into that Secret Service computer that I ran. So he sends me these documents, and I don't think the kid knew what he had at that point of time. The investigative report starts out, Yevgeniy Likhtenshteyn, a.k.a. Deuce. As I'm reading, I'm like, you know, man, I know... I know that goddamn Lichtenstein name from someplace. I know that name. So I googled Lichtenstein and up pops Eugene Lichtenstein. He Americanizes his name. And then I see Ilya Lichtenstein from the Bitfinex hack.

**John Giannone** [00:50:13] Brett and I realized, holy shit, this is Ilya Lichtenstein's dad. We found out the Secret Service identified Eugene Lichtenstein in 2005, and they flew up to Chicago to pay him a visit about hacking into their computer and also about the Indiana Bank hack. Eugene stated that he had moved to the United States from Russia approximately 13 years before, and he admitted to hacking into that Bank of Indiana. But he was never charged with anything because he immediately agreed to cooperate as an informant for the Secret Service. Apparently they never reported it. So he has no criminal record. And it turned out Eugene Lichtenstein became a real estate agent in Chicago.

JA426.

There is now little doubt that a major breach of security occurred during the very time the Secret Service alleges its informant was messaging over the Internet with Giannone. The documentary's description is corroborated by the records produced to Giannone under FOIA.

### iii. Travel records.

In addition to the heist evidence, the Government presented evidence of travel to show the real-world travel matched up with the internet messaging discussions of travel. This would corroborate the chat logs. But the Government had evidence, only disclosed to Giannone years after his trial and conviction, that the corroboration was not nearly as accurate as the Government claimed.

26

An investigative report disclosed after FOIA litigation reflects that travel arrangements were made at various times under different names, but linked to Giannone's credit card. JA396-397. Because the case agents were aware that travel they were linking to Giannone could not always be linked to Giannone, they had evidence in their possession that refuted their own testimony.

The district court dismissed this argument by stating Giannone had his own records and this new evidence was not material or favorable. JA469. This misunderstands the part of the evidence that was relevant. It was not the transaction that mattered. It was the fact a person different from Giannone conducted the transaction and the Government had the name of that person. The redaction is important because it redacts whoever conducted the transaction in part for law enforcement purposes. JA396-397. The specific identity of the person is material, not whether or not the transaction actually occurred.

### iv. Bank records and ATM withdrawal.

Giannone discovered an additional piece of information in the FOIA production that was material to his defense. He was provided a chat log between informant Brett Johnson and another target who was collecting money through Johnson. JA439. There is discussion of account information to pay for fraudulent credit card information. JA446-447. Bank records reflect an ATM withdrawal in San Francisco from that account on July 11, 2005. JA437.

27

The significance of this information is only apparent when combined with the additional chat logs that were not disclosed to Giannone. Because the Government based an important part of its case on Giannone being the only person with access to the bank account, this chat log would have revealed an entirely different target had access to the bank account.

### c.    The *Brady* violations in this case are fundamental violations.

The district court ruled that none of this newly discovered evidence was material or favorable. Yet the evidence goes to the heart of the Government's case against Giannone.

Evidence is material if there is a reasonable probability its disclosure would have produced a different result. *United States v. Parker*, 790 F.3d 550, 559 (4th Cir. 2015). As this Court has recognized, that standard does not require a showing that it is likely a jury would have returned a different verdict. *Id.* Instead, it is met if the likelihood of a different result is enough to undermine confidence in the trial's outcome. *Id.*

Impeachment evidence is material if it relates to a witness who provided the only evidence of an essential element. *United States v. Bartko*, 728 F.3d 327, 339 (4th Cir. 2013). That standard is met here. The Government repeatedly argued to the jury and presented evidence that the chat logs at issue were not impeachable because they were simply recordings of events that could not have been manipulated. The evidence of the hack alone is enough to meet this standard and grant relief. It clearly refutes all of the Government's evidence that its computer records were accurate and

28

could not have been manipulated. Giannone was entitled to this information and it would have significantly changed the nature of this case. The evidence at trial would have been significantly undermined with this information and there can be no confidence in the outcome of this trial.

The other evidence is powerful impeachment of the remaining parts of the Government's case. The list of IP addresses at the very least belied the Government's claims that there was no way to determine who was chatting on internet messenger services. More importantly, it would have provided Giannone material information he could use to dispute the Government's claims. He would be able to determine when chats occurred with people in various locations or where they originated from. In turn, that information would have been material for him to show he could not have been a party to the Government's "unimpeachable" logs. Perhaps more importantly, there is obviously more undisclosed information. Records related to the trap and trace that uncovered the list in the Joint Appendix would have been material to the defense. Those records appear to remain undisclosed and further undermine confidence in the result of Giannone's trial.

The travel records dispute the claims that real world events could only be tied to Giannone. Having the name of the person who was travelling under his identity would call into question whether was the actual person travelling. Combined with the mismatches of dates in the travel, it would have been compelling evidence that someone else had been conducting the chats with Johnson.

Finally, the bank records would have disputed the Government's certainty that only Giannone was using the account at issue for payment in this case.

This evidence was all material. Each piece of evidence, especially the computer hack, was favorable evidence that casts doubt on the Government's case. In combination, the case literally falls apart. The very theory of the prosecution no longer works based on this new evidence.

It appears from notes on the FOIA response letter that much of the redactions in the provided Secret Service documents were based on things the agency believed Giannone should not see. JA457. Because they are relevant to his case they should have been disclosed. Because they were not, a fundamental violation has occurred that this Court should correct through a writ of coram nobis.

## d.    The timeliness of Giannone's petition does not warrant its dismissal.

Giannone concedes it took some time to file this petition, but that is based on the complexity of the case and the material disclosed. Much of the evidence discussed here was not obvious on its face and Giannone was unable to hire counsel until long after his release from prison and his obtaining of these documents.

The district court recognized that this Court is not strict on timeliness when a claim of actual innocence is raised and Giannone is bringing a claim

of actual innocence. JA463. Two periods are relevant to the district court's dismissal, but neither should be held against Giannone.

First, there was a three-year delay between Giannone's release from custody and his FOIA litigation. This period should be disregarded. Giannone was not able to engage in the litigation and receive the vast amount of documents withheld from him until he was released. At the same time, he had no idea this evidence existed so would not have sought it sooner.

Additionally, the second period of delay is attributable to his handling of this matter on his own. He was unable to hire counsel until he hired the undersigned counsel, and did not know what he should do with the information. He made the reasonable decision to send the information to the Department of Justice and ask for help. Once that was denied, he sought counsel as best he could.

Regardless, this Court has recognized delay is a minimal factor in a case claiming actual innocence. *United States v. Lesane*, 40 F.4th 191, 198-199 (4th Cir. 2022). The fundamental violations described in this appeal warrant relief, and timeliness of the petition should not bar such relief.

## CONCLUSION

Based on these arguments, Giannone requests the Court grant his petition and vacate his conviction. He has long since completed his sentence, which cannot be corrected. But the ongoing consequences of a federal felony can be corrected and the Court should grant relief in this case.

In the alternative, if the Court does not grant the petition, Giannone requests the matter be remanded to the district court for an evidentiary hearing to determine why the evidence was not disclosed and further explore the probability this evidence undermines confidence in the outcome of this trial.

## STATEMENT REGARDING ORAL ARGUMENT

This matter is novel in this Circuit, but of critical importance in making sure federal criminal law is appropriately limited. As such, oral argument would aid the Court in crafting an opinion in this matter.

Respectfully submitted,

**_s/ Joshua Snow Kendrick_**
Joshua Snow Kendrick
KENDRICK & LEONARD, P.C.
Post Office Box 6938
Greenville, SC 29606
(864) 760-4000
Josh@KendrickLeonard.com

Greenville, South Carolina

32

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 25-6132      **Caption:** United States v. Jonathan Giannone

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑   this brief or other document contains _____7308_____ [*state number of*] words

☐   this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑   this brief or other document has been prepared in a proportionally spaced typeface using
   Microsoft Word_____ [*identify word processing program*] in
   14 point Georgia Pro_____ [*identify font, size, and type style*];

**or**

☐   this brief or other document has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Joshua Snow Kendrick_____

Party Name Jonathan Giannone_____      Date: 9/19/25_____