NO. _____25-6132_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff/Appellee,

v.

JONATHAN GIANNONE,

Defendant/Appellant,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA (COLUMBIA)

# JOINT APPENDIX

Joshua Snow Kendrick
KENDRICK & LEONARD, P.C.
Post Office Box 6938
Greenville, South Carolina 29606
(864) 760-4000

Andrea Hoffman
OFFICE OF THE U.S. ATTORNEY
151 Meeting Street, Suite 200
Charleston, South Carolina 29401
(843) 727-4381

*Counsel for* Appellant

*Counsel for* Appellee

# TABLE OF CONTENTS

District Court Docket Sheet............................................................ JA001

Indictment

      Filed September 20, 2006................................................. JA035

Letter to District Court from Brett Johnson .............................. JA042

Government Exhibit list from trial............................................ JA058

Jury trial before The Honorable Cameron McGowan Currie...... JA061

      Government opening argument......................................... JA062

      Testimony of Special Agent Brad Smith ........................... JA074

      Testimony of Special Agent Bobby Kirby.......................... JA147

      Government closing argument ......................................... JA349

Declaration of Brett Johnson ...................................................... JA375

Affidavit of Bobby Kirby............................................................. JA382

Court order denying motion for a new trial

      Filed September 9, 2008.................................................. JA385

Reports discovered in FOIA litigation........................................ JA392

Transcript of Netflix documentary

      "Biggest Heist Ever"........................................................ JA410

Bank record spreadsheet............................................................ JA437

Chat logs.................................................................................... JA439

FOIA letter and notes................................................................. JA455

Order denying petition for writ of coram nobis

      Filed February 11, 2025.................................................. JA458

Notice of Appeal

      Filed February 21, 2025.................................................. JA473

APPEAL,CLOSED

# U.S. District Court
## District of South Carolina (Columbia)
## CRIMINAL DOCKET FOR CASE #: 3:06-cr-01011-CMC-1

Case title: USA v. Giannone

Date Filed: 09/20/2006

Related Case: 3:10-cv-70256-CMC
Magistrate judge case number: 3:06-mj-00849-MCRI

Date Terminated: 08/28/2007

---

Assigned to: Honorable Cameron McGowan Currie

Appeals court case numbers: '07-4844' '4CCA', '08-4357' '4CCA', '08-5020' '4CCA', '08-8386' '4CCA', '09-7513', 10-4363 4CCA, 11-6577 4CCA, 25-6132 USCA

### Defendant (1)

**Jonathan Giannone**
*TERMINATED: 08/28/2007*

represented by **Jonathan Giannone**
PO Box 528
Rockville Centre, NY 11571
PRO SE

**Christopher Shannon Leonard**
Kendrick and Leonard
PO Box 886
Columbia, SC 29202
803-667-3186
Fax: 803-667-3187
Email: chris@kendrickleonard.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Drummond C Smith**
Zeldes Needle and Cooper
1000 Lafayette Boulevard
Bridgeport, CT 06604
203-333-9441
Email: drummondsmith@hotmail.com
*TERMINATED: 02/08/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Jack Bruce Swerling**
Jack Swerling Law Office
1720 Main Street
Suite 301

Columbia, SC 29201
803-765-2626
Fax: 803-799-4059
Email: jacklaw@aol.com
*TERMINATED: 02/16/2007*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Joshua Snow Kendrick**
Kendrick and Leonard
PO Box 6938
Greenville, SC 29606
864-760-4000
Fax: 803-667-3187
Email: josh@kendrickleonard.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**William Rhett Eleazer**
Eleazer Law Firm
912 Lake Spur Lane
Chapin, SC 29036
803-345-1379
Email: rhetteleazer@sc.rr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Thomas F Liotti**
Thomas F Liotti Law Offices
600 Old Country Road
Suite 530
Garden City, NY 11530
516-794-2816
*TERMINATED: 02/08/2010*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

18:1343 Devise a scheme and artifice to defraud to and to obtain money and property be means of false and fraudulent pretenses
(1)

**Disposition**

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of Fifty-seven (57) months. This sentence consists of Thirty-three (33) months as to Counts One, Three, and Four to be served concurrently and Twenty-four (24) months as to Counts Two, and Five, those terms to run concurrently to each other and consecutively to Counts One, Three, and Four. Upon release from imprisonment, the defendant shall be on supervised release for

a term of Three (3) years. This consists of Three (3) years as to Counts One, Three, and Four and One (1) year as to Counts Two and Five, those terms to run concurrently. Standard conditions of supervised release as well as the following special conditions apply: 1. The defendant shall participate in a program of substance abuse counseling/treatment, to include random drug testing as approved by the U.S. Probation Office. 2. The defendant shall participate in a Computer/Internet monitoring program as approved by the U.S. Probation Office. Special assessment of $500.00 already paid.

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of Fifty-seven (57) months. This sentence consists of Thirty-three (33) months as to Counts One, Three, and Four to be served concurrently and Twenty-four (24) months as to Counts Two, and Five, those terms to run concurrently to each other and consecutively to Counts One, Three, and Four. Upon release from imprisonment, the defendant shall be on supervised release for a term of Three (3) years. This consists of Three (3) years as to Counts One, Three, and Four and One (1) year as to Counts Two and Five, those terms to run concurrently. Standard conditions of supervised release as well as the following special conditions apply: 1. The defendant shall participate in a program of substance abuse counseling/treatment, to include random drug testing as approved by the U.S. Probation Office. 2. The defendant shall participate in a Computer/Internet monitoring program as approved by the U.S. Probation Office. Special assessment of $500.00 already paid.

18:1028A(a)(1) Did knowingly transfer, possess and use, without lawful authority, a means of identification of another person (2)

18:1343 Devise a scheme and artifice to defraud to and to obtain money and property be means of false and fraudulent pretenses (3-4)

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of Fifty-seven (57) months. This sentence consists of Thirty-three (33) months as to Counts One, Three, and Four to be served concurrently and Twenty-four (24) months as to Counts Two, and Five, those terms to run concurrently to each other and consecutively to Counts One, Three, and Four. Upon release from imprisonment, the

**JA003**

18:1028A(a)(1) Did knowingly transfer, possess and use, without lawful authority, a means of identification of another person (5)

defendant shall be on supervised release for a term of Three (3) years. This consists of Three (3) years as to Counts One, Three, and Four and One (1) year as to Counts Two and Five, those terms to run concurrently. Standard conditions of supervised release as well as the following special conditions apply: 1. The defendant shall participate in a program of substance abuse counseling/treatment, to include random drug testing as approved by the U.S. Probation Office. 2. The defendant shall participate in a Computer/Internet monitoring program as approved by the U.S. Probation Office. Special assessment of $500.00 already paid.

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of Fifty-seven (57) months. This sentence consists of Thirty-three (33) months as to Counts One, Three, and Four to be served concurrently and Twenty-four (24) months as to Counts Two, and Five, those terms to run concurrently to each other and consecutively to Counts One, Three, and Four. Upon release from imprisonment, the defendant shall be on supervised release for a term of Three (3) years. This consists of Three (3) years as to Counts One, Three, and Four and One (1) year as to Counts Two and Five, those terms to run concurrently. Standard conditions of supervised release as well as the following special conditions apply: 1. The defendant shall participate in a program of substance abuse counseling/treatment, to include random drug testing as approved by the U.S. Probation Office. 2. The defendant shall participate in a Computer/Internet monitoring program as approved by the U.S. Probation Office. Special assessment of $500.00 already paid.

**<u>Highest Offense Level (Opening)</u>**

Felony

**<u>Terminated Counts</u>**

None

**<u>Highest Offense Level (Terminated)</u>**

**<u>Disposition</u>**

**JA004**

None

**Complaints**                                                    **Disposition**

18:1343 devise a scheme to defraud by
transmitting datat aover the internet, via
computer, for the purpose of obtaining
money and property by means of fruadulent
pretenses

---

**Plaintiff**

**USA**                                      represented by    **Kathleen Michelle Stoughton**
                                                              US Attorneys Office (Cola)
                                                              1441 Main Street
                                                              Suite 500
                                                              Columbia, SC 29201
                                                              803-929-3114
                                                              Fax: 803-929-3135
                                                              Email: kathleen.stoughton@usdoj.gov
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Designation: Assistant US Attorney*

                                                              **Dean A Eichelberger**
                                                              Deceased 29003
                                                              803-929-3000
                                                              Fax: 803-254-2943
                                                              *TERMINATED: 08/06/2012*
                                                              *Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/14/2006 | 1 | COMPLAINT as to Jonathan Giannone (1). (ljon, ) [3:06-mj-00849-MCRI] (Entered: 08/14/2006) |
| 08/14/2006 | 2 | ARREST Warrant Issued (Restricted Access) in case as to Jonathan Giannone. (ljon) [3:06-mj-00849-MCRI] (Entered: 08/14/2006) |
| 08/16/2006 | | Arrest of Jonathan Giannone in Eastern District of NY. (mdea ) [3:06-mj-00849-MCRI] (Entered: 08/31/2006) |
| 08/30/2006 | 3 | Rule 5c3 Documents Received as to Jonathan Giannone from Eastern District of NY. (Attachments: # 1 Waiver of Rule 5 & 5.1 Hearings # 2 Order Setting Conditions of Release (redacted) # 3 Notice of Attorney Appearance (NY) # 4 NY minute sheet # 5 NY Removal to SC)(mdea ) [3:06-mj-00849-MCRI] (Entered: 08/31/2006) |
| 08/30/2006 | 4 | UNREDACTED DOCUMENT by Jonathan Giannone re 3 Rule 5c3 Documents Received: Order Setting Conditions of Release (mdea ) [3:06-mj-00849-MCRI] (Entered: 08/31/2006) |
| 09/01/2006 | 5 | Arrest Warrant Returned Executed on 8/16/2006 in case as to Jonathan Giannone. (mdea ) [3:06-mj-00849-MCRI] (Entered: 09/01/2006) |

| 09/06/2006 | 6 | First MOTION for Leave to Appear Pro Hac Vice Attorney: Thomas F. Liotti. ( Filing fee $ 250 receipt number 717395) by Jonathan Giannone. Proposed Order sent to Judge Chambers email address? n. (Swerling, Jack) Additional attachment(s) added on 9/7/2006 - corrected pdf (mdea, ). [3:06-mj-00849-MCRI] (Entered: 09/06/2006) |
|---|---|---|
| 09/06/2006 | 7 | Minute Entry for proceedings held before Judge Joseph R McCrorey :Initial Appearance/Bond Hearing as to Jonathan Giannone held on 9/6/2006; attorney Chris Hines makes a general appearance on behalf of attorney Jack Swerling; attorney Thomas Liotti makes an oral motion to appear pro hac vice - granted; defendant waives preliminary hearing; defense counsel moves to modify bond and conditions set in the E/D of New York; the court modifies bond to $150,000.00 unsecured and requires defendants' father to sign as surety on the bond and removes the travel restrictions (all other conditions of the bond will remain the same); defendant continued on bond. Court Reporter Courtsmart/Kurt McKaughan.CJA Time 10:00-11:15. (ttil, ) [3:06-mj-00849-MCRI] (Entered: 09/07/2006) |
| 09/06/2006 | 8 | WAIVER of Preliminary Examination or Hearing by Jonathan Giannone (ttil, ) [3:06-mj-00849-MCRI] (Entered: 09/07/2006) |
| 09/06/2006 | 9 | Unsecured Bond Entered as to Jonathan Giannone in amount of $ 150,000.00 surety: Albert Giannone (father) (ttil, ) [3:06-mj-00849-MCRI] (Entered: 09/07/2006) |
| 09/06/2006 | 12 | ORDER Setting Conditions of Release as to Jonathan Giannone (1). Signed by Magistrate Judge William Wall (E/D of New York) on 08/16/06.(ttil, ) [3:06-mj-00849-MCRI] (Entered: 09/07/2006) |
| 09/07/2006 | | DOCKET ANNOTATION - NO Correction by attorney required. As to Jonathan Giannone: pdf for entry #6 corrected and replaced. (mdea ) [3:06-mj-00849-MCRI] (Entered: 09/07/2006) |
| 09/08/2006 | 13 | ORAL ORDER granting 6 Motion for Leave to Appear Pro Hac Vice for Attorney Thomas F Liotti for Jonathan Giannone(1). Signed by Judge Joseph R McCrorey on 09/08/06.(ttil, )There is no document for this entry [3:06-mj-00849-MCRI] (Entered: 09/08/2006) |
| 09/20/2006 | 15 | INDICTMENT as to Jonathan Giannone (1) count(s) 1, 2, 3-4, 5. (ydav) (Entered: 09/20/2006) |
| 09/20/2006 | 17 | NOTICE OF HEARING as to Jonathan Giannone Arraignment set for 10/3/2006 9:45 AM in Columbia # 7, Matthew J. Perry, Court House, 901 Richland St, Columbia before Magistrate Judge Bristow Marchant. (ydav) (Entered: 09/20/2006) |
| 09/28/2006 | 18 | Case Assigned as to Jonathan Giannone to Judge Cameron McGowan Currie. (cram) (Entered: 09/28/2006) |
| 10/03/2006 | 19 | Minute Entry for proceedings held before Judge Bristow Marchant : Arraignment as to Jonathan Giannone (1) Count 1,2,3-4,5 held on 10/3/2006. Defendant waives reading of indictment. Plea of not guilty. (Court Reporter ESR.) (ljon, ) (Entered: 10/03/2006) |
| 10/03/2006 | 20 | NOT GUILTY PLEA ENTERED as to Jonathan Giannone (ljon, ) (Entered: 10/03/2006) |
| 10/03/2006 | 21 | SCHEDULING NOTICE as to Jonathan Giannone:Motions due by 10/17/2006 Pretrial Conference set for 10/17/2006 10:00 AM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. Jury Selection set for 11/2/2006 09:30 AM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie (ljon, ) (Entered: 10/03/2006) |

| | | |
|---|---|---|
| 10/04/2006 | 22 | MOTION for Discovery *and Inspection and Other* *Listed Motions* by Jonathan Giannone. Proposed Order sent to Judge Chambers email address? No. (Swerling, Jack) (Entered: 10/04/2006) |
| 10/04/2006 | 23 | MOTION to Suppress by Jonathan Giannone. Proposed Order sent to Judge Chambers email address? No. (Swerling, Jack) (Entered: 10/04/2006) |
| 10/04/2006 | 24 | MOTION for Leave to File *Additional Motions* by Jonathan Giannone. Proposed Order sent to Judge Chambers email address? No. (Swerling, Jack) (Entered: 10/04/2006) |
| 10/13/2006 | 25 | MOTION for Discovery by USA as to Jonathan Giannone. Proposed Order sent to Judge Chambers email address? No. (Eichelberger, Dean) (Entered: 10/13/2006) |
| 10/16/2006 | 26 | DISCLOSURE ORDER as to Jonathan Giannone. Signed by Judge Cameron McGowan Currie on 10/16/2006.(will, ) (Entered: 10/16/2006) |
| 10/17/2006 | 27 | WAIVER of PRESENCE by Jonathan Giannone (will, ) (Entered: 10/18/2006) |
| 10/17/2006 | 28 | Minute Entry for proceedings held before Judge Cameron McGowan Currie : Pretrial Conference as to Jonathan Giannone held on 10/17/2006. Parties' request for a continuance to the 1/9/2007 term granted. Defendant having waived appearance, Mr. Swerling to obtain defendant's written consent on proposed continuance order. Court Reporter Gary Smith.CJA Time 10:00 - 11:00. (will, ) (Entered: 10/18/2006) |
| 10/17/2006 | 29 | ORAL ORDER TO CONTINUE - Ends of Justice as to Jonathan Giannone. Time excluded from 11/2/2006 until 1/09/2007. Signed by Judge Cameron McGowan Currie on 10/17/2006.(will, ) (Entered: 10/18/2006) |
| 10/18/2006 | 30 | REVISED SCHEDULING NOTICE as to Jonathan Giannone Pretrial Conference set for 12/14/2006 09:30 AM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. Jury Selection set for 1/9/2007 09:30 AM (continued from 11/2/2006) in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie (will, ) (Entered: 10/18/2006) |
| 10/24/2006 | 31 | ORDER as to Jonathan Giannone re 29 Order to Continue - Ends of Justice. Follows oral order of 10/17/2006. Signed by Judge Cameron McGowan Currie on 10/24/2006. (Attachments: # 1 Defendant's consent)(will, ) (Entered: 10/24/2006) |
| 12/07/2006 | 32 | MOTION to Compel *ATM Photo of Defendant* by USA as to Jonathan Giannone. Proposed Order sent to Judge Chambers email address? No. (Eichelberger, Dean) (Entered: 12/07/2006) |
| 12/07/2006 | 33 | Amended MOTION to Compel *ATM Photo of Defendant* by USA as to Jonathan Giannone. Proposed Order sent to Judge Chambers email address? No. (Eichelberger, Dean) (Entered: 12/07/2006) |
| 12/11/2006 | 35 | First MOTION to Change Venue *and First Motion to Quash Affadavit filed in Connection with Defendant's Arrest and Dismiss Indictment and First Motion to Treat Defendant as a Juvenile* by Jonathan Giannone. Proposed Order sent to Judge Chambers email address? n. (Attachments: # 1 Memo in Support Memorandum of Law# 2 Affidavit Declaration from Attorney# 3 Exhibit Exhibit A# 4 Exhibit Exhibit B# 5 Exhibit Exhibits C-E) (Swerling, Jack) Modified on 12/12/2006 to change filing date to original filing date of motion; Attachment #2 Affidavit (unsigned) deleted; See Entry #37 for additional attachment (signed declaration)(will, ). (Entered: 12/12/2006) |
| 12/12/2006 | | ENTRY #34 DELETED as to Jonathan Giannone at request of filing attorney. See Corrected Filing Document Number: 35. (will, ) (Entered: 12/12/2006) |

| | | |
|---|---|---|
| 12/12/2006 | 37 | Additional Attachments to Main Document 35 First MOTION to Change Venue *and First Motion to Quash Affadavit filed in Connection with Defendant's Arrest and Dismiss Indictment and First Motion to Treat Defendant as a Juvenile* (Swerling, Jack) (Entered: 12/12/2006) |
| 12/14/2006 | 38 | Minute Entry for proceedings held before Judge Cameron McGowan Currie : Pretrial Conference as to Jonathan Giannone held on 12/14/2006. Parties' oral motion to continue case to February, 2007, term granted. Hearing on pending motions set for 1/19/2007 at 9:30. Defendant having waived his appearance not present. Defendant's written consent to continuance to be obtained and proposed order submitted. Court Reporter Gary Smith.CJA Time 9:30 - 10:30. (will, ) (Entered: 12/15/2006) |
| 12/14/2006 | 39 | ORAL ORDER TO CONTINUE - Ends of Justice as to Jonathan Giannone Time excluded from 1/9/2007 until 2/22/2007. Written order to follow. Signed by Judge Cameron McGowan Currie on 12/14/2006.(will, ) (Entered: 12/15/2006) |
| 12/15/2006 | 40 | REVISED SCHEDULING NOTICE as to Jonathan Giannone: Pretrial Conference and motions hearing set for 1/19/2007 09:30 AM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. Jury Selection reset for 2/22/2007 09:30 AM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. (will, ) (Entered: 12/15/2006) |
| 01/11/2007 | 43 | ORDER as to Jonathan Giannone re 39 Order to Continue - Ends of Justice to the 2/22/2007 term. Follows oral order of 12/14/2006. Signed by Judge Cameron McGowan Currie on 1/11/2007. (Attachments: # 1 Consents)(will, ) (Entered: 01/11/2007) |
| 01/11/2007 | 44 | RESPONSE in Opposition by USA as to Jonathan Giannone re 35 First MOTION to Change Venue *and First Motion to Quash Affadavit filed in Connection with Defendant's Arrest and Dismiss Indictment and First Motion to Treat Defendant as a Juvenile* (Attachments: # 1)(Eichelberger, Dean) (Entered: 01/11/2007) |
| 01/12/2007 | 45 | Proposed Voir Dire by Jonathan Giannone (Swerling, Jack) (Entered: 01/12/2007) |
| 01/18/2007 | 48 | Deficiency Memo as to Jonathan Giannone: Entry #46 - Reply. See attached Deficiency Memo. Any response due is based on the filing date of the original document. Docket Correction due 1/19/2007. (will, ) (Entered: 01/18/2007) |
| 01/18/2007 | 49 | Deficiency Memo as to Jonathan Giannone: Entry #47 - Letter. See attached Deficiency Memo. Any response due is based on the filing date of the original document. Docket Correction due 1/19/2007. (will, ) (Entered: 01/18/2007) |
| 01/18/2007 | 51 | Letter as to Jonathan Giannone (Swerling, Jack) (Entered: 01/18/2007) |
| 01/18/2007 | | ENTRY #50 DELETED as to Jonathan Giannone as requested by filing attorney. (will, ) (Entered: 01/18/2007) |
| 01/18/2007 | 52 | REPLY TO RESPONSE to Motion by Jonathan Giannone re 35 First MOTION to Change Venue *and First Motion to Quash Affadavit filed in Connection with Defendant's Arrest and Dismiss Indictment and First Motion to Treat Defendant as a Juvenile* (Swerling, Jack) (Entered: 01/18/2007) |
| 01/18/2007 | | ENTRY #46 DELETED as to Jonathan Giannone re: 48 Deficiency Memo Corrected Filing Document Number: #52. (will, ) (Entered: 01/18/2007) |
| 01/18/2007 | | ENTRY 47 DELETED as to Jonathan Giannone re: 49 Deficiency Memo Corrected Filing Document Number: 51. (will, ) (Entered: 01/18/2007) |

| 01/19/2007 | 53 | Minute Entry for proceedings held before Judge Cameron McGowan Currie : denying 35 Motion for Change of Venue as to Jonathan Giannone (1); granting 24 Motion for Leave to File Additional Motions as to Jonathan Giannone (1); Pretrial Conference as to Jonathan Giannone held on 1/19/2007. Defendant not present, having waived presence; Attorney Liotti not present. Court considered allegations contained in defendant's pleadings against prosecution to be baseless and without merit. Government's oral motion for a forthwith order granted. Final pretrial conference set for 2/16/2007 at 2:00 p.m. Defendant and Attorney Liotti are required to be present in person at the pretrial conference and to bring any computers defendant plans to use at the trial to the pretrial conference on 2/16/2007. Court directs Mr. Swerling to be involved in all proceedings. Court sets possible trial dates for the week of 3/5/2007 or 3/12/2007. Jury Selection remains set for 2/22/2007. Court will allow additional motions to be filed through 2/9/2007. Court Reporter Debra Jernigan.CJA Time 9:30 - 11:00. (will, ) (Entered: 01/19/2007) |
| 01/19/2007 | 54 | FORTHWITH ORDER pursuant to Rule 17(c)(1) of the F.R.Cr.P. as to Jonathan Giannone. Signed by Judge Cameron McGowan Currie on 1/19/2007.(will, ) (Entered: 01/19/2007) |
| 01/19/2007 | 55 | NOTICE OF HEARING as to Jonathan Giannone: Final Pretrial Conference set for 2/16/2007 02:00 PM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. Defendant and Attorney Liotti must be present at the hearing. (will, ) (Entered: 01/19/2007) |
| 01/23/2007 | 56 | TRANSCRIPT of Proceedings as to Jonathan Giannone, Motion Hearing held on January 19, 2007, before Judge Cameron McGowan Currie. Court Reporter: D Jernigan. (djernigan, ) (Entered: 01/23/2007) |
| 02/15/2007 | 57 | Letter from Attorney Liotti as to Jonathan Giannone in re: Appearance on 2/16/2007 (will, ) (Entered: 02/15/2007) |
| 02/15/2007 | 58 | Letter from Honorable Cameron McGowan Currie as to Jonathan Giannone in re: defendant's presence on 2/16/2007. (Filed at the direction of the Court.) (will, ) (Entered: 02/15/2007) |
| 02/16/2007 | 59 | Minute Entry for proceedings held before Judge Cameron McGowan Currie : Pretrial Conference as to Jonathan Giannone held on 2/16/2007. Additional discovery provided by Government today. Parties attempting to stipulate as to facts. Defendant's computer to be turned over to Government agents and parties agree that a chain of custody will be maintained and any downloading of hard drive will be video-taped for defendant. Mr. Swerling moves to be relieved as local counsel. In-camera hearing held re. oral motion to be relieved. Court orally relieves Mr. Swerling as local counsel and will allow Mr. Liotti to proceed without local counsel. Court also will allow Mr. Liotti to submit hard copies of any filings to Clerk for filing. Trial set for 3/5/2007 at 9:30; jury selection remains as set for 2/22/2007 at 9:30 a.m. Defendant continued on bond. Court Reporter Dan Mayo.CJA Time 2:00 - 3:30. (will, ) (Entered: 02/16/2007) |
| 02/16/2007 | | ORAL ORDER as to Jonathan Giannone relieving Mr. Swerling as local counsel. Signed by Judge Cameron McGowan Currie on 2/16/2007.(will, ) (Entered: 02/16/2007) |
| 02/16/2007 | 60 | NOTICE OF HEARING as to Jonathan Giannone: Jury Selection set for 2/22/2007 09:30 AM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. Jury Trial set for 3/5/2007 09:30 AM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. (will, ) (Entered: 02/16/2007) |

| 02/21/2007 | 61 | MOTION to Strike by USA as to Jonathan Giannone. Proposed Order sent to Judge Chambers email address? No. (Eichelberger, Dean) (Entered: 02/21/2007) |
| 02/21/2007 | 62 | MOTION to Strike Jurors for Cause by Jonathan Giannone. (will, ) (Entered: 02/21/2007) |
| 02/22/2007 | 63 | Minute Entry for proceedings held before Judge Cameron McGowan Currie : JURY SELECTION as to Jonathan Giannone held on 2/22/2007. CD-Rom discovery handed over to counsel for defendant with the understanding of the secured nature of information thereon. Challenges to selected jurors who were excused by Jury Clerk withdrawn. Jury drawn. Defendant continued on bond pending Jury Trial set for March 5-8, 2007. Court Reporter Dan Mayo.CJA Time 9:30 - 5:00. (will, ) (Entered: 02/23/2007) |
| 03/01/2007 | 64 | Proposed Jury Instructions by USA as to Jonathan Giannone (Eichelberger, Dean) (Entered: 03/01/2007) |
| 03/02/2007 | 65 | TRIAL BRIEF by USA as to Jonathan Giannone (Eichelberger, Dean) (Entered: 03/02/2007) |
| 03/02/2007 | 66 | MOTION in Limine *to use extracts from Liotti Declaration* by USA as to Jonathan Giannone. Proposed Order sent to Judge Chambers email address? No. (Eichelberger, Dean) (Entered: 03/02/2007) |
| 03/03/2007 | 67 | MOTION in Limine *to use excerpt from Liotti Declaration in Opposition (4th Cir. Filing)* by USA as to Jonathan Giannone. Proposed Order sent to Judge Chambers email address? No. (Eichelberger, Dean) (Entered: 03/03/2007) |
| 03/05/2007 | 68 | Letter (copy) from Drummond C. Smith to Dean Eichelberger with copy to Judge Currie as to Jonathan Giannone in re: stipulations and motions in limine (filed at the direction of the Court). (will, ) (Entered: 03/05/2007) |
| 03/05/2007 | 69 | LETTER/MOTION to the Court re. Government's trial procedure by Jonathan Giannone. (will, ) (Entered: 03/05/2007) |
| 03/05/2007 | 70 | RESPONSE in Opposition by USA as to Jonathan Giannone re 69 MOTION re. trial (will, ) (Entered: 03/05/2007) |
| 03/05/2007 | 71 | Proposed Jury Instructions by Jonathan Giannone (will, ) (Entered: 03/05/2007) |
| 03/05/2007 | 72 | Minute Entry for proceedings held before Judge Cameron McGowan Currie : granting 66 Motion in Limine as to Jonathan Giannone (1); granting 67 Motion in Limine as to Jonathan Giannone (1); granting in part and denying in part 69 Motion review of 404(b) evidence and excluding late discovery as to Jonathan Giannone (1); Jury Trial Begun as to Jonathan Giannone on 3/5/2007. Jury sworn; witnesses sequestered. Court's preliminary instructions; witnesses and exhibits. Jury to reconvene at 9:30 on 3/6/2007. Attorneys to reconvene at 9:15 on 3/6/2007. Court Reporter Gary Smith.CJA Time 9:30 - 5:30. (will, ) (Entered: 03/06/2007) |
| 03/06/2007 | 74 | Minute Entry for proceedings held before Judge Cameron McGowan Currie : Jury Trial Held as to Jonathan Giannone held on 3/6/2007. Witnesses and exhibits; Juror #167 excused; Jurors and attorneys to reconvene on 3/7/2007 at 9:30 a.m. Court Reporter Gary Smith.CJA Time 9:15 - 5:45. (will, ) (Entered: 03/07/2007) |
| 03/07/2007 | 73 | Proposed Jury Instructions by Jonathan Giannone (will, ) (Entered: 03/07/2007) |
| 03/07/2007 | 75 | MOTION for Leave to Appear Pro Hac Vice Attorney: Drummond C Smith. Filing Fee Receipt Number 300017778 ( Filing fee $ 250) by Jonathan Giannone. Proposed Order sent to Judge Chambers email address? n. (Attachments: # 1 Application/Affidavit)(gpea, ) (Entered: 03/07/2007) |

| 03/07/2007 | 77 | ORDER granting 75 Motion for Leave to Appear Pro Hac Vice for Attorney Drummond C Smith for Jonathan Giannone as to Jonathan Giannone (1). Signed by Judge Cameron McGowan Currie on 3/7/2007.(will, ) (Entered: 03/07/2007) |
| 03/07/2007 | 78 | Jury Instructions as to Jonathan Giannone (will, ) (Entered: 03/07/2007) |
| 03/07/2007 | 79 | Jury Note as to Jonathan Giannone (will, ) (Entered: 03/07/2007) |
| 03/07/2007 | 80 | Minute Entry for proceedings held before Judge Cameron McGowan Currie : Juror #94 excused because of illness. Jury Trial Held as to Jonathan Giannone held on 3/7/2007. Witnesses and Exhibits; Government rests. Rule 29 motions by defendant denied. Defense rests. Closing arguments by parties. Court's final charge to the Jury. Deliberations begin. Jury to continue deliberations on 3/8/2007 at 9:30 a.m. Court Reporter Gary Smith.CJA Time 9:30 - 5:30. (will, ) (Entered: 03/08/2007) |
| 03/08/2007 | 81 | Minute Entry for proceedings held before Judge Cameron McGowan Currie : Jury Deliberations continued. Verdict published. Jury Trial Completed as to Jonathan Giannone on 3/8/2007. Court directs that all exhibits be returned to the parties introducing them. Defendant's bond revoked and defendant remanded to custody pending sentencing. Court Reporter Gary Smith.CJA Time 9:30 - 12:00 Noon. (will, ) (Entered: 03/08/2007) |
| 03/08/2007 | 82 | Jury Note as to Jonathan Giannone (will, ) (Entered: 03/08/2007) |
| 03/08/2007 | 83 | JURY VERDICT as to Jonathan Giannone (1) Guilty on Count 1,2,3-4,5. (will, ) (Entered: 03/08/2007) |
| 03/08/2007 | 85 | ORDER RETURNING EXHIBITS as to Jonathan Giannone. Signed by Judge Cameron McGowan Currie on 3/8/2007. (Attachments: # 1 Government's Receipt w/Exhibit List; # 2 Defendant's Receipt w/Exhibit List)(will, ) (Entered: 03/08/2007) |
| 03/09/2007 | 87 | Writ of Habeas Corpus ad Prosequendum Issued as to Jonathan Giannone for from time to time as needed for the purpose of conducting interviews. Signed by Judge Joseph R McCrorey on 03/09/07.(ttil, ) (Entered: 03/12/2007) |
| 04/11/2007 | 88 | ORDER as to Jonathan Giannone to relinquish custody to U.S. Secret Service agents on April 12, 2007 and from time to time as needed. Signed by Judge Cameron McGowan Currie on 4/11/2007.(will, ) (Entered: 04/11/2007) |
| 04/20/2007 | 89 | TRANSCRIPT of Proceedings as to Jonathan Giannone pretrial conference held on February 16, 2007 before Judge Cameron McGowan Currie. Court Reporter: Dan Mayo. (dmayo, ) (Entered: 04/20/2007) |
| 04/20/2007 | 90 | TRANSCRIPT of Proceedings as to Jonathan Giannone jury selection held on February 22, 2007 before Judge Cameron McGowan Currie. Court Reporter: Dan Mayo. (dmayo, ) (Entered: 04/20/2007) |
| 05/15/2007 | 91 | NOTICE OF HEARING as to Jonathan Giannone: Sentencing set for 7/9/2007 10:00 AM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. (will, ) (Entered: 05/15/2007) |
| 05/24/2007 | 92 | ORDER as to Jonathan Giannone: Defendant's request for an extension of time until June 4, 2007 to file objections to the Presentence Report is hereby granted. Signed by Judge Cameron McGowan Currie on 5/24/2007.(will, ) (Entered: 05/24/2007) |
| 06/08/2007 | 93 | NOTICE OF RESCHEDULED HEARING as to Jonathan Giannone - Sentencing on 7/9/2007 at 10:00 cancelled and rescheduled to: Sentencing reset for 7/30/2007 09:30 AM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. (will, ) (Entered: 06/08/2007) |

| 07/16/2007 | 95 | Letter (faxed) as to Jonathan Giannone in re: rescheduling sentencing (will, ) (Entered: 07/16/2007) |
|---|---|---|
| 07/17/2007 | 96 | NOTICE OF RESCHEDULED HEARING as to Jonathan Giannone - Sentencing on 7/30/2007 at 9:30 a.m. cancelled and rescheduled to: Sentencing reset for 8/22/2007 02:00 PM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. (will, ) (Entered: 07/17/2007) |
| 08/21/2007 | 97 | NOTICE OF RESCHEDULED HEARING as to Jonathan Giannone: Sentencing on 8/22/2007 at 2:00 cancelled and rescheduled to: Sentencing reset for 8/22/2007 01:00 PM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. (will, ) (Entered: 08/21/2007) |
| 08/22/2007 | 99 | Letter from Attorney Thomas F. Liotti as to Jonathan Giannone in re: Sentencing on 8/22/2007 (will, ) (Entered: 08/22/2007) |
| 08/22/2007 | 100 | Minute Entry for proceedings held before Judge Cameron McGowan Currie : Sentencing held on 8/22/2007 as to Jonathan Giannone. Government's objection to the presentence report withdrawn; Defendant's objections overruled. Witness and Exhibits. Court orally directs that Exhibits be marked as Court Exhibit 1 and be filed under seal. Defendant returned to custody pending designation by Bureau of Prisons. Court Reporter Dan Mayo.CJA Time 1:00 - 3:30. (will, ) (Entered: 08/23/2007) |
| 08/22/2007 | 101 | EXHIBIT LIST from 8/22/2007 Sentencing as to Jonathan Giannone (will, ) (Entered: 08/23/2007) |
| 08/28/2007 | 103 | JUDGMENT as to Jonathan Giannone (1), Count(s) 1,2,3,4,and 5 - The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of Sixty-five (65) months. This term consists of Forty-one (41) months as to Counts 1, 3 and 4 to be served concurrently; Twenty-four (24) months as to Count 2, and Twenty-four (24) months as to Count 5, those terms to run concurrently with each other and consecutively to counts 1, 3 and 4. The Court recommends that FCI Fort Dix, NJ, be designated as facility for service of the period of incarceration. Upon release from imprisonment, the defendant shall be on supervised release for a term of Three (3) years. This term consists of Three (3) years as to Counts 1, 3 and 4 and One (1) year as to Counts 2 and 5, those terms to run concurrently. Special conditions of supervision are 1. The defendant shall participate in a program of substance abuse counseling and treatment, to include random drug testing as approved by the U.S. Probation Office. 2. The defendant shall participate in a computer monitoring program. Total Special Assessment in the amount of $500.00 is due immediately. Signed by Judge Cameron McGowan Currie on 8/28/2007.(will, ) (Entered: 08/28/2007) |
| 08/28/2007 | 104 | STATEMENT OF REASONS (Sealed) as to Jonathan Giannone (will, ) (Entered: 08/28/2007) |
| 08/28/2007 | 106 | NOTICE OF APPEAL OF FINAL JUDGMENT by Jonathan Giannone re 103 Judgment. The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (will, ) (Entered: 08/28/2007) |
| 08/29/2007 | 107 | Transmittal Sheet for Notice of Appeal to USCA as to Jonathan Giannone to US Court of Appeals re 106 Notice of Appeal - Final Judgment, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (bbro, ) (Entered: 08/29/2007) |

| 09/26/2007 | 109 | USCA Appeal Fees received $ 455, receipt number 300020571 as to Jonathan Giannone re 106 Notice of Appeal - Final Judgment, : (bbro, ) (Entered: 09/26/2007) |
| 10/09/2007 | 110 | Letter as to Jonathan Giannone in re: copy request (Attachments: # 1 Envelope)(gpea, ) (Entered: 10/10/2007) |
| 10/17/2007 | 111 | ORDER as to Jonathan Giannone: The Clerk shall provide Defendant with a form to Proceed In Forma Pauperis on appeal. If Defendant meets the financial requirements to have appointed counsel represent him, this court will notify the Fourth Circuit Court of Appeals that he wishes different counsel be appointed to. Signed by Judge Cameron McGowan Currie on 10/17/2007.(will, ) (Entered: 10/17/2007) |
| 10/17/2007 | 112 | ***DOCUMENT MAILED as to Jonathan Giannone re 111 Order, placed in U.S. Mail to Jonathan Giannone, #1815-053, Low Security Correctional Institution-Allenwood, PO Box 1000, White Deer, PA 17887-1000. (will, ) (Entered: 10/17/2007) |
| 10/31/2007 | 114 | ORDER of USCA (certified copy) as to Jonathan Giannone re 106 Notice of Appeal - Final Judgment, granting appellant leave to proceed under the CJRA and sealing the CJA 23 affidavit. (bbro, ) (Entered: 10/31/2007) |
| 11/05/2007 | 115 | ORDER of USCA (certified copy) as to Jonathan Giannone re 106 Notice of Appeal - Final Judgment, appointing Janie Richardson Hall for the appellant. (bbro, ) (Entered: 11/05/2007) |
| 12/17/2007 | 116 | ENTRY DELETED as to Jonathan Giannone, document # 124, a transcript deleted per Court Reporter's request due to an error. The transcript will be refiled. (gjoh, ) (Entered: 12/17/2007) |
| 12/17/2007 | 117 | TRANSCRIPT (Unredacted) filed as to Jonathan Giannone Bail Hearing for dates of 9-6-06 before Judge Joseph R. McCrorey, re 106 Notice of Appeal - Final Judgment, Court Reporter: Debra Potocki. (dpotocki, ) (Entered: 12/17/2007) |
| 01/07/2008 | 120 | TRANSCRIPT (Unredacted) of Proceedings as to Jonathan Giannone sentencing hearing held on August 22, 2007 before Judge Cameron McGowan Currie. Court Reporter: Dan Mayo. (dmayo, ) (Entered: 01/07/2008) |
| 02/27/2008 | 124 | MOTION for Release from Custody pending Appeal by Jonathan Giannone, pro se. (Attachments: # 1 Exhibit A - Plan of Study, # 2 Exhibit B - Education Transcript, # 3 Exhibit C - Memo Drug Specialist, # 4 Exhibit D - Boston Mun Court Docket, # 5 Exhibit E - Inmate Request to Staff, # 6 Cover Letter, # 7 Envelope)(will, ) (Entered: 02/27/2008) |
| 03/03/2008 | 126 | Letter from Jonathan Giannone in re: Copy of docket (Attachments: # 1 Envelope)(will, ) (Entered: 03/04/2008) |
| 03/04/2008 | 127 | Letter from Clerk to Jonathan Giannone in re: request for copy of docket. (will, ) (Entered: 03/04/2008) |
| 03/04/2008 | 128 | ***DOCUMENT MAILED as to Jonathan Giannone re 127 Letter placed in U.S. Mail to Jonathan Giannone (will, ) (Entered: 03/04/2008) |
| 03/07/2008 | 129 | Letter from Jonathan Giannone in re: copy of docket (Attachments: # 1 Envelope)(will, ) (Entered: 03/07/2008) |
| 03/13/2008 | 131 | RESPONSE in Opposition by USA as to Jonathan Giannone re 124 MOTION for Release from Custody (Eichelberger, Dean) (Entered: 03/13/2008) |
| 03/13/2008 | 132 | ORDER denying 124 Motion for Release from Custody as to Jonathan Giannone (1) for the reasons stated in the Government's response with which the Court agrees. Signed by Honorable Cameron McGowan Currie on 3/13/2008.(will, ) (Entered: 03/13/2008) |

| 03/13/2008 | 133 | ***DOCUMENT MAILED as to Jonathan Giannone re 132 Order on Motion for Release from Custody placed in U.S. Mail to Jonathan Giannone. (will, ) (Entered: 03/13/2008) |
| 03/20/2008 | 135 | NOTICE OF APPEAL of Conditions of Release by Jonathan Giannone as to 132 Order on Motion for Release from Custody (Attachments: # 1 Envelope)(bbro, ) (Entered: 03/20/2008) |
| 03/20/2008 | 136 | Transmittal Sheet for Notice of Appeal to USCA as to Jonathan Giannone to US Court of Appeals re 135 Notice of Appeal - Conditions of Release The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (bbro, ) (Entered: 03/20/2008) |
| 03/26/2008 | 137 | MOTION to Rescind (Vacate) Order Denying Defendant's Motion for Bond Pending Appeal and to Allow a Supplemental Memorandum of Law in Reply to the Government's Response by Jonathan Giannone, pro se. (Attachments: # 1 Envelope)(will, ) (Entered: 03/26/2008) |
| 03/31/2008 | 139 | ORDER of USCA (certified copy) as to Jonathan Giannone re 135 Notice of Appeal - appointing Thomas Liotti as counsel for the appellant. (bbro, ) (Entered: 03/31/2008) |
| 03/31/2008 | 140 | Letter from Jonathan Giannone in re: Court's rulings and copies. (Attachments: # 1 Envelope)(will, ) (Entered: 04/01/2008) |
| 04/09/2008 | 142 | Letter from Jonathan Giannone in re: withdrawing Entry #137. (Attachments: # 1 Envelope)(will, ) (Entered: 04/09/2008) |
| 04/18/2008 | 144 | ORDER of USCA (certified copy) as to Jonathan Giannone re 135 Notice of Appeal granting Thomas Liotti's motion to withdraw. (bbro, ) (Entered: 04/18/2008) |
| 05/02/2008 | 145 | Transcript filed as to Jonathan Giannone, jury trial, volume I for dates of March 5, 2007 before Judge Cameron McGowan Currie, re 106 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 5/23/2008. Redacted Transcript Deadline set for 6/2/2008. Release of Transcript Restriction set for 7/31/2008. (gsmith, ) (Entered: 05/15/2008) |
| 05/02/2008 | 146 | Transcript filed as to Jonathan Giannone, jury trial, volume II for dates of March 6, 2007 before Judge Cameron McGowan Currie, re 106 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 5/23/2008. Redacted Transcript Deadline set for 6/2/2008. Release of Transcript Restriction set for 7/31/2008. (gsmith, ) (Entered: 05/16/2008) |
| 05/02/2008 | 147 | Transcript filed as to Jonathan Giannone, jury trial, volume III, for dates of March 7, 2007 before Judge Cameron McGowan Currie, re 106 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction |

| | | |
|---|---|---|
| | | Request due 5/23/2008. Redacted Transcript Deadline set for 6/2/2008. Release of Transcript Restriction set for 7/31/2008. (gsmith, ) (Entered: 05/16/2008) |
| 05/02/2008 | 148 | Transcript filed as to Jonathan Giannone, jury trial, volume IV, for date of March 8, 2007 before Judge Cameron McGowan Currie, re 106 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 5/23/2008. Redacted Transcript Deadline set for 6/2/2008. Release of Transcript Restriction set for 7/31/2008. (gsmith, ) . (Entered: 05/16/2008) |
| 05/06/2008 | 150 | ***DOCUMENT MAILED NEF for transcripts as to Jonathan Giannone and transcripts instructions re 149 CJA24 Location, 148 Transcript, 147 Transcript, 146 Transcript, placed in U.S. Mail to Jonathan Giannone (bbro, ) Modified on 5/15/2008 to delete associations so that transcripts may be refiled using correct event (will, ). (Entered: 05/06/2008) |
| 05/19/2008 | 152 | ENTRIES DELETED as to Jonathan Giannone, Numbers 152, 153, 154 and 155. Reason for Deletion: To correct wrong event per filer's request (sdon, ) (Entered: 05/19/2008) |
| 06/02/2008 | 154 | USCA OPINION as to Jonathan Giannone for 135 Notice of Appeal - Conditions of Release filed by Jonathan Giannone, affirming the District Court's decision. (Attachments: # 1 Judgment, # 2 Notice of Judgment)(will, ) (Entered: 06/02/2008) |
| 06/02/2008 | 155 | Letter from Jonathan Giannone in re: request for copies from file. (Attachments: # 1 Envelope)(will, ) (Entered: 06/02/2008) |
| 06/02/2008 | 156 | Letter from Clerk to Jonathan Giannone in re: Request for copies. (will, ) (Entered: 06/02/2008) |
| 06/02/2008 | 157 | ***DOCUMENT MAILED as to Jonathan Giannone re 156 Letter placed in U.S. Mail to Jonathan Giannone (will, ) (Entered: 06/02/2008) |
| 06/05/2008 | 158 | MOTION to Compel United States for Disclosure of Trial Discovery by Jonathan Giannone. (Attachments: # 1 Envelope)(will, ) (Entered: 06/05/2008) |
| 06/05/2008 | 159 | MOTION for Disclosure of Grand Jury Proceedings by Jonathan Giannone, pro se. (Attachments: # 1 Envelope)(will, ) (Entered: 06/05/2008) |
| 06/06/2008 | 160 | RESPONSE in Opposition by USA as to Jonathan Giannone re 159 MOTION for Disclosure, 158 MOTION to Compel (Eichelberger, Dean) (Entered: 06/06/2008) |
| 06/06/2008 | 161 | MOTION to Amend/Correct 103 Judgment under proper Guidelines by Jonathan Giannone, pro se. (Attachments: # 1 Envelope)(will, ) (Entered: 06/06/2008) |
| 06/09/2008 | 162 | RESPONSE in Opposition by USA as to Jonathan Giannone re 161 MOTION to Amend/Correct 103 Judgment,,,, (Eichelberger, Dean) (Entered: 06/09/2008) |
| 06/11/2008 | 163 | ORDER denying 158 Motion to Compel as to Jonathan Giannone (1); denying 159 Motion for Disclosure as to Jonathan Giannone (1); dismissing 161 Motion to Amend/Correct as to Jonathan Giannone (1). Signed by Honorable Cameron McGowan Currie on 6/11/2008.(will, ) (Entered: 06/11/2008) |
| 06/11/2008 | 164 | ***DOCUMENT MAILED as to Jonathan Giannone re 163 Order on Motion to Compel, Order on Motion for Disclosure, Order on Motion to Amend/Correct, placed in U.S. Mail to Jonathan Giannone. (will, ) (Entered: 06/11/2008) |

| | | |
|---|---|---|
| 06/17/2008 | 165 | REPLY TO RESPONSE to Motion by Jonathan Giannone re 159 MOTION for Disclosure of Trial Discovery and Grand Jury Transcripts. (Attachments: # 1 Envelope) (will, ) (Entered: 06/17/2008) |
| 06/20/2008 | 166 | MOTION to Appoint Counsel for purposes of a Motion for New Trial by Jonathan Giannone, pro se. (Attachments: # 1 Envelope)(will, ) (Entered: 06/20/2008) |
| 06/24/2008 | 167 | MANDATE and JUDGMENT of USCA (certified copy) as to Jonathan Giannone re 135 Notice of Appeal - Conditions of Release (will, ) (Entered: 06/24/2008) |
| 07/14/2008 | 168 | MOTION for New Trial by Jonathan Giannone, pro se. (Attachments: # 1 motion - part 2, # 2 Affidavit, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D)(will, ) Modified on 7/14/2008 to note additional attachments in Entry 169 (will, ). Modified on 9/5/2008 to note additional attachment in Entry 197 (will, ). (Entered: 07/14/2008) |
| 07/14/2008 | 169 | Additional Attachments to Main Document 168 MOTION for New Trial (Attachments: # 1 Exhibit F, # 2 Exhibit G, # 3 Exhibit H, # 4 Exhibit I, # 5 Exhibit J, # 6 Exhibit K, # 7 Exhibit L, # 8 Exhibit M, # 9 Exhibit N, # 10 Exhibit O, # 11 Exhibit P, # 12 Exhibit Q, # 13 Exhibit R, # 14 Exhibit S, # 15 Envelope)(will, ) Modified on 9/5/2008 to note additional attachment in Entry 197 (will, ). (Entered: 07/14/2008) |
| 07/16/2008 | 170 | MOTION for Disclosure (entitled "Defendant's Brief in Support of Disclosure") by Jonathan Giannone, pro se. (Attachments: # 1 Exhibit A - Letter to Homeland Security, # 2 Exhibit B - Letter from Homeland Security, # 3 Exhibit C - Appeal to Secret Service, # 4 Exhibit D - Letter from Secret Service, # 5 Exhibit E - Order, ED-NY, # 6 Envelope) (will, ) (Entered: 07/16/2008) |
| 07/21/2008 | 171 | RESPONSE in Opposition by USA as to Jonathan Giannone re 170 MOTION for Disclosure (Eichelberger, Dean) (Entered: 07/21/2008) |
| 07/21/2008 | 172 | MOTION for Bond by Jonathan Giannone, pro se. (Attachments: # 1 Exhibit A - Transcript, Jury Trial, # 2 Exhibit B - Docket Entries, Boston Municipal Court, # 3 Exhibit C - Government's Appeal Brief, # 4 Exhibit D - 4CCA Opinion Re. Bond, # 5 Cover Letter, # 6 Envelope)(will, ) (Entered: 07/21/2008) |
| 07/28/2008 | 173 | RESPONSE in Opposition by USA as to Jonathan Giannone re 168 MOTION for New Trial (Attachments: # 1 Affidavit from Special Agent Bobby Joe Kirby)(Eichelberger, Dean) (Entered: 07/28/2008) |
| 07/28/2008 | 174 | RESPONSE in Opposition by USA as to Jonathan Giannone re 172 MOTION for Bond (Eichelberger, Dean) (Entered: 07/28/2008) |
| 07/28/2008 | 175 | MOTION to Compel United States for access to undercover computer by Jonathan Giannone. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Envelope)(bbro, ) (Entered: 07/29/2008) |
| 07/28/2008 | 176 | MOTION for Writ of Habeas Corpus ad prosequendum by Jonathan Giannone. (Attachments: # 1 Envelope)(bbro, ) (Entered: 07/29/2008) |
| 07/28/2008 | 177 | MOTION for Disclosure of suppressed camtasia demonstration by Jonathan Giannone. (Attachments: # 1 Envelope)(bbro, ) (Entered: 07/29/2008) |
| 07/28/2008 | 178 | NOTICE of Motion by Jonathan Giannone (Attachments: # 1 Envelope)(bbro, ) (Entered: 07/29/2008) |
| 07/28/2008 | 179 | NOTICE of Potential Witnesses for Evidentary Hearing by Jonathan Giannone (Attachments: # 1 Envelope)(bbro, ) (Entered: 07/29/2008) |

| 07/28/2008 | 180 | NOTICE of Intent to File Reply Motions by Jonathan Giannone (Attachments: # 1 Envelope)(bbro, ) (Entered: 07/29/2008) |
|---|---|---|
| 07/31/2008 | 181 | RESPONSE in Opposition by USA as to Jonathan Giannone re 175 MOTION to Compel (Eichelberger, Dean) (Entered: 07/31/2008) |
| 07/31/2008 | 182 | RESPONSE in Opposition by USA as to Jonathan Giannone re 177 MOTION for Disclosure (Eichelberger, Dean) (Entered: 07/31/2008) |
| 07/31/2008 | 183 | REPLY TO RESPONSE to Motion by Jonathan Giannone, pro se, re 170 MOTION for Disclosure. (Attachments: # 1 Envelope)(will, ) (Entered: 08/01/2008) |
| 08/05/2008 | 185 | ORDER denying 166 Motion to Appoint Counsel as to Jonathan Giannone (1). Signed by Honorable Cameron McGowan Currie on 8/5/2008.(will, ) (Entered: 08/05/2008) |
| 08/05/2008 | 186 | ***DOCUMENT MAILED as to Jonathan Giannone re 185 Order on Motion to Appoint Counsel placed in U.S. Mail to Jonathan Giannone. (will, ) (Entered: 08/05/2008) |
| 08/07/2008 | 187 | Letter from Jonathan Giannone in re: Mail box rule and filing of reply to opposition to a new trial. (Attachments: # 1 Envelope)(will, ) (Entered: 08/07/2008) |
| 08/11/2008 | 188 | REPLY TO RESPONSE to Motion by Jonathan Giannone re 168 MOTION for New Trial (Attachments: # 1 Exhibit A-American Express ads, # 2 Exhibit B-wired.com article, # 3 Affidavit of Jonathan Giannone, # 4 Envelope)(cbru, ) (Entered: 08/11/2008) |
| 08/14/2008 | 189 | REPLY TO RESPONSE to Motion by Jonathan Giannone re 172 MOTION for Bond (Attachments: # 1 Envelope)(cbru, ) (Entered: 08/15/2008) |
| 08/15/2008 | 190 | Letter from Jonathan Giannone in re: correction of page numbers in Affidavit in connection with Reply memorandum. (Attachments: # 1 Envelope)(will, ) (Entered: 08/18/2008) |
| 08/19/2008 | 191 | ORDER of USCA (certified copy) as to Jonathan Giannone re 106 Notice of Appeal - Final Judgment. The motion to hold this case in abeyance pending disposition of Mr. Giannone's pro se Rule 33 motion that is currently pending in the District Court is granted. The parties are directed to notify the USCA in writing promptly upon issuance of the decision. (will, ) (Entered: 08/19/2008) |
| 08/25/2008 | 192 | MOTION to Appoint Counsel for Evidentiary Hearing by Jonathan Giannone, pro se. (Attachments: # 1 Cover Letter, # 2 Envelope)(will, ) (Entered: 08/26/2008) |
| 08/25/2008 | 193 | Certificate of Service by Jonathan Giannone re 189 Reply to Response in opposition for bail. (Attachments: # 1 Cover Letter, # 2 Envelope)(will, ) (Entered: 08/26/2008) |
| 08/25/2008 | 194 | Certificate of Service by Jonathan Giannone re 188 Reply to Response in opposition to a new trial. (Attachments: # 1 Cover Letter, # 2 Envelope)(will, ) (Entered: 08/26/2008) |
| 08/28/2008 | 195 | Letter from Jonathan Giannone, pro se, in re: Enclosing corrected pages to Defendant's reply memorandum to Government's Response in Opposition to a new trial. (Attachments: # 1 Envelope)(will, ) (Entered: 08/28/2008) |
| 08/28/2008 | 196 | Letter from Jonathan Giannone in re: Enclosing corrected pages of Defendant's Affidavit. (Attachments: # 1 Envelope)(will, ) (Entered: 08/28/2008) |
| 09/04/2008 | 197 | Additional Attachments to Main Document 169 Additional Attachments to Main Document, 168 MOTION for New Trial. (Attachments: # 1 Cover Letter, # 2 Envelope) (will, ) (Entered: 09/05/2008) |
| 09/09/2008 | 198 | ORDER denying 168 Motion for New Trial as to Jonathan Giannone (1); denying 170 Motion for Disclosure as to Jonathan Giannone (1); denying 172 Motion for Bond as to |

| | | |
|---|---|---|
| | | Jonathan Giannone (1); finding as moot 175 Motion to Compel as to Jonathan Giannone (1); finding as moot 176 Motion for Writ of Habeas Corpus ad prosequendum as to Jonathan Giannone (1); denying 177 Motion for Disclosure as to Jonathan Giannone (1); finding as moot 192 Motion to Appoint Counsel as to Jonathan Giannone (1). Signed by Honorable Cameron McGowan Currie on 9/9/2008.(will, ) (Entered: 09/09/2008) |
| 09/09/2008 | 199 | ***DOCUMENT MAILED as to Jonathan Giannone re 198 Order on Motion for New Trial, Order on Motion for Disclosure, Order on Motion for Bond, Order on Motion to Compel,Order on Motion for Writ of Habeas Corpus ad prosequendum, Order on Motion to Appoint Counsel placed in U.S. Mail to Jonathan Giannone. (will, ) (Entered: 09/09/2008) |
| 09/15/2008 | 200 | NOTICE OF APPEAL OF 9/9/2008 ORDER by Jonathan Giannone, pro se, re 198 Order on Motion for New Trial. The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (Attachments: # 1 Cover Letter, # 2 Envelope)(will, ) (Entered: 09/15/2008) |
| 09/15/2008 | 201 | Transmittal Sheet for Notice of Appeal to USCA as to Jonathan Giannone to US Court of Appeals re 200 Notice of Appeal. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (will, ) (Entered: 09/15/2008) |
| 09/15/2008 | 202 | ***DOCUMENT MAILED as to Jonathan Giannone re 201 Transmittal Sheet for Notice of Appeal to USCA, placed in U.S. Mail to Jonathan Giannone (will, ) (Entered: 09/15/2008) |
| 10/10/2008 | 203 | MOTION to Compel the Government to show cause re. Rule 35 motion by Jonathan Giannone. (Attachments: # 1 Declaration of Thomas F. Liotti, # 2 Letter - 9/11/2008, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C)(will, ) (Entered: 10/14/2008) |
| 10/21/2008 | 204 | RESPONSE in Opposition by USA as to Jonathan Giannone re 203 MOTION to Compel *(with Certificate of Service)* (Eichelberger, Dean) (Entered: 10/21/2008) |
| 10/22/2008 | 206 | ORDER of USCA (certified copy) as to Jonathan Giannone re 200 Notice of Appeal - Final Judgment, appointing Thomas Liotti as appeal counsel. (will, ) (Entered: 10/22/2008) |
| 10/24/2008 | 207 | ORDER of USCA (certified copy) as to Jonathan Giannone consolidating re 200 Notice of Appeal - Final Judgment, 106 Notice of Appeal - Final Judgment; Lead Case Number 07-4844 shall be included on all papers subsequently filed in 4CCA. (will, ) Modified on 10/24/2008 to correct spelling in text(will, ). (Entered: 10/24/2008) |
| 10/27/2008 | 208 | REPLY DECLARATION TO RESPONSE to Motion by Jonathan Giannone re 203 MOTION to Compel Government to file Rule 35 motion. (will, ) (Entered: 10/27/2008) |
| 10/31/2008 | 209 | ORDER denying 203 Motion to Compel the Government to file a Motion for Reduction of Sentence, Rule 35(b), as to Jonathan Giannone (1). Signed by Honorable Cameron McGowan Currie on 10/31/2008.(will, ) (Entered: 10/31/2008) |
| 11/07/2008 | 210 | NOTICE OF APPEAL OF FINAL JUDGMENT by Jonathan Giannone re 209 Order on Motion to Compel - The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (Attachments: # 1 Order)(will, ) (Entered: 11/10/2008) |
| 11/10/2008 | 211 | Transmittal Sheet for Notice of Appeal to USCA as to Jonathan Giannone to US Court of Appeals re 210 Notice of Appeal - Final Judgment, The Clerk's Office hereby certifies the |

**JA018**

| | | |
|---|---|---|
| | | record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (will, ) (Entered: 11/10/2008) |
| 11/17/2008 | [214](#) | ORDER of USCA (certified copy) as to Jonathan Giannone re [210](#) Notice of Appeal - Final Judgment appointing Thomas Liotti to represent appellant. (will, ) (Entered: 11/18/2008) |
| 11/19/2008 | [215](#) | ORDER of USCA (certified copy) as to Jonathan Giannone re [200](#) Notice of Appeal - Final Judgment, [210](#) Notice of Appeal - Final Judgment, consolidating appeals into lead case number 07-4844. (will, ) (Entered: 11/19/2008) |
| 11/25/2008 | [216](#) | ORDER of USCA (certified copy) as to Jonathan Giannone re [200](#) Notice of Appeal - Final Judgment, [210](#) Notice of Appeal - Final Judgment, (cbru, ) (Entered: 11/25/2008) |
| 12/08/2008 | [217](#) | MOTION for Recusal by Jonathan Giannone. Proposed Order sent to Judge Chambers email address? no. (Attachments: # [1](#) Affidavit, # [2](#) Envelope)(cbru, ) (Entered: 12/08/2008) |
| 12/16/2008 | 218 | DELETION OF ENTRY NUMBER 218 as to Jonathan Giannone. Reason: Filer's Request. (will, ) (Entered: 12/16/2008) |
| 12/16/2008 | [219](#) | RESPONSE in Opposition by USA as to Jonathan Giannone re [217](#) MOTION for Recusal (Attachments: # [1](#) Certificate of Service)(Eichelberger, Dean) (Entered: 12/16/2008) |
| 12/22/2008 | [220](#) | ORDER of USCA (certified copy) as to Jonathan Giannone re [200](#) Notice of Appeal - Final Judgment, [210](#) Notice of Appeal - Final Judgment, [106](#) Notice of Appeal - Final Judgment, (cbru, ) (Entered: 12/22/2008) |
| 12/29/2008 | [221](#) | REPLY TO RESPONSE to Motion by Jonathan Giannone, pro se, re [217](#) MOTION for Recusal. (Attachments: # [1](#) Envelope)(will, ) (Entered: 12/29/2008) |
| 01/05/2009 | [222](#) | Sealed Document from Jonathan Giannone, pro se. (Sealed at the direction of the Court). (Attachments: # [1](#) Wired Magazine Articles, # [2](#) Envelope)(will, ) (Entered: 01/05/2009) |
| 01/05/2009 | 223 | ***DOCUMENT E-MAILED as to Jonathan Giannone re [222](#) Sealed Document to counsel of record and AUSA Eichelberger. (will, ) (Entered: 01/05/2009) |
| 03/27/2009 | [224](#) | MOTION for Recusal (entitled Certification of Pro Se Counsel) by Jonathan Giannone, pro se. (Attachments: # [1](#) Envelope)(will, ) (Entered: 03/27/2009) |
| 03/31/2009 | [225](#) | NOTICE (entitled Motion to Take Judicial Notice of Defendant's Appeal Brief filed before Fourth Circuit) by Jonathan Giannone, pro se. (Attachments: # [1](#) Envelope)(will, ) (Entered: 04/01/2009) |
| 03/31/2009 | [226](#) | MOTION for Recusal of District Judge for purposes of Defendant's bail application or refer to Magistrate by Jonathan Giannone, pro se. (Attachments: # [1](#) Envelope)(will, ) (Entered: 04/01/2009) |
| 03/31/2009 | [227](#) | MOTION to Stay Sentence and for Release from Custody pending Disposition of Pending Appeal by Jonathan Giannone, pro se. (Attachments: # [1](#) Exh A - Progress Report, # [2](#) Exh B - Drug Abuse Program, # [3](#) Envelope)(will, ) (Entered: 04/01/2009) |
| 03/31/2009 | [228](#) | UNREDACTED DOCUMENT Exhibit A to [227](#) MOTION to Stay Sentence and for Bond pending Disposition of Appeal. (will, ) (Entered: 04/01/2009) |
| 04/02/2009 | [229](#) | RESPONSE in Opposition by USA as to Jonathan Giannone re [227](#) MOTION for Bond (Attachments: # [1](#) Certificate of Service)(Eichelberger, Dean) (Entered: 04/02/2009) |
| 04/02/2009 | 230 | ORDER denying [226](#) Motion for Recusal for purposes of bail consideration as to Jonathan Giannone (1); denying [227](#) Motion for Bond as to Jonathan Giannone (1). |

| | | Signed by Honorable Cameron McGowan Currie on 4/2/2009.(will, ) (Entered: 04/02/2009) |
|---|---|---|
| 04/02/2009 | 231 | ***DOCUMENT MAILED as to Jonathan Giannone re 230 Order on Motion for Recusal, Order on Motion for Bond placed in U.S. Mail to Jonathan Giannone. (will, ) (Entered: 04/02/2009) |
| 04/06/2009 | 232 | Letter from Jonathan Giannone in re: Motion to Stay. (Attachments: # 1 Envelope)(will, ) (Entered: 04/07/2009) |
| 05/12/2009 | 233 | Letter from Jonathan Giannone, pro se, in re: bail and judicial notice. (Attachments: # 1 Envelope)(will, ) (Entered: 05/12/2009) |
| 06/05/2009 | 234 | ORDER of USCA as to Jonathan Giannone re 135 Notice of Appeal - Conditions of Release (bond); motion to direct the District Court to issue a statement of reasons for denying his motion for bond pending appeal is denied. (will, ) (Entered: 06/05/2009) |
| 06/15/2009 | 235 | MOTION for Reconsideration re 227 MOTION for Bond filed by Jonathan Giannone by Jonathan Giannone, pro se. (Attachments: # 1 Exh A-Letter from Court, # 2 Exh B - Letter to 4CCA from Attorney Liotti, # 3 Exh C - Excerpt from Brief, # 4 Exh D - Excerpt from Brief, # 5 Exhibit E - Excerpt of Sentencing Transcript, # 6 Proposed Order, # 7 Envelope)(will, ) (Entered: 06/16/2009) |
| 06/17/2009 | 236 | RESPONSE in Opposition by USA as to Jonathan Giannone re 235 MOTION for Reconsideration re 227 MOTION for Bond filed by Jonathan Giannone MOTION for Reconsideration re 227 MOTION for Bond filed by Jonathan Giannone (Eichelberger, Dean) (Entered: 06/17/2009) |
| 06/19/2009 | 237 | MOTION for Hearing by telephone on Request for Bond by Jonathan Giannone, pro se. (Attachments: # 1 Envelope)(will, ) (Entered: 06/19/2009) |
| 06/25/2009 | 238 | REPLY TO RESPONSE to Motion by Jonathan Giannone re 237 MOTION for Hearing, 235 MOTION for Reconsideration re 227 MOTION for Bond filed by Jonathan Giannone MOTION for Reconsideration re 227 MOTION for Bond filed by Jonathan Giannone. (Attachments: # 1 Exh A - Transcript Excerpt, # 2 Envelope)(will, ) (Entered: 06/25/2009) |
| 07/13/2009 | 239 | MOTION to Seal Documents 88, 99, 101, 120, 203, 208, 209, 222 by Jonathan Giannone, pro se. (Attachments: # 1 Envelope)(will, ) (Entered: 07/13/2009) |
| 07/28/2009 | 240 | REPLY by USA to 238 Reply to Response, (Eichelberger, Dean) (Entered: 07/28/2009) |
| 07/30/2009 | 241 | ORDER denying 217 Motion for Recusal as to Jonathan Giannone (1); terminating 224 Motion for Recusal as to Jonathan Giannone (1); denying 235 Motion for Reconsideration as to Jonathan Giannone (1); denying 237 Motion for Hearing as to Jonathan Giannone (1); denying in part and mooting in part 239 Motion to Seal Document as to Jonathan Giannone (1). Signed by Honorable Cameron McGowan Currie on 7/30/2009.(cbru, ) (Entered: 07/30/2009) |
| 07/30/2009 | 242 | ***DOCUMENT MAILED as to Jonathan Giannone re 241 Order on Motion for Recusal,, Order on Motion for Reconsideration, Order on Motion for Hearing, Order on Motion to Seal Document,,,,, placed in U.S. Mail to Jonathan Giannone (cbru, ) (Entered: 07/30/2009) |
| 08/10/2009 | 243 | Pro Se NOTICE OF APPEAL OF FINAL JUDGMENT by Jonathan Giannone re 241 Order on Motion for Recusal,, Order on Motion for Reconsideration, Order on Motion for Hearing, Order on Motion to Seal Document - Filing fee $ 0. The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to |

| | | |
|---|---|---|
| | | the clerk's office upon filing of the Transcript Order form. (Attachments: # 1 Envelope) (cbru, ) (Entered: 08/10/2009) |
| 08/10/2009 | 244 | Pro Se NOTICE OF APPEAL OF FINAL JUDGMENT by Jonathan Giannone re 241 Order on Motion for Recusal,, Order on Motion for Reconsideration, Order on Motion for Hearing, Order on Motion to Seal Document - Filing fee $ 0. The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (Attachments: # 1 Envelope) (cbru, ) (Entered: 08/10/2009) |
| 08/10/2009 | 245 | Transmittal Sheet for Notice of Appeal to USCA as to Jonathan Giannone to US Court of Appeals re 243 Notice of Appeal - Final Judgment,, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (cbru, ) (Entered: 08/10/2009) |
| 08/10/2009 | 246 | Transmittal Sheet for Notice of Appeal to USCA as to Jonathan Giannone to US Court of Appeals re 244 Notice of Appeal - Final Judgment,, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (cbru, ) (Entered: 08/10/2009) |
| 10/26/2009 | 248 | DISPOSITION ORDER of USCA granting the motion to dismiss this appeal pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure as to Jonathan Giannone re 243 Notice of Appeal - Final Judgment, 244 Notice of Appeal - Final Judgment. (cbru, ) (Entered: 10/27/2009) |
| 10/26/2009 | 249 | MANDATE of USCA as to Jonathan Giannone re 243 Notice of Appeal - Final Judgment,, 244 Notice of Appeal - Final Judgment,, (cbru, ) (Entered: 10/27/2009) |
| 12/14/2009 | 250 | PRO SE MOTION to Dismiss Indictment, MOTION for Release from Custody by Jonathan Giannone. (Attachments: # 1 Memo in Support, # 2 Exhibit A, # 3 Proposed Order, # 4 Envelope)(ssam, ) Modified to add additional attachments 252 on 12/22/2009 (ssam, ). Modified to add additional attachments 261 on 1/25/2010 (ssam, ). (Entered: 12/15/2009) |
| 12/21/2009 | 251 | RESPONSE in Opposition by USA as to Jonathan Giannone re 250 MOTION to Dismiss MOTION for Release from Custody (Eichelberger, Dean) (Entered: 12/21/2009) |
| 12/22/2009 | 252 | Additional Attachments to Main Document 250 MOTION to Dismiss Indictment, MOTION for Release from Custody (Attachments: # 1 Copy of FRAP Rule 12.1, # 2 Envelope)(ssam, ) (Entered: 12/22/2009) |
| 12/22/2009 | 253 | Letter from Jonathan Giannone in re: request for access to Bank of America account holder statements (Attachments: # 1 Letter from Drummond Smith to US Attorney's Office, # 2 Envelope)(ssam, ) (Entered: 12/22/2009) |
| 01/04/2010 | 254 | REPLY TO RESPONSE to Motion by Jonathan Giannone re 250 MOTION to Dismiss, MOTION for Release from Custody (Attachments: # 1 Exhibit A, # 2 Envelope)(ssam, ) (Entered: 01/05/2010) |
| 01/04/2010 | 255 | PRO SE MOTION to Stay Sentence of Imprisonment, MOTION for Release from Custody by Jonathan Giannone. (Attachments: # 1 Memo of Law in Support, # 2 Exhibit A Declaration of Jonathan Giannone, # 3 Exhibit B Inmate Date of Jonathan Giannone, # 4 Exhibit C Correctional Systems Manual, # 5 Exhibit D Program Statement on Home Confinement, # 6 Envelope)(ssam, ) (Entered: 01/05/2010) |
| 01/07/2010 | 256 | USCA OPINION (Unpublished) as to Jonathan Giannone for 200 Notice of Appeal - Final Judgment, filed by Jonathan Giannone, 210 Notice of Appeal - Final Judgment, filed by Jonathan Giannone, 106 Notice of Appeal - Final Judgment, filed by Jonathan |

**JA021**

| | | |
|---|---|---|
| | | Giannone affirming in part, vacating in part and remanding for resentencing. (ssam, ) Modified to edit text on 1/7/2010 (ssam, ). (Entered: 01/07/2010) |
| 01/07/2010 | 257 | USCA JUDGMENT as to Jonathan Giannone re 200 Notice of Appeal - Final Judgment, 210 Notice of Appeal - Final Judgment, 106 Notice of Appeal - Final Judgment affirming the judgments of the District Court in part and vacating in part. These cases are remanded to the District Court for further proceedings. (Attachments: # 1 Notice of Judgment) (ssam, ) (Entered: 01/07/2010) |
| 01/08/2010 | 258 | RESPONSE in Opposition by USA as to Jonathan Giannone re 255 MOTION to Stay Sentence of Imprisonment MOTION for Release from Custody (Eichelberger, Dean) (Entered: 01/08/2010) |
| 01/25/2010 | 259 | Letter from Jonathan Giannone in re: follow up to 250 Motion to Dismiss Indictment (Attachments: # 1 Article "The Property Rights Limitation in Mail and Wire Fraud Cases", # 2 Envelope)(ssam, ) (Entered: 01/25/2010) |
| 01/25/2010 | 260 | Letter from Jonathan Giannone in re: receipt of copy of 258 RESPONSE in Opposition by USA as to Jonathan Giannone re 255 MOTION to Stay Sentence of Imprisonment and request to defer ruling on Motion until Petition for Rehearing is decided. (Attachments: # 1 Envelope)(ssam, ) (Entered: 01/25/2010) |
| 01/25/2010 | 261 | Additional Attachments to Main Document 250 MOTION to Dismiss Indictment, MOTION for Release from Custody *Supplemental Memorandum of Law in Support* (Attachments: # 1 Exhibit A Modern Federal Jury Instructions on Aggravated Identity Theft, # 2 Certificate of Service, # 3 Envelope)(ssam, ) (Entered: 01/25/2010) |
| 01/27/2010 | 262 | ORDER as to Jonathan Giannone re 255 MOTION to Stay Sentence of Imprisonment MOTION for Release from Custody filed by Jonathan Giannone, 250 MOTION to Dismiss MOTION for Release from Custody filed by Jonathan Giannone. The court is unclear whether Defendant still seeks a ruling on his motion for bail. Therefore, Defendant shall have until Friday, February 12, 2010, to file with the Clerk a notification of whether he still wishes to have the court consider his motion for bail, or whether that, too, should be deferred. The Court defers ruling on the other Motions at this time. (Notification due by 2/12/2010). Signed by Honorable Cameron McGowan Currie on 1/27/2010.(ssam, ) (Entered: 01/27/2010) |
| 01/27/2010 | 263 | ***DOCUMENT MAILED as to Jonathan Giannone re 262 Order placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 01/27/2010) |
| 01/27/2010 | 264 | ORDER of USCA as to Jonathan Giannone re 244 Notice of Appeal - Final Judgment amending the opinion filed January 7, 2010 and adding on page 2, attorney information section, the name Drummond C. Smith, LAW OFFICES OF THOMAS F. LIOTTI, Garden City, New York, for Appellant is added at line 4. (ssam, ) (Entered: 01/27/2010) |
| 02/01/2010 | 265 | REPLY TO RESPONSE to Motion by Jonathan Giannone re 255 MOTION to Stay Sentence of Imprisonment MOTION for Release from Custody (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Envelope)(ssam, ) (Entered: 02/02/2010) |
| 02/02/2010 | 266 | ORDER of USCA as to Jonathan Giannone re 244 Notice of Appeal - Final Judgment denies the petition for rehearing and rehearing en banc. The Court also denies the motion to attach addendum/attachment to the petition. (ssam, ) (Entered: 02/02/2010) |
| 02/02/2010 | 267 | NOTICE OF HEARING as to Jonathan Giannone Re-sentencing set for 3/23/2010 09:30 AM in Columbia # 2, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Cameron McGowan Currie. Government is responsible for submitting ASR |

| | | form to Marshals to ensure defendant is present at this hearing. (ssam, ) Modified to edit text on 2/2/2010 (ssam, ). (Entered: 02/02/2010) |
|---|---|---|
| 02/03/2010 | 268 | OPINION AND ORDER denying 255 Motion to Stay Sentence of Imprisonment, MOTION for Release from Custody as to Jonathan Giannone (1).Signed by Honorable Cameron McGowan Currie on 2/3/2010.(ssam, ) (Entered: 02/03/2010) |
| 02/03/2010 | 269 | ***DOCUMENT MAILED as to Jonathan Giannone re 268 Order on Motion for Release from Custody placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 02/03/2010) |
| 02/08/2010 | 270 | NOTICE of Termination of Counsel by Jonathan Giannone (Attachments: # 1 Envelope) (ssam, ) (Entered: 02/08/2010) |
| 02/08/2010 | 272 | PRO SE MOTION to Vacate Judgment, MOTION to Strike Presentence Report, MOTION to Appoint Counsel by Jonathan Giannone. (Attachments: # 1 Memo in Support, # 2 Certificate of Service, # 3 Envelope)(ssam, ) (Entered: 02/08/2010) |
| 02/08/2010 | 273 | CJA 23 Financial Affidavit (Restricted Access) by Jonathan Giannone (ssam, ) (Entered: 02/08/2010) |
| 02/08/2010 | 277 | REPLY to 262 Order by Jonathan Giannone. (Attachments: # 1 Envelope)(ssam, ) (Entered: 02/09/2010) |
| 02/09/2010 | 274 | TEXT ORDER as to Jonathan Giannone re 272 MOTION to Vacate, MOTION to Strike, MOTION to Appoint Counsel filed by Jonathan Giannone: Defendants Motion to Appoint Counsel is granted. Attorney William Rhett Eleazer appointed. Signed by Honorable Cameron McGowan Currie on 2/9/2010.(ssam, ) (Entered: 02/09/2010) |
| 02/09/2010 | 276 | ***DOCUMENT MAILED as to Jonathan Giannone re 274 Order placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 02/09/2010) |
| 02/10/2010 | 278 | MANDATE of USCA as to Jonathan Giannone re 244 Notice of Appeal - Final Judgment. (ssam, ) (Entered: 02/10/2010) |
| 02/10/2010 | 279 | CJA 20 APPOINTMENT ORDER: Appointment of William Rhett Eleazer for Jonathan Giannone. Signed by Honorable Cameron McGowan Currie on 2/9/2010.(ssam, ) (Entered: 02/10/2010) |
| 02/11/2010 | 280 | Letter from Jonathan Giannone in re: case update and request for Court to schedule Motion Hearing on pending Motion to Dismiss (Attachments: # 1 Envelope)(ssam, ) (Entered: 02/11/2010) |
| 02/12/2010 | 282 | Letter from Jonathan Giannone in re: filing objections to revised Presentence Report and request to determine type of sentencing (Attachments: # 1 Email, # 2 Envelope)(ssam, ) (Entered: 02/16/2010) |
| 02/22/2010 | 283 | First MOTION for Extension of Time *to File Objections to Presentence Report* by Jonathan Giannone. No proposed order(Eleazer, William) (Entered: 02/22/2010) |
| 02/22/2010 | 284 | TEXT ORDER granting 283 Motion for Extension of Time to File *Objections to Presentence Report* as to Jonathan Giannone (1). Objections due by March 9, 2010. Signed by Honorable Cameron McGowan Currie on 2/22/2010.(ssam, ) (Entered: 02/22/2010) |
| 03/12/2010 | 285 | Letter from Jonathan Giannone in re: clarifying issues in connection with resentencing (Attachments: # 1 Envelope)(ssam, ) (Entered: 03/12/2010) |
| 03/19/2010 | 287 | SENTENCING MEMORANDUM by USA as to Jonathan Giannone (Eichelberger, Dean) (Entered: 03/19/2010) |

| 03/19/2010 | 288 | Sealed Document (Attachments: # 1 Envelope)(ssam, ) (Entered: 03/19/2010) |
|---|---|---|
| 03/22/2010 | 289 | MOTION to Depart from Guidelines. Type of Departure: Downward *Variance* by Jonathan Giannone. No proposed order(Eleazer, William) (Entered: 03/22/2010) |
| 03/22/2010 | 290 | SENTENCING MEMORANDUM by Jonathan Giannone (Eleazer, William) (Entered: 03/22/2010) |
| 03/23/2010 | 292 | Minute Entry for proceedings held before Honorable Cameron McGowan Currie: denying 250 Motion to Dismiss as to Jonathan Giannone (1); denying 250 Motion as to Jonathan Giannone (1); finding as moot 272 PRO SE MOTION to Vacate Judgment, MOTION to Strike Presentence Report, MOTION to Appoint Counsel by Jonathan Giannone (1); denying 289 Motion to Depart from Guidelines as to Jonathan Giannone (1); Re-sentencing held on 3/23/2010 as to Jonathan Giannone. Witness/exhibit. Defense objections 1-6 overruled. Court adopts report and addendum. Defendant remanded to custody. Court Reporter Gary Smith.CJA Time 9:30-11:26. (ssam, ) Modified to edit text on 3/23/2010 (ssam, ). (Entered: 03/23/2010) |
| 03/23/2010 | 293 | Sealed Document - Court Exhibit #1 from Re-Sentencing on 3/23/2010. Filed under seal at direction of Court. (ssam, ) Modified to edit text on 3/23/2010 (ssam, ). (Entered: 03/23/2010) |
| 03/23/2010 | 294 | AMENDED JUDGMENT as to Jonathan Giannone (1), Count(s) 1, 2, 3, 4, 5, The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of Fifty-seven (57) months. This sentence consists of Thirty-three (33) months as to Counts One, Three, and Four to be served concurrently and Twenty-four (24) months as to Counts Two, and Five, those terms to run concurrently to each other and consecutively to Counts One, Three, and Four. Upon release from imprisonment, the defendant shall be on supervised release for a term of Three (3) years. This consists of Three (3) years as to Counts One, Three, and Four and One (1) year as to Counts Two and Five, those terms to run concurrently. Standard conditions of supervision as well as the following special conditions apply: 1. The defendant shall participate in a program of substance abuse counseling/treatment, to include random drug testing as approved by the U.S. Probation Office. 2. The defendant shall participate in a Computer/Internet monitoring program as approved by the U.S. Probation Office. Special assessment of $500.00 already paid.Signed by Honorable Cameron McGowan Currie on 3/23/2010.(ssam, ) (Entered: 03/23/2010) |
| 03/23/2010 | 295 | STATEMENT OF REASONS (Sealed) as to Jonathan Giannone (ssam, ) (Entered: 03/23/2010) |
| 03/30/2010 | 298 | PRO SE MOTION to Correct Sentence under Rule 35(a) of F.R.Crim.P. by Jonathan Giannone. (Attachments: # 1 Envelope)(ssam, ) (Entered: 03/30/2010) |
| 04/01/2010 | 299 | NOTICE OF APPEAL OF FINAL JUDGMENT by Jonathan Giannone re 294 Amended Judgment - Filing fee not paid. The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (Eleazer, William) Modified to edit text on 4/1/2010 (ssam, ). (Main Document 299 replaced on 4/1/2010) (ssam, ). (Entered: 04/01/2010) |
| 04/01/2010 | 301 | Transmittal Sheet for Notice of Appeal to USCA as to Jonathan Giannone to US Court of Appeals re 299 Notice of Appeal - Final Judgment, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (ssam, ) (Entered: 04/01/2010) |

| 04/05/2010 | 303 | ORDER of USCA as to Jonathan Giannone re 299 Notice of Appeal - Final Judgment appointing William Rhett Eleazer to represent appellant. (ssam, ) (Entered: 04/05/2010) |
|---|---|---|
| 04/16/2010 | 304 | ORDER of USCA as to Jonathan Giannone re 299 Notice of Appeal - Final Judgment granting the motion to withdraw as counsel on appeal and appointing James Arthur Brown, Jr. to represent appellant. (Attachments: # 1 New Counsel Notice)(ssam, ) (Entered: 04/16/2010) |
| 04/23/2010 | 307 | PRO SE MOTION to Amend/Correct 298 MOTION to Correct Sentence under Rule 35(a) of F.R.Crim.P. filed by Jonathan Giannone by Jonathan Giannone. (Attachments: # 1 Certificate of Service, # 2 Envelope)(ssam, ) (Entered: 04/26/2010) |
| 04/26/2010 | 308 | Sealed Document (Attachments: # 1 Envelope)(ssam, ) (Entered: 04/26/2010) |
| 04/26/2010 | 309 | TEXT ORDER as to Jonathan Giannone re 308 Sealed Document filed by Jonathan Giannone: Defendant's request to seal transcript is granted. If transcript is ordered and filed, Court Reporter is directed to file under seal only the portion of the resentencing where defendant describes cooperation. Signed by Honorable Cameron McGowan Currie on 4/26/2010.(ssam, ) (Entered: 04/26/2010) |
| 04/26/2010 | 310 | ***DOCUMENT MAILED as to Jonathan Giannone re 309 Order, placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 04/26/2010) |
| 04/27/2010 | 311 | ORDER dismissing 298 Motion to Correct Sentence under Rule 35(a) of F.R.Crim.P. as to Jonathan Giannone (1); denying 307 Motion to Amend/Correct as to Jonathan Giannone (1). Signed by Honorable Cameron McGowan Currie on 4/27/2010.(cbru, ) (Entered: 04/27/2010) |
| 04/27/2010 | 312 | ***DOCUMENT MAILED as to Jonathan Giannone re 311 Order on Motion for Miscellaneous Relief, Order on Motion to Amend/Correct placed in U.S. Mail to Jonathan Giannone (cbru, ) (Entered: 04/27/2010) |
| 04/29/2010 | 313 | Letter as to Jonathan Giannone in re: request to transfer jurisdiction of supervised release to the Eastern District of New York (Attachments: # 1 Envelope)(ssam, ) (Entered: 04/29/2010) |
| 05/03/2010 | 314 | AMENDED PRO SE MOTION to Correct Sentence under Rule 35(a) of F.R.Crim.P. by Jonathan Giannone. (Attachments: # 1 Declaration of Jonathan Giannone, # 2 Exhibit A, # 3 Exhibit B, # 4 Certificate of Service, # 5 Envelope)(ssam, ) (Main Document 314 replaced on 5/4/2010) (ssam, ). (Entered: 05/04/2010) |
| 05/06/2010 | 315 | ORDER dismissing for lack of jurisdiction 314 Motion to Correct Sentence under Rule 35(a) of F.R.Crim.P. as to Jonathan Giannone (1). Signed by Honorable Cameron McGowan Currie on 5/6/2010.(ssam, ) (Entered: 05/06/2010) |
| 05/06/2010 | 316 | ***DOCUMENT MAILED as to Jonathan Giannone re 315 Order on Motion for Miscellaneous Relief placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 05/06/2010) |
| 05/17/2010 | 318 | Letter from Jonathan Giannone in re: request for copies of trial exhibits (ssam, ) (Additional attachment(s) added on 5/17/2010: # 1 Envelope) (ssam, ). (Entered: 05/17/2010) |
| 05/17/2010 | 319 | Letter from Clerk to Jonathan Giannone in re: request for copies of trial exhibits (ssam, ) (Entered: 05/17/2010) |
| 05/17/2010 | 320 | ***DOCUMENT MAILED as to Jonathan Giannone re 319 Letter placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 05/17/2010) |

| 05/24/2010 | 322 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jonathan Giannone, resentencing hearing for date of March 23, 2010 before Judge Cameron McGowan Currie, re 243 Notice of Appeal - Final Judgment,, 200 Notice of Appeal - Final Judgment, 135 Notice of Appeal - Conditions of Release, 244 Notice of Appeal - Final Judgment,, 299 Notice of Appeal - Final Judgment, 210 Notice of Appeal - Final Judgment, 106 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 6/14/2010. Redacted Transcript Deadline set for 6/24/2010. Release of Transcript Restriction set for 8/23/2010. (gsmith, ) (Entered: 05/24/2010) |
| 07/06/2010 | 327 | ORDER of USCA as to Jonathan Giannone re 299 Notice of Appeal - Final Judgment granting the motion to dismiss this appeal pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure (ssam, ) (Entered: 07/06/2010) |
| 07/06/2010 | 328 | USCA MANDATE and ORDER as to Jonathan Giannone re 299 Notice of Appeal - Final Judgment dismissing this appeal (Attachments: # 1 Order)(ssam, ) (Entered: 07/06/2010) |
| 07/06/2010 | 329 | PRO SE MOTION to Order United States to Preserve Trial Exhibits by Jonathan Giannone. (Attachments: # 1 Envelope)(ssam, ) (Entered: 07/07/2010) |
| 07/15/2010 | 330 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Jonathan Giannone held on October 17, 2006, before Judge Cameron McGowan Currie. Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 8/5/2010. Redacted Transcript Deadline set for 8/16/2010. Release of Transcript Restriction set for 10/13/2010. (gsmith, ) (Entered: 07/15/2010) |
| 07/15/2010 | 331 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Jonathan Giannone held on December 14, 2006, before Judge Cameron McGowan Currie. Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 8/5/2010. Redacted Transcript Deadline set for 8/16/2010. Release of Transcript Restriction set for 10/13/2010. (gsmith, ) (Entered: 07/15/2010) |
| 07/16/2010 | 332 | TEXT ORDER granting 329 Motion to Order United States to Preserve Trial Exhibits as to Jonathan Giannone (1). This matter is before the court on Defendants motion to preserve trial exhibits. Dkt. # 329 (filed July 6, 2010). Defendant seeks an order that the Government maintain its trial exhibits until a disposition is reached on Defendants 28 U.S.C. § 2255 motion or until the time period to file such motion expires. Mot. at 1. Defendants motion is granted. The Government shall maintain its trial exhibits through the statutory time period for the filing of a motion for relief under § 2255 and, if no such motion is timely filed, ninety (90) days thereafter. If a timely § 2255 motion is filed by Defendant, the Government shall maintain its trial exhibits until final disposition of said motion, including any appeal therefrom. After the above-referenced time periods, the Government may, in its discretion, manage the retention or disposition of the trial exhibits |

| | | according to its standard practice.Signed by Honorable Cameron McGowan Currie on 7/16/2010.(ssam, ) (Entered: 07/16/2010) |
|---|---|---|
| 07/16/2010 | 333 | ***DOCUMENT MAILED as to Jonathan Giannone re 332 Order on Motion for Miscellaneous Relief placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 07/16/2010) |
| 07/26/2010 | 334 | PRO SE MOTION to Compel United States to provide defendant with a copy of trial exhibits by Jonathan Giannone. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Envelope)(ssam, ) (Entered: 07/26/2010) |
| 08/19/2010 | 336 | RESPONSE in Opposition by USA as to Jonathan Giannone re 334 MOTION to Compel (Eichelberger, Dean) (Entered: 08/19/2010) |
| 08/24/2010 | 337 | ORDER denying without prejudice 334 Motion to Compel as to Jonathan Giannone (1). Signed by Honorable Cameron McGowan Currie on 8/24/2010.(ssam, ) (Entered: 08/24/2010) |
| 08/24/2010 | 338 | ***DOCUMENT MAILED as to Jonathan Giannone re 337 Order on Motion to Compel placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 08/24/2010) |
| 09/07/2010 | 339 | PRO SE MOTION to Vacate under 28 U.S.C. § 2255 by Jonathan Giannone. (Attachments: # 1 Declaration in Support, # 2 Exhibit A Fee Agreement, # 3 Exhibit B Retainer Agreement, # 4 Exhibit C USA Today article on Cybercrime, # 5 Exhibit D Chats between Gollumfun and generous, # 6 Exhibit E January 19, 2007 Letter, # 7 Exhibit F Letter from Brett Johnson, # 8 Memorandum of Law in Support, # 9 Exhibit A to Memorandum Brief of Appellee, # 10 Exhibit B to Memorandum Court's Memorandum, # 11 Exhibit C to Memorandum Bender's Federal Practice Notice form, # 12 Exhibit D to Memorandum Sample Rule 902(11) Certification, # 13 Exhibit E to Memorandum Excerpt of Government's Appeal Brief, # 14 Exhibit F to Memorandum Excerpt of Government's Appeal Brief, # 15 Exhibit G to Memorandum Copy of Costa Mesa Police Report, # 16 Exhibit H to Memorandum Modern Federal Jury Instructions - Criminal, # 17 Exhibit I to Memorandum Excerpt of Government's Appeal Brief, # 18 Envelope)(ssam, ) Civil case 3:10-cv-70256-CMC opened. (Attachment 1 replaced on 9/9/2010) (ssam, ). Modified to add additional attachment 351 on 10/1/2010 (ssam, ). (Entered: 09/07/2010) |
| 09/08/2010 | 340 | TEXT ORDER as to Jonathan Giannone: Defendant has filed a motion pursuant to 28 U.S.C. § 2255. The United States Attorney shall file an answer or other pleading within twenty (20) days from the filing date of this order. Response due to 339 MOTION to Vacate under 28 U.S.C. § 2255. Response to Motion due by 9/28/2010. Signed by Honorable Cameron McGowan Currie on 9/8/2010.(ssam, ) (Entered: 09/08/2010) |
| 09/08/2010 | 341 | ***DOCUMENT MAILED as to Jonathan Giannone re 340 Order to Respond - 2255 placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 09/08/2010) |
| 09/20/2010 | 342 | MOTION for Extension of Time to File Response/Reply as to 339 MOTION to Vacate under 28 U.S.C. § 2255 by USA as to Jonathan Giannone. No proposed order(Eichelberger, Dean) (Entered: 09/20/2010) |
| 09/21/2010 | 343 | Amended MOTION for Extension of Time to File Response/Reply as to 339 MOTION to Vacate under 28 U.S.C. § 2255 by USA as to Jonathan Giannone. No proposed order (Attachments: # 1 Exhibit - Letter to Mr. Liotti dated 9/8/2010, # 2 Exhibit - Letter to Mr. Liotti dated 9/13/2010, # 3 Exhibit - Letter to Mr. Eichelberger dated 9/13/2010, # 4 Exhibit - Letter to Mr. Eichelberger dated 9/14/2010, # 5 Exhibit - Letter to Mr. Liotti dated 9/20/2010)(Eichelberger, Dean) Modified to add descriptions to exhibits on 9/21/2010 (ssam, ). (Entered: 09/21/2010) |

| 09/22/2010 | 344 | ORDER as to Jonathan Giannone directing defendant to notify the court in writing by Tuesday, October 5, 2010, which option he chooses to pursue as to his § 2255 motion. The Government's time in which to respond to the motion is hereby held in abeyance until after October 5, 2010 ( Reply to Order due by 10/5/2010). Signed by Honorable Cameron McGowan Currie on 9/22/2010.(ssam, ) (Entered: 09/22/2010) |
| --- | --- | --- |
| 09/22/2010 | 345 | ***DOCUMENT MAILED as to Jonathan Giannone re 344 Order placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 09/22/2010) |
| 09/30/2010 | 347 | PRO SE MOTION to Appoint Counsel and Reply to 344 Order by Jonathan Giannone. (Attachments: # 1 Exhibit A Letter from Mr. Liotti, # 2 Exhibit B Letter from Jonathan Giannone, # 3 Exhibit C Letter from Mr. Eichelberger, # 4 Envelope)(ssam, ) (Entered: 09/30/2010) |
| 09/30/2010 | 348 | CJA 23 Financial Affidavit (Restricted Access) by Jonathan Giannone (ssam, ) (Entered: 09/30/2010) |
| 10/01/2010 | 349 | ORDER as to Jonathan Giannone directing the Clerk to file the trial exhibits received from Defendant as an attachment to his motion for relief under 28 U.S.C. § 2255. Signed by Honorable Cameron McGowan Currie on 10/1/2010.(ssam, ) (Entered: 10/01/2010) |
| 10/01/2010 | 350 | ***DOCUMENT MAILED as to Jonathan Giannone re 349 Order placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 10/01/2010) |
| 10/01/2010 | 351 | Additional Attachments to Main Document 339 MOTION to Vacate under 28 U.S.C. § 2255 *Trial Exhibits*. Filed at direction of Court. (Attachments: # 1 9/23/10 Letter from Jonathan Giannone, # 2 Exhibit A to 9/23/10 Letter - Letter from Executive Office of US Attorneys, # 3 Envelope to 9/23/10 Letter, # 4 9/27/10 Letter from Jonathan Giannone, # 5 Envelope to 9/27/10 Letter)(ssam, ) (Entered: 10/01/2010) |
| 10/06/2010 | 352 | TEXT ORDER granting in part and denying in part 347 Motion to Appoint Counsel as to Jonathan Giannone (1). This matter is before the court on Defendants motion for appointment of counsel and motion to proceed in forma pauperis (ifp). Defendants motion to proceed ifp is granted. Defendant appears to be well-versed in legal matters, and there has been no showing yet that an evidentiary hearing is required. Therefore, Defendants motion for appointment of counsel is denied without prejudice. Signed by Honorable Cameron McGowan Currie on 10/6/2010.(ssam, ) (Entered: 10/06/2010) |
| 10/06/2010 | 353 | ***DOCUMENT MAILED as to Jonathan Giannone re 352 Order on Motion to Appoint Counsel placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 10/06/2010) |
| 10/06/2010 | 354 | REPLY to 344 Order from Mr. Thomas Liotti re: defendant's desire not waive the attorney-client privilege (Attachments: # 1 Letter from Jonathan Giannone dated 9/13/2010, # 2 Cover page)(ssam, ) (Entered: 10/07/2010) |
| 10/12/2010 | 356 | PRO SE REPLY to 344 Order by Jonathan Giannone (Attachments: # 1 Envelope)(ssam, ) (Entered: 10/12/2010) |
| 10/13/2010 | 358 | Letter from USA as to Jonathan Giannone in re: 354 REPLY to 344 Order from Mr. Thomas Liotti filed on October 6, 2010. Filed at direction of court. (ssam, ) Modified to edit text on 10/13/2010 (ssam, ). (Main Document 358 replaced on 10/13/2010) (ssam, ). (Entered: 10/13/2010) |
| 10/13/2010 | 359 | Letter from Mr. Thomas Liotti as to Jonathan Giannone in re: 358 Letter from USA. Filed at direction of court. (Attachments: # 1 Fax Cover Page)(ssam, ) (Main Document 359 replaced on 10/13/2010) (ssam, ). (Entered: 10/13/2010) |

| 10/28/2010 | 360 | NOTICE of Change of Address by Jonathan Giannone (Attachments: # 1 Envelope) (ssam, ) (Entered: 10/28/2010) |
|---|---|---|
| 11/08/2010 | 361 | PRO SE MOTION to set Scheduling Order for the Government to file responsive pleadings by Jonathan Giannone. (Attachments: # 1 Envelope)(ssam, ) (Entered: 11/09/2010) |
| 11/10/2010 | 362 | RESPONSE in Opposition by USA as to Jonathan Giannone re 361 MOTION to set Scheduling Order for the Government to file responsive pleadings (Attachments: # 1 Exhibit Correspondence from Attorney Liotti)(Eichelberger, Dean) (Entered: 11/10/2010) |
| 11/18/2010 | 363 | PRO SE REPLY TO RESPONSE to Motion by Jonathan Giannone re 361 MOTION to set Scheduling Order for the Government to file responsive pleadings (Attachments: # 1 Envelope)(ssam, ) (Entered: 11/18/2010) |
| 11/22/2010 | 364 | ORDER as to Jonathan Giannone granting 361 MOTION to set Scheduling Order for the Government to file responsive pleadings filed by Jonathan Giannone. No later than December 31, 2010, the Government shall respond to the claims in Defendant's motion unrelated to ineffective assistance of counsel and any claims based on the alleged ineffectiveness of counsel for which the Government believes no affidavit or evidence beyond that which already exists in the record is necessary. The Government's response shall indicate the claims to which it is not responding based on a lack of testimony by Liotti and/or Drummond C. Smith (Smith). Defendant shall thereafter be given thirty (30) days to respond to the Government's filing. If an evidentiary hearing on claims of ineffective assistance of counsel is needed, the court will thereafter set a hearing at which, if necessary, attorneys Liotti and/or Smith may be required to testify. (Government Response due by 12/31/2010). Signed by Honorable Cameron McGowan Currie on 11/22/2010.(ssam, ) (Entered: 11/22/2010) |
| 11/22/2010 | 365 | ***DOCUMENT MAILED as to Jonathan Giannone re 364 Order placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 11/22/2010) |
| 11/24/2010 | 366 | NOTICE of Change of Address by Jonathan Giannone (Attachments: # 1 Envelope) (ssam, ) (Entered: 11/24/2010) |
| 12/20/2010 | 367 | RESPONSE in Opposition by USA as to Jonathan Giannone re 339 MOTION to Vacate under 28 U.S.C. § 2255 (Attachments: # 1 Exhibit Index to Exhibits, # 2 Affidavit of Bobby Kirby, # 3 Exhibit Communication Regarding Trial Evidence, # 4 Exhibit Letter from Andrea Vaughn)(Eichelberger, Dean) Modified to remove duplicative text from exhibit descriptions on 12/21/2010 (ssam, ). (Entered: 12/20/2010) |
| 12/28/2010 | 368 | ROSEBORO ORDER directing clerk to forward summary judgment explanation to the opposing party and directing that party to respond in 34 days as to Jonathan Giannone. Response to Motion due by 1/31/2011. Signed by Honorable Cameron McGowan Currie on 12/28/2010.(ssam, ) (Entered: 12/28/2010) |
| 12/28/2010 | 369 | ***DOCUMENT MAILED as to Jonathan Giannone re 368 Roseboro Order placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 12/28/2010) |
| 12/28/2010 | 370 | PRO SE MOTION to Appoint Counsel by Jonathan Giannone. (Attachments: # 1 Envelope)(ssam, ) (Entered: 12/29/2010) |
| 12/29/2010 | 371 | ORDER denying without prejudice 370 Motion to Appoint Counsel as to Jonathan Giannone (1). Signed by Honorable Cameron McGowan Currie on 12/29/2010.(ssam, ) (Entered: 12/29/2010) |
| 12/29/2010 | 372 | ***DOCUMENT MAILED as to Jonathan Giannone re 371 Order on Motion to Appoint Counsel placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 12/29/2010) |

| 02/01/2011 | 373 | PRO SE REPLY TO RESPONSE to Motion by Jonathan Giannone re 339 MOTION to Vacate under 28 U.S.C. § 2255 (Attachments: # 1 Exhibit A Appellant's Appellate Brief, # 2 Exhibit B Appellee Appellate Brief, # 3 Exhibit C Letter dated January 18, 2011 from Laurie Peterson, # 4 Exhibit D Letter and Superseding Indictment, # 5 Exhibit E February 16,2010 Letter from Roger Corbin to Thomas F. Liotti, # 6 Declaration, # 7 Exhibit A to Declaration September 25,2009 EOUSA letter, # 8 Exhibit B to Declaration AUSA Eichelberger faxed correspondence from EOUSA, # 9 Exhibit C to Declaration July 30, 2008 letter from Jonathan Giannone to EOUSA, # 10 Envelope)(ssam, ) (Entered: 02/01/2011) |
| 02/03/2011 | 374 | PRO SE MOTION for Release pending resolution of 339 Motion to Vacate under 28 U.S.C. § 2255 by Jonathan Giannone. (Attachments: # 1 Envelope)(ssam, ) (Entered: 02/04/2011) |
| 02/10/2011 | 376 | RESPONSE in Opposition by USA as to Jonathan Giannone re 374 MOTION for Release from Custody (Eichelberger, Dean) (Entered: 02/10/2011) |
| 02/14/2011 | 377 | PRO SE REPLY TO RESPONSE to Motion by Jonathan Giannone re 374 MOTION for Release from Custody pending resolution of 2255 Motion (Attachments: # 1 Envelope) (ssam, ) (Entered: 02/14/2011) |
| 04/22/2011 | 378 | PRO SE MOTION to Stay Condition of Supervised Release involving computer monitoring by Jonathan Giannone. No envelope. (ssam, ) (Entered: 04/22/2011) |
| 04/22/2011 | 379 | **TEXT ORDER denying without prejudice 378 Motion to Stay Condition of Supervised Release involving computer monitoring as to Jonathan Giannone (1). This matter is before the court on Defendant's motion to stay the conditions of supervised release. Dkt. #378 (received April 22, 2011). This motion was forwarded to the Clerk via facsimile. Defendant's motion is denied without prejudice for two reasons. First, documents are not accepted for filing via facsimile absent preauthorization of the court. Second, the motion is denied based on its lateness of filing without prejudice to Defendant's right to file a motion to amend the conditions of supervision. Defendant has been aware of the condition since his original sentencing in August 2007 and his re-sentencing in March 2010, yet has waited until the last business day before the commencement of the period of supervised release to assert this issue. Thus, it is impossible for proper briefs to be filed and considered. Therefore, all previously imposed conditions of supervised release shall remain in effect absent further order of this court. Directed by Honorable Cameron McGowan Currie on 4/22/2011.(ssam, )** (Entered: 04/22/2011) |
| 04/22/2011 | 380 | ***DOCUMENT MAILED as to Jonathan Giannone re 379 Order on Motion for Miscellaneous Relief placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 04/22/2011) |
| 04/26/2011 | 381 | **OPINION AND ORDER dismissing with prejudice 339 Motion to Vacate 2255 as to Jonathan Giannone (1); granting 367 Motion for Summary Judgment and Response in Opposition by USA as to Jonathan Giannone (1); finding as moot 374 Motion for Release from Custody as to Jonathan Giannone (1); denying a certificate of appealability. Signed by Honorable Cameron McGowan Currie on 4/26/2011.(ssam, )** Civil Case 3:10-cv-70256-CMC closed. (Main Document 381 replaced on 4/26/2011) (ssam, ). (Entered: 04/26/2011) |
| 04/26/2011 | 382 | JUDGMENT on 28:2255 PETITION as to Jonathan Giannone re: 339 MOTION to Vacate under 28 U.S.C. § 2255. Summary judgment is entered in favor of the respondent, United States of America. The petitioner, Jonathan Giannone, shall take nothing of his |

| | | petition filed pursuant to 28 U.S.C. § 2255, and this action is dismissed with prejudice. (ssam, ) (Entered: 04/26/2011) |
|---|---|---|
| 04/26/2011 | 383 | ***DOCUMENT MAILED as to Jonathan Giannone re 381 Order on Motion to Vacate 2255, Order on Motion for Release from Custody, 382 28:2255 Judgment placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 04/26/2011) |
| 04/29/2011 | 384 | NOTICE OF APPEAL OF FINAL ORDER by Jonathan Giannone re 381 Order on Motion to Vacate 2255, Order on Motion for Release from Custody - Filing fee not paid. The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (Attachments: # 1 Envelope)(ssam, ) (Entered: 04/29/2011) |
| 04/29/2011 | 385 | Transmittal Sheet for Notice of Appeal to USCA as to Jonathan Giannone to US Court of Appeals re 384 Notice of Appeal - Final Judgment, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (ssam, ) (Entered: 04/29/2011) |
| 04/29/2011 | 386 | ASSEMBLED INITIAL ELECTRONIC RECORD TRANSMITTED TO FOURTH CIRCUIT COURT OF APPEALS as to Jonathan Giannone re 384 Notice of Appeal - Final Judgment, Electronic record successfully transmitted. (ssam, ) (Entered: 04/29/2011) |
| 11/14/2011 | 388 | USCA OPINION Dismissed by unpublished per curiam opinion as to Jonathan Giannone for 384 Notice of Appeal - Final Judgment filed by Jonathan Giannone. (ssam, ) (Entered: 11/14/2011) |
| 01/31/2012 | 389 | USCA MANDATE and JUDGMENT as to Jonathan Giannone re 384 Notice of Appeal - Final Judgment dismissing the appeal and denying a certificate of appealability. (Attachments: # 1 Judgment)(ssam, ) (Entered: 01/31/2012) |
| 02/16/2012 | 390 | PRO SE MOTION to Appoint Counsel by Jonathan Giannone. (Attachments: # 1 Fourth Circuit Opinion in 10-9504). No envelope.(ssam, ) Modified to edit text and to correct filing date on 2/17/2012 (ssam, ). (Entered: 02/17/2012) |
| 02/24/2012 | 391 | **TEXT ORDER denying 390 Motion to Appoint Counsel as to Jonathan Giannone (1). This matter is before the court on Defendant's motion for appointment of counsel. ECF No. 390 (filed Feb. 16, 2012). There are no cases or post-conviction motions pending before this court. Therefore, Defendant's motion is denied. Directed by Honorable Cameron McGowan Currie on 2/24/2012.(ssam, )** (Entered: 02/24/2012) |
| 02/24/2012 | 392 | ***DOCUMENT MAILED as to Jonathan Giannone re 391 Order on Motion to Appoint Counsel placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 02/24/2012) |
| 05/04/2012 | 393 | PRO SE MOTION to Transfer Jurisdiction of Supervised Release to Eastern District of New York by Jonathan Giannone. (Attachments: # 1 Envelope)(ssam, ) (Entered: 05/04/2012) |
| 05/18/2012 | 394 | WITHDRAWAL of Motion by Jonathan Giannone (Pro Se) re 393 MOTION to Transfer Jurisdiction of Supervised Release to Eastern District of New York filed by Jonathan Giannone (Attachments: # 1 Envelope)(cbru, ) (Entered: 05/18/2012) |
| 05/18/2012 | 395 | MOTION (Pro Se) for Permission to Travel Abroad by Jonathan Giannone. No proposed order (Attachments: # 1 Envelope)(cbru, ) (Entered: 05/18/2012) |
| 05/21/2012 | 396 | **TEXT ORDER granting 395 Motion for Permission to Travel Abroad as to Jonathan Giannone (1). Directed by Honorable Cameron McGowan Currie on 5/21/12.(mflo, )** |

| | | |
|---|---|---|
| | | (Entered: 05/21/2012) |
| 05/21/2012 | 397 | ***DOCUMENT MAILED as to Jonathan Giannone re 396 Order on Motion for Permission to Travel Abroad placed in U.S. Mail to Jonathan Giannone PO Box 528 Rockville Centre, NY 11571. (mflo, ) (Entered: 05/21/2012) |
| 05/22/2012 | 398 | **TEXT ORDER as to Jonathan Giannone; This matter is before the court on Defendant's request to withdraw his motion to transfer this matter to the Eastern District of New York for management of Defendant's period of supervised release. This court has already executed and forwarded the necessary paperwork to the Eastern District of New York. Therefore, Defendant's request is denied. re 393 MOTION to Transfer Jurisdiction of Supervised Release to Eastern District of New York filed by Jonathan Giannone, and 394 Withdrawal of Motion filed by Jonathan Giannone. Directed by Honorable Cameron McGowan Currie on 5/22/12.(mflo, )** (Entered: 05/22/2012) |
| 05/22/2012 | 399 | ***DOCUMENT MAILED as to Jonathan Giannone re 398 Order, placed in U.S. Mail to Jonathan Giannone PO Box 528 Rockville Centre, NY 11571 (mflo, ) (Entered: 05/22/2012) |
| 05/22/2012 | 400 | ***DOCUMENT E-MAILED as to Jonathan Giannone re 398 Order, and 396 Order on Motion for Miscellaneous Relief to Andrew Jingeleski/NYEP/02/USCOURTS@USCOURTS (mflo, ) (Entered: 05/22/2012) |
| 06/25/2012 | 401 | Probation Jurisdiction Transferred to Eastern District of New York as to Jonathan Giannone Transmitted Transfer of Jurisdiction form, with certified copies of indictment, judgment and docket sheet. (kbos) (Entered: 06/26/2012) |
| 08/06/2012 | 402 | PRO SE MOTION for Early Termination of Supervised Release by Jonathan Giannone. (Attachments: # 1 Envelope)(ssam, ) (Entered: 08/07/2012) |
| 08/09/2012 | 403 | **ORDER denying 402 Motion for Early Termination of Supervised Release as to Jonathan Giannone (1). Signed by Honorable Cameron McGowan Currie on 8/9/2012.(ssam, )** (Entered: 08/09/2012) |
| 08/09/2012 | 404 | ***DOCUMENT MAILED as to Jonathan Giannone re 403 Order on Motion for Early Termination of Probation placed in U.S. Mail to Jonathan Giannone (ssam, ) (Entered: 08/09/2012) |
| 08/28/2024 | 405 | MOTION (Petition for a Writ of Coram Nobis) by Jonathan Giannone. No proposed order (Attachments: # 1 Appendix Appendix to Petition)(Kendrick, Joshua) (Entered: 08/28/2024) |
| 08/28/2024 | 406 | **TEXT ORDER as to Jonathan Giannone re 405 MOTION (Petition for a Writ of Coram Nobis) filed by Jonathan Giannone: Pursuant to Local Criminal Rule 12.05, DSC, the Government shall respond to this motion within thirty (30) days of the entry of this Order. ( Response to Motion due by 9/27/2024. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. ) Signed by Honorable Cameron McGowan Currie on 8/28/2024.(mdea )** (Entered: 08/28/2024) |
| 09/23/2024 | 407 | MOTION for Extension of Time to File Response/Reply as to 405 MOTION (Petition for a Writ of Coram Nobis) by USA as to Jonathan Giannone. No proposed order(Stoughton, Kathleen) (Entered: 09/23/2024) |

| 09/23/2024 | 408 | **TEXT ORDER granting 407 Motion for Extension of Time to File Response/Reply as to 405 MOTION (Petition for a Writ of Coram Nobis)as to Jonathan Giannone (1) until 10/11/2024. Signed by Honorable Cameron McGowan Currie on 9/23/2024. (mdea ) (Entered: 09/23/2024)** |
|---|---|---|
| 10/10/2024 | 410 | Second MOTION for Extension of Time to File Response/Reply as to 405 MOTION (Petition for a Writ of Coram Nobis) by USA as to Jonathan Giannone. No proposed order(Stoughton, Kathleen) (Entered: 10/10/2024) |
| 10/10/2024 | 411 | **TEXT ORDER granting 410 Motion for Extension of Time to File Response/Reply as to 405 MOTION (Petition for a Writ of Coram Nobis) as to Jonathan Giannone (1) until 10/16/2024. Signed by Honorable Cameron McGowan Currie on 10/10/2024.(mdea ) (Entered: 10/10/2024)** |
| 10/16/2024 | 413 | RESPONSE in Opposition by USA as to Jonathan Giannone re 405 MOTION (Petition for a Writ of Coram Nobis) (Stoughton, Kathleen) (Entered: 10/16/2024) |
| 10/23/2024 | 414 | MOTION for Extension of Time to File Response/Reply as to 405 MOTION (Petition for a Writ of Coram Nobis) by Jonathan Giannone. No proposed order(Kendrick, Joshua) (Entered: 10/23/2024) |
| 10/23/2024 | 415 | **TEXT ORDER granting 414 Motion for Extension of Time to File Response/Reply as to 405 MOTION (Petition for a Writ of Coram Nobis)as to Jonathan Giannone (1) until 11/4/2024. Signed by Honorable Cameron McGowan Currie on 10/23/2024. (mdea ) (Entered: 10/23/2024)** |
| 11/04/2024 | 416 | MOTION for Extension of Time to File Response/Reply as to 405 MOTION (Petition for a Writ of Coram Nobis) *(7 days requested)* by Jonathan Giannone. No proposed order(Kendrick, Joshua) (Entered: 11/04/2024) |
| 11/04/2024 | 417 | **TEXT ORDER granting 416 Motion for Extension of Time to File Response/Reply as to 405 MOTION (Petition for a Writ of Coram Nobis)as to Jonathan Giannone (1) until 11/11/2024. Signed by Honorable Cameron McGowan Currie on 11/4/2024. (mdea ) (Entered: 11/04/2024)** |
| 11/12/2024 | 419 | REPLY TO RESPONSE to Motion by Jonathan Giannone re 405 MOTION (Petition for a Writ of Coram Nobis) (Attachments: # 1 Exhibit USSS FOIA letter and notes, # 2 Exhibit Chat logs and bank record)(Kendrick, Joshua) (Entered: 11/12/2024) |
| 01/24/2025 | 420 | MOTION for Leave to Consider Supplemental Material re 405 MOTION (Petition for a Writ of Coram Nobis) by Jonathan Giannone. No proposed order (Attachments: # 1 Exhibit Netflix documentary - transcript)(Kendrick, Joshua) (Entered: 01/24/2025) |
| 02/11/2025 | 421 | **ORDER denying 405 Petition for a Writ of Coram Nobis as to Jonathan Giannone (1); granting 420 Motion for Leave to Consider Supplemental Material as to Jonathan Giannone (1). Signed by Honorable Cameron McGowan Currie on 2/11/2025.(mdea ) (Entered: 02/11/2025)** |
| 02/21/2025 | 422 | NOTICE OF APPEAL OF FINAL JUDGMENT by Jonathan Giannone re 421 Order on Motion for Miscellaneous Relief,,, - Filing fee $ 605, receipt number ASCDC-12279655. The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (Kendrick, Joshua) (Entered: 02/21/2025) |
| 02/21/2025 | 424 | Transmittal Sheet for Notice of Appeal to USCA as to Jonathan Giannone to US Court of Appeals re 422 Notice of Appeal - Final Judgment, The Clerk's Office hereby certifies the |

| | | record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (mdea ) (Entered: 02/21/2025) |

IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.____ 3:06-1011 _____ |
| | ) | 18 USC § 1343 |
| v. | ) | 18 USC § 1028A(a)(1) |
| | ) | |
| JONATHAN GIANNONE | ) | INDICTMENT |

## COUNT 1

THE GRAND JURY CHARGES:

1.    Beginning at a time unknown to the grand jury, but from at least May 26, 2005, JONATHAN GIANNONE knowingly and willfully did devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises;

2.    The goal of the scheme and artifice to defraud was to obtain money from others by selling fraudulently obtained credit card account numbers which could then be used by the person purchasing them to pay for goods and services;

3.    It was a part of said scheme and artifice to defraud that JONATHAN GIANNONE did and caused to be done the following:

a.    Send five Bank of America Platinum debit card numbers for accounts maintained at a Texas branch of Bank of America as samples of the numbers he had to offer;

b.    Send an additional three credit card numbers after it was determined that the first five were not active accounts;

c.    Offer to sell 21 account numbers in exchange for payment of $600.00;

4.    On or about May 26, 2005, in the District of South Carolina and elsewhere, JONATHAN GIANNONE, for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain money and property from others by means of false and fraudulent pretenses, representations, and promises, knowingly did transmit a file in interstate commerce over the internet to Columbia, South Carolina, containing account numbers and the names of the account owners for five (5) Bank of America Platinum debit cards;

In violation of Title 18, United States Code, Section 1343.

<u>COUNT 2</u>

THE GRAND JURY FURTHER CHARGES:

On or about May 26, 2005, in the District of South Carolina, JONATHAN GIANNONE, during and in relation to a felony violation as enumerated in Title 18, United States Code, Section 1028A(c)(4), to wit: Violation of Title 18, United States Code, Section 1343, as specified in Count 1 above, which is incorporated herein by reference, did knowingly transfer, possess and use, without lawful authority, a means of identification of another person;

In violation of Title 18, United States Code, Section 1028A(a)(1).

## COUNT 3

THE GRAND JURY FURTHER CHARGES:

1.    Paragraphs 1 through 3 of Count 1 of this Indictment are incorporated herein by this reference as setting forth a scheme and artifice to defraud;

2.    On or about May 31, 2005, in the District of South Carolina and elsewhere, JONATHAN GIANNONE, for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain money and property from others by means of false and fraudulent pretenses, representations, and promises, knowingly did transmit by means wire in interstate commerce a communication via AOL Instant Messenger which contained account numbers for three (3) Bank of America Platinum debit cards;

In violation of Title 18, United States Code, Section 1343.

## COUNT 4

THE GRAND JURY FURTHER CHARGES:

    1.    Paragraphs 1 through 3 of Count 1 of this Indictment are incorporated herein by this reference as setting forth a scheme and artifice to defraud;

    2.    On or about June 6, 2005, in the District of South Carolina and elsewhere, JONATHAN GIANNONE, for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain money and property from others by means of false and fraudulent pretenses, representations, and promises, knowingly did transmit by means wire in interstate commerce a communication via AOL Instant Messenger which contained account numbers for twenty-one (21) Bank of America Platinum debit cards and the names of eleven (11) of the account owners;

    In violation of Title 18, United States Code, Section 1343.

<u>COUNT 5</u>

THE GRAND JURY FURTHER CHARGES:

On or about June 6, 2005, in the District of South Carolina, JONATHAN GIANNONE, during and in relation to a felony violation as enumerated in Title 18, United States Code, Section 1028A(c)(4), to wit: Violation of Title 18, United States Code, Section 1343, as specified in Count 4 above, which is incorporated herein by reference, did knowingly transfer, possess and use, without lawful authority, a means of identification of another person;

In violation of Title 18, United States Code, Section 1028A(a)(1).


A   <u>TRUE</u>   BILL


<u>s/Foreperson</u>
Foreperson


<u>s/Reginald I. Lloyd</u>
REGINALD I. LLOYD            (DAE)
UNITED STATES ATTORNEY

MAXIMUM SENTENCE FOR COUNTS 1, 3, and 4
FINE OF $250,000  (18 U.S.C. § 3571)
AND/OR IMPRISONMENT FOR
20 YEARS AND A TERM OF SUPERVISED
RELEASE OF 3 YEARS (18 U.S.C. § 3583)
SPECIAL ASSESSMENT $100 (18 U.S.C. § 3013)


MAXIMUM SENTENCE FOR COUNTS 2 and 5
FINE OF $250,000  (18 U.S.C. § 3571)
AND/OR IMPRISONMENT FOR
2 YEARS CONSECUTIVE AND A TERM OF SUPERVISED
RELEASE OF 1 YEAR (18 U.S.C. § 3583)
SPECIAL ASSESSMENT $100 (18 U.S.C. § 3013)

March 1, 2007

Brett Shannon Johnson
P.O. Box 2019
Lexington, SC 29071

CR 3:06-1129

Judge Currie
901 Richland Street
Columbia, SC 29201

Your Honor,

My name is Brett Shannon Johnson. You are the Judge in my Federal Fraud case.

By the time you read this I will have already plead guilty to whatever final plea agreement the US Attorney's Office has deemed fit to offer me. I will, of course, accept the plea agreement as I am aware and have been informed by both my Attorney and Secret Service Agents that only the foolish decide to go to trial in Federal matters. My Attorney has also informed me that we have no defense. Besides - what I have been indicted for are crimes for which I am surely guilty. I balked a bit on February 20th, my plea acceptance date, when the questions came up regarding if I felt I had received responsible representation. I apologize for that. It was just that I had had a little less than one hour in the meetings with my lawyer to look at the actual discovery material against me. And subsequent requests regarding the nature of some evidence against me were never answered by my Attorney. I don't think that matters as, again, I am guilty of these charges. And there were 4 CD-Roms of discovery against me.

2

The only reason I would have wanted my case to go to trial was so I could tell my side of the story. I feel it important that people passing judgement on me know why I committed those crimes. Hence this letter to you. I have no idea whether this letter will inspire sympathy, compassion, disgust, or resentment of you toward me. I can only hope that you read this letter in its entirety, along with my forthcoming "Statement in Mitigation"; this way I can be sure that the person who is to determine my fate, you, will - at least - have heard what I feel to be my side of this matter. It is all I can ask. And I greatly appreciate you taking the time to read over my thoughts and motivations on this matter.

Let me reiterate — I am guilty on the matters. There has never been a question on that and I have readily admitted such to law enforcement officials. So the hardships, pain, loss, and suffering that I have experienced over the past 2+ years is entirely of my own making. Even what I know to be threats, coercion, intimidation, harrassment, and deprivation of civil liberties and rights by the United States Secret Service — I still consider to be my fault; if I had not committed the crimes, none of that would have happened.

Not a day nor hour passes that I don't dwell on what landed me in this place I now reside. It has been this way since my initial arrest on February 8, 2005, and it has only intensified now that I find myself incarcerated, without hope, with my future hanging in the balance. I have been and am punished constantly and will be for the rest of my life. Such deep reflection, while black and torturous, also has the benefit of bringing to light the errors which have brought me to this point in my life.

I lost my wife in late December of 2003. ███ ███ ███ Susan left me. We had been married, happily, for over 9 years. I had found she had started cheating on me with another man. That was the end of our

<u>3</u>

marriage. I cannot say what specific behaviour of mine led her to those actions, but I know in my heart that it was my fault. We were happy and for over 9 years I had treated her as a princess. Everything she wanted I gave to her — regardless of how hard I had to work or what I needed to sacrifice. I made sure she was happy. I doted on her. She was my life. But that is how marriage is supposed to be. What ended our marriage? It wasn't the 17-year old with which she was having an affair. It was either my cocaine addiction which I desperately tried to keep hidden from her (and to this day still think I succeeded in), or it was my past involvement in online hacker activities. One of those or likely both was the reason my marriage ended. I had quit my hacker activities around 8 months earlier, but that and the drugs — much harder to stop — was still what ended my marriage and ultimately led me to the cell in which I now sit.

My wife left me and I was devastated. I walked around in a near-catatonic state, wept, lost weight, and never left the house. My life was over. I finally realized that I needed professional help or I was going to end up hurting myself.

I contacted and started receiving help from a psychologist in Mount Pleasant, South Carolina. She helped. Greatly. I started getting out. I joined some theatre groups and classes and made friends. I started rebuilding my life and was, once again, headed in the right direction to be a good, productive person.

Or so it seemed. I still had the skeleton in my closet of addiction. And I was lonely. The loss of my wife had left a hole that I daily felt; could almost touch.

And then I met Elizabeth. This was April or May of 2004. I met Elizabeth at a bar. We got to talking and talked about 4 hours at first night. I was taken with her, everything about her. We seemed to click. and I felt a closeness to her that I could never remember feeling toward

4

another woman. Not even my wife.

Elizabeth was 23. She had just graduated from the College of Charleston with a degree in Religious Studies. She was also a dancer. A stripper. Until I met Elizabeth I had never been to a strip club. And I can thankfully, gratefully say that I never saw Elizabeth strip. Ever.

After meeting her that first night I couldn't get her out of my head. I thought of her constantly. After a week I screwed up my courage and went to where she worked. I walked in, spotted her. Asked her for a moment of her time. I told her I had been thinking of her and that I couldn't stop. I told her that I felt a connection to her and that it would be a shame to miss out on a chance to see if we were meant for one another. I asked her for a date. She agreed. She told me the restaurant, day, and time. I also got her phone number.

Thus began my courtship with Elizabeth. The dinner date was the most expensive meal I had had in my life up to that point. But I didn't mind. I was trying to impress.

We dated regularly. I won't bore you with the details. I will say that we dated for 6 months without her and I making out or having sex. But I was deeply in love with her during that time. My falling in love with her came with a price, however. I felt she loved me in return, but she never said so. All my attempts at kissing her or more were always politely refused. I didn't know what to do. So I cried. A lot. And I drank and I used drugs. I bought her gifts she hinted at. $1500ºº purses here. $600ºº shoes there. Whatever she wanted and whatever she wanted to do, I did. And I continued to become more and more upset as to why she did not really want to even kiss me. I didn't know the reason. And looking back now — I wish I had found out the truth.

5

I guess we had been dating about 5 months when Elizabeth started sleeping at my house. No sex at first. Merely sleep. But we finally did have sex. I say "have sex" instead of "make love" because it didnt really strike me as love-making. I don't remember any kissing and there was little cuddling or foreplay. But I felt that this was, at least, a start.

Elizabeth started coming to my house regularly. I really felt things were coming along. Though I still worried what was going on with Elizabeth. Some nights she wouldn't come over after saying she would. Or she might arrive at 5 or 6 in the morning. And her behaviour was odd. I didn't know what was happening. So I did something that I had never done in my entire life; I caught her asleep and I went through her purse. I found cocaine. And I just started to cry. I think even then I knew the rest of the answer to my question, but I just couldnt admit it at the time. I went to her, woke her, and asked her about it. I was crying and she began too, as well. She said it wasnt a problem and that she would quit. But she didn't. Not yet. It was about 2 more weeks til she was to stop using cocaine for good.

During that time I turned to my computer to see if my further fears were true. I located a website which had reviews of strippers and which ones gave "extras". There I found Elizabeth was a prostitute for both money and cocaine. And I got detailed descriptions of everything. It broke my heart. I couldnt imagine what she had been going through. And it also answered my questions on why she wasnt intimate with me. And I couldnt blame her. I never felt so sorry for someone in my life as I did her.

I was 3 days confronting her with it. I was scared. But I knew I owed her and I knew I had to get her out of that — regardless of the cost.

When I did confront her with it — she yelled. She cried. And she denied it. I let her deny it and I said that I was wrong. I felt there

<u>6</u>

WAS NO NEED IN MAKING her ADMIT it, AND I didnt WANT to lose her. She tried to leave, but I got on my KNees AND begged her to stay. I told her I loved her AND I would do ANYthing IN the World For her.

Shortly After that she quit dancing AND using cocaine. She had went to work AND didnt come home. She called the Next morning At 11am AND Asked me to come get her. I said I would. I wrote her A letter saying I loved her And she had to quit the drugs, the job, AND the rest or we couldnt go on. I left it on the bed so she could read it. I then went AND got her. I dropped her off At home AND I left. I came back late that Night. I didnt Know what I would find, what to expect. That day she quit her job, the drugs, AND the rest.

She was with me constantly from that point. And I was Afraid to leave her. It was AN irrational Fear, but I couldn't leave her Alone. I had to help her. I called my Friends And told them what was going on. And I broke off All contact with them And told them that no matter what it took I had to see to her; I had to help her. I mean, thats what you do when you love someone And they Are hurt And in trouble~ you do whatever you can.

So instead of cocaine I showered her with gifts And expensive dinners. Im not sure if it was A conscious or subconscious thought, but I felt that if I did that it would at least take her mind off the drugs And all would be OK.

I quickly went through my savings. I pawned or sold All items of value in my home. And then I was broke. And I still needed A lot of money. So I turned back to the same internet hacker group I had quit well before I lost my wife.

I initially purchased fake cashiers checks From this website And passed them off For C.O.D. (collect on Delivery) orders shipped via Fedex And UPS. I would then sell the items I Acquired through the fake checks. Later, I made the checks myself.

<u>7</u>

I was arrested on February 8, 2005 in Charleston, South Carolina for the clocks. I had proposed to Elizabeth and that was 3 weeks before we were to be married.

I admitted and confessed to everything and signed statements to that effect. I didn't agree with everything that was on the statement, but told them it was ok as long as they let me call her.

Elizabeth was devastated. She was crying. And I knew then that I was nothing more than scum.

I was placed at Charleston County Detention Centre. And there I found myself in a worse emotional state than when I lost my wife.

I was there 90 days. The Secret Service approached me after I was incarcerated a week. They wanted me to be an informant. I said I would do whatever it took to be with Elizabeth. It took them 90 days to get me out.

During those 90 days I wrote Elizabeth daily. I think I got maybe 5 letters from her. She visited me 2-3 times. And I spoke to her on the telephone 5-6 times. Just this — even though she lived only 5-6 minutes from the jail I was in.

I was released the first week of April 2005 after the Secret Service had my bond reduced to $10,000⁰⁰. There were never any conditions noted for bond release. I was released around 9pm that night. I called Elizabeth as she said to call her my release. A Secret Service agent was waiting at the CCDC parking lot to take me to a hotel. Elizabeth came through the parking lot with a friend of hers and she drops out two plastic storage containers with my clothes in the parking lot of CCDC. She hugs me. And she says to call her later. And she leaves without saying anything else. I was crushed.

I am taken to the hotel and call her that night. She comes over and after much discussion and tears we are back together.

7

The Secret Service does not put me to work for 30 days. So I stay at Elizabeth's. Elizabeth has a part-time job working 10-15 hours a week. That's it. I don't have a job, cannot get one, and have to rely on my mother for what she can do for us. And the thing is - I can tell Elizabeth loves me and wants me there, but there are constant arguments and we aren't getting along well at all. But I try to make it work. And I think it does. Sort of.

Then I move to Columbia, SC to work as an informant. Elizabeth won't visit me. But we do talk on the phone. I tell her that we will be ok. And, at least, I should have a book deal out of this mess.

But I'm already starting to slide back to my cocaine addiction. And the $50⁰⁰ per day per diem that the Secret Service is giving me can't pay for my survival, my drugs, and save my relationship with Elizabeth. And yes - I went right back to cocaine. Why? A number of reasons. All my own fault. It boiled down to it was easier to do that than face the tragedy my life had quickly become. And it was easier to find solace and escape in a powder than face the Secret Service Agents who daily reminded me that as soon as the investigation was over I was going back to jail. The same Secret Service Agents who taunted me routinely, calling Elizabeth a "whore" and "harlot", and asking how much she charged for a blow-job.

And that's exactly what happened from the start of my work as a C.I. Agents would harrass me thus or watch porn while I was working and ask if Elizabeth did that. And I couldn't say anything back to them. So I found escape the only place I knew — at the bottom of a bottle and the end of a line.

I was advised that the job would last no longer than 3 months. (It lasted 10.) I thought if I could hang on those 3 month everything would be ok. But, of course, it wasn't. I had to feed my addiction. So I started filing fraudulent income tax returns so I could get enough money to do what I needed.

JA049

9

I moved Elizabeth to Columbia with me.

My relationship with Elizabeth ended approximately 3 months into my job when our Secret Service computer was hacked. As a result — my information, Elizabeth's information, and her past were published across the internet and within the community I was working in as a C.I. (and though I may have deserved that treatment, Elizabeth did not). I was able to convince the community that none of it was true (though it was) and work continued. The Secret Service made me move for fear of my life and Elizabeth's. I moved. And I ended my relationship with Elizabeth out of fear for her safety and because of the increased harassment from Secret Service members regarding her after we were hacked. I didn't tell Elizabeth about her information or her past being published. I tried to explain to her the best I could, but she didn't understand.

As a result I grew suicidal and plunged headlong into drink and drugs. I went through women, drugs, and money like water. And I moved Elizabeth to Charleston and paid her rent and living expenses. I supported those actions by filing fraudulent income tax returns.

I mentioned earlier that my release on bond came with no condition. That is true. I signed no agreement and was not initially told I was forbidden to use a computer or talk to anyone. I mention this because I was contacted by a New York Times reporter shortly after starting my job with the Secret Service. He began interviewing me and flew in several times in person to speak with me. This was without Secret Service knowledge or agreement. The Secret Service discovered shortly after my initial contact with him that I had spoke to him — though they did not know nor did I till then the level of that contact. It was at this point that the Secret Service told me I could not speak to anyone, nor use a computer, and had no choice but to accept requests for polygraphs and searches and sign whatever papers presented me.

10

I didn't respond well to these comments by the Secret Service. I felt I was still a USA citizen and had the freedom to speak with who I wished as long as it didn't hurt an investigation. I also felt that being forced to submit to searches and sign papers or take polygraphs was a tad in violation of my rights. But I kept my mouth shut because I didn't want to go back to jail.

I also continued my discussions with the New York Times, without the Secret Service being aware. We discussed my history and what I was doing. And it was agreed that nothing would be published until after my work was over and my case disposed of. As of this date, nothing has yet been published.

On March 26, 2006 following a nationwide sweep of several Secret Service targets, including one of my targets, I was forced to take a polygraph to see if I had warned the target that he was going to be arrested. 3 questions were asked on the polygraph: 1) Did I contact the target? 2) Did I have anyone contact the target? 3) Did I have any unauthorized contact with anyone? I failed the polygraph. It was the third question that got me. The Times reporter was frequently on the forum and we spoke often.

During the follow-up interrogation I admitted to speaking to the press and also my plans for a book. I had often said the same in jest, but they finally understood I was serious. That evening around 2am, after 7+ hours of interrogation, I was made to sign a consent to search my apartment. The initial search yeilded nothing. I was not charged with anything and was not allowed to go home. I was kept at the Secret Service office through the night until Neal Dolan arrived the next morning. I didn't see Dolan.

I was escorted to my apartment to shower and then brought back to the office. I was then informed that I had to return to Charleston that day for a bond hearing. I didn't find out until I was in Charleston that this was a lie:

**JA051**

11

What actually took place is that Agent Dolan called my bondsman and told him to revoke the bond. The bondsman told me this and said he didn't want to revoke the bond, but felt obligated to do so. So I was placed back in Charleston County Detention Center. I didn't know what was going on. 3 days later Agents Bobby Kirby and Jim Rannicone show up to ask questions about items a subsequent search of my apartment yielded. It was evidence of my filing fraudulent income tax refunds.

Rannicone and Kirby come in. Kirby has a Miranda waiver in his hand. Before they present or read it to me Rannicone looks at me and says, "Before we begin, Brett, I just want to say that you are either going to tell us everything you've done the past 6 years or I'm going to make it my mission in life to fuck over you and your family. And I'm not just talking about these current charges, once you get out I will hound you for the rest of your life. Now — do you want to talk to us?" Kirby then hands the Miranda waiver my way. I look at Rannicone and say, "I don't want to talk to you." Rannicone gets up, storms out, and says, "Fuck you very much!" on the way out. I go back to my cell.

I took that exactly as it was meant — as a threat against my family and I. Because of the antics I had already been a part of while working for the Secret Service, I knew that I was, indeed, going to be "fucked over" by the Secret Service. Add that Neal Dolan had told me after I first met Dean Eichelberg that Eichelberg would do whatever the Secret Service told him to; I knew that I would be charged with something severe and that would likely be the start as Rannicone had promised.

Two weeks after my visit from Agents Kirby and Rannicone my bond was reinstated. The bond had been improperly revoked as my lawyer explained to me. I bonded back out again. As a result — I went on the run.

<u>12</u>

I didn't, at first, intend to run. My intent was to round up enough money for an excellent attorney and to fight; I felt that was my only chance against what they had promised to do. However — as time progressed and I became increasingly aware of the lies Secret Service Agents were telling my family and friends concerning my charges and the threats against them — I reached the conclusion that it didn't matter what type of attorney I had, they would still fulfill their promise of "fucking over" my family and I. I mean — it is the federal government; when they want to ruin lives there isn't much that can be done.

So I had it in my head to leave the country. I thought if I could at least do that my family would not be bothered. (of course, I was wrong on that point) So it went from me getting a lawyer to me running. In the end — I couldn't leave my family: I wasn't and will never be ready to leave my family.

So I went to Dallas and ripped off money. Then to Las Vegas and ripped off money. — doing massive amounts of cocaine daily. I was finally arrested in Orlando, Florida on September 16, 2006. One of the first things the Secret Service told me upon my arrest was that the "fucking has just begun". I believed them then and believe them now.

Before being threatened and going on the run I was ready to do what I felt would be 18-24 months and I was satisfied with that. I had broken the law in Charleston and Columbia; I didn't have a problem with doing my time. I could get the help I needed to overcome my addiction, sort out my personal problems, and pay the debt to society I rightly owe. But I feel the actions, tactics, and threats of the Secret Service exacerbated that problem to an enormous degree.

As of this writing my plea agreement looks like it will result in my getting at least 7 years. That includes over 3 years of enhancements I'm told the prosecution intends to pursue; an enhancement for 10 victims, an

<u>13</u>

enhancement for obstruction, and an enhancement for it being a complicated scheme. 6 additional points. 3+ years.

I can kind of understand the 10 victim enhancement — almost. I will give them 9 victims. The 10th victim wasn't a victim; they didnt lose any property or cash. That was the check I was arrested on.

The obstruction the solicitor claims? Never happened. I spoke to the press regarding my history and current work. Nothing was to be published until after I was through with the Secret Service. Nothing was published and nothing will be published until this is over. I told no one online I was a C.I. I didnt obstruct anything. In fact, I helped investigations in several states.

As for a complicated scheme enhancement? It wasnt complicated. I got some debit cards, got a list of dead people, and filed taxes in their names. Nothing complicated about that. Even during my December court appearance Eichelberg said to the court that my crime wasnt complicated. He used these exact words. I dont see how the solicitor can pursue such an enhancement if he himself says it isnt true. I mentioned that to my lawyer and told him to get a copy of the transcript for that day. My lawyer said it doesnt matter, but I still feel it certainly does.

As of this writing I can only assume these additional enhancements and the lack of a better plea agreement are a result of my talking to the press and the potential embarrassment that publication could mean for the Secret Service.

A potential article or book might likely include my harassment by Secret Service concerning Elizabeth. It could mention my drug problems and addiction while working there.

The antics of the Secret Service would also likely be brought up, including: their stripping away my civil liberties and rights while working there, their circumventing the orders of Dean Eichelberg on how to conduct the investigation and what to do, the unprofessional activities like watching porn incessantly and lewd talk while

JA054

14

working. It will talk about the jealously running rampant among the different "co-operating" investigations and how on 2 occasions that jealously manifested itself by my being directed to wreck a website the agents knew to be operated by Canadian authorities (though I did not), and another occasion where I was ordered to threaten the person and family of another Secret Service Informant working in Rochester, NY named Daniel Delfippio. It will mention the embarrassing instance of the Secret Service computer being hacked. And the unmitigated joy that agents derived at ruining people's lives and tormenting those who were not even targets of an investigation — like the 14 year old girl they "joked" around with by asking her if she preferred oral sex with cocaine on the penis. That could well be mentioned in an article.

Also likely discussed would be how open the Columbia Secret Service was with me concerning other investigations and sensitive details. Another potential black eye for them as agents constantly disclosed sensitive details of other investigations.

Something published would certainly mention Ranniccine's threats to my family and I. And maybe how Secret Service agents, once I went on the run, told my family and friends I was a crack cocaine dealer and a pedophile — instead of the truth. I'm addicted to cocaine. But I'm not a dealer. And I'm not a pedophile. I'm guilty of fraud. I think that was just another way of following through on the promise of wrecking my life and my family's.

So yes — I ran. I ran because I didn't know what to do. I ran because I was scared. And I ran because I knew full well that the Secret Service didn't intend to play fair. And yes — I broke the law before I met the Secret Service. And yes — I broke the law while working with them up until my bond was improperly revoked and the threats came. But these are the actions of someone whose life was in turmoil and addiction ruled their every decision. The actions of the Secret Service magnified my problems while I worked with them; As

15

I slid deeper into drugs and depression I also slid further into illegal activities. Afterword, the Secret Service significantly exacerbated the problem by issuing threats in which I felt compelled to take flight. Everything done after March 26, 2006 is in direct relation and response to the threats of the Secret Service. Yes - I did it. Yes - I'm guilty. And Yes - I'm at fault. Ultimately, all this mess lies at my doorstep. But there are things which aided in bringing it there.

That is my story. I'm sorry it took so many pages, but I don't know how it could have been shorter; there is much more to include that I did not.

Am I sorry for my crimes? Yes. There isn't a day that has passed over the past 2 years that I don't think of the pain I have brought myself, my family, and my friends. I have hurt people I love and people I don't even know. There isn't a day that passes that I don't beat myself up over it. I will always remember the look of pain on my parents faces, my family's, and Elizabeth's. And though I don't know some of those I hurt, I am deeply troubled that I was in such a state of mind that I would bring others hardship and pain. I deeply regret what I have done, and I'm tormented constantly by it. I know it will be like that for the rest of my life. I'm very sorry for what I have done. I always will be.

Because of the choices I have made the past years I have lost all that I have and all that I am. I once had a promising future; I was intelligent, hard-working, reliable, trustworthy, successful, and a good person. However, drugs led to a series of poor choices which ultimately led me to where I am today. I can't believe I ended up here at this point in my life. I can't believe that any person could go from such a lofty level to such a low point.

I met with great excitement the initial job offer of the Secret Service. I felt I could finally get my life in order. I could use my knowledge and

**JA056**

<u>16</u>

expertise to the common good and stop crime. I thought I could make a career of it and still believe so. And I did do an extraordinary amount of good and crime-stopping. But as a person I wasn't at a point where I could leave my addictions and move on. I deeply regret that my demons were too strong and my will too weak to overcome my problems.

I know none of this would ever have happened if I hadn't had a problem of cocaine addiction. Its the biggest mistake of my life. I know I would have been of more sound mind and character and would have made better choices had not cocaine been leading my life. Its a difficult thing knowing my potential as a human being and seeing that squandered away and wrecked hopelessly. Its difficult for me to reconcile who I know I am with what I know Ive done. Its a guilt I will never be rid of.

There was a time when I had no regrets and was happy with my life. That time seems long past, but I hope to regain it. I know I need help in overcoming my problems and I hope to receive such. I know I can rebuild my life-given the chance

I got completely lost from the person that I am. Im a far better person than the scum I have been acting as. I just need to get myself situated.

The most important thing in the world to me is family. And I hope to have the opportunity to have a family of my own in the future, before its too late.

That is all I can say, your Honor. I appreciate you taking the time to read over this. And I pray you see fit to give me a second chance and order the help I need. Regardless of your decision I know that you at least know my thoughts on the matter. I greatly thank you for that opportunity.

Sincerely



Brett Johnson

AO187 (REV. 4/82)

## GOVERNMENT'S EXHIBIT LIST

| | | | | | | DISTRICT COURT DISTRICT OF SOUTH CAROLINA |
|---|---|---|---|---|---|---|
| United States of America vs. JONATHAN GIANNONE | | | | | | |
| PLAINTIFF'S ATTORNEY Dean Eichelberger, AUSA Robert Daly, AUSA | | | DEFENDANT'S ATTORNEY Thomas Liotti, Esq. Drummond Smith, Esq. | | | DOCKET NUMBER 06-1011-CMC TRIAL DATE(S) 3/5/2007 - 3/8/2007 |
| PRESIDING JUDGE Hon. Cameron McGowan Currie | | | COURT REPORTER Gary Smith | | | COURTROOM DEPUTY Becky Willis |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| 1 | | 3/5/2007 | X | X | Chat Transcript - May 23, 2005 |
| 1A | | | X | X | Camtasia File - May 23, 2005 chat session |
| 2 | | | X | X | Chat Transcript - May 26, 2005 |
| 2A | | | X | X | FleetOne Premier Statement - 5/13/05 through 6/15/05 |
| 2B | | | X | X | American Express Statement - Closing date 6/14/05 (p. 5 of 12) |
| 3 | | | X | X | Chat Transcript - May 29, 2005 |
| 4 | | | X | X | Chat Transcript - May 31, 2005 |
| 5 | | | X | X | Chat Transcript - June 3, 2005 |
| 5A | | | X | X | Thrify Car Rental Statement - 6/03/05 |
| 5B | | | X | X | American Express Statement - Closing date 6/14/05 (p. 5 of 12) |
| 6 | | | X | X | Chat Transcript - June 4, 2005 |
| 7 | | | X | X | Chat Transcript - June 6, 2005 |
| 7A | | | X | X | Summary Chart |
| 8 | | | X | X | Chat Transcript - June 7, 2005 |
| 8A | | | X | X | Receipt for $600 Deposit into A&W Auto Clinic account |
| 9 | | | X | X | Chat Transcript - June 8, 2005 |
| 10 | | | X | X | Chat Transcript - June 10, 2005 |
| 10 A | | | X | X | American Express Statement - Closing date 5/13/05 (p. 1 of 8) |
| 10 B | | | X | X | American Express Statement - Closing date 6/14/05 (p. 1 of 12) |
| 11 | | | X | X | Chat Transcript - June 17, 2005 |
| 12 | | | X | X | Chat Transcript - June 18, 2005 |

3:06-cr-01011-CMC    Date Filed 03/08/07    Entry Number 85-1    Page 3 of 4

| 13 | | | X | X | Chat Transcript - June 20, 2005 |
|---|---|---|---|---|---|
| 13 A | | | X | X | American Express Statement (p. 4 of 12) |
| 14 | | | X | X | Chat Transcript - June 28, 2005 |
| 15 | | | X | X | Chat Transcript - July 1, 2005 |
| 15 A | | | X | X | Thrifty Car Rental Statement - 7/6/05 |
| 15 B | | | X | X | Fleetstone Premier Statement - 6/16/05 through 7/14/05 |
| 15 C | | | X | X | United Airlines Statement |
| 15 D | | | X | X | American Express Statement (p. 5 of 12) |
| 16 | | | X | X | Chat Transcript - July 2, 2005 |
| 17 | | | X | X | Chat Transcript - July 6, 2005 |
| 17 A | | | X | X | Fleetone Premier Statement - 6/16/05 through 7/14/05 |
| 17 B | | | X | X | American Express Statement (p. 6 of 12) |
| 18 | | | X | X | Chat Transcript - September 25, 2005 |
| 18 A | | | X | X | thrifty Car Rental Statement - 10/13/05 |
| 18 B | | | X | X | American Express Statement (p. 4 of 12) |
| 19 | | | X | X | Chat Transcript - October 23, 2005 |
| 20 | | | X | X | Chat Transcript - November 8, 2005 |
| 20 A | | | X | X | United Airlines Statement |
| 20 B | | | X | X | Thrifty Car Rental Statement - 11/14/05 |
| 20 C | | | X | X | American Express Statement (p. 6 of 12) |
| 21 | | | X | X | Chat Transcript - imakemovies4free with ElevenOnce |
| 21 A | | | X | X | Southwest Airlines statement |

3:06-cr-01011-CMC    Date Filed 03/08/07    Entry Number 85-1    Page 4 of 4

| 22 | | 3/5/2007 | X | X | Sea Harvest Inc., Crew Manifest and Terms of Employment |
| 23 | | | X | X | Sea Harvest, Inc., Fishing Vessel Settlement Release |
| 24 | | | | | (Withdrawn) |
| 25 | | | X | X | Stipulation |
| 26 | | | X | X | Stipulation |
| 27 | | | X | X | Stipulation |
| 28 | | 3/6/2007 | X | X | Christopher Branca Plea Agreement (redacted) |
| | | | | | |

3:06-cr-01011-CMC   Doc. 26   Date Filed 05/02/08   Entry Number 145   Page 1 of 262
USCA4 Appeal: 25-6132   Doc: 26   Date Filed: 08/19/2025   Pg: 63 of 475
3:06-cr-01011-CMC   Date Filed 08/28/24   Entry Number 405-1   Page 211 of 1090
1-1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF SOUTH CAROLINA
 2                    COLUMBIA DIVISION

 3

 4   UNITED STATES OF AMERICA,      )      Cr. No. 3:06-1011
                                    )
 5                                  )
     VERSUS                         )      Columbia, SC
 6                                  )      March 5, 2007
     JONATHAN GIANNONE,             )
 7                                  )
          Defendant.               )
 8                                  )
     ---------------------------)
 9

10

11                   JURY TRIAL - VOLUME I

12        BEFORE THE HONORABLE CAMERON MCGOWAN CURRIE
            UNITED STATES DISTRICT JUDGE, and a jury.
13

14

15   Appearances:

16   For the Government:   DEAN EICHELBERGER, ESQ.
                           ROBERT DALEY, ESQ.
17                         Assistant U.S. Attorneys
                           1441 Main Street, Suite 500
18                         Columbia, SC  29201

19   For the Defendant:    THOMAS F. LIOTTI, ESQ.
                           DRUMMOND C. SMITH, ESQ.
20                         600 Old Country Road, Suite 530
                           Garden City, NY, 11530
21

22

     Court Reporter:    Gary N. Smith, CM
23                      901 Richland Street
                        Columbia, SC  2920
24                      (803) 256-7743

25          Stenotype/Computer-Aided Transcription
```

1          Mr. Eichelberger.

2          MR. EICHELBERGER:  Thank you, Your Honor.  May

3  it please the court?

4          THE COURT:  Yes.

5          MR. EICHELBERGER:  Mr. Liotti, Mr. Smith.

6          Good morning.

7          THE JURY:  Good morning.

8          MR. EICHELBERGER:  I love the Internet.  The

9  Internet is a fascinating thing.  It's a place where we

10 can entertain ourselves; we can get information; we can

11 watch videos; we can play games; we can buy things.

12 EBay is a great place, you can bid on things.  If you

13 think about it, you can buy it on eBay.

14          But, ladies and gentlemen, there's a side of

15 the Internet that we don't like to think about.  There's

16 kind of a dark underbelly to the Internet, one where not

17 trinkets or bobbles are bought, sold, and traded like on

18 eBay, but there's a part of the Internet where people's

19 lives are bought, sold, and traded.

20          Now, by that I don't mean the physical lives of

21 their daily existence.  What I mean is, their economic

22 and their emotional lives are bought and sold and

23 traded.

24          And that's a little bit about what this case is

25 going to be about.  You are going to see that side of

1    the Internet and, I suspect, that you are never going to

2    exactly look at the Internet the same again after this.

3         Before I talk about the nature of that dark

4    underbelly of the Internet, I would like to reintroduce

5    myself.  About two weeks ago I came in here and we

6    picked a jury.  You folks were the ones selected for

7    this.

8         My name is Dean Eichelberger.  I'm an Assistant

9    United States Attorney and I will be prosecuting the

10   case.  Mr. Bob Daley was not with me during jury

11   selection, but he's going to be helping me with the

12   prosecution of this case.  Mr. Daley is also an

13   Assistant United States Attorney.

14        Special Agent Brad Smith with the United States

15   Secret Service, he's helped out immeasurably in the

16   preparation of this case, the investigation.  Similarly,

17   Special Agent Bobby Joe Kirby with the United States

18   Secret Service has fulfilled that function of being

19   somebody who worked closely with Mr. Daley and myself as

20   we brought this case to the presentation.

21        I apologize for the cough.  My voice has just

22   been incredibly scratchy and tired, so during the course

23   of the trial I apologize in advance.  I'm going to cough

24   some.  I have got water here.  I have got cough drops in

25   my pocket.  I will do my best, but please bear with me.

USCA4 Appeal: 25-6132   Doc: 26      Date Filed 05/19/2025   Pg: 66 of 475
3:06-cr-01011-CMC   Date Filed 05/02/08   Entry Number 145   Page 60 of 262
3:06-cr-01011-CMC   Date Filed 08/28/24   Entry Number 405-1   Page 270 of 1090
1-60

```
 1            One other thing that is going to be used during

 2   this trial is this computer, because the computer is

 3   going to be used to display documents on those monitors

 4   that are right there in front of you.  Now, there's an

 5   old saying, to err is human, but to really foul things

 6   up takes a computer.

 7            Well, this computer may well make its presence

 8   known at some point during the course of this trial.

 9   And if that happens, just bear with us.  We will have to

10   log in -- we have to let the computer know we care,

11   periodically, about what is going on.

12            But that brings us back to what this case is

13   about.  Because, you see, what happened in this case

14   is -- I don't know -- two, three years ago, federal

15   agents managed to develop a window into this dark

16   underbelly.

17            A guy by the name of Brett Johnson was arrested

18   down in Charleston, South Carolina.  Brett Johnson, I've

19   got to tell you, is a person who for years has been

20   engaged in this type of buying, selling, and trading of

21   people's lives, their information, their credit cards.

22   Anything possible about them that someone could use for

23   fraudulent purposes, Brett Johnson was involved in that.

24            Well, when Brett Johnson got arrested down in

25   Charleston, law enforcement found out about his very
```

3:06-cr-01011-CMC   Date Filed 05/02/08   Entry Number 145   Page 61 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed 08/19/2025   Pg: 68 of 475
3:06-cr-01011-CMC   Date Filed 08/28/24   Entry Number 405-1   Page 271 of 1090

1-61

1    highly placed role in this underground economy.  And

2    they thought this would be a good opportunity to use

3    Brett Johnson, to put him to work to try to draw other

4    people out of the Internet, people who knew of his prior

5    identity, gollumfun.  Keep that name in mind, because

6    that's the name that Brett Johnson used throughout this

7    investigation.

8            What happened was, these agents brought Brett

9    Johnson, gollumfun, back here to Columbia, South

10   Carolina, and they set him up in an office at their

11   facility.  And he was provided with a computer and

12   various other materials.  They are going to talk in some

13   detail about how that worked.

14           And then his job was to come in somewhere

15   between four and six hours a day and simply be on that

16   computer as gollumfun and chat with people.  And in the

17   course of those chats, you are going to hear testimony

18   about how one individual -- an individual who went by

19   two separate online names, Pit Boss 2600 and CIA INTEL.

20           This person, Pit Boss or CIA INTEL -- I will

21   just refer to Pit Boss for ease of reference, take it as

22   referring to either one -- but this person chatted

23   multiple times with gollumfun and the subject of the use

24   of people's lives:  Their credit card information, their

25   names, Bank of America Premium debit cards, things that

1   would allow somebody who was bent on mischief to

2   withdraw money from their accounts, or to purchase goods

3   with that information.  All of this was talked about

4   during the course of these chats.

5          And there came a time where Pit Boss 2600

6   transferred people's lives -- information about them,

7   about their credit cards -- on three separate occasions

8   to gollumfun, to this investigation, three separate

9   occasions.  That's the three counts of wire fraud that

10  are referenced in this indictment.

11         In connection with two of those times, he also

12  gave the names of people that owned the accounts that

13  were referenced.  That's where counts 2 and 5 come in,

14  the aggravated identity theft.  And after -- in

15  connection, I should say, with that third of the three

16  times when there were -- 21 sets of information were

17  transferred to gollumfun.  The agreement had been made

18  that Pit Boss 2600 would receive a payment of $600 for

19  the lives of 21 people, the financial lives.

20         And these agents actually took $600 in cash and

21  they placed it into a Bank of America business account,

22  it was identified specifically by Pit Boss 2600.

23         And then in a chat they notified Pit Boss 2600

24  that that money was there.  And within about an hour and

25  a half, maybe an hour and 35 minutes, Mr. Jonathan

1    Giannone appeared at an ATM machine up in New York and

2    he punched in the codes and he withdrew $500 in cash,

3    money that came from the investigation.

4              But this case is a whole lot more than merely

5    having some chats and having Mr. Giannone show up.

6    Because we truly have a star witness in this case, and

7    the star witness in the case is the record of those

8    chats, the written words on a piece of paper.

9              Those chats, you will hear, were generated by

10   the computer program that was used for the

11   communication.  So I don't know if any of you have

12   children that like to get online and with AIM, AOL

13   Instant Messaging, and they'll be chatting, "Hi, how you

14   doing?"  Somebody says, "Great, how are you?"  And it's

15   back and forth and things flying at you.

16             They can also be set where they generate a

17   transcript of those chat sessions and that truly, ladies

18   and gentlemen, is going to be the star witness in this

19   case, those chat transcripts.

20             But it's more than merely having Mr. Giannone

21   show up.  Because during the course of these chat

22   transcripts, CIA INTEL/Pit Boss 2600 made specific,

23   factual references to things that happened out -- the

24   computer term is "in the real world."

25             So, for instance, if on one occasion -- and you

3:06-cr-01011-CMC    Date Filed 05/02/08    Entry Number 145    Page 64 of 262
3:06-cr-01011-CMC    Date Filed 08/28/24    Entry Number 405-1    Page 274 of 1090

1-64

1    will hear testimony about this -- that Pit Boss 2600

2    says in a chat that took place on May the 26 of 2005, "I

3    was in Jacksonville yesterday."  These agents went out

4    and in a laborious process secured financial, business,

5    travel -- a number of records -- and they will show you

6    that on May the 25th, the day before the 26, on May the

7    25th, 2005, there was a financial transaction on

8    Mr. Giannone's bank account in Jacksonville, Florida.

9            You are going to see how that happens time and

10   time and time and time again.  We are going to show you

11   multiple instances where references to things in the

12   real world are borne out by the financial records, the

13   travel records of Mr. Giannone.

14           Now, as to linking the Pit Boss 2600 and the

15   CIA INTEL name together being one and the same person,

16   that will be done primarily through internal

17   consistencies within chats where it's CIA INTEL speaking

18   or Pit Boss 2600 speaking.

19           I will give you a teaser for some of those

20   things.  Pay attention to a cotton candy machine.  Why a

21   cotton candy machine?  You will see that there are chats

22   where at one time Pit Boss 2600 is asking about a cotton

23   candy machine, at another time CIA INTEL is asking about

24   the same thing.

25           Also, remember an online identity of Enhance,

USCA4 Appeal: 25-6132   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 65 of 262
3:06-cr-01011-CMC   Date Filed 08/28/24   Entry Number 405-1   Page 275 of 1090

1-65

1  E-n-h-a-n-c-e.  Enhance is referenced, first, through --

2  I think it's Pit Boss 2600 talking about how Pit Boss

3  purchased that identification.  Later in the chat CIA

4  INTEL says the exact same thing.

5          And, then, finally there's going to be,

6  actually, some specific cross-references where, for

7  instance, CIA INTEL says, "Contact me on AIM, use Pit

8  Boss 2600."

9          So, we will show you those to first establish

10  that Pit Boss and CIA INTEL are one and the same

11  person.  And then by linking that one person to the real

12  world, we will show you that this unified identity is,

13  in fact, Mr. Jonathan Giannone, and that Mr. Giannone

14  showed up an hour and a half after the money was

15  deposited and got his ill-gotten gain.

16          Well, in the course of this trial, though,

17  Mr. Giannone came up with an explanation for that fact.

18  He said that what really happened is a guy by the name

19  of Christopher Cutler -- Mr. Cutler will testify -- but

20  he says that Mr. Christopher Cutler purchased or had

21  agreed to purchase a Ford F-150 pickup and that there

22  was a 20 percent deposit that was required and that that

23  deposit equaled $600.

24          According to what Mr. Giannone said in this

25  case, Mr. Cutler is the true criminal, the one who sold

USCA4 Appeal: 25-6132   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 66 of 262
3:06-cr-01011-CMC   Date Filed 08/28/24   Entry Number 405-1   Page 276 of 1090
Filed 08/19/2025   Pg. 72 of 475

1-66

1    these 21 lives and then had that $600 deposited into

2    Mr. Giannone's account to satisfy that obligation on the

3    pickup.

4            We will present to you information, ladies and

5    gentlemen, that will convince you that that explanation

6    is false.  You will see how the necessary implications

7    of this purported pickup transaction is that this is the

8    first time Mr. Giannone and Mr. Cutler had any dealings

9    with each other, May of 2005.

10           Regrettably for Mr. Giannone, you will hear

11   that in February of 2005, three months before that took

12   place, Mr. Giannone paid for airline tickets for himself

13   and Chris Cutler to travel to Florida.

14           Additionally, in the chat, purported chat

15   transcript, Mr. Giannone says, "You remember me?  I'm

16   the guy Branca introduced to you at the car lot, May of

17   last year."  Branca is Christopher Branca.  Mr. Branca

18   also will testify.  Similarly he will say, no pickup

19   transaction.

20           Now, both Mr. Cutler and Mr. Branca have their

21   own criminal problems.  Mr. Cutler is charged in a

22   separate indictment in this court with having engaged in

23   some of the same type of activity, violating people's

24   lives, their financial lives.  Similarly, Mr. Branca has

25   signed a plea agreement in agreeing to plead guilty to

3:06-cr-01011-CMC    Date Filed 05/02/08    Entry Number 145    Page 67 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed 08/19/2025    Pg: 73 of 475
3:06-cr-01011-CMC    Date Filed 08/28/24    Entry Number 405-1    Page 277 of 1090

1-67

1    what we call a felony information charge with conspiracy

2    to do these very type of activities.

3           Let's go back to Mr. Brett Johnson.

4    Mr. Johnson, the person who worked with the Secret

5    Service, he has lots of criminal problems.  He's not

6    going to testify during the course of this case, but I

7    wanted to be up front with you about him.

8           While he was working with the Secret Service,

9    he had his own secret life.  He was engaging in

10   additional criminal activity.  When it was discovered,

11   he was put back into state custody.  When he got out of

12   state custody, he went on a cross-country fraud tour.

13   When he was arrested, he had $150,000 cash on his

14   person.

15          I'm going to tell you this up front because I

16   have nothing to hide with respect to Mr. Johnson or

17   Mr. Cutler or Mr. Branca.  But their credibility, such

18   as it is, really has nothing to do with the star

19   witness, which is the chat transcripts in this case,

20   those that were generated as they happened by operation

21   of the computer.  So that's what we are going to have in

22   this case.

23          By the way, we are going to have one other

24   witness, a guy by the name of Mr. Awkal.  Mr. Awkal

25   lives in Holyoke, Massachusetts.  You see, when

1  Mr. Giannone claimed to have sold the pickup, he made

2  specific reference having done it through A&W Auto

3  Clinic.

4        Well, Mr. Awkal is actually the owner of A&W

5  Auto Clinic.  Now, he will tell you that Mr. Giannone

6  had negotiated through an eBay transaction to purchase

7  that business, but Mr. Giannone did not go through with

8  it.

9        Mr. Giannone was not authorized to use the A&W

10 Auto Clinic business name.  Mr. Giannone never sold any

11 vehicles through that business, never transacted

12 business at that location.  That's testimony you are

13 going to hear from Mr. Awkal.

14       So all this testimony we are going to have

15 coming in, it's going to establish at its core a very

16 simple set of facts.  That is, the star witness, the

17 chats, will convince you that there were conversations

18 between Pit Boss and gollumfun, conversations dealing

19 with how to steal people's lives, their financial lives,

20 their emotional and mental well-being.

21       And that $600 was paid.  That an hour and a

22 half after notification that $600 was sitting in the

23 bank account, Jonathan Giannone was there punching those

24 numbers and pulling that money out.  And we're going to

25 show you that Jonathan Giannone was the person behind

1    Pit Boss 2600 the entire time.

2            We are going to do that through this series of

3    in-the-real-world encounters, transactions, places.  I

4    mean, you are going to hear about Florida, Hawaii,

5    Washington, D.C., California.  All these places where we

6    can tie Mr. Giannone to, places he specifically

7    references during these chats.

8            And then when this trial is over I'm going to

9    come right back to this very same place and I'm going to

10   talk to you about the chats.  I'm going to talk to you

11   about Mr. Cutler, Mr. Branca, Mr. Awkal, and I'm going

12   to explain the inferences.

13           I'm going to explain to you how that set of

14   facts ties together and how those facts prove beyond a

15   reasonable doubt that Mr. Giannone is guilty as charged

16   with three counts of wire fraud, two counts of

17   aggravated identity theft.

18           And I will stand here and I will ask you to

19   return a verdict that the evidence cries out for in this

20   case.  That is, I will ask you to return a verdict of

21   guilty on all counts.

22           Thank you for your attention.

23           THE COURT:  Mr. Liotti.

24           MR. LIOTTI:  Thank you, Judge.

25           Good morning, ladies and gentlemen.

```
 1            All right.  Are you ready to proceed with your

 2  first witness?

 3            MR. EICHELBERGER:  We are, Your Honor.

 4            THE COURT:  All right.  You may bring the jury

 5  in.

 6            (Jury present)

 7            THE COURT:  All right.  Mr. Eichelberger, you

 8  may call your first witness.

 9            MR. EICHELBERGER:  Call Special Agent Brad

10  Smith of the United States Secret Service.

11            THE COURT:  All right.  Mr. Smith, if you

12  would, step up beside the witness stand there and raise

13  your right hand and tell us your full name, sir.

14            THE WITNESS:  Bradley Steven Smith.

15                 BRADLEY STEVEN SMITH, SWORN

16                    DIRECT EXAMINATION

17  BY MR. EICHELBERGER:

18  Q.  Good morning.

19  A.  Good morning.

20  Q.  Mr. Smith, would you please introduce yourself to

21  the jury?

22  A.  Hi.  My name is Brad Smith.  I'm an agent with the

23  Secret Service here in the Columbia field office.

24  Q.  Mr. Smith, how long have you been employed by the

25  United States Secret Service?
```

1  A.  In July it will be seven years.

2  Q.  And let's talk about your educational background for

3  a second.  Where did you get your undergraduate degree?

4  A.  I went to college at the Air Force Academy in

5  Colorado Springs.

6  Q.  That means that you served in the Air Force for a

7  period of time after that?

8  A.  Yes.  I did six years in the Air Force stationed in

9  Boston, Hanscom Air Force Base, and then three years at

10  Charleston Air Force Base.

11  Q.  During your service with the United States Air Force

12  did you further your education?

13  A.  I did.  While I was in Boston I got a master's

14  degree in finance at the Western New England College.

15  Q.  Now, if you would, just for purposes of background,

16  help us to understand the mission of the United States

17  Secret Service.

18  A.  Secret Service has a dual mission.  Most people know

19  us for the protection mission.  By law we provide

20  protection for the President and his family;

21  Vice-President and his family; and then any foreign head

22  of state that comes into the United States.

23       The protection -- by executive order we can

24  pick up other people.  If cabinet members -- if there's

25  deemed a credible threat, we can pick them up.  And then

1   during campaigns, while the people are out campaigning,

2   if there's credible threats with them, we will also

3   provide protection for those candidates.

4   Q.  So, since we are coming into the presidential

5   campaign season, you can be kind of busy?

6   A.  Yes, during a campaign there's a lot of travel.

7   Q.  All right.  Now, you are a field agent, though, down

8   here in Columbia, South Carolina, correct?

9   A.  That's right.

10  Q.  Now, has your entire service been down here in South

11  Carolina?

12  A.  Yes.

13  Q.  And in addition then to the protection mission of

14  the Secret Service, what else do you do?

15  A.  The Secret Service -- the other prong of our mission

16  is the investigative mission.  We started out -- the

17  agency was founded to investigate counterfeit money.

18  Over time, as the financial transactions have changed,

19  banking has changed, it's included things like checking,

20  the check systems, credit card systems, things like

21  that.  As the Internet has developed, we have also

22  included fraud that is perpetuated through the Internet.

23  Q.  All right.  Now, in connection then with Internet

24  fraud, did there come a time when the name Brett Johnson

25  came up?

3:06-cr-01011-CMC   Doc. 26   Date Filed 05/02/08   Entry Number 145   Pg 79 of 475
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 79 of 475   Page 83 of 262
SMITH - DIRECT                                    1-83

1  A.  Yes.

2  Q.  How did that come about?

3  A.  Brett Johnson was arrested in Charleston.  He was

4  using counterfeit Bank of America cashier's checks to

5  pay for items that he won on eBay.

6  Q.  Now, you say he had won on eBay.  Let's -- we don't

7  know if our jurors have personal knowledge about how

8  eBay works.  I don't want an insider's view of what

9  happens, but give us a general idea of how eBay works

10 and how Mr. Johnson's fraud related to that.

11 A.  Sir, eBay is an Internet site that people auction

12 things off, items that they have and they want to put up

13 for sale.  They'll put it on eBay and people will bid on

14 it.  Through the eBay web system they'll bid on that

15 item, offering a certain amount of money for that item.

16        Brett Johnson was -- would look at certain

17 items and he would contact the people that are selling

18 that item through e-mail and he would offer them money

19 for it, you know, he would bid for it and tell them, "If

20 I win, can I pay by cash on delivery?" so that those

21 people would ship the item.  In some cases it was a

22 watch, some jewelry, would ship it to Mr. Johnson and on

23 delivery he would give them a counterfeit cashier's

24 check as payment for that item.

25 Q.  And the time came when he was caught?

 1  A.  Yes.

 2  Q.  So how did the fact that Mr. Johnson got caught

 3  doing this eBay fraud bring him to your attention in

 4  connection with this matter?

 5  A.  When he was arrested, the arresting agency notified

 6  us and said, "Well, Brett Johnson has been arrested, is

 7  he -- is he known to the Secret Service?"  He was.

 8          So we had agents go out, participate in an

 9  interview with Brett Johnson and the other arresting

10  agency, conduct a consensual search of his apartment.

11  About a week later we had other agents come in and talk

12  to Brett Johnson.

13          Brett had claimed that he was this gollumfun

14  screen name and agents of the service were familiar with

15  that name.  They came and interviewed him, verified

16  that, you know, he was who he said he was.  So since he

17  was here in South Carolina, we decided to use him as

18  what we call a confidential informant here in Columbia.

19  Q.  Well, you said that he claimed that he was gollumfun

20  and that other agents came and interviewed him and

21  confirmed that he was gollumfun?

22  A.  Yes.

23  Q.  Why did we care?

24  A.  Well, gollumfun -- as we talked about these web

25  sites, you will understand that everyone uses a screen

3:06-cr-01011-CMC   Doc. 26   Date Filed 05/02/08   Entry Number 145   Pg: 81 of 475   Page 85 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 81 of 475   Page 85 of 262
SMITH - DIRECT                                              1-85

1   name -- you know, they try and come up with the most

2   clever -- and need a screen name, and each of those

3   screen names has a reputation.  And gollumfun had a

4   strong reputation for the things that he did, so a lot

5   of people would probably want to claim that they were

6   gollumfun.

7   Q.  And what were the things that Brett Johnson did

8   through that name gollumfun?

9   A.  Brett Johnson was a fraudster.  I mean, he explained

10  to people how to commit fraud, he helped develop some of

11  the web sites that we had monitored.  So the stature of

12  him and his ability to kind of unite people and educate

13  them on these fraud schemes made him a popular person.

14  Q.  So Brett Johnson, not so much because he was Brett

15  Johnson, but because he was gollumfun, had developed a

16  recognizable name?

17  A.  Yes.

18  Q.  In the circle of fraudsters?

19  A.  Yes.

20  Q.  All right.  So then having identified and confirmed

21  that this gollumfun, Brett Johnson, was, in fact, the

22  gollumfun of all this fraud, how did you seek to use it

23  in connection with this undercover, online computer

24  investigation?

25  A.  We brought him to Columbia.  We put him up in an

1  apartment and we would have him come into our field

2  office and get back online using the gollumfun screen

3  name and see who he could chat with, you know, what

4  people would converse with him and what type of

5  fraudulent schemes those people were involved in.

6  Q.  Did gollumfun, during the course of this -- and I'm

7  going to, instead of referring to him as Brett Johnson,

8  we're going to refer to him as -- under his Internet

9  name, gollumfun.

10  A.  Uh-huh.

11  Q.  Did he initiate contact with other people during

12  this investigation?

13  A.  For the most part they came to him.  When he got

14  online through the chat programs and they saw gollumfun,

15  a lot of people would contact him.

16  Q.  Okay.

17  A.  I would say that he did initiate, sometimes, contact

18  with people.

19  Q.  Now, you said that he was working with the Secret

20  Service here at the Columbia field office.  Does that

21  mean he was kind of off on his own, doing his thing?

22  A.  No.  We -- in one of our offices we set up two

23  undercover lines.  Basically, it's a DSL connection,

24  it's a broadband connection.

25  Q.  We are starting to get into tech talk.  DSL?

1   A.  It's like a cable.  You know, like Time Warner Road

2   Runner.

3   Q.  Suffice it to say that's an Internet connection

4   through which a lot of data can flow so you can do

5   things very quickly as opposed to dial up, which may

6   take forever.

7   A.  Right.

8           MR. LIOTTI:  Objection, counsel testifying,

9   Your Honor.

10          THE COURT:  Sustained.

11  BY MR. EICHELBERGER:

12  Q.  Continue.

13  A.  We just set up two Internet connections through our

14  office, but did not come back to the Secret Service.

15  While he was on the computer we would monitor him.  His

16  computer was hooked up to a large-screen television so

17  that as he typed or did anything on the computer, we

18  would monitor it on that television.

19  Q.  The large-screen television, similar to what we see

20  in the back corner?

21  A.  Yes.

22  Q.  Large plasma screen?

23  A.  Yes.

24  Q.  So the computer is set up, two lines going out,

25  neither of which come back, monitoring with a large

1  screen.  What was the function of the large plasma

2  screen to this investigation?

3  A.  Well, we wanted to watch everything that he did.

4  You know, anything that he would do, whether it be

5  surfing on the Internet, chatting with people.  We

6  didn't want to have to stand over his shoulder and watch

7  it, we wanted to be able to sit and watch the screen and

8  see what was happening.

9  Q.  What steps did you use to document the chat sessions

10 that gollumfun would engage in?

11 A.  We used a program called Spector Pro.  It's

12 basically a program that could go on there and it will

13 record every keystroke, web site visited.  Activity on

14 the computer, basically, would be recorded.

15         In the Instant Messenger, the text -- the

16 chats, those text documents would automatically be

17 generated as you are chatting with someone on that

18 computer.

19 Q.  I want to make sure I understand because that's an

20 important point about the development or the generation

21 of chat transcripts.  Walk us through, again, how a

22 transcript, that is a written record of the chat

23 session --

24         MR. LIOTTI:  Objection counsel is testifying.

25         THE COURT:  He was, but he's not now.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 89 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 85 of 475   Page 89 of 262
SMITH - DIRECT                                          1-89

1           Mr. Eichelberger, you don't need to summarize

2    the testimony, then restate the question, just move to

3    the next question.

4    BY MR. EICHELBERGER:

5    Q.  Can you walk us through that process, with the

6    development of a chat transcript?

7    A.  Sure.  When he logs on there's different chat

8    clients that we were using.  AOL Instant Messenger -- we

9    call it AIM -- and ICQ.  Each one of those has a

10   different identity.

11          Before each session that he would come in, we

12   would start the computer up.  We would start Spector

13   Pro.  So as soon as we started him on the -- that day's

14   operation, everything would be recorded via those chat

15   logs.

16          Now, while he's chatting with people, every

17   keystroke he touches and whatever is coming in on those

18   chats is going to be automatically generated onto a text

19   document through that program.

20   Q.  Is that chat transcript that is generated require

21   any interaction or -- by Mr. -- by gollumfun?

22   A.  No.  No, it's automatically generated, so anything

23   that goes on there, or any chat that is occurring

24   between our end and the other end is automatically

25   generated.

1   Q.  Did you have any back-up systems in place to track

2   chat activity?

3   A.  Yes.  We also used Camtasia, which is a program that

4   basically records everything that is happening on the

5   computer screen.  You set it so that everything that is

6   on the screen, it's recording it as everything is

7   occurring, and then it saves it as a large file, like an

8   mpeg, or a file that people may e-mail to you with

9   little funny videos that people always send on e-mail.

10  Q.  Okay.  With respect to the chat transcripts, did

11  gollumfun and Mr. Johnson have the ability to change

12  what was generated by the computer?

13  A.  No.

14  Q.  How did that work?

15  A.  With Spector Pro you can install it, and they call

16  it stealth mode -- kind of a cute term -- where you have

17  to have a specific hot-key combination to access that

18  program, and once that program comes up you have to have

19  a password to get into that information.

20  Q.  What is a hot-key combination?

21  A.  Hot-key combination is a series of keys that you

22  have to press all together to -- for something to

23  happen.  In this case we would have three different keys

24  you had to press all at the same time so that that

25  program would come up.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 91 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 87 of 475   Page 91 of 262
SMITH - DIRECT                                              1-91

1   Q.  And is the hot-key combination so that you can

2   custom set for yourselves?

3   A.  Yes.

4   Q.  Was that hot-key combination known by Mr. Johnson?

5   A.  No.

6   Q.  Did Mr. Johnson know the password --

7             MR. LIOTTI:  Objection as to what Mr. Johnson

8   knew.

9             THE COURT:  Sustained.

10  BY MR. EICHELBERGER:

11  Q.  Had you told Mr. Johnson what the hot-key

12  combination was?

13  A.  No.

14  Q.  Had you told Mr. Johnson what the password was once

15  someone got past the hot-key combination?

16  A.  No.

17            MR. LIOTTI:  Objection to the form of the

18  question.

19            THE COURT:  Overruled.

20  BY MR. EICHELBERGER:

21  Q.  Now, with respect to chats that might be going on

22  between gollumfun and other persons, are these neatly

23  segregated chats, that they are going on one at a time?

24  A.  No.  The chats happen simultaneously with those chat

25  clients.  You can have multiple windows going at the

1  same time and it was not unusual for us to have 8 or 10

2  chats going at the same time.  So, we are constantly

3  switching between different chat clients, different

4  people trying to make sure we keep up with what everyone

5  is chatting about.

6  Q.  And the Camtasia file you referenced before, how

7  would that show these multiple chats?

8  A.  It's anarchy on the screen.  It's basically bringing

9  up a window, typing in a few lines to respond to them,

10  going to another window, type a response to them.  If

11  someone says, "Hey go check out a web site," and we

12  bring up our web browser to go check out a web site,

13  that is going to be thrown in there as well.

14          So it's really, as things progress, it's real

15  time, so things are kind of flying on and off the screen

16  as we go.

17  Q.  All right.  And similarly with then -- with respect

18  to chat transcripts, do they similarly show bringing up

19  web browsers and all the things that we're talking about

20  here?

21  A.  No.  No.  The chat -- the chat transcript will just

22  show what's sent and received in that specific chat.

23  Q.  All right.  Thank you.

24          Approximately how long did this investigation

25  go on where Mr. Johnson, acting as gollumfun, worked

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 93 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 89 of 475   Page 93 of 262
SMITH - DIRECT                                                          1-93

1   with the United States Secret Service?

2   A.  Approximately 11 months.

3   Q.  And what if anything happened that caused that to

4   come to an end?

5   A.  We got to a point in the operation where Brett

6   Johnson or gollumfun was very prominent on a couple of

7   boards that we were looking at.  He held prominent

8   positions on them, and we also were starting to arrest

9   people based on the information we gathered.

10          Well, we went out to arrest a person in

11  California and when agents knocked on that person's

12  door, the apartment had been cleaned out and to us it

13  appeared that someone had tipped him off.

14          Also, at that same time, we lost our

15  positions -- our prominent positions on the boards.

16  Just all of a sudden we were cut off and, you know, lost

17  that position.  So, we sat Brett down and asked him why

18  all of this was happening.  And he admitted to us that

19  he had shared operational secrets, targets of the

20  operation with a member of the press.

21  Q.  All right.  So as a result of that, Mr. Johnson,

22  gollumfun, was taken off work with the investigation?

23  A.  Right.

24  Q.  Did it come to your attention that Mr. Johnson had

25  at some point engaged in additional fraudulent activity

```
 1  while he was supposed to be working with you?

 2  A.  Yes.

 3          MR. LIOTTI:  Objection to the form of the

 4  question.

 5          THE COURT:  Sustained.

 6  BY MR. EICHELBERGER:

 7  Q.  Did Mr. Johnson engage in new crime?

 8  A.  Yes, he did.

 9  Q.  What happened?

10          MR. LIOTTI:  Objection to the form of the

11  question.

12          THE COURT:  Overruled.

13          If you have personal knowledge.

14          THE WITNESS:  Yes.

15  A.  We took Brett Johnson back into custody.  A couple

16  of agents took him down to Charleston and we went to the

17  apartment that we had been renting for Brett Johnson,

18  went through the apartment and found numerous

19  stored-value cards.  They are the -- they look like

20  credit cards -- they allow you to put money onto the

21  card, you know, like $500, and then slowly take that

22  money off through either purchases or ATM transactions.

23          We found a large amount of cash in his

24  apartment.  We also found FedEx/Kinko's cards which,

25  basically, they're a stored-value card where you go into
```

3:06-cr-01011-CMC    Doc. 26    Date Filed 05/02/08    Entry Number 145    Pg: 91 of 475    Page 95 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 91 of 475    Page 95 of 262
SMITH - DIRECT                                           1-95

1    the FedEx/Kinko's locations, you put that into a

2    computer -- if you put 20 bucks on there, you can use

3    that to buy time on their computers.

4    BY MR. EICHELBERGER:

5    Q.   So Mr. Johnson did unauthorized activity?

6    A.   Yes, he did.

7    Q.   Did the fact that Mr. Johnson engaged in any

8    unauthorized activity, based upon your knowledge of the

9    process of generating the transcripts, have any effect

10   on the words that were recorded by the computers during

11   the chat sessions?

12            MR. LIOTTI:  Objection.

13            THE COURT:  Overruled.

14   A.  No, it did not.

15   BY MR. EICHELBERGER:

16   Q.  Thank you.  In the course of working on this

17   investigation, working on a day-to-day basis with

18   Mr. Johnson, did you come to develop an understanding of

19   terminology that we are going to see on some of these

20   chat transcripts?

21   A.  Yes, I did.

22   Q.  What I would like to do is ask you about just some

23   kind of esoteric terminology that is used in connection

24   with these chat transactions and ask you to give a basic

25   definition of terminology that we are going to see.

 1  Okay?

 2          Let's start off with the term dumps.

 3  A.  Dumps are the information on the magnetic stripe of

 4  a credit card.  If, like, you ever looked at your credit

 5  card on the back of it, there's that black stripe,

 6  that's a magnetic stripe.  That's what allows you to

 7  slide through the point-of-sale terminal or your

 8  self-help gas stations.

 9          That information -- there's a lot of

10  identifiers and numbers on there that identify that

11  card, and it's magnetically encoded so that you can make

12  those purchases there.  Those -- the world we are

13  dealing with, those are referred to as dumps.

14  Q.  How about a COB?

15  A.  A COB is a change of billing.  A change of billing

16  will consist of a person's name, address, date of birth,

17  Social Security number, mother's maiden name.

18  Basically, the information you would provide to a credit

19  card company to open an account.

20          And a COB would include a line of credit.  And

21  with that COB you could notify that issuing bank or that

22  credit card company and purport to be that person and

23  change the billing address so that all correspondence

24  will now be sent to that new address.  You can order a

25  replacement card that will be sent to that new address.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Pg: 93 of 475   Page 97 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 93 of 475   Page 97 of 262
SMITH - DIRECT                                    1-97

1  Q.  All right.  How about a full info?

2  A.  Full info is basically -- excuse me -- a person's

3  name, date of birth, Social Security number, address.

4  Usually -- most of the same information as a change of

5  billing, but it usually doesn't have a line of credit.

6  You know, it won't have an account number with it.

7  Q.  Based on your experience and training, Agent Smith,

8  what kind of mischief can someone accomplish with dumps,

9  with COBs, with full infos?

10          MR. LIOTTI:  Objection.

11          THE COURT:  Overruled.

12  A.  With dumps people have the capability of re-encoding

13  the information that they've received, that dump, onto a

14  different card.

15          Some things that we call white plastic, which

16  could be a blank piece of plastic with that magnetic

17  stripe, if they had the right equipment, they can

18  re-encode that magnetic stripe to mimic that of the card

19  that it was originally on and use those cards to make

20  purchases.  Usually purchases would be made at self-help

21  centers, gas stations.

22          If someone has the capability, they'll create

23  counterfeit credit cards to mimic exactly what the

24  original card looked like and then encode the back with

25  the dump on that magnetic stripe, and use that card to

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 98 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 94 of 475   Page 98 of 262
SMITH - DIRECT                                    1-98

1    go into a store, a retail store, and make purchases

2    using that card.

3    BY MR. EICHELBERGER:

4    Q.  How about with the COBs?

5    A.  COB.  They would contact the credit card company or

6    issuing bank, purport to be the person on the account

7    and tell them that you want to change the billing, so

8    that now all correspondence is going to that new

9    address.

10          The reason people would do that is to either

11   get a replacement card or it kind of lengthens the life

12   of that -- that stolen account.  With the dump, you

13   know, if you do it at the right time, you are going to

14   have 30 days, one billing cycle, to make your purchases

15   before someone who looks at their statement may say,

16   "You know, there is something going on here."

17          If you have those statements going to another

18   address, people that aren't really paying attention,

19   "Hey, I didn't get my monthly statement," you know, they

20   may not notice it for maybe another month.  You kind of

21   extend the life of that account.

22   Q.  Well, then, how about full infos?

23   A.  Full info, because it's all the personal identifiers

24   of someone, you can apply for lines of credit, you can

25   use them for fraudulent tax returns.  It really -- you

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 99 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 95 of 475   Page 99 of 262
SMITH - DIRECT                                          1-99

```
 1  can do a various number of things with full information

 2  of a person.

 3           MR. EICHELBERGER:  Bear with me for just a

 4  second.

 5           Agent Smith, thank you for your testimony.

 6           THE WITNESS:  Uh-huh.

 7           MR. EICHELBERGER:  Mr. Liotti is going to have

 8  some questions for you.

 9           MR. LIOTTI:  Judge, where would you like me to

10  be?  Over here or over here?

11           THE COURT:  Either one.

12           MR. LIOTTI:  If it's all right with you, I will

13  be over here.  The microphone is a little bit higher.

14                     CROSS-EXAMINATION

15  BY MR. LIOTTI:

16  Q.  Agent Smith, good afternoon.

17  A.  How're you doing?

18  Q.  A couple of things.  Do I have it right that this

19  whole investigation involving Mr. Johnson lasted 11

20  months?

21  A.  Yes.

22  Q.  And when did it start?

23  A.  Started in May of 2005.

24  Q.  Now, Mr. Johnson is in custody right now, isn't he?

25  A.  Yes, he is.
```

1  Q.  And, in fact, he's right here in Columbia, isn't he?

2  A.  Yes.

3  Q.  And it's my understanding that the government does

4  not intend to call him as a witness in this case; is

5  that correct?

6  A.  Yes.

7  Q.  And the investigation began in '05, as I understood

8  your testimony, when the Secret Service did an interview

9  with Mr. Johnson; is that correct?

10 A.  Yes.

11 Q.  Were you present during that interview?

12 A.  Not for the first interview, no.

13 Q.  The information that you told us today came from

14 memoranda or other information that you gathered during

15 the course of your involvement in this case; is that

16 right?

17 A.  Yes.

18 Q.  Okay.  And at that time you learned that

19 Mr. Johnson's involvement in violating the law,

20 allegedly, had to do with him selling, or I should

21 say -- withdrawn -- indicating that he would give

22 cashier's checks for items transmitted by sellers over

23 the Internet, right?

24 A.  Yes.

25 Q.  Okay.  And this is, I think you told us, sort of an

1   eBay type thing where he would advertise on a web site

2   that he had cashier's checks and money available to buy

3   this product -- these products over the Internet,

4   correct?

5   A.  Not exactly.

6   Q.  Okay.  What did he do?

7   A.  He sent e-mails to the people selling those items

8   saying that he would like to purchase them and he asked

9   that they send the items cash on delivery.

10  Q.  I see.  So they were --

11  A.  And it would be a cashiers's check.

12  Q.  I interrupted you.  Did you finish what you were

13  saying?

14  A.  I just said that he would pay with a cashier's

15  check.

16  Q.  So they were advertising on eBay?

17  A.  Yes.

18  Q.  He looked at these products and said, "Gee, I like

19  this" or "I like that," and then he would contact them,

20  they would send the product to him, and at the same time

21  he would transmit a counterfeit cashier's check; is that

22  right?

23  A.  Yes.  He would hand it to the delivery person.

24  Q.  At that time when you were first investigating -- or

25  the Secret Service was first investigating that

1  situation --

2  A.  No, we were not.

3  Q.  You were not.  Were local authorities investigating

4  that?

5  A.  Yes.

6  Q.  Is that in Columbia, here in South Carolina?

7  A.  No, sir.

8  Q.  Where was that?

9  A.  Charleston, South Carolina.

10 Q.  All right.  So it was a state police or local

11 authorities that were conducting that investigation; is

12 that right?

13 A.  Charleston City Police Department.

14 Q.  All right.  And they contacted you to find out if

15 you knew the name -- when I say "you," I'm talking about

16 the Secret Service.

17 A.  Yes.

18 Q.  But they contacted the Secret Service and presumably

19 other law enforcement agencies to find out if Brett

20 Johnson was known to you?

21 A.  Yes.

22 Q.  And, again, "you," meaning other law enforcement

23 agencies, right?

24 A.  (Nods head in the affirmative).

25 Q.  And as a result of that, the Secret Service then did

1  a check of some kind on Brett Johnson?

2  A.  Yes.

3  Q.  Okay.  And during that preliminary check by the

4  Secret Service you found that he was known to the Secret

5  Service, correct?

6  A.  Yes.

7  Q.  Okay.  Are you familiar with how he was known at

8  that point?

9  A.  No.

10  Q.  Well, do you have any knowledge as to whether the

11  Secret Service knew of him at that juncture because of

12  any credit card activity?

13  A.  The Secret Service did not know of him based on

14  credit card activity.

15  Q.  Okay.

16  A.  Not that I know of.

17  Q.  And as far as you know of, at that particular point

18  in time when you were notified by local authorities --

19  Secret Service being notified, there was no indication

20  of illegal credit card activity on his part; is that

21  correct?

22  A.  Correct.

23  Q.  Okay.  But nonetheless you had some knowledge of

24  potential illegal activity on his part; is that correct?

25  A.  Yes.

```
 1   Q.   Okay.  And it might involve credit cards or it could

 2   involve a whole bunch of other things, right?

 3   A.   Yes.

 4   Q.   And when the agents interviewed Mr. Johnson in

 5   Charleston, they really didn't have any particular item

 6   or things that they were looking at; is that correct?

 7   A.   Just the counterfeit cashier's checks.

 8   Q.   Okay.  Now, at that time do you know -- and I'm

 9   talking about when the Secret Service conducted their

10   investigation, their interview of Mr. Johnson, that

11   first interview -- and you got this information from

12   data and memos and so forth that you have gathered,

13   right?

14   A.   Yes.

15   Q.   Okay -- did the name Jonathan Giannone surface at

16   that point?

17   A.   No.

18   Q.   So after that initial interview, did the Secret

19   Service continue its investigation of Mr. Johnson?

20   A.   No -- well, we used him -- that's when we made him a

21   confidential informant.

22   Q.   Okay.  But still your involvement at that point was

23   limited to cashier's checks and also eBay, correct?

24   A.   Correct.

25   Q.   And in that initial interview there was no
```

1  indication of credit card transactions by Mr. Johnson,

2  correct?

3  A.  Correct.

4  Q.  So now during this 11-month period -- which I think

5  you said began in May of '05?

6  A.  Yes, sir.

7  Q.  Okay.  May of '05 you're moving along with

8  Mr. Johnson, right?

9  A.  Yes.

10  Q.  And he's in custody during that whole period,

11  correct?

12  A.  No, sir.

13  Q.  Okay.  So, he was allowed to be out on bail by state

14  authorities; is that correct?

15  A.  Correct.

16  Q.  Did federal authorities have any agreement with

17  Mr. Johnson at that point?

18  A.  Just that we would testify when it came time for his

19  sentencing on those state charges.

20  Q.  Did you have any sort of a cooperation or plea

21  agreement with Mr. Johnson at that point?

22  A.  No.

23  Q.  Did you ever enter into a plea or cooperation

24  agreement with Mr. Johnson?

25  A.  Nothing written.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 106 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 102 of 475   Page 106 of 262
SMITH - CROSS                                                    1-106

1  Q.  Never?

2  A.  No.

3  Q.  So while Mr. Johnson was out on bail from the state

4  case, the federal government had no hold on him at all;

5  is that correct?

6  A.  That's correct.

7  Q.  And yet he was talking to you about his involvement

8  with the cashier's checks and eBay because he was hoping

9  not to be prosecuted by the federal government; isn't

10 that right?

11 A.  We never really addressed the topic.  We focused

12 more on the investigation and using him.

13 Q.  Well, by virtue of his cooperation with you, even

14 though it was informal and not subject to a written

15 agreement, that helped him to get bail, didn't it?

16 A.  Yes.

17 Q.  Okay.  So, the federal government went to the state

18 court in Charleston and said, "This gentleman is

19 cooperating with federal authorities and therefore he

20 should be granted bail," right?

21 A.  Yes.

22 Q.  "He's working with us"?

23 A.  Correct.

24 Q.  Okay.  So, now he's out on bail and presumably if he

25 helped you, you would help him on his state charges;

1  isn't that right?

2  A.  We would testify in his behalf.

3  Q.  Right.  You would have written letters, you would go

4  before the judge, you would talk to the state

5  prosecutor, and you would say, "This gentleman helped us

6  in connection with a federal investigation," right?

7  A.  Yes.

8  Q.  And this gentleman also was able to cause the arrest

9  and prosecution, maybe even the conviction of certain

10  individuals, right?

11  A.  Yes.

12  Q.  And all of that would inure to Mr. Johnson's

13  benefit; isn't that right?

14  A.  Yes.

15  Q.  Okay.  So, now, while he is out, the Secret Service

16  is talking to him during that time, right?

17  A.  Well, as soon as he was out of jail he came to work

18  for us --

19  Q.  Okay.

20  A.  -- in the online --

21  Q.  Was that in May of '05, sir?

22  A.  Yes.

23  Q.  Okay.  So now you had a particular assignment for

24  him that you testified about during Mr. Eichelberger's

25  direct examination of you, right?

1   A.  Yes.

2   Q.  Okay.  And you wanted him to go on the Internet and

3   do certain things; isn't that right?

4   A.  Yes.

5   Q.  And perform certain transactions which you told us

6   about, right?

7   A.  Yes.

8   Q.  And you were monitoring what you described as chats,

9   right?

10  A.  Yes.

11  Q.  And you had two lines coming into Mr. Johnson,

12  right?

13  A.  No, one line was for Mr. Johnson, one line was for

14  an agent.

15  Q.  Okay.  And an agent, to the best of your knowledge,

16  was always there monitoring those chats; is that

17  correct?

18  A.  There would be times that an agent might not be

19  there.

20  Q.  And when those chats were made, these are written

21  communications that are sent out over the Internet; is

22  that right?

23  A.  Yes.

24  Q.  You would print the chats; isn't that right?

25  A.  Some chats we would.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 109 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 105 of 475   Page 109 of 262
SMITH - CROSS                                           1-109

```
 1  Q.  And, again, when I say "you," I'm talking about the
 2  Secret Service.
 3  A.  Yes.
 4  Q.  Okay.  And were local authorities also involved in
 5  this process?
 6  A.  At times.
 7  Q.  Okay.  So somebody on the other end of the chat is
 8  typing something out, you call it a textual message, I
 9  think?
10  A.  Well, it's an instant message between us and another
11  party.
12  Q.  Okay.  But it can be printed out by a printer,
13  right?
14  A.  Yes.
15  Q.  Okay.  And then you collect that as a piece of paper
16  or what you call a hard copy, right?
17  A.  Right.
18  Q.  Okay.  The piece of paper becomes a hard copy and
19  that's the record of the chat communication?
20  A.  It's not what we would use as our record.
21  Q.  Now, you mentioned something called gollumfun.  Let
22  me just spell that, if I may, because I think that may
23  have been omitted before, so we have it for the record.
24          I have, Your Honor, G-o-l-l-u-m, as in Mary,
25  f-u-n, as in Norman; is that right?
```

1   A.  Yes.

2   Q.  What was gollumfun?

3   A.  It was a screen name.

4   Q.  And is that something that Mr. Johnson used?

5   A.  Yes.

6   Q.  Did Mr. Johnson use the name Pit Boss 2600?

7   A.  No.

8   Q.  Did he use the name CIA INTEL?

9   A.  No.

10  Q.  Now, you told us about something -- and, again, I'm

11  kind of a novice at this, if I misstate something,

12  please correct me.

13  A.  Okay.

14  Q.  You mentioned something called a dump, do you

15  remember that, d-u-m-p?

16  A.  I do remember that.

17  Q.  Okay.  Does the case against Mr. Giannone involve

18  cashier's checks?

19  A.  No.

20  Q.  Does the case against Mr. Giannone involve that

21  concept that you told us about, dumping?

22  A.  It involves dumps, yes.

23  Q.  Okay.  How does it involve that concept of dumping?

24  A.  When you are chatting with someone, they can cut and

25  paste text into that instant message.  In one of the

1  chats we had with Pit Boss 2600/CIA INTEL, within the

2  text of that chat the dump information was included in

3  it.

4  Q.  Now, you also mentioned -- that's one chat you said,

5  right?  One chat?

6  A.  Well, one chat we received -- we received dumps over

7  several chats.

8  Q.  So at some point, the Secret Service went to

9  Mr. Johnson and basically told him that instead of the

10 credit card stuff that he was doing, or in addition to

11 it, you wanted him to become involved in credit card

12 activities; is that right?

13 A.  We wanted him involved in any fraudulent scheme that

14 was out on these web sites.

15 Q.  Right.  And you were monitoring these chats and you

16 came with the idea, the Secret Service did, that you

17 wanted an investigation of credit card activity because

18 that, by the way, is what the Secret Service does,

19 right?

20 A.  Yes.

21 Q.  In addition to protecting the President of the

22 United States?

23 A.  Correct.

24 Q.  Right?  And those campaigning for the presidency of

25 the United States?

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Pg: 108 of 475    Page 112 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 108 of 475    Page 112 of 262
SMITH - CROSS                                                        1-112

1   A.  Right.

2   Q.  Okay.  You mentioned that.

3           Now, you also mentioned something called C-O-B,

4   as in boy.  Do you remember that?

5   A.  Yes.

6   Q.  Okay.  And I wrote that down.  I think that refers

7   to change of billing; am I right?

8   A.  You are right.

9   Q.  Okay.  Is there a change of billing part of this

10  case, the case against Jonathan Giannone?

11  A.  No, sir.

12  Q.  Okay.  Now, you also mentioned something called

13  COD.  Do I have that right?

14  A.  No, sir.

15  Q.  No?  Just COB?

16  A.  Just COB.

17  Q.  Okay.  I'm sorry.  All right.  In any event,

18  somewhere along the line, while Mr. Johnson was working

19  with you and expecting to get the benefit of what he

20  could do as a result of working with the Secret Service,

21  he becomes sort of an entrepreneur, doesn't he?  Goes

22  out on his own and does things on his own without your

23  knowledge; isn't that right?

24  A.  Yes.

25  Q.  Okay.  So, he was violating his bail conditions,

1  correct?

2  A.  Correct.

3  Q.  He was violating his agreement with you; isn't that

4  right?

5  A.  That's right.

6  Q.  He's violating his agreement with state authorities

7  to not be involved in additional crimes, correct?

8  A.  Correct.

9  Q.  And he is, in fact, committing additional crimes, at

10 least according to the Secret Service, right?

11 A.  Yes.

12 Q.  When did you learn that Mr. Johnson was out there on

13 his own doing that?

14 A.  It was March 30th when we confronted him on our

15 operation.  We noted some things going funny on the

16 operation.

17 Q.  March 30th of '06?

18 A.  Yes, sir.

19 Q.  All right.  So, that's almost a year, 10 months

20 roughly, from the time when you first started working

21 with Mr. Johnson; is that right?

22 A.  Yes.

23 Q.  Thank you.  Agent, in looking back on that now and

24 based on the information that you have, when did

25 Mr. Johnson go off on this tangent and start getting

```
1   involved in this other criminal activity?

2   A.  I can't remember exactly, but I know it was the

3   beginning of '06 that he started doing these things.

4   Q.  Okay.  And then it became at least another two or

5   three months before the Secret Service learned of that;

6   is that right?

7   A.  Yes.

8   Q.  And that was notwithstanding the fact that on all of

9   the activities that he was doing for your agency, you

10  had an agent there with him as he was communicating over

11  the Internet, doing whatever he did from May of '05

12  onward; isn't that right?

13  A.  Yes.

14  Q.  So he must have had another computer, another wire,

15  something out there that you guys weren't watching and

16  supervising wherein he was making those communications

17  and committing those crimes; isn't that right?

18  A.  Yes.

19  Q.  As a result of that, Mr. Johnson was charged, wasn't

20  he, with additional criminal activity?

21  A.  Yes.

22  Q.  And that relates to wire fraud and identity theft;

23  isn't that so?

24  A.  Yes.

25  Q.  Some of the same charges that Mr. Giannone has
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 115 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 111 of 475   Page 115 of 262
SMITH - CROSS                                                    1-115

1   against him here; isn't that right?

2   A.  That's right.

3   Q.  When did the Secret Service first learn that

4   Mr. Johnson was involved in credit card fraud and

5   identity theft?  Is that the two-month or three-month

6   period that you were talking about, sir?

7   A.  He wasn't involved in credit card fraud.

8   Q.  What was he involved in?

9   A.  Wire fraud and identity theft.

10  Q.  Now, by wire fraud you mean that with some

11  knowledge, some criminal intent, Mr. Johnson was

12  communicating over the Internet and saying things over

13  the Internet that were not true?  In fact, they were

14  fraudulent; isn't that right?

15  A.  Well, what we charged him with, he didn't chat with

16  other people about.

17  Q.  What did you charge him with?

18  A.  With wire fraud.

19  Q.  And what's the substance of the charge against

20  Mr. Johnson?

21  A.  Filing fraudulent tax returns via the Internet.

22  Q.  Filing fraudulent tax returns over the Internet.

23  Now, am I right -- and I don't mean this as a frivolous

24  question.  I don't mean to sound impertinent, please.

25  And I say it very respectfully, but aren't we right --

1  so we have a full record here -- that tax returns have

2  to be sworn to when you sign them?

3          Don't you have to say this is a true

4  statement -- maybe not sworn to, maybe that's a bad

5  phrase -- don't you have to say on a tax return this is

6  a true and accurate tax return, as far as you know?

7  A.  Yeah.

8  Q.  Okay.  So, he was filing tax returns for himself?

9  A.  No.  He was using other people's information.

10 Q.  And was he trying to get tax refunds?

11 A.  Yes.

12 Q.  He was trying to get their refunds?

13 A.  Yes, he was.

14 Q.  By filing their tax returns for them over the

15 Internet?

16 A.  Yes.

17 Q.  Which you can do at the IRS, right?

18 A.  Yes.

19 Q.  Okay.  So that was one thing that you learned about,

20 and you charged him with that; is that correct?

21 A.  That's correct.

22 Q.  And when you learned about that did you then say,

23 "Okay.  Mr. Johnson, all bets are off.  That's it, no

24 more cooperation"?  Did you do that?

25 A.  Yes.

```
 1   Q.  So at this juncture he is not a cooperator anymore.
 2   You don't want him as a cooperator, right?
 3   A.  No.  He's the subject of an investigation.
 4   Q.  And I use these fancy words, cooperator;
 5   Mr. Eichelberger used another fancy term, informant,
 6   right?  He was both of those things, right?
 7   A.  Yes.
 8   Q.  In the vernacular, in the street sense, just so we
 9   all understand what Mr. Johnson was, he is, in common
10   parlance, what we would refer to as a rat or a snitch;
11   isn't that right?
12   A.  Sure, if you want to call him that.
13   Q.  Okay.  But you know, and it's no disrespect to you,
14   but that's how we refer to some of these witnesses;
15   isn't that right?
16   A.  Yes.
17   Q.  Okay.  So, in addition to doing all of those illegal
18   things with cashier's checks and now IRS returns -- tax
19   returns, taking people's money and their tax refunds,
20   he's also violated his agreement, even as a snitch,
21   where he told you and told state authorities, "You know
22   what, I'm going to go out there and make cases against
23   people so I can get a break on my case, right?
24   A.  Yes.
25   Q.  And again, with all due respect to you, the federal
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 118 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 114 of 475   Page 118 of 262
SMITH - CROSS                                                    1-118

1   government often is in the position, as they were in

2   this case, to some extent rely on the reliability of an

3   informant, correct?

4   A.  Yes, if you want to get with the bad guys, you've

5   got to get with them.

6   Q.  Okay.  So that means, then, that you were very

7   upset -- the Secret Service was very upset when you

8   learned that he had betrayed the trust and confidence

9   that you had in him concerning what he was doing, right?

10  A.  Yes.

11  Q.  Because it could jeopardize an entire investigation;

12  isn't that so?

13  A.  That's correct.

14  Q.  And it really depends on what other witnesses you

15  have, what other evidence you have.  But you, as an

16  agent in looking at that case, now have to discount the

17  value of any potential testimony that Mr. Johnson might

18  offer, right?

19          MR. EICHELBERGER:  Objection, calls for

20  speculation.

21          THE COURT:  Overruled.

22  BY MR. LIOTTI:

23  Q.  Isn't that right?  You have to discount the value of

24  his testimony or potential testimony; isn't that right?

25          THE COURT:  You can answer, did you discount?

```
1          THE WITNESS:  I guess I would discount it.

2   He's a liar.  I mean, that's it.

3   BY MR. LIOTTI:

4   Q.  Thank you for your candor.

5   A.  Yes.

6   Q.  I don't think there is any secret about that?

7   A.  No.

8   Q.  You have to evaluate the case, and here is a guy who

9   you -- you believe committed these crimes and has lied

10  to you.  I mean, there is no doubt this guy was working

11  on the Internet at your behest -- Secret Service's

12  behest to try and gather information about potential

13  crimes out there, right?

14  A.  Right.

15  Q.  Now, when you went to him, did you say to

16  Mr. Johnson, "Look, this is the nature and scope of a

17  potential investigation.  These are the guys that we are

18  targeting, we want to get information about these

19  individuals"?  Did that happen?

20  A.  We didn't give him specific names.  We wanted him to

21  target specific web sites.

22  Q.  So, basically, he was just on sort of a search and

23  destroy mission.  He was out there on the Internet

24  trying to find people that he could essentially rat out,

25  to make cases against, and then give that information
```

1   over to you, right?

2   A.  He wouldn't give it over to us, we were there when

3   he was doing it.

4   Q.  Okay.  Except when he was doing his thing on the

5   side with the IRS, if he had somebody that he was

6   involved with there, you didn't know about that?

7   A.  No.  We weren't with him when he went home.

8   Q.  He withheld that information from you, didn't he?

9   A.  Yes.

10  Q.  So, for example, if he was getting copies of tax

11  returns, just let's say, hypothetically, from an

12  accountant, okay, and maybe an accountant was on -- in

13  it with him.  You didn't have the accountant's name,

14  right, or anyone else's name about that particular

15  criminal activity, right?

16  A.  Hypothetically, no we didn't have anyone else's

17  name.

18  Q.  Well, let's go back to the cashiers's check.  He

19  made up cashier's checks, presumably printed checks,

20  right?

21  A.  Yes.

22  Q.  Issued by some bank, maybe a phony bank, right?

23  Phony routing numbers on the bottom of the checks,

24  perhaps, but they looked like cashier's checks, right?

25  A.  Yes.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 121 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 117 of 475   Page 121 of 262
SMITH - CROSS                                          1-121

1   Q.  Now, Johnson, as far as you know, wasn't a printer,

2   so he was getting those cashier's checks from someplace,

3   right?

4   A.  I know that he did print some of those out and he

5   also received some.

6   Q.  He got some from some other source?

7   A.  Correct.

8   Q.  Okay.  Do you know that source?

9   A.  We know the screen name, but we don't know the

10  person associated with that screen name.

11  Q.  So if he used a printer, for example, you don't know

12  that?

13  A.  Yes, we do.

14  Q.  Okay.  Did he have a bank name on it?

15  A.  Yes.

16  Q.  Was it a legitimate bank?

17  A.  Yes.

18  Q.  Did he have full federal reserve numbers on the

19  bottom of those checks?

20  A.  I believe he had the right numbers.

21  Q.  You think you got everything that Mr. Johnson was

22  involved in on the cashier's checks, or do you think

23  he's still holding back information from you, or has?

24  A.  I think he probably held back information.

25  Q.  I'm sorry?

1  A.  I think he held back information.

2  Q.  Okay.  So, now, that's another problem with

3  Mr. Johnson, right?  Because in order to cooperate or to

4  be a good snitch, you have to be truthful, and that

5  means not just responding to questions that agents may

6  ask and not only doing their bidding and acting in

7  accordance with their supervision, but you are supposed

8  to be forthcoming with everything you know; isn't that

9  right?

10  A.  Yes.

11  Q.  And if you are -- if you committed a crime, such as

12  selling or giving phony cashier's checks, right, if you

13  have done that, the first order of business when the

14  agents sit down with a cooperator is for that individual

15  who would be cooperating to say, "I did it and this is

16  what I've done," right?

17  A.  Right.

18  Q.  But you allowed him to cooperate without knowing the

19  full picture; isn't that right?

20  A.  No.  In regards to those counterfeit cashier's

21  checks, we asked him all the questions, but I do believe

22  that he was probably into other things as well.

23  Q.  Well, let me ask you this:  Does it ever happen that

24  before you decide to have somebody cooperate, you have

25  them submit to a polygraph examination --

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 123 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 119 of 475    Page 123 of 262
SMITH - CROSS                                              1-123

1           MR. EICHELBERGER:  Objection, Your Honor.

2           THE COURT:  Sustained.

3           MR. LIOTTI:  I'm not offering a polygraph.  I'm

4    just asking about the process, Judge.

5           MR. EICHELBERGER:  Objection --

6           THE COURT:  Sustained.

7    BY MR. LIOTTI:

8    Q.  Well, in deciding to have somebody cooperate, there

9    are some agents present, right?

10   A.  Yes.

11   Q.  And typically there are Assistant U.S. Attorneys

12   present, correct?

13   A.  Sometimes.

14   Q.  And you listen to what the would-be cooperator has

15   to say, and then with all of your experience, in your

16   case seven years with the Secret Service, you evaluate

17   the credibility of that would-be witness; isn't that

18   right?

19   A.  Yes.

20   Q.  And you decide, you have to make a judgment, "Is

21   this somebody we can trust," right?

22   A.  Right.

23   Q.  "Is this somebody that we can trust to come into a

24   courtroom or before a grand jury under oath, on a stack

25   of Bibles, and say, 'I'm telling you the truth, ladies

1   and gentlemen of the jury.  This is the truth.  This is

2   what I did.'"  That's what you have to satisfy yourself

3   about, right?

4   A.  Right.

5   Q.  Is this person going to be a good witness or a bad

6   witness, right?

7   A.  Right.

8   Q.  Can he look the jurors in the eyes and tell them a

9   true story, right?

10  A.  Right.

11  Q.  This guy couldn't do that, right?

12  A.  I wouldn't like him to.

13  Q.  Right.  Because he's a liar and he's a snitch and he

14  can't be trusted at all, right?

15  A.  Right.

16          MR. LIOTTI:  Excuse me one second, Your Honor,

17  please.  Judge, I just need one minute.  I'm sorry.

18          THE COURT:  Yes.

19          MR. LIOTTI:  Could I have this marked for

20  identification, Your Honor, please?

21          THE COURT:  Yes.

22          MR. LIOTTI:  Thank you.

23          MR. EICHELBERGER:  Subject to relevance.

24          THE COURT:  Ask Ms. Willis to put an exhibit

25  sticker on it, Mr. Liotti.

1              MR. LIOTTI:  We will do it letters or numbers?

2              THE COURT:  Numbers.  Defendant's 1 for

3    identification.

4    BY MR. LIOTTI:

5    Q.  Now, is it your testimony that at some point

6    Mr. Johnson had certain communications with somebody who

7    had a screen name of Pit Boss 2600?

8    A.  Yes.

9    Q.  And when did that occur?

10   A.  I believe we started chatting with him towards the

11   end of May of '05 through, you know, June, and continued

12   on through '05.

13   Q.  And how did the Secret Service or Mr. Johnson, if

14   you know, learn of that name, Pit Boss 2600?

15   A.  As we were sitting at the computer we were chatting

16   with people and a message popped up asking us to accept

17   a message from Pit Boss 2600.

18   Q.  And what about CIA INTEL?

19   A.  Just after Pit Boss popped up, it was an AIM message

20   saying, "Would you like to communicate with Pit Boss

21   2600?"  We said, no, and then almost 30 seconds or so

22   after that, CIA INTEL popped up on the other chat

23   client, ICQ, with a message.

24   Q.  Now, I understand that as part of your proof in this

25   case that at some point you believe you learned that Pit

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 126 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 122 of 475    Page 126 of 262
SMITH - CROSS                                                          1-126

1   Boss 2600 and CIA INTEL is, in fact, Jonathan Giannone,

2   right?

3   A.  Yes.

4   Q.  Okay.  But at that time, whenever you started seeing

5   that name Pit Boss 2600, and the other one, CIA INTEL,

6   there was no name associated with that at that point,

7   right?

8   A.  Right.

9   Q.  Okay.  When, for the first time, do you believe that

10  Jonathan Giannone's name appeared?

11  A.  Probably June 7th of '05, somewhere around that

12  date.  It was after that we put money in his account.

13  Q.  I'm not going to hold you to that exact date.

14  A.  Okay.

15  Q.  But you used the word "probably," so the lawyers in

16  this room, and hopefully the jurors, are wondering about

17  what you mean by probably.  Are you not sure of that?

18  A.  The exact date?  I know we put money into his

19  account on June 6th and I'm pretty sure I called Bank of

20  America the next day, June 7th, to obtain information on

21  that account.

22  Q.  All right.  Now, let's talk about that.  Again,

23  there were communications between Mr. Johnson and Pit

24  Boss 2600 and CIA INTEL, right?

25  A.  Yes.

```
 1   Q.  And you were telling Mr. Johnson at some point to

 2   transmit money to a bank; isn't that right?

 3   A.  No.

 4   Q.  Okay.  Was money -- I'm sorry.  Was money

 5   transmitted?

 6   A.  In what way?

 7   Q.  Well, you just mentioned a moment ago money was

 8   transferred.

 9   A.  We deposited money into an account.

10   Q.  Okay.  That's what I'm asking.

11   A.  Yes.

12   Q.  And that was done on or about June 7th, right?

13   A.  Yes, I believe it was June 6th.

14   Q.  Okay.  Again, I'm not holding you to the exact

15   date --

16   A.  I'm sure you will.

17   Q.  -- that's why I'm saying on or about.  So if it's

18   the 5th or the 9th or whatever, it is what it is.

19   Okay?

20           So you deposited money into an account.  Where?

21   A.  Bank of America on Harbison Boulevard.

22   Q.  And where is that?

23   A.  On the -- you take 26 west here in Columbia.  It's

24   down by the mall.

25   Q.  Okay.  I just wanted to get Columbia.
```

```
 1  A.   Yes.

 2  Q.   So Bank of America.  And how much was put in there?

 3  A.   $600.

 4  Q.   And was that in Mr. Johnson's account or was it some

 5  other account?

 6  A.   No, it was in the A&W Auto Clinic bank account.

 7  Q.   Okay.  So it was in an agent's bank account?

 8  A.   I'm sorry?

 9  Q.   Was it an agent's bank account?

10  A.   No.

11  Q.   Okay.  Tell me again whose bank account that was?

12  A.   A&W Auto Clinic is the name of the account with Bank

13  of America.

14  Q.   Oh, okay.  I got it.  A&W Auto, right?

15  A.   Yes, sir.

16  Q.   Okay.  And how did you come to get that name, A&W

17  Auto?

18  A.   It was sent to us in the chat.

19  Q.   Okay.  From whom?

20  A.   Pit Boss 2600 and CIA INTEL.

21  Q.   And did you come to learn what A&W Auto was?

22  A.   Yes.

23  Q.   Or is -- at that time.  What did you believe it was?

24  A.   It appeared to be a car dealership.

25  Q.   Okay.  And do you know where it was located?
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 129 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 125 of 475   Page 129 of 262
SMITH - CROSS                                                    1-129

 1  A.  Yes.

 2  Q.  Where?

 3  A.  Holyoke, Massachusetts.

 4  Q.  Do you know if it was incorporated in Holyoke,

 5  Massachusetts?

 6  A.  I do not know.

 7  Q.  Did you ever check to see if it was an actual

 8  entity, a legal entity?

 9  A.  Yes.

10  Q.  Okay.  And what did you find?

11  A.  I found no record in the State of -- Commonwealth

12  database.

13  Q.  Did you check the state capital?

14  A.  No, just on the web site.  You go to the Secretary

15  of Commonwealth for Massachusetts.

16  Q.  So $600 went into a bank account under A&W Auto and

17  what happens thereafter?

18  A.  We go back and get online and notify Pit Boss 2600

19  that -- or CIA INTEL that $600 is in the account.

20  Q.  Presumably, you believe, at that point for the

21  purchase of an automobile; is that right?

22  A.  No.

23  Q.  Well, you said A&W Auto was an auto dealership.

24  A.  Correct.  But during the text of the chat we

25  received the 21 dumps and that was payment for those

3:06-cr-01011-CMC  Doc: 26  Date Filed 05/02/08  Entry Number 145  Page 130 of 262
USCA4 Appeal: 25-6132  Doc: 26  Filed: 09/19/2025  Pg: 126 of 475  Page 130 of 262
SMITH - CROSS                                                1-130

1  dumps.

2  Q.  All right.  Let's take a look at that now.  Now, you

3  are talking about dumps.  So this goes back to what you

4  were testifying about on your direct examination, right?

5  A.  (Nods head in the affirmative).

6  Q.  Now, the dumps in this case you believe amounted to

7  credit card numbers; isn't that correct?

8  A.  That's correct.

9  Q.  Did they amount to anything else?

10  A.  Well, they could be debit cards.  Credit cards slash

11  ATM -- or debit cards.

12  Q.  Well, you speak very fast and sometimes I have to

13  listen more closely to you as a witness than I would --

14  A.  I will try to slow down.

15  Q.  But you say it could be, again, my lawyer ears are

16  kind of going up when you say "could be" or "probably"

17  and I have to ask the question.

18  A.  Uh-huh.

19  Q.  What was the information transmitted in those

20  dumps?  Was it just credit card numbers?

21  A.  Well, I mean, to be technical it was the track-two

22  data from either a credit card or debit card.

23  Q.  It was track-two data?

24  A.  Yes, on a magnetic stripe those -- all those numbers

25  and identifiers are called track information and that's

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 131 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 127 of 475    Page 131 of 262
SMITH - CROSS                                    1-131

1   what was sent to us in the text of the chat.

2   Q.  Okay.  So you are saying there was some track-two

3   data on the magnetic tape and credit card numbers,

4   right?

5   A.  On the magnetic stripe on the back of a card

6   (indicating).

7   Q.  Right.  Careful now, we may have to mark your card

8   as an exhibit.

9   A.  Please don't.  On a credit card there's a magnetic

10  stripe on the back, and on that stripe is information

11  that is magnetically encoded on there, and that's what

12  allows you to use it at terminals.

13  Q.  I see.

14  A.  And that information is text, you know, it's letters

15  and numbers, things like that.  And you are able,

16  through certain devices, to find out what that text is

17  and then with that text you can include it into a chat

18  or a file or whatever you like.

19  Q.  Is that like a pin number?

20  A.  No, sir.  No, it is the account number, and then

21  there's also other numbers included in that that they

22  call an algorithm that are in that track.

23  Q.  Right.  And that's what gives you the authorization,

24  correct --

25  A.  Yes.

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 132 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 128 of 475    Page 132 of 262
SMITH - CROSS                                          1-132

```
 1  Q.  -- to use the card?

 2  A.  That's what -- when you swipe through a machine,

 3  that's what it reads.

 4  Q.  All right.  So what you are saying though is, if I

 5  understand you right, on the 21 dumps, what information

 6  was transmitted were 21 numbers which included the

 7  track-two information; is that correct?

 8  A.  Yes.

 9  Q.  Okay.  But there was no other information, such as

10  credit card holders' names or Social Security numbers or

11  anything of that sort?

12  A.  Correct.

13  Q.  And no dates of birth?

14  A.  Correct.

15  Q.  Am I right?  All right.  So, now that information,

16  you say, is transmitted to Brett Johnson; is that right?

17  A.  Yes.

18  Q.  Over the Internet in return for the $600 which you

19  say was deposited into a Bank of America account; is

20  that correct?

21  A.  That's correct.

22  Q.  Okay.  And again, the 21 numbers are coming from

23  this individual or individuals who identify themselves

24  as Pit Boss 2600/CIA INTEL and you are saying that's

25  Jonathan Giannone?
```

```
 1   A.  Yes, sir.

 2   Q.  Correct?

 3   A.  (Nods head in the affirmative.)

 4   Q.  I got it then, right?

 5   A.  Yes, that's good.

 6   Q.  Okay.  All right.  So what happens with

 7   Mr. Johnson?  Now you've got the 21 numbers, what if

 8   anything is done with the 21 numbers?

 9   A.  We record them and we write them down.  I contacted

10   Bank of America to let them know that we had them.

11   Q.  Okay.  And do I have it right at that point

12   Mr. Johnson is not permitted to use those 21 numbers,

13   right?

14   A.  Right.

15   Q.  And you don't charge anything on those cards, right?

16   A.  Right.

17   Q.  So no one uses those cards, right?

18   A.  Right.

19   Q.  Okay.

20   A.  Hopefully.

21   Q.  So, as far as those 21 cards are concerned, there is

22   no, if I may use the term, actual loss with respect to

23   those credit card holders; is that correct?

24           MR. EICHELBERGER:  Objection, relevance.

25           THE COURT:  Overruled.
```

1   A.  At that time we didn't know of any loss associated

2   with them.

3   BY MR. LIOTTI:

4   Q.  Okay.  And since that time, with respect to those 21

5   cards, you have not learned of any actual losses; isn't

6   that so?

7   A.  No, there are actual losses associated with some

8   cards.

9   Q.  Among those 21?

10  A.  Yes, sir.

11  Q.  Okay.  So somebody may have been using those cards

12  improperly prior to the numbers being transmitted to

13  Mr. Johnson?

14  A.  No.

15  Q.  Those numbers were used improperly after the

16  information went to Mr. Johnson?

17  A.  Yes.

18  Q.  And do you have any way of knowing who that person

19  or persons are?

20  A.  No.

21  Q.  And do you have any way of knowing how much money

22  was actually taken as a result of those transactions?

23  A.  Yes.

24  Q.  How much?

25  A.  I don't know exactly.

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 135 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 131 of 475    Page 135 of 262
SMITH - CROSS                                                   1-135

1  Q.  Does $12,000 ring a bell with you?

2  A.  It's approximately 12,000.

3  Q.  Approximately 12,000?

4  A.  Yes.

5  Q.  But as you sit here now, you cannot say that

6  Jonathan Giannone -- you may believe whatever you

7  want -- but based on the evidence you cannot say that

8  Jonathan Giannone is responsible for that actual loss,

9  if you will?

10  A.  No, never made that claim.

11  Q.  Thank you, sir.

12          Okay, now --

13          MR. LIOTTI:  Judge, I don't want to delay the

14  testimony but this may be a -- I know it's about seven

15  minutes early, this may be a good time to break, if Your

16  Honor would allow that.

17          THE COURT:  That's fine.

18          MR. LIOTTI:  Thank you, Judge.

19          THE COURT:  All right.  Ladies and gentlemen,

20  we will break now for lunch.  We'll start back at 2:15.

21  Please take your pads and leave them in the jury room

22  during lunch.  Do not discuss the case with anyone or

23  allow anyone to discuss it with you.  And get the jury

24  tags before you go to lunch, they should be on the table

25  in there.

```
 1              (Jury not present)

 2              THE COURT:  All right.  You may not discuss

 3   your testimony with anyone while you are at lunch.

 4              THE WITNESS:  Okay.

 5              THE COURT:  Don't talk about this case.

 6              And I will advise him not to talk about the

 7   case while he's at lunch.  Okay, 2:15.

 8              MR. EICHELBERGER:  Thank you, Your Honor.

 9              (Lunch recess)

10              THE COURT:  All right.  Does either side have

11   anything before we bring the jury back?

12              MR. EICHELBERGER:  Nothing from the government,

13   Your Honor.  Thank you.

14              MR. LIOTTI:  Nothing, Judge.  Thank you.

15              THE COURT:  All right.  You may come back up.

16              And you may bring the jury in.

17              (Jury present)

18              THE COURT:  Good afternoon, everyone.  We are

19   ready to get underway with the continuation of the

20   cross-examination of Agent Smith.

21              MR. LIOTTI:  Thank you, Judge.

22   BY MR. LIOTTI:

23   Q.  If I may, Agent, just a few more questions and then

24   we will be done.

25              At some point during that 11-month period that
```

1    you told us about, was there a time when you learned

2    that Mr. Johnson was preparing to jump bail?

3    A.    No.

4    Q.    Was there a time that you learned that he was

5    preparing to travel outside of the jurisdiction?

6    A.    No.

7    Q.    Or even outside of the continental United States?

8    A.    Well, when we started our investigation on him, you

9    know, we -- he had often talked about going to Brazil.

10   Q.    Now, Agent, there was a point in time when you had

11   collected some, I will say, 75 DVD-type disks with

12   information on it, correct?

13   A.    Yes.

14   Q.    Okay.  Could I show you what has been marked as

15   Defense Exhibit 1 for identification and ask you if you

16   can identify this document?

17           MR. LIOTTI:  Can I just walk up, Judge?

18           THE COURT:  Yes.

19           MR. LIOTTI:  Thank you (handing).

20   BY MR. LIOTTI:

21   Q.    Can you identify that?

22   A.    It's a screen shot of an MSN Hotmail e-mail account.

23   Q.    And who is it by?

24   A.    BrettTheVetMan@hotmail.com, is the account name.

25   Q.    Do you recognize that as a communication sent or

1   received by Brett Johnson?

2   A.  Yes.  I mean, this was an e-mail account that he

3   used.

4   Q.  Okay.  And does he make reference in that

5   communication to --

6           MR. EICHELBERGER:  Objection, hearsay.

7           THE COURT:  Sustained.

8   BY MR. LIOTTI:

9   Q.  Did you obtain a copy of that during the course of

10  your investigation?

11  A.  If it came from those CDs, then that was obtained

12  during our operation.

13  Q.  Okay.  And that is a business record that you have

14  maintained during the course of this investigation?

15  A.  Well, those CDs are generated from Camtasia and

16  Spector Pro and we maintained those throughout the

17  investigation.

18  Q.  And it would be your responsibility to maintain that

19  business record as part of the investigation?

20  A.  Yes.

21          MR. EICHELBERGER:  Objection, characterization

22  as a business record.

23          THE COURT:  Well, are you referring, Agent

24  Smith -- are you saying that this document that

25  Mr. Liotti has offered you -- or has handed to you is

1   something that was recorded from one of the Secret

2   Service computers?

3            THE WITNESS:  Yes.  As Brett Johnson would be

4   on that computer, it would be four to six, seven, eight

5   hours a day.  We had Camtasia, which is the recording

6   software, going, and everything that happens on that

7   screen is recorded.

8            And at the end of the day or at the end of the

9   week we would take each of those days and record the

10  Camtasia file and, as well as the Spector Pro data, and

11  put it onto a CD or a DVD and then put that into

12  evidence.

13           THE COURT:  All right.  I just wasn't sure

14  whether this was something they found on his home

15  computer when they searched his apartment in Charleston

16  or whether this was something that came off of the

17  Secret Service computers.

18           You may proceed.

19           MR. LIOTTI:  I would offer it as an exception

20  to the hearsay rule.

21           THE COURT:  All right.

22           Mr. Eichelberger?

23           MR. EICHELBERGER:  Your Honor, it's hearsay

24  within hearsay.  If I could take a look at it for a

25  second.  I had just a brief moment to look at it.

1              THE COURT:  All right.

2              MR. EICHELBERGER:  Sidebar, if we could?

3              THE COURT:  All right.

4              (Bench conference)

5              MR. EICHELBERGER:  It's a little bit of a

6    complicated issue.  First off, I'm not sure which -- is

7    the testimony that this info at fedmedical.com; is that

8    Johnson's e-mail?

9              MR. LIOTTI:  Apparently it is.  That's what I

10   have been advised.

11             MR. EICHELBERGER:  By?

12             THE COURT:  Well --

13             MR. EICHELBERGER:  I'm clear what it is, plus

14   it's already been -- it's already been annotated,

15   emphasis drawn to something.  It's speculative.  It's

16   speculative as to what is going on.

17             THE COURT:  Okay.  So, is this showing that it

18   was the Hotmail account of Brett Johnson?  That's what

19   the agent was saying, right?

20             MR. LIOTTI:  Yes, I believe so.

21             THE COURT:  Okay.  So this would be an e-mail

22   he's received?

23             MR. LIOTTI:  There's no testimony --

24             MR. EICHELBERGER:  Whether that's spam or

25   unsolicited, it really gets into all kinds of

 1  speculation.  It could be unsolicited.

 2          THE COURT:  Well, what I'm saying is, I think

 3  you were offering it, Mr. Liotti, to show that -- well,

 4  I'm not really sure why you were offering it, but this

 5  is e-mail which looks like spam to him.

 6          MR. LIOTTI:  Right.

 7          THE COURT:  So what would be the relevance?

 8          MR. LIOTTI:  Well, there are some other

 9  Hotmails that we have, and which we received from

10  Mr. Eichelberger, which refer to the fact that he was

11  cooperating with the Secret Service.

12          And apparently he communicated this to people

13  who are not involved in the investigation at all.

14          THE COURT:  Right.

15          MR. LIOTTI:  And this is part of an ongoing

16  dialogue that he was having with someone about traveling

17  outside the country, in this case to Britain.

18          MR. EICHELBERGER:  That's speculation as to

19  whether he was having a conversation at all.  That could

20  well give this spam e-mail -- we're running into 403

21  issues --

22          THE COURT:  This particular document is not

23  admissible other than just to show that this was his

24  Hotmail address but --

25          MR. LIOTTI:  Just one second.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 142 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 138 of 475

SMITH - CROSS                                          1-142

1              Could we offer it, Judge, to show that that is

2     his e-mail account, just for that limited purpose?

3              MR. EICHELBERGER:  It's been acknowledged by

4     the witness that that's his e-mail account.

5              THE COURT:  The problem is you just have to cut

6     it off right here.  This bottom part is not going in

7     because it has no relevance.

8              MR. LIOTTI:  Okay.

9              THE COURT:  If you want to offer it -- just cut

10    it.

11             MR. LIOTTI:  We can do that.

12             THE COURT:  Okay.

13             MR. LIOTTI:  As redacted, I can hold it and --

14             THE COURT:  She can cut it with some scissors.

15             MR. LIOTTI:  Thank you.

16             (In open court)

17             THE COURT:  She's got to step outside for just

18    a moment.

19             Ladies and gentlemen of the jury, what I'm

20    doing is, I'm admitting this document, which is a page

21    of someone's e-mail inbox, and I'm admitting the top

22    half of it to show that -- what e-mail address

23    Mr. Johnson was using on Hotmail, but I'm not admitting

24    the inbox information.  I have found that that is not

25    relevant, so we are cutting it off and we are just going

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 143 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 139 of 475    Page 143 of 262
SMITH - CROSS                                              1-143

```
1    to admit the top part of the document.  Okay?

2            MR. LIOTTI:  Should I continue, Judge, while --

3            THE COURT:  Sure, go ahead.

4            MR. LIOTTI:  -- she is doing that?  Very good.

5    BY MR. LIOTTI:

6    Q.  Agent, if I may, you mentioned before something

7    about IRS tax returns and so on and how Mr. Johnson was

8    attempting to recover refunds --

9    A.  Yes.

10   Q.  -- IRS returns.  Did he do this off of the computers

11   and so forth that you had set up for his cooperation?

12   A.  No.

13   Q.  Okay.

14           MR. LIOTTI:  Could I have this marked for

15   identification, please?  Your Honor, may I place this

16   before the witness?

17           THE COURT:  Sure.

18           MR. LIOTTI:  Thank you.

19   BY MR. LIOTTI:

20   Q.  Agent, I'm placing before you what has been marked

21   as Defendant's Exhibit 2 for identification.  Please

22   take a look at that and tell me if you can identify it.

23   A.  It's a form 1040, address and residency 2004.

24   Q.  Okay.  Have you seen that before?

25   A.  No.
```

1   Q.  Do you know if that was part of the discovery

2   material that the government provided to us with the

3   DVDs that you've testified about?

4   A.  It's possible.

5   Q.  Okay.  Do you know if that was generated by

6   Mr. Johnson while he was cooperating with you?

7   A.  I don't know.

8   Q.  Okay.  All right.  Just to go back to that last

9   exhibit that the judge has instructed the jury on, that

10  would be Defendant's Exhibit 1 for Identification --

11          THE COURT:  Well, it's admitted now.

12          MR. LIOTTI:  Yes, it's been received in

13  evidence now.

14  BY MR. LIOTTI:

15  Q.  Could I ask you to identify that please and, in

16  particular, I would direct your attention to the

17  receiver's name on that Hotmail?

18  A.  BrettTheVetMan@hotmail.com.

19  Q.  And as far as you know that is the Hotmail address

20  for Brett Johnson?

21  A.  One of many, yes.

22  Q.  All right.  Now, did you learn at some point that

23  while he -- while he was cooperating with the United

24  States Government that Mr. Johnson was advising friends

25  and acquaintances that he was cooperating with the

```
 1   United States Government?

 2   A.  Yes.

 3           MR. LIOTTI:  Could I have this marked as one

 4   exhibit for identification, please?

 5           THE COURT:  So you want it to be Defendant's --

 6   Defendant's No. 3 for ID?

 7           MR. LIOTTI:  Yes.  It has multiple pages,

 8   that's why I said -- I'm sorry.

 9           Judge, if Your Honor pleases, I've asked your

10   able clerk to mark this as Defendant's Exhibit 3 for

11   Identification.  It consists of three, four, five, six

12   pages of marked copy.

13           I'm showing that to Mr. Eichelberger because

14   he's asked for a copy.

15           MR. EICHELBERGER:  Objection on the grounds of

16   relevance.  Also on the grounds that they have been

17   modified by highlighting certain portions of text, Your

18   Honor.  They are not exactly as the screen printouts

19   would originally be.

20           MR. LIOTTI:  I haven't offered them yet, Judge.

21           THE COURT:  All right.

22           MR. LIOTTI:  If I may, just a few more

23   questions, Your Honor, please?

24           THE COURT:  Go ahead.

25   BY MR. LIOTTI:
```

1  Q.  Now, just so we understand this -- I think you said

2  this as part of your direct testimony, but let me ask

3  you again just so we can be very clear about it.

4        When you have someone who is acting as an

5  informant or otherwise cooperating with the government,

6  they are considered to be a confidential informant,

7  correct?

8  A.  Correct.

9  Q.  And that means, if I have it right, that they are

10  not supposed to be talking about their work, as far as

11  you are concerned, with anyone, right?

12  A.  Right.

13  Q.  Because that can jeopardize the integrity of the

14  investigation, correct?

15  A.  That's correct.

16  Q.  Okay.  I would like to place before you a document.

17  Just ask you if you can identify it.  It's marked as

18  Defendant's Exhibit 3 for Identification only,

19  consisting of six pages.  Would you take a look at that

20  and tell me if you can identify it?

21  A.  Yes, I recognize it.

22  Q.  And what is that?  What do you know it to be?

23  A.  An e-mail.

24  Q.  Okay.  And was it received or sent by Mr. Johnson,

25  as far as you know?

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 147 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 143 of 475   Page 147 of 262
SMITH - CROSS                                          1-147

```
 1  A.  Yes, as far as I know.

 2  Q.  And is Mr. Johnson -- or can you conclude from that

 3  document that Mr. Johnson was communicating with people

 4  outside of the scope of your investigation?

 5  A.  Yes.

 6  Q.  Okay.  Do you have any way of knowing how many

 7  people he spoke to?

 8  A.  No.

 9  Q.  Or communicated with?

10  A.  No.

11  Q.  Is it fair to say that it was more than one?

12  A.  Oh, yes.

13  Q.  Okay.  And when did you first learn that he was

14  doing that?

15  A.  We saw this e-mail.  He had told people,

16  unfortunately, before he actually came to work for us

17  what he was going to be doing.  We interviewed those

18  people regarding that, made them understand what the

19  consequences were.  "We," meaning the Secret Service.

20  We also found out at the end of the investigation that

21  he was telling people he was a Secret Service agent,

22  pretty much.

23  Q.  When did you find that e-mail for the first time --

24  and, again, when I say "you," I'm talking about the

25  Secret Service -- to the best of your knowledge?
```

```
 1  A.  It's dated June 20th, and --

 2  Q.  That was June --

 3  A.  I can't remember exactly when we saw it, but we knew

 4  that he had communicated with people in Charleston about

 5  him working for us.

 6  Q.  That was June 20th of '05?

 7  A.  Yes.

 8  Q.  And nonetheless you, then, allowed him to continue

 9  cooperating with you for another 10 months,

10  approximately?

11  A.  10 months, yes.

12  Q.  Thank you, Agent.

13          MR. LIOTTI:  No further questions.

14          THE COURT:  Redirect?

15                      REDIRECT EXAMINATION

16  BY MR. EICHELBERGER:

17  Q.  With respect to Mr. Johnson's status as a

18  confidential informant, to your knowledge, at any time

19  during this investigation did Mr. Johnson give any

20  information about Jonathan Giannone himself that was not

21  reflected in chat transcripts?

22  A.  No.

23  Q.  At any time during the investigation did Mr. Johnson

24  provide any confidential information based upon

25  face-to-face contacts with anyone during the course of
```

1   the investigation?

2   A.  No.

3   Q.  With respect to the comment that you made in

4   response to a question that there were a couple of times

5   when Mr. Johnson was not directly in the presence of

6   either yourself, Special Agent Kirby, or some other

7   Secret Service agent, approximately how long of a period

8   would Mr. Johnson have been by himself?

9   A.  It would vary; maybe 5, maybe 10 minutes.  You know

10  if we had to go to the bathroom or if we had a chat with

11  someone that was regarding, you know, a fraudulent

12  scheme, if they wanted -- to say, "Hey, are you -- you

13  want to get involved in this?"

14        And I would have to go -- go to the boss and

15  say, "Hey, you know, this is what we've got going on.

16  Do we want to, you know, further this?"

17  Q.  All right.  During the periods of time that

18  Mr. Johnson was by himself, were the -- was the

19  monitoring software, that is the software -- both the

20  Camtasia and the transcript-generating software, was it

21  turned off?

22  A.  No.  No, it stayed on the entire time he was there.

23  Q.  Based upon everything that you know -- well, let me

24  come back to that in a second.

25        With respect to -- I think you testified that

1  there were three times that dump information came

2  through?

3  A.  Yes.

4  Q.  In any of those dumps, was there information other

5  than simply the track-two data that came through on

6  those e-mail chats?

7  A.  Yes, there was.

8  Q.  What type of information?

9  A.  On some of the tracks that would have the account

10 information, it would also have the account holder's

11 name.  Just first and last name.

12 Q.  First and last name?

13 A.  Yes.

14 Q.  Specifically, there were three transactions.  Do you

15 recall which of those three?

16 A.  I know the one on June 6th had several names --

17 Q.  That was the 21 --

18 A.  That was the 21 numbers.  And I'm pretty sure the

19 first communication we had or the -- the first time we

20 received dumps, which might have been May 27th,

21 somewhere around there, had that information as well.

22 Q.  All right.

23 A.  And then the middle one, the second one, from what I

24 remember, it had the account information and then it

25 just said "your name."  So it didn't have an identifying

1  name.

2  Q.  Now, I want to make sure that we understand

3  Mr. Johnson's function in this investigation.  Was he

4  supposed to go out and deal face-to-face with anyone?

5  A.  No, everything was done on the computer.

6  Q.  And the computer had both Camtasia and the

7  transcript monitoring?

8  A.  Yes, and there's people supervising.

9  Q.  With respect to loss, counsel asked about potential

10  loss.  In the course of preparing for this trial did you

11  and Agent -- and Agent Kirby go through bank records to

12  determine how much would have been available had you

13  folks, in fact, been bent on mischief?

14  A.  Yes.

15  Q.  Approximately how much?

16  A.  It was approximately 130,000 that was available on

17  the cards that were sent to us.

18  Q.  But the person who sent them didn't know that you

19  were law enforcement?

20  A.  Correct.

21  Q.  Now, based upon everything that you know, all these

22  details about Mr. Johnson's past, present, and continued

23  illegality, do you have any concerns at all about the

24  accuracy of the chat transcripts?

25  A.  No.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Filed: 09/19/2025   Pg: 148 of 475   Page 152 of 262
USCA4 Appeal: 25-6132   Doc: 26   Date Filed 05/02/08   Filed: 09/19/2025   Pg: 148 of 475   Page 152 of 262
SMITH - REDIRECT                                           1-152

```
 1              MR. LIOTTI:  Objection, move to strike.

 2              THE COURT:  Overruled.

 3              MR. EICHELBERGER:  Thank you.  That's all.

 4              THE COURT:  Agent, when you say 130,000 was

 5   available, you mean that that's the maximum credit line

 6   on those cards?

 7              THE WITNESS:  Ma'am, they were debit cards --

 8              THE COURT:  Oh, they were debit cards.

 9              THE WITNESS:  -- drawn specifically on an

10   account, and we looked at the statements and that was

11   the available balance for those cards at the time we

12   received them.

13              THE COURT:  Okay.  Thank you.

14              All right.  Anything else, Mr. Liotti, for this

15   witness?

16              MR. LIOTTI:  No, Your Honor.  Thank you.

17              THE COURT:  Thank you.  You may step down.

18              You may call your next witness.

19              MR. EICHELBERGER:  Call Special Agent Bobby

20   Kirby.

21              Your Honor, if I could, we do have a

22   stipulation that I want to reference at this time.

23              THE COURT:  All right.  Ladies and gentlemen, a

24   stipulation is an agreement between the parties that --

25   that something is established, it's not in dispute, and
```

1   up to Ms. Willis, please?

2          MR. EICHELBERGER:  I will.

3          THE COURT:  Thank you.

4          All right.  Agent Kirby, you may come on up and

5   be sworn.  If you will just stand right next to that

6   witness box, raise your right hand, and give me your

7   full name, please.

8          THE WITNESS:  Bobby Joe Kirby, Jr.

9          THE COURT:  All right.  Keep your hand up,

10  please.

11              BOBBY JOE KIRBY, JR., SWORN

12         MR. EICHELBERGER:  Thank you for your patience,

13  Your Honor.  We were making sure the computer was going

14  to be up and running.

15                  DIRECT EXAMINATION

16  BY MR. EICHELBERGER:

17  Q.  Good afternoon, Agent Kirby.  If you would, please

18  introduce yourself to the jury.

19  A.  I'm Agent Bobby Joe Kirby, Jr., a special agent with

20  the United States Secret Service in Columbia.

21  Q.  Mr. Kirby, how long have you been employed by the

22  United States Secret Service?

23  A.  A little over four years.

24         THE COURT:  Agent Kirby, would you sit up

25  closer to the mike, please?  Thank you.

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 155 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 150 of 475    Page 155 of 262
KIRBY - DIRECT                                                    1-155

1  BY MR. EICHELBERGER:

2  Q.  And before becoming employed by the United States

3  Secret Service, where did you get your education?

4  A.  Francis Marion University.  I have a bachelor in

5  business economics, and I have a master of business

6  administration from the University of South Carolina.

7  Q.  Right here in Columbia?

8  A.  Yes, sir.

9  Q.  The four years that you have served with the United

10 States Secret Service, where have those been served?

11 A.  Here in the Columbia field office.

12 Q.  All right.  Agent Kirby, in preparation for your

13 testimony in this case here today, would you go through

14 the process that you undertook to prepare together -- to

15 put chat transcripts together and the review that you

16 undertook?

17 A.  For the actual trial or the operation itself?

18 Q.  In preparation for trial.

19 A.  Okay.  Preparation for the trial we had a lot of

20 chat transcripts; organized those by dates.  Usually had

21 them in order, ended up being 170 pages of chats we

22 had.  At that time I started going line by line through

23 the chats looking for things that I could tie to, as

24 they call, the real world.  Maybe a place, maybe a

25 financial transaction that he talked about in the chat.

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 156 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 151 of 475    Page 156 of 262
KIRBY - DIRECT                                                          1-156

1         At that time I got -- I sent subpoenas for

2    business records for such things as checking accounts,

3    credit card accounts, travel statements from car rental

4    companies, airlines, that sort of thing.

5    Q.  All right.  Now, with respect to these various

6    accounts' information -- let's start from a common

7    premise, that is the bank account for Mr. Giannone.  Did

8    you see economic activity between that bank account and

9    any of these other sets of records that you obtained?

10   A.  We did.  That A&W Auto account, which the $600 was

11   put into and made the $500 withdrawal, there were two

12   payments to an AmEx, American Express, credit card, so

13   that's how we obtained the credit card -- that's one of

14   the ways.

15   Q.  How about payment for travel?

16   A.  Right.  There was also payment for travel that was

17   mostly either on his credit card statement or his joint

18   checking account, also Bank of America.

19   Q.  The joint checking account was with -- who was the

20   other person on that account?

21   A.  Jordan Giannone.

22   Q.  Now, with respect to review of these various chats,

23   let's start out with -- we have heard reference, a

24   Camtasia file, shall we?

25         What we need to do -- we are going to put into

1  evidence at this point, it's already been admitted,

2  Government's Exhibit 1A -- and I would like for you

3  to -- before we start playing it, give the jury an idea

4  of what they are going to see.  We are going to show it

5  to them and I'm going to want you to give a kind of

6  play-by-play as we go through it, if you would?

7  A.  Camtasia, that's just -- simplest way I look at it,

8  if someone is sitting at a computer, if you had a video

9  camera just shooting everything that happens on the

10 screen, that's basically what Camtasia does.  It just

11 records everything happening on the computer screen,

12 sort of like a video recorder.

13 Q.  And with respect to your review of all the chats

14 through this investigation, where does the Camtasia

15 sequence that we are going to watch fit into the

16 contacts from either CIA INTEL or Pit Boss 2600?

17 A.  Actually, what you will see here is at the very

18 beginning of the first day that we made contact with Pit

19 Boss 2600 or CIA INTEL.  At the very beginning we will

20 show how -- our operation, when we came in, we would

21 automatically bring the computer up, we would begin

22 recording, so it records everything that we do while

23 we're on that computer.

24         So, in the very beginning you will see the

25 computer screen as we did, our desktop, all the icons

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 158 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 153 of 475    Page 158 of 262
KIRBY - DIRECT                                                    1-158

1   that are on it, that sort of thing.  And then we will

2   forward to the part where Pit Boss 2600 makes initial

3   contact with gollumfun.

4   Q.  I'm going to check the screen back here and see if

5   we can't -- I think we have got it the largest size.

6          All right.  Let's go ahead, then, and start, if

7   we could, and publish 1A.

8          And, again, as things happen, Agent Kirby, if

9   you would, tell us what we are seeing.

10  A.  I will.  As you can see in the bottom it says

11  Camtasia, a studio, on the bottom task bar.  That's just

12  where we started Camtasia and it's actually running at

13  the time.  You'll see the red and green bulb that keeps

14  flashing.

15  Q.  You can actually -- you can touch your screen and --

16  to tell them where you are referring.

17  A.  The red and green bulb is flashing now.  That

18  actually shows that Camtasia is up and running.  At this

19  time you will see ICQ, which is an Internet chat client.

20  Q.  Lets's freeze the screen, please.

21         The computer has reared its ugly head.  Let's

22  start it again.  Fortunately it was short.

23  A.  When it comes back you will see on the right-hand

24  side of the screen, it's an ICQ.  It shows our buddy

25  list, which -- everyone that we have been talking to so

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 159 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 154 of 475    Page 159 of 262
KIRBY - DIRECT                                                    1-159

```
 1  far in the investigation, so it will pop back up.

 2          MR. EICHELBERGER:  Mr. Daley, when the ICQ box

 3  comes up, pause it.

 4          THE WITNESS:  There.

 5          MR. EICHELBERGER:  Okay, pause, please.

 6  BY MR. EICHELBERGER:

 7  Q.  Again, touch the screen so we know exactly what it

 8  is you are talking about.

 9  A.  If you look here.

10  Q.  You can draw a circle if you want.

11  A.  That's the ICQ screen I'm referring to.  We are

12  about to sign on the ICQ and, like I said, that's just

13  an Internet chat client --

14  Q.  All right.

15  A.  -- that we used during the investigation.

16          MR. EICHELBERGER:  Continue to play, please.

17          THE WITNESS:  Okay.

18  BY MR. EICHELBERGER:

19  Q.  This is real time?

20  A.  Right.  This is, actually, as he's doing it, that's

21  why it's just so -- I mean, if we sat there for five

22  minutes, you would just see this for five minutes.

23  Q.  What just happened?

24  A.  He's going now -- AOL AIM.  If you -- in the middle

25  of the screen.  He's about to attempt to sign on AIM,
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 160 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 155 of 475   Page 160 of 262
KIRBY - DIRECT                                      1-160

1  which we used a lot.

2  Q.  Do I read that correctly?  It says AOL instant

3  manager, gollumfun?

4  A.  That's the messenger, right.  We are logging on as

5  gollumfun.

6  Q.  Okay.  So that's the online identity of Mr. Brett

7  Johnson; is that correct?

8  A.  Correct.

9  Q.  Okay.

10         MR. EICHELBERGER:  Continue, please.

11  A.  Oh, and one more thing.  If you look over to ICQ,

12  the place that I circled, that is actually our ICQ

13  number.  That's just the number that is assigned to

14  gollumfun.

15  BY MR. EICHELBERGER:

16  Q.  All right.  We have got two things we are talking

17  about now, we have got AOL Instant Messenger and we have

18  got ICQ.

19  A.  Right.

20  Q.  Tell us what those are and how they relate to each

21  other, or perhaps don't relate to each other.

22  A.  Both of these are just Internet chat clients.  If

23  you are logged onto the Internet, you can log in through

24  ICQ or you can go to AIM Instant Messenger; you can use

25  Yahoo, Windows Messenger.  It's just a way of having

1  real -- real-time communication with someone.  You type

2  in something, they see it, they type an answer back.

3  So, it's basically just a way of communicating real

4  time.

5  Q.  Just different protocols for chat?

6  A.  Right.

7  Q.  And I believe -- who is the corporate entity behind

8  AOL Instant Messenger?

9  A.  America Online.

10  Q.  Okay.  How about ICQ?

11  A.  ICQ, and I'm not sure of the -- it stands for "I

12  seek you," but I'm not sure about the company.

13  Q.  When you say it stands for "I seek you," you mean,

14  "I seek," as in s-e-e-k, and you, y-o-u?

15  A.  Right.

16  Q.  The letters are just a shorthand of "I seek you"?

17  A.  Yes, sir.

18  Q.  Let's continue with the Camtasia file, please.

19  A.  And if I remember correctly, a couple of times the

20  AIM's sign-in, the America Online, which it's trying to

21  do now, didn't go through for some reason, but we

22  eventually get signed on.

23  Q.  All right.

24  A.  See, that's the message here, that "AIM cannot be

25  reached," so we attempted to do it again.  At this time

1   he's just bringing up -- a lot of things we did, we

2   would bring up web pages to check to see, you know, new

3   postings out on the Internet.  We would check our

4   different -- we had e-mail accounts, we would check

5   that, that we were dealing with individuals with, so we

6   would also do that, also.

7           As you can see now, he's attempting to go to

8   MailVault, which that is just one place that we had an

9   e-mail account.

10          And, again, it's saying now AIM couldn't be

11  reached, so there was a problem with the service at that

12  time.

13          Now, we've jumped forward a couple of hours,

14  that was just the beginning, showing the setup.  Now

15  he's actually checking our firewall logs.  We were just

16  going through some things -- stop right here.

17  Q.  When you say firewall logs, what do you mean?

18  A.  We had a firewall on our computer that, you know,

19  keep it -- it kind of blocks certain things we don't

20  want to happen, like if someone is trying to get into

21  our computer, something of that sort, we try and block

22  it with a firewall.

23  Q.  You may have heard the term "hackers," trying to

24  get --

25  A.  Right.

1  Q.  Okay.

2  A.  Now, if you look here, this is actually a message to

3  gollumfun from the user Pit Boss 2600.  It's saying he

4  sent us a message, would we like to accept it.  And this

5  is coming through, actually, AIM, America Online's

6  messenger.  And it happens pretty quickly, but you will

7  see we reject this message.  We don't --

8  Q.  So we should watch the cursor?

9  A.  Right.  And it's going to -- it's going to be pretty

10 quick.  Not until it starts --

11          MR. EICHELBERGER:  Continue to play, please,

12 Mr. Daley.

13 A.  So that was the first initial contact that we had

14 with Pit Boss 2600.

15 BY MR. EICHELBERGER:

16 Q.  Initiated by Pit Boss 2600?

17 A.  Right.  Right.

18 Q.  So the contact has been rejected?

19 A.  Right.  Now, we are just -- if you see on the screen

20 now, we are talking with an individual on the screen now

21 through ICQ, which is here (indicating).

22 Q.  And that is someone that's unrelated to this

23 investigation?

24 A.  Unrelated, right.  Stop right here.

25          Now, we have a message that pops up here at the

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 159 of 475   Page 164 of 262
USCA4 Appeal: 25-6132   Doc: 26   Date Filed: 09/19/2025   Pg: 159 of 475   Page 164 of 262
KIRBY - DIRECT                                          1-164

1   bottom right.  It has -- if you see the 296, and I can't

2   even read the rest of it.

3   Q.  It looks like 632892 or perhaps 842?

4   A.  That's actually from ICQ and it's telling us that we

5   have an individual -- a message from an individual that

6   we do not have on our contact list.  So this is the

7   first initial contact and, actually, this ICQ number, as

8   you'll see in a second, belongs to CIA INTEL.

9   Q.  Well, let's continue.

10  A.  Camtasia is pretty boring sometimes.

11  Q.  Well, it's recording things at the same time as they

12  happen in real life.

13  A.  Right.

14          Okay.  That was another user that is not

15  related to this case so we keep going.  We just stop

16  here.

17          MR. EICHELBERGER:  Freeze, please.

18          THE WITNESS:  This is an ICQ message that pops

19  up from the individual CIA INTEL at 6:18 p.m.  And he's

20  saying, "Hey."  So that is his first contact with

21  gollumfun.

22          MR. EICHELBERGER:  Continue.

23          THE WITNESS:  And from there we will begin a

24  small chat.

25          MR. EICHELBERGER:  Let's see -- let's pause for

1   a second.

2   BY MR. EICHELBERGER:

3   Q.  There is some typing going on in the bottom half of

4   that ICQ dialogue box.  What is happening?

5   A.  That's -- gollumfun is actually typing in his

6   message.  You will see it as he types.  The letters pop

7   up on the screen, so that's as he's typing.

8           MR. EICHELBERGER:  Continue playing, please.

9           THE WITNESS:  So gollumfun begins, then, the

10  conversation, "Greetings.  Nice name you have there."

11  And he just went and changed it, make it an uppercase G,

12  uppercase R.

13          So now we have sent -- actually, when he sent

14  the message, you saw it pop up in the top of the screen,

15  so he had actually sent it to CIA INTEL.

16          Now -- well, it's already gone.  At the bottom

17  you can see it will start flashing orange --

18          MR. EICHELBERGER:  Freeze, please.

19          THE WITNESS:  -- when you get a message and you

20  aren't on ICQ.  You are still logged on, but it's just

21  showing -- while you're doing something else, if it

22  starts flashing you know you have a new message that you

23  haven't read yet.

24  BY MR. EICHELBERGER:

25  Q.  But now we have a dialogue box that's got the

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 166 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 161 of 475    Page 166 of 262
KIRBY - DIRECT                                                      1-166

1  beginning, "Hey," then the response was sent,

2  "Greetings.  Nice name you have there."

3  A.  Right.

4  Q.  Now, we have what appears to be two lines from CIA

5  INTEL?

6  A.  Right.  CIA INTEL has posted -- he came back with

7  our response.  And now he's saying "Hey, get me on AIM,"

8  which, again, is AOL Instant Messenger.

9           MR. LIOTTI:  Your Honor, may I approach?  A

10  sidebar?

11           THE COURT:  Yes.

12           MR. LIOTTI:  Thank you.

13           THE WITNESS:  And at that time he gives --

14           THE COURT:  Wait just a minute.

15           THE WITNESS:  Oh, sorry.

16           (Bench conference)

17           MR. LIOTTI:  Judge, I believe that this witness

18  is testifying as an expert and he has not had a Daubert

19  hearing or anything of that genre to determine the

20  reliability of his proffered testimony.  He's just

21  throwing stuff out there and I don't believe it's been

22  submitted to Your Honor in the form of a proffer or

23  anything else.

24           MR. EICHELBERGER:  He's not testifying as an

25  expert.  He's merely recounting what is going on

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 167 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 162 of 475   Page 167 of 262
KIRBY - DIRECT                                          1-167

1   on-screen.

2           THE COURT:  He's just saying what is happening

3   on the screen.  I don't see that as expert testimony

4   either.

5           MR. LIOTTI:  All right.

6           THE COURT:  Okay.

7           MR. LIOTTI:  I understand.  Thank you.

8           (In open court)

9   BY MR. EICHELBERGER:

10  Q.  I'm sorry.  Did I -- I think I asked you about the

11  two lines that came up under CIA INTEL?

12  A.  Right.  As I was saying, CIA INTEL is -- his

13  response back to us.  He says, "Hey, get me on AIM,"

14  which is AOL Instant Messenger, and he gives us his AIM

15  name, which is Pit Boss 2600.

16          MR. EICHELBERGER:  Let's continue playing,

17  please.

18          THE WITNESS:  And at that time, gollumfun types

19  in "Who are you?"

20          Now, if you see, CIA INTEL responds with

21  "markrich" at 6:20 p.m.  That name, actually, was

22  familiar to the investigation.

23          So at this time -- if you begin playing

24  again -- he knows who he's speaking with now.  And you

25  will see that we will open up an AIM window in just one

1   second.  We have opened up AIM on the side and actually,

2   now, he's going in.  He's highlighting Pit Boss 2600

3   from the CIA INTEL message.  He's just copying and

4   pasting that to keep from having to type it in, in AIM.

5          Now, this is an AIM message box.  He just

6   pasted that Pit Boss 2600 ID into the "to" box, so now

7   he's beginning to communicate with Pit Boss 2600 on the

8   AIM chat line.

9          MR. EICHELBERGER:  Thank you.

10  BY MR. EICHELBERGER:

11  Q.  Continue.

12  A.  Again, he's typing in his message, "Greetings."  And

13  if you see, it tells you when Pit Boss is typing.  Pit

14  Boss responds, "Long time."  And you can see gollumfun

15  typing here.

16  Q.  Very slowly.

17  A.  Right.  "Very long time.  How goes it?"  Pit Boss

18  responds, "Good.  You?"

19          And, basically, we just have a conversation now

20  on AIM with the individual Pit Boss 2600.

21  Q.  In real time.

22          MR. EICHELBERGER:  Let's go ahead and clear the

23  screen now, please.

24  BY MR. EICHELBERGER:

25  Q.  I mean, we could continue with this Camtasia but

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 169 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 164 of 475   Page 169 of 262
KIRBY - DIRECT                                    1-169

1  it's kind of painfully slow.

2  A.  Well, as I said, it's real time.  These weren't the

3  only two individuals we were speaking with.  Some nights

4  we would speak with 10 to 20, maybe even 30 individuals

5  at the same time, so we would be bouncing back and

6  forth.

7  Q.  And then in connection with preparation for this

8  case, you made reference earlier to 170 pages of chat

9  transcripts?

10 A.  Correct.

11 Q.  Now, give us the interplay between what we saw on

12 the Camtasia files versus what we can expect to see from

13 the transcript files.

14 A.  Okay.  The Camtasia files, it's just a recording, so

15 we used some other programs -- we began with the program

16 called Spector Pro.  It basically -- just everything

17 that was typed on the screen -- if we talked with CIA

18 INTEL it would form a file for CIA INTEL, everything

19 that is typed by him or to him.

20          If it was typed by him, it logs it into that --

21 it's a text file, basically, and then our response would

22 also be logged into that text file.  So it's just a

23 running transcript of our conversations.

24 Q.  And before the trial started we put into evidence 20

25 separate transcripts of chat sessions between gollumfun

 1  and either Pit Boss 2600 or CIA INTEL; is that correct?

 2  A.  Correct.

 3          MR. EICHELBERGER:  At this point, Your Honor,

 4  we'd like to publish portions of Government's Exhibit 1

 5  through 20.

 6          THE COURT:  All right.

 7          MR. EICHELBERGER:  Let's start, if we could.

 8  Let's bring up Government's 1, page 1.

 9          And just so we demonstrate what we are going to

10  do here, we can actually zoom in on the text so it's

11  easier to read by everyone, and within a zoomed box we

12  can scroll so everyone will be able to follow along with

13  us as we read.

14          For ease of reference I will read the part of

15  either Pit Boss 2600 or of CIA INTEL, as appropriate,

16  and I will ask Special Agent Kirby to read the parts

17  from gollumfun.

18          Let's begin back down where it says Pit Boss

19  2600, "Sup."

20          Let's go ahead and get that up, Mr. Daley, if

21  we could.  Good.  And let's go ahead and scroll within

22  there so that's at the top of our box.

23          THE COURT:  Can you tell us what date this was?

24          MR. EICHELBERGER:  I'm sorry.  Yes.

25          Scroll back down to the bottom, please.

```
 1  BY MR. EICHELBERGER:

 2  Q.  This chat transcript, the very first chat transcript

 3  was on what day?

 4  A.  May 23rd, 2005.

 5          MR. EICHELBERGER:  Mr. Daley, again, if you

 6  would scroll to where Pit Boss is first identified.  You

 7  scrolled too far.  We will have you trained on this

 8  before the trial is over.  There we go.  And I'm going

 9  to read the part of Pit Boss.

10  BY MR. EICHELBERGER:

11  Q.  "Sup.  Long time old guy, long time, long time."

12  A.  "Very long time.  How goes it?"

13  Q.  "Good.  You?"

14  A.  "Well, getting back to business.  I take it that

15  529allite is your buddy?"

16  Q.  "520allite (sic)?"

17  A.  "Hm -- just someone that wanted to verify it was

18  really me on IAACA.  Thought it might have been you.

19  Guess not though."

20  Q.  "Oh, no.  I'm just a lurker these days."

21  A.  "Well, I used to be a lurker and did minor business

22  under bogart, but I think it's time to come out of

23  retirement.  Strange times these days."

24  Q.  "Eh, a lot of people I know got busted.  Remember

25  Enhance?  The kid I bought the name from."
```

1   A.  "Its been a D long time since we spoke.  Yep, I

2   remember Enhance.  He went down too?  F."

3           MR. EICHELBERGER:  For the record, Your Honor,

4   where -- with expletives, with the blessings of the

5   court and counsel, we will refer to them by letter

6   rather than by actual word, the jury can read them.

7           THE COURT:  All right.

8   BY MR. EICHELBERGER:

9   Q.  "He's sitting in jail right now in NH, got picked up

10  on a carding charge by SS.  Can't get bail because of

11  probation.  Made the news."

12  A.  "That's F'd up.  Most everyone I knew was snagged

13  also.  F'ing shame.  Time to rebuild -- at least for

14  me."

15  Q.  "Yeah, I never got pinched.  I've been staying under

16  the radar for a while.  I used to have that chump CC

17  Suppliers work for me."

18  A.  "Same here.  I'm guessing it's where (sic) I retired

19  before the SS set up the VPN through Cumba."

20  Q.  "Same."

21  A.  "Can't believe enhance got caught.  He was a good

22  kid."

23  Q.  "You know his real name, right?"

24  A.  "No.  I never asked real names and told people never

25  to tell me.  Little rule of mine."

1   Q.   "Ah, I was gonna link you to the story."

2   A.   "You know anyone on Samurai that can verify me so I

3   can get my A on over?"

4   Q.   "Apparently he was running crews" --

5              MR. EICHELBERGER:  We need to go to page 2.

6   And back to the zoom box, please.  Excellent.

7   BY MR. EICHELBERGER:

8   Q.   "Apparently he was running crews, paying friends a

9   percent to in store.  One of them got busted, he never

10  knew."

11  A.   "Well, you can still link me.  I guess it doesn't

12  matter any longer."

13  Q.   "The kid told the cops that enhance was this big

14  carder.  Blah, blah.  They set up him and the rest is

15  history."

16  A.   "Fram'd was running crews for a while also, not to

17  the extent Enhance was, though."

18  Q.   "Well, S.  So was I.  I was just slick about it."

19  And a smiley face emoticon.  And then there is a URL for

20  www.Boston.com/news/local/New_Hampshire/articles/2005/02

21  /11/teen_charged_in_credit_card_fraud_police_say_

22  information_gleaned_on_wireless_networks_online?mode=PF.

23  A.   "Heh.  You know, I often advised against that.  More

24  money; more risk though."

25  Q.   "It's funny how they twist the story around.

1  Wireless hacker -- heh, heh -- he bought dumps from my

2  guy."

3  A.  "So how much time is Enhance looking at?  Anyone get

4  to talk to him?  Heh, yeah, wireless hacker."

5  Q.  "I attempted to bail him out but they have a bail

6  hold.  I visited him in Boston in Jan., a few weeks

7  before he got busted."

8  A.  "I know he did.  LE doesn't give a S about that

9  though.  It sounds better if it's all on him.  He's

10 young though, might not get too much time."

11 Q.  "I haven't been following the case.  CC Suppliers

12 got busted in Orange County for carding Apple and the

13 Sony store, only did 30 days."

14 A.  "Well, you are a good man for trying to bail him

15 out.  I remember doing the same for Fra'd before I

16 retired, and another fellow."

17 Q.  "Yeah, no one should spend time as a pretrial

18 inmate.  That's the worst."

19 A.  "30 days.  That's a good one.  Doesn't really send

20 the message that carding is a bad thing, does it?"

21 Q.  "Plus three years' probation.  Eh, I have been

22 staying away from it."

23 A.  "They can do the probation standing on their head,

24 no biggie."

25 Q.  "The spots I have been hitting are pretty much blown

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 175 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 170 of 475   Page 175 of 262
KIRBY - DIRECT                                          1-175

```
 1  up."  Then in parentheses, "Apple."

 2  A.  "Well, I was trying to stay away from it, but I

 3  wasn't very profitable this year.  S, I think, as well

 4  come back full time."

 5  Q.  "The game has changed."

 6          We will wait for the screen to catch up to us.

 7          "The game has changed big time.  Where you

 8  around during the Citibank era?"

 9  A.  "I see the game is a wee bit different these days.

10  COBs are still working though.  Looks like people are

11  starting coming back for business too.  Nope, I missed

12  out on the Citibank and the cash-outs, was doing my own

13  thing then."

14  Q.  "Ah, man, that was so much fun."

15  A.  "Yeah, it figures my ignorant A would sever all ties

16  and then a gold mine appears."

17          MR. LIOTTI:  Objection, may we be heard at

18  sidebar?

19          THE COURT:  Yes.

20          (Bench conference)

21          MR. LIOTTI:  Your Honor, I object to this whole

22  line of inquiry on the grounds of relevancy.  I don't

23  see any connection to our case.  They see Pit Boss 2600

24  and CIA INTEL, but nothing else that connects us to this

25  indictment.
```

 1          MR. EICHELBERGER:  During the course of the

 2   investigation, Your Honor -- we fronted that in our

 3   pretrial brief.  Pursuant to Rule 104, it's information

 4   coming in, subject to satisfaction of a condition, that

 5   condition being the linkage of Pit Boss and CIA INTEL,

 6   which has already been done, and the second linkage

 7   being, taking that unified identity and linking it to

 8   Mr. Giannone, which will be done through the course of

 9   the 20 exhibits.

10          THE COURT:  I'm going to allow it, but if you

11   can't link it, I will strike it all.

12          MR. LIOTTI:  Thanks, Judge.

13          Judge, can I just state on the record, so the

14   jurors are aware of my objection just to relevance, and

15   Your Honor can then make your ruling on the record so

16   the jurors know why I objected?

17          THE COURT:  At this time?

18          MR. LIOTTI:  At this time, please.

19          THE COURT:  Okay.

20          MR. LIOTTI:  Thank you, judge.

21          (In open court)

22          MR. LIOTTI:  Your Honor, if you please, I

23   object on grounds of relevance.

24          THE COURT:  Overruled.

25   BY MR. EICHELBERGER:

1   Q.  Agent Kirby, I believe we are at the line that

2   reads, "Black Ops went down."

3   A.  "They all went down."

4   Q.  "They did an entire news thing on him.  How he is

5   this loser who lives with his mother, former mortgage

6   broker."

7   A.  "Papers said Back Ops was the only one to bond out.

8   Maybe more have since, don't know."

9   Q.  "Scarface did.  He messaged me the other day and was

10  like, what up, N?  He disappeared, though."

11  A.  "Are you sure Scarface is out?  He was looking at a

12  lot of time."

13  Q.  "He posted bail and I verified it was actually him.

14  He changed all of his user names."

15  A.  "You read the indictment?  They have a boatload of

16  charges on Scarface."

17  Q.  "Yeah, I accidentally ran into him on his new user

18  name."

19  A.  "Scary S.  Time to be very careful from now on.

20  People can't be lazy anymore."

21  Q.  "And he was, like, 'How did you get this name?'  My

22  dump guy got us confused.  Weird.  But I haven't seen

23  him in a while.  He told me he was bouncing."

24  A.  "I would like to speak to him.  I've always liked

25  him.  Maybe I will run into him sometime."

1  Q.  "I can give you his last known ICQ.  He banked away

2  a lot of money over the years, though."

3  A.  "Well, I can try his ICQ, if you don't mind.  He

4  must have an S-load of money saved."

5  Q.  "327539466."

6  A.  "I will try to get up with hi.  I hope he's okay."

7  Q.  "Funny, after the news came out -- Deck lived real

8  close to me."

9  A.  "Deck was okay.  I always liked him.  It was just a

10  couple of idiots that led to TESC downfall.  Deck wasn't

11  one of them."

12  Q.  "Any word on Mac?"

13  A.  "No.  Last I heard, everyone was still inside.  A

14  lot of them going to be doing some serious time.  It

15  really upsets me."

16  Q.  "Is Fram'd out?"

17  A.  "Not that I know."

18  Q.  "I'm assuming everyone is in local jails in the

19  areas they were arrested."

20  A.  "From what I understood, many were moved to New

21  Jersey.  That's the way it sounded, anyway."

22  Q.  "Did you see the news story from a few days ago?"

23  A.  "Nope, what story?  I'm aware that El Mariachi is

24  trying to rofit from the SC downfall as best he can."

25  Q.  "Yes.  He wrote a book.  He was always a F."

1   A.   "Hee, hee."

2   Q.   Then Pit Boss references a URL at news.yahoo.com/

3   news?tmpl=story&u=/bw20050520/bs_bw/b3935001mz001

4   gollumfun caret --

5            I'm sorry, that's -- next line yours.

6   A.   "Hey, are you still well connected enough that you

7   can verify me either on Samurai or IAACA?"

8   Q.   "I'm not connected at all.  I'm just nobody these

9   days and happy as a nobody.

10            "The story starts with an unlikely

11   partnership.  Andrew Mantovani was a part-time student

12   at Scottsdale Community in Arizona.  David Appleyard was

13   a one-time mortgage broker who lived in Linwood, New

14   Jersey, just outside of Atlantic City.  This is the duo

15   who led the ShadowCrew from 2002 until they were

16   arrested last fall, according to an indictment filed in

17   U.S. District court in New Jersey."

18   A.   "Growl.  Well, I wish I could accomplish what I

19   needed to as a nobody, but, heh, no matter."

20   Q.   "What are you looking to do?"

21   A.   "Well, I'm looking to make a good pile of money.  To

22   do it I think I need to bring the gollum name out, unite

23   a few folks, get a little organized, and conduct

24   business.  Basically, just what Phoenix, Mr. X, and

25   myself did with CL and SC.  I need a place where I'm

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 180 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 175 of 475   Page 180 of 262
KIRBY - DIRECT                                        1-180

```
 1   comfy doing business."
 2   Q.  "The operation was quite sophisticated.  Mantovani
 3   who used the handle ThnkYouPleaseDie.  Wasn't that
 4   Deck?"
 5   A.  "Yep, that was Deck."
 6   Q.  "Well, to make a good pile of money, in store
 7   online?"
 8   A.  "Yeppers.  I might do a little physical plastic, but
 9   I never liked that and I'm not the type that would
10   employ a crew."
11   Q.  "What part of the country are you:  west, east,
12   midwest, south?"
13   A.  "South."
14   Q.  "In store is real easy there."
15           MR. EICHELBERGER:  Next screen, please.
16   A.  "Yep, but not in chain stores.  Best Buy is still a
17   B here."
18   BY MR. EICHELBERGER:
19   Q.  "Hey, Apple Store, dude, is the easiest.  I've F'ing
20   walked out with two $3,000 laptops on a Simon card."
21   A.  "I will try that.  On a Simon card.  LOL."
22   Q.  "Yeah."
23   A.  "That's funny S."
24   Q.  "I got the best bin I've seen in years now for dumps
25   and the best connects for it, for 2K" -- $2,000 -- "I
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 181 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 176 of 475

KIRBY - DIRECT                                              1-181

1 can get like 150 to 180 dumps."

2 A.  "Reading that article you sent.  It looks like they

3 overlooked kidd entirely.  Ten, again, maybe kidd was

4 Deck as well.  Well, I might have to round you up for

5 dumps when the time comes.  How much you getting out of

6 each dump?

7 Q.  "2 to 4,000."

8 A.  "Very nice."

9 Q.  "Do you still have an MSR?"

10 A.  "No.  When the wife split she threw away a S-load of

11 things away:  IDs, diplomas, templates, and the trusty

12 206."

13 Q.  "Ah."

14 A.  "Yeah.  Good riddance, though.  Much better off.  I

15 can finally afford some stuff for me."

16 Q.  "Heh.  Another scam I got going is a Rolex gig."

17 A.  "I got a few nice fakes still lying around.  Got

18 them doing cashier's checks for COD orders.  Needless to

19 say it really Ps one off to as a fake cashier's check

20 for a fake Rolex.  Not something to make me appy."

21 Q.  "Heh."

22 A.  "Happy."

23 Q.  "Well, I found a connect to get fakes that you can't

24 even tell are fakes.  The use real gold, diamonds, and

25 everything."

```
 1  A.  "Which ones you dealing in?  I've got the Daytona

 2  and Yachtmaster."

 3  Q.  "Are expensive fakes, though.  Submariner."

 4  A.  "Anniversary or regular?"

 5  Q.  "Reg."

 6  A.  "How much you paying for them?  Come with boxes and

 7  papers?"

 8  Q.  "Yeah.  950.  Could sell to an eBay sucker for an

 9  easy 4,000."

10  A.  "Good deal.  What do the D things look like when you

11  open them up?  Jap movement or Swiss?"

12  Q.  "Swiss."

13  A.  "Good deal."

14  Q.  "I figure I could make an easy 20K real quick

15  husslin' them."

16          MR. EICHELBERGER:  The next page, please.

17  A.  "Any luck thus far?"

18  BY MR. EICHELBERGER:

19  Q.  "Yeah.  I sold one.  I also got this other connect

20  in Long Beach that hijacks F'ing containers off the

21  docks.  We got 50 plasmas."

22  A.  "Heh.  You need any help getting money in pocket

23  from them, I will walk you through an easy way to do

24  it.  Sounds like you have your S together, though.  Now,

25  that's the way to go."
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 183 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 178 of 475   Page 183 of 262
KIRBY - DIRECT                                        1-183

1   Q.   "They are looking for about 1,000 each."

2   A.   "What brand and size?"

3   Q.   "Not sure.  I just got a text message from my guy

4   and he's meeting up with them later tonight to find out

5   the details.  I believe Sony."

6   A.   "What size?"

7   Q.   "Not sure.  I want to say 50.  Let me call now."

8   A.   "That's quite a deal.  Let me know which Sony it is

9   as well.  Why aren't you selling them on eBay?"

10  Q.   "I don't have any in hand."

11  A.   "How soon can you get them?"

12  Q.   "I know these guys jack S all the time.  They've

13  called before with 500 ATVs.  All sorts of S."

14  A.   "Yeah.  No interest with ATVs, prefer electronics.

15  Plasmas are right up my alley."

16  Q.   "I can get them, like, this week.  ATVs have numbers

17  on them anyway."

18  A.   "Well, you certainly whetted my appetite.  $1,000

19  each?  Find out the model number for E.  If nothing

20  else, I can certainly help offload them on eBay."

21  Q.   "I just called."

22  A.   "Okay."

23  Q.   "He won't find out until around 10 p.m. PST time."

24  A.   Okay.  Hit back tomorrow with the info.  Okay?  You

25  really have these?"

```
 1  Q.  "Yeah."

 2  A.  "Good deal.  Good chunk of money to be made of

 3  that."

 4  Q.  "How much do you think one can make?"

 5  A.  "Depends on the model.  Find out the model number

 6  and we can go from there.  They can be eBayed and cased

 7  out with extremely minimal risk."

 8  Q.  "Heh.  You got a good eBay account?"

 9  A.  "EBay is good to go."

10  Q.  "Cool."

11  A.  "Get back with me tomorrow.  Okay?"

12  Q.  "No doubt.  You got better ideas with the Rolex?"

13  A.  "Good deal.  God to see you around and run into

14  someone I know.

15        "Better ideas with Rolex?  That's probably the

16  best idea.  The only other thing is old escrow switch,

17  but that takes money up front.  Airline insurance is

18  another way to go."

19  Q.  "Airline insurance?"

20  A.  "Yeah.  It's in your luggage.  You buy insurance, it

21  goes missing or destroyed.  Escrow, you buy a real one

22  using escrow and then switch the fake one."

23  Q.  "You have done this before?"

24  A.  "Sunking did the airline deal.  The escrow deal is

25  rampant across eBay right now."
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 185 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 180 of 475   Page 185 of 262
KIRBY - DIRECT                                                      1-185

1    Q.  "Heh.  My watches, though, you can't tell they are

2    fake."

3    A.  "Well, you got to keep up-to-date on things, heh.

4    You taken them to a jeweler yet, a Rolex dealer?"

5    Q.  "A jeweler, yes."

6    A.  "The pop the back of it and look at the numbers?"

7    Q.  "Yep."

8    A.  "Good deal."

9    Q.  "Checking a few other things too.  Mine have all the

10   2005 updates."

11   A.  "They have the Zenith movement or what?"

12   Q.  "Zenith movement?"

13   A.  "Yep.  Rolex watches have a couple of different

14   movements to them depending on the model or the year of

15   production.  I was wondering if you knew which movement

16   yours had."

17   Q.  "Not sure.  Gotta eBay it in a few days."

18   A.  "Well, you did find out about those plasma units.

19   Those are much easier to deal with."

20   Q.  "I will."

21   A.  "Okay.  I'm out then.  Good to hear from you.  It's

22   been a while.  Nice to know you are still around."

23   Q.  "BTW.  How do I know you're the real you?"

24   A.  "What do you want, a few chums thrown in?  How about

25   the rantings of the madman, El Mariachi, which verify

1  me?"

2  Q.  "Heh.  Talk to you later."

3  A.  "Or if you can round up anyone that's done business

4  with me in the past."

5  Q.  "Everyone I know."

6  A.  "Or anyway, you can come up with any gollum

7  question, I can answer it."

8  Q.  "Is un custody.  Which vendor did I get into a huge

9  fight with that almost got me banned?"

10  A.  "Which vendor?  I remember me banning people or

11  threatening to ban people over god, though e may not

12  have went by that name then."  In parenthesis, "It was

13  greywolf.  And that would have been credit related.  ID

14  related would have been lighthawk or Kevlar.  I'm trying

15  to remember, it's been a while."

16  Q.  "Listguy."

17  A.  "You are absolutely right.  You are raising all

18  kinds of H and so was he.  I kept trying to get it

19  straightened out but bot of you were hardheaded, you

20  wouldn't budge."

21  Q.  "Yeah."

22  A.  "I remember you posted out the A about him and I

23  kind of remember you even had your signature saying

24  something about it.  Maybe I'm imagining that, though.

25  It's been a while."

1  Q.  "Yeah.  All right.  Peace, out."

2  A.  "Take care.  Peace, gollum."

3  Q.  "Peace."

4  A.  "Hey, if want further verification, I can send you

5  over a convo I had with El Mariachi earlier today."

6          And that's repeated twice.

7  Q.  Let's go back to the first page of Government's 1.

8  There's a --

9          MR. EICHELBERGER:  We don't need to make that

10 change on the screen, Mr. Daley.

11 BY MR. EICHELBERGER:

12 Q.  There is a reference to a person having been picked

13 up by a carding charge by SS.  What is SS in reference

14 to?

15 A.  Secret Service.

16 Q.  Are you familiar with the reference to IAACA, which

17 is contained within this chat?

18 A.  Yes, sir.

19 Q.  And what is it?

20 A.  It's a web site -- acronym for International

21 Association for the Advancement of Criminal Activity.

22 Q.  Let's move forward, please, to Government's

23 Exhibit 2, beginning at the first page.

24          First question I want to ask you is, what date

25 is Government's Exhibit 2?

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 188 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 183 of 475   Page 188 of 262
KIRBY - DIRECT                                            1-188

```
 1  A.  May 26, 2005.

 2  Q.  Beginning at the beginning, once again I will read

 3  the part of Pit Boss, you will read the part of the

 4  undercover investigation or gollumfun.

 5          "No good word on the hols, they only come with

 6  plastic."

 7  A.  "Growl."

 8  Q.  "Growl.  Figured that was coming."

 9  A.  "Yeppers.  Why no holos by themselves?"

10  Q.  "No idea.  Dude, my friend hit Apple yesterday, they

11  totally knew."

12  A.  "Heh.  What happened?"

13  Q.  "They let him card the S.  The guy came out from the

14  back with the laptops and everything, all laughing and

15  S.  And it's like, quote, anything else you want, sir?

16  We got printers, scanners, all kinds of S."

17  A.  "Heh."

18  Q.  "Three laptops, one swipe."

19  A.  "Good deal.  I'm buying some cards as we speak.

20  Sorry about delay in responding."

21  Q.  "I can sell you some seriously good dumps."

22          And, again, there is smiley emoticon.

23          "Actually, you know what" --

24          MR. EICHELBERGER:  At this point, Your Honor,

25  there is about six lines of data.
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 189 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 184 of 475   Page 189 of 262
KIRBY - DIRECT                                         1-189

1          Rather than reading all that, if I could simply

2   ask the agent --

3   BY MR. EICHELBERGER:

4   Q.  Are we, there, talking about the track-two data that

5   would be encoded on the back of a credit card?

6   A.  Yes, sir.

7   Q.  All right.  We will skip down to where Pit Boss 2600

8   says, "Free."

9   A.  "Heh.  You are an excellent fellow.  LOL."

10  Q.  "Those will make you very happy.  If you like them,

11  2000 for 200."

12  A.  "Just seeing them flash up almost gives me a

13  hard-on, heh.  That's a good deal.  Let me try these out

14  for size.  Okay?"

15  Q.  "No problem.  My guy got 9,000 off one yesterday,"

16  then "dumps by markrich," with a smiley emoticon.

17  A.  "Heh.  I like you more and more by the day."

18  Q.  "Yeah.  I was an A-hole back in the day."

19  A.  "Here I was losing faith in you over those holos.

20  You are a good man, sir.  Heh."

21  Q.  "Did you pick up Business Week?"

22  A.  "No.  Why?"

23  Q.  "ShadowCrew, front cover."

24  A.  "Which issue date?  I take it I wasn't mentioned?

25  No respect, no respect."

1  Q.  "Hold.  May 30, 2005."

2  A.  "Okay.  I'll look it up."

3  Q.  "It mentions the busted folks."

4  A.  "Well, I guess it's a good thing I wasn't

5  mentioned.  Heh."

6  Q.  "Indeed, funny how they credit Deck and Black Ops

7  for running the site, not you, mac, onthefringe."

8  A.  "Oh, well, no.  Credit where credit is due I

9  suppose."

10  Q.  "Hey, whatever happened to that guy midwestdirect?"

11  A.  "Oh, what was his F'ing nickname?  Hold a second,

12  it'll hit me.  Gemini."

13  Q.  "Yes."

14  A.  "Don't know.  He disappeared."

15  Q.  "Shame.  The Jacksonville Apple store is cake,

16  BTW."

17  A.  "Hey, you know any good e-gold exchanges?

18        Jacksonville?  I thought you were hitting the

19  Yankee game the other night."

20  Q.  "Yeah.  I flew down to Jacks yesterday to take care

21  of some stuff.  The bullionexchange.com, direct

22  deposit."

23  A.  "Let me check.  I'm hoping I can deposit in my

24  area."

25  Q.  "You make a deposit at a Wells Fargo or a Bank One,

3:06-cr-01011-CMC   Doc. 26   Date Filed 05/02/08   Entry Number 145   Page 191 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 186 of 475
KIRBY - DIRECT

1-191

1  and," parenthetically, "Bank One deposits can be made at

2  Chase."

3  A.  "No Wells or Bank One here.  Growl."

4  Q.  "Nor over here.  They used to take Washington

5  Mutual."

6  A.  None of those here either.  None of them take WU or

7  MoneyGram any longer?"

8  Q.  "Not sure."

9  A.  "Growl again."

10  Q.  "I thought Black Ops was an ex-KGB agent or some

11  crap."

12  A.  "Oh, no, I knew who he was.  He just liked to think

13  he was a supersp."

14  Q.  "Heh.  A former mortgage broker."

15  A.  "Hey, track one on those dumps you sent.  Any

16  specific format to follow or do you have a generic that

17  will work?"

18  Q.  Bear with me for a second.  I think we may have

19  skipped a page in reading.  There we go.

20  A.  "Yeppers."

21  Q.  "Sucks, some guy is selling blanks on IAACA."

22  A.  "Eyeless?"

23  Q.  "Yeah, expensive as F."

24  A.  "Yep.  I'm ordering from him."

25  Q.  "I get them for 20 bucks a blank."

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 192 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 187 of 475

KIRBY - DIRECT                                              1-192

1  A.  "20.  How much extra for encoding and dumps and

2  embossing?"

3  Q.  "Don't know about the embossing because I have my

4  own embosser, and dumps, I told you the prices."

5  A.  "I certainly like you mare and more each day.  You

6  got any scans of what you are handling?  Eyeless sent

7  scans my way, not bad at all.  Question mark."

8  Q.  "Not sure."

9  A.  "Good quality, though?"

10  Q.  "Heh, to be honest, I could tell they are fake."

11  A.  "Hmm.  Worked at Apple store, though, right?"

12  Q.  "The signature strip is printed."

13  A.  "Okay."

14  Q.  "Apple, I use real cards."

15  A.  "Ah, I see."

16  Q.  "Simons, my reals, other people's reals, and I just

17  encode over them."

18  A.  "Heh."

19  Q.  "They don't even look at the card, you slide it

20  yourself."

21  A.  "That's a D good deal."

22  Q.  "Sometimes they ask to see ID before you slide it."

23  A.  "I'll try those dumps out in the next day or so,

24  okay?"

25  Q.  "90 percent of the time I show my ID on my own, real

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 193 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 188 of 475    Page 193 of 262
KIRBY - DIRECT
1-193

```
 1  quick, then slide the card.
 2          "Okay.  You know listguy is in jail, right?"
 3  A.  "Yep, swiping ATM cards.  They locked his A right in
 4  the ATM room until the police showed up."
 5  Q.  "He got out on bail for a few months.  I think he
 6  was sentenced to around eight years."
 7  A.  "You know, he actually had an MBA."
 8  Q.  "Yeah, I heard.  People in India work cheap."
 9  A.  "Hey, track one on those dumps you sent.  Any
10  specific format to follow or do you have a generic that
11  will work?"
12  Q.  "Yeah, give me one as a sample."
13          And there's track-two data continuing, and if
14  you would read beyond the track-two data.
15  A.  "Name to go on would be Steven Rea."
16  Q.  Responding with track-two data, "Steven, slash,
17  Rea," more data.  And Pit Boss says, "It's basically
18  doing the upwards caret slash upwards caret and six
19  zeros at the end."
20  A.  "God deal.  So where is the expiration in that?
21  It's been a while.  Jan. of 2005?"
22  Q.  "Oh, S, that expired."
23  A.  "I'm betting that dump probably won't work for me,
24  heh?"
25  Q.  "My bad."
```

1    A.   "No prob."

2    Q.   And then there's another track-two data and dump

3    with referencing the name Hoefle, H-o-e-f-l-e, slash

4    Donna slash L Bank of America, National Association,

5    Platinum.

6    A.   "You didn't have to do that, but thanks much.  You

7    skimming or buying these?"

8    Q.   "Buying."

9    A.   "Good deal.  Okay.  I'll try those out.  So do I

10   need to go through you if I need any more of these dumps

11   or what?"

12   Q.   "Yeah, but I'm not making anything off you."

13   A.   "That's fine."

14   Q.   "I can't believe we are reunited."

15   A.   "Heh.  Well, hopefully these forums can come

16   together a bit better than they have been.  I hope so

17   anyway."

18   Q.   "Yeah.  I'm thinking of starting my own forum,

19   Shadowcrewinc, try to reunite all the old-timers that

20   aren't doing time."

21   A.   "Yeah.  You like that SC name, eh?  The old SC

22   domain opens up in July."

23   Q.   "I'm sure someone back-ordered it."

24   A.   "Maybe."

25   Q.   "BRB."

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 195 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 190 of 475

KIRBY - DIRECT                                              1-195

```
 1   A.   "Hey, any idea who the F M-i-n-h Corp. is?"

 2   Q.   "Nope."

 3   A.   "Dip S wanted me to contact him on Yahoo.  Posted

 4   over on mazafaka."

 5   Q.   "HRM, no idea.  Prob some B."

 6   A.   "Yeah, probably.  He was banned as a ripper after

 7   posting for me to contact him."

 8   Q.   "Just ordered 100 AmEx."

 9   A.   "Sweet."

10   Q.   "$600."

11   A.   "What percent success you getting out of those

12   AmEx?"

13   Q.   "Eh, when they work, they work well."

14   A.   "You of the opinion I need to move directly over to

15   AmEx?"

16   Q.   "They are call for auth havy."

17   A.   "Then why you going to the trouble?"

18   Q.   "Cheap enough."

19   A.   "Ah, understood."

20   Q.   "$6 a dump, can't beat it.  Gas, groceries -- gas

21   mainly.  My car loves gas."

22   A.   "So, what?  You go in with five to ten and when you

23   get a call FR" -- for "auth, you just pull out another?"

24   Q.   "Oh, just self-swiping" --

25            I'm sorry, that's your line.
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Pg: 191 of 475   Page 196 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 191 of 475   Page 196 of 262
KIRBY - DIRECT                                                1-196

```
 1   A.  "Oh, just self-swiping or actually shopping?"

 2   Q.  "Yeah.  I like how the last fours all, all the

 3   same.  My last four on my real one is 1001, which is

 4   very, very, very common with AmEx."

 5   A.  "Ah, good deal, very smart.  No troub from anyone

 6   yet?"

 7   Q.  "Nope."

 8   A.  "You have come a long way since the SC days, heh."

 9   Q.  "I've never ordered AmEx from this guy, though.  I

10   used to get 'em from Tron.  These could work for

11   powerbooks.  I got a group of kids who are going to try

12   them."

13   A.  "Well, I thought you were probably still getting

14   from Tron."

15   Q.  "No.  I just ordered a batch from my guy."

16   A.  "Good deal.  You hook me up with AmEx so I can try

17   one of those nifty powerbooks?"

18   Q.  "Yeah.  I only have a few right now.  Are you going

19   tonight?"

20   A.  "Maybe, I need to get my A offline."

21   Q.  "You got an encoder?"

22   A.  "Yes, I do.  Well, I say I do, a buddy of mine."

23   Q.  "You got an AmEx plastic?"

24   A.  "Not that I would want to use.  Do I need to find

25   some AmEx plastic I'm comfy with?"
```

KIRBY - DIRECT                                        1-197

1   Q.  "Eh.  It depends on your state.  Are you in FL?"

2   A.  "Well, South Carolina.  I thought you knew that."

3   Q.  "Never tried S there.  New York is hard as F.  You

4   should be good."

5   A.  "Well, I might give it a go."

6   Q.  "Encode one of those Visas and grab a 17 inch.  Feel

7   rejoiced" -- there's a misspelling -- "that you just

8   made 2,000."

9   A.  "Indeed, going to try that ASAP.  Applewise, I would

10  need to go to Charlotte."

11  Q.  "Which is in NC?"

12  A.  "Now, how am I going to repay your generosity?

13  Correct, NC."

14  Q.  "Don't worry about it?"

15  A.  "Well, I will worry about it.  Tell you what, if I

16  find something I think is profitable, I will let you in

17  as well.  Fair enough?"

18  Q.  "Naw, I don't care.  I'm all about helping people

19  from the old days."

20  A.  "Well, thanks for everything thus far.  Like I said,

21  you have come a long way.  Heh, sounds like a Virginia

22  Slims ad, eh."

23  Q.  "Yeah, I used to be an A-hole in the SC days."

24  A.  "Well, I'm steadily rebuilding myself in these

25  forums so I have some good contacts if you need

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 198 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 193 of 475   Page 198 of 262
KIRBY - DIRECT                                              1-198

1   anything. I wouldn't say you are an A-hole.  I would say

2   that you were as experienced as you seem to be now.

3   That only comes with time."

4   Q.  "Ack, sorry.  I X'd out of your IM."

5   A.  "No prob."

6   Q.  "Can you repaste it?"

7   A.  "Well, I'm steadily rebuilding myself in these

8   forums, so I have some good contacts if you need

9   anything.  I wouldn't say you were an A-hole.  I would

10  say that you were -- I would say that you were as

11  experienced as you seem to be now.  That only comes with

12  time."

13  Q.  "Ah, okay.  I still think we should start our own

14  forum.  It's just a big liability."

15  A.  "Well, maybe later.  I think that starting another

16  forum right now would dilute the community even

17  further."

18  Q.  "I am away from my computer right now."

19          Mr. Kirby, in connection with work on -- with

20  respect to this chat, at page 2 of Government's 2,

21  there's a reference to Pit Boss having flown down to JAX

22  yesterday, that would have been May the 25th of 2005.

23  When checking records, what if anything did you find

24  related to that statement?

25  A.  Checking the joint interest checking account with

1   Bank of America and the name of Jonathan Giannone or

2   Jordan Giannone, on May 25th, 2005, there was an ATM

3   network withdrawal at Discount Stores in Jacksonville,

4   Florida.

5   Q.  And that's referenced in Government's Exhibit 2A; is

6   that correct?

7   A.  Yes, sir.

8   Q.  And that is a statement for what type of an account?

9   A.  It's a Fleet One Premier account, with Bank of

10  America.

11  Q.  All right.  Similarly, with respect to Government's

12  Exhibit 2B, what if anything does it reflect?

13  A.  The affidavit?  Is that what you are referring to?

14  Q.  I'm sorry, was there an American Express statement

15  as well, Government's 2B?

16  A.  Oh, I see it.  On May 25th, 2005, on the AmEx card

17  for Jonathan Giannone, Southwest Airline ticket was

18  purchased from Jacksonville, Florida, to Ft. Lauderdale,

19  Florida.  Date of departure being May 25th.  Passenger

20  name, Jonathan Giannone.

21  Q.  Does the record that you are showing -- looking at,

22  show the last four digits of the AmEx card that's

23  referenced?

24  A.  Shows the last four as 1001.

25  Q.  Thank you.

1  A.  There is also another purchase, also on 5-25 of

2  '05.  A jetBlue airline ticket from Ft. Lauderdale,

3  Florida, to La Guardia International Airport -- or JFK

4  airport in New York.  Date of departure also 5-25,

5  passenger name, Jon Giannone.

6  Q.  Now, with respect to the Fleet One Premier

7  statement, who is the owner of that statement?  That's

8  Government's Exhibit 2.

9  A.  It's a joint account, Jonathan Giannone or Jordan

10 Giannone.

11 Q.  And with respect to Government's 2B, the American

12 Express statement, that's for the card with the last

13 four digits of 1001, who is the owner of that account?

14 A.  Jonathan Giannone.

15 Q.  Thank you.  Moving on, please, to Government's

16 Exhibit 3.  What's the date of chat in Government's

17 Exhibit 3?

18 A.  May 29th, 2005.

19 Q.  Again, I will read the part, in this case, of CIA

20 INTEL, and if you would read Gollum or gollumfun.

21         CIA INTEL said at 11:28 p.m., "Hey."

22 A.  "Greetings."

23 Q.  "Yankees suck -- to see them lose."

24 A.  "Sox fan myself."

25 Q.  "Yankee stadium is always fun."

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 201 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 196 of 475   Page 201 of 262
KIRBY - DIRECT                                        1-201

1  A.  "Never been.  So who is this?  Mark?"

2  Q.  "Yes, Pit Boss 2600."

3          And that's where we will stop with Government's

4  Exhibit 3.

5          MR. EICHELBERGER:  Moving on, please, to

6  Government's Exhibit 4.  You will have to double click

7  within that bar and bring Government's Exhibit 4 back

8  up, please.  Thank you.

9  BY MR. EICHELBERGER:

10 Q.  What's the date of the chat in Government's 4?

11 A.  May 31st, 2005.

12 Q.  I will read the Pit Boss 2600 lines.

13          "Sup?"

14 A.  "Greetings.  AmEx last four is 1003."

15 Q.  "Been looking into this PicPay S.

16          "Growl.  I don't have that last four."

17 A.  "D.  PicPay."

18 Q.  "Some guy was selling it at 25 percent.  It's an

19 e-gold mock-up.  Did some Googlin on it.  It's cool, but

20 they take months to cash you out."

21 A.  "Hey, none of those cards were good, all were

22 declined."

23 Q.  "No S?"

24          And then we have a listing of approximately --

25 appears to be three dumps, that is track-two data,

```
 1   relating to Bank of America Platinum card.
 2           Skipping over, if you would, Agent, read
 3   beginning where gollum says, "No S."
 4   A.  "No S.  None of them for anything.  Those look like
 5   the same batch, interchange direct indicates them as
 6   debit; is that correct?"
 7   Q.  "Yeah.  They are BoA debits.  I would have checked
 8   them out but I wasn't sure on when you were going to use
 9   them."
10   A.  "That's okay.  I got around to it today.  I'll just
11   re-encode and try again."
12   Q.  "My bad."
13   A.  "Heh.  No problem.  Just letting you know.  I'll
14   check those dumps out this evening.  Will advise on how
15   they work."
16           That line is repeated, "I will check those
17   dumps out this evening.  Will advise on how they work."
18   Q.  "Cool."
19   A.  "Thanks again.  I'm getting cards from eyeless
20   tomorrow also."
21   Q.  "What stores are you F'ing?"
22   A.  "Well, going to try Office Depot, Home Depot, and
23   Lowes."
24   Q.  "Nice.  Be careful."
25   A.  "Will do.  Home Depot here rarely looks at the
```

```
 1  card."

 2  Q.  "In NY they UV it."

 3           And that's where we will stop publishing from

 4  Government's Exhibit 4.

 5           Read on, please, to Government's Exhibit 5.  If

 6  you would, what's the date of the chat in Government's

 7  Exhibit 5?

 8  A.  June 3rd, 2005.

 9  Q.  I will read the lines for Pit Boss 2600, and if you

10  would, read the lines for gollumfun.

11           "Man, rental cars don't verify S."

12  A.  "Hey, laptop, grill, LCD TV," in parentheses, "Sony

13  Vega, on those dumps you sent."

14  Q.  "Good.  I am 22."

15  A.  "Very good."

16  Q.  "I chalked my real ID to say I'm 30."

17  A.  "LOL."

18  Q.  "So I can rent wherever I want.  They don't even

19  check my ID."

20  A.  "Okay.  So where you get those groovy dumps?"

21  Q.  "Heh.  You need some?"

22  A.  "Oh, yes.  I like a lot."

23  Q.  "How much did you get off one dump?"

24  A.  "1999 on one, $1698 on one, $699 on third."

25  Q.  "Nice.  You got any e-gold?"
```

```
 1  A.  "Very nice.  No e-gold right now, sent it to

 2  eyeless, who, by the way, hasn't sent the items yet.

 3  Went through escrow though, so no big deal.  So, I might

 4  have some e-gold back fairly soon if numbnuts doesn't

 5  ship."

 6  Q.  "Ah, I needed some and it's a bitch for me to get."

 7  A.  "Go through wahl in Tampa, good legit exchanger."

 8  Q.  "Heh, I flew down to Boston, rented a car with a

 9  forged document."

10  A.  "Heh.  Good deal."

11  Q.  "Carded, carded, carded.  Went to Cape Cod and

12  partied.  Drove back to NY."

13  A.  "You are a busy camper."

14  Q.  "And hit stores all the way down to NY."

15  A.  "So I'm guessing I need to go through you for more

16  of those dumps, eh?"

17  Q.  "Yeah.  I go through a guy I know personally."

18  A.  "How much?"

19  Q.  "What do you need?  How many?"

20  A.  "Say five to ten at a time.  I don't like to have

21  them laying around, as they might die."

22  Q.  "Ah, I don't have any left and I have to buy in

23  bulk."

24  A.  "Ah, gotcha."

25  Q.  "I might" --
```

```
 1          That's the next page.

 2          "I might hit up D.C. tomorrow a.m."

 3   A.   "Heh.  Good deal."

 4   Q.   "BRB.  I got to run to the office and get my mail."

 5          And then CIA INTEL on the same date, 7:24 p.m.,

 6   "Sup, boss man."

 7   A.   "Hey there."

 8   Q.   Back to the first page of Government's Exhibit 5

 9   there is a reference where Pit Boss says that he flew to

10   Boston, rented a car with a forged document.  With

11   respect to Government's Exhibit 5A, which is in

12   evidence, what does it show?

13   A.   I have a statement from Dollar Thrifty Operations

14   doing business as Thrifty Car Rental.  A car rental in

15   the name of a Jonathan Giannone, time out was June 2nd,

16   2005, from Revere, Massachusetts, time in was June 3rd,

17   2005, in New York.

18   Q.   And Revere, Massachusetts is how far from Boston?

19   A.   As I understand, it's a short distance.  I'm not as

20   sure to the exact location.

21   Q.   All right.  With respect to Government's Exhibit 5B,

22   an American Express statement, what does it reflect?

23   A.   On -- purchase for an airline ticket from United

24   Airlines on June 2nd, 2005.  It's from New York, New

25   York, to Boston, Mass.  Date of departure 6-2 of '05.
```

1  Passenger name, Mr. Jonathan Giannone.

2  Q.  And, again, the American Express that was used to

3  pay for the airline ticket from New York to Boston,

4  Massachusetts, was owned by who?

5  A.  What was that question again?

6  Q.  The American Express card, whose was it that was

7  used to pay for this ticket?

8  A.  Jonathan Giannone.

9  Q.  Thank you.  Moving on, please, to Government's

10  Exhibit 6.  What's the date of the chat referenced in

11  Government's Exhibit 6?

12  A.  June 4th, 2005.

13  Q.  You've got the first line this time.  I will be

14  reading the CIA INTEL lines.

15  A.  "Greetings.  Dump fellow got with you yet?"

16  Q.  "Neg."

17  A.  "D."

18  Q.  "I think I have some I can hook you up with."

19  A.  "Hee, hee.  How much?"

20  Q.  "I have 21."

21  A.  "All plats and valid, question mark?"

22  Q.  "All Platinum.  Same bin, didn't check them."

23  A.  "Give me a price."

24  Q.  "HRM, 600 good?"

25  A.  "Sounds good.  Let me see what the piggy bank says

KIRBY - DIRECT                                    1-207

1    and I will let you know.  Okay?"

2    Q.  "E-gold?"

3    A.  "Yeah.  I will need to transfer funds into it

4    though.  I go through wahl in Tampa."

5    Q.  "Let me make it easier.  You got a BofA around?"

6    A.  "Heh, okay.  Yep, I have a BofA."

7    Q.  "Just drop the cash in my account.  Cool?"

8    A.  "I know you ain't going to give me a real account

9    info, that's just silly."

10   Q.  "Heh."

11   A.  "But yeah, that's fine."

12   Q.  "One of my corporations."

13   A.  "Okay.  Shoot."

14   Q.  "Bank of America.  Make sure you tell them it's a

15   Fleet account."

16   A.  "Okay.  I can't deposit till Monday though, right?"

17   Q.  "Don't worry about it.  Account: 9505552565,

18   ACK9505552565, name: A&W Auto Clinic, address: 395 Maple

19   Street."

20   A.  "Groovy."

21   Q.  "Holyoke, MA 1" -- excuse me -- "01040."

22   A.  "Sweet.  I will get that there ASAP, get that in

23   there.  Okay, I'm out to round up the cash.  I will get

24   up with you tomorrow to confirm, send on Monday, okay?"

25   Q.  "You need the S now?"

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 208 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 203 of 475   Page 208 of 262
KIRBY - DIRECT                                          1-208

1  A.  "Wait till tomorrow.  Okay?  I can't use them

2  tonight anyway."

3  Q.  Next page.

4            "No problem."

5  A.  "Thanks much, I appreciate it.  It really is good

6  getting in contact with you again."

7  Q.  "You got to grow some balls and go get some

8  powerbooks."

9  A.  "LOL.  I'm thinking very much about that, especially

10  how those last three turned out."

11  Q.  "Dude, that's all I use them for.  I use the AmEx

12  for gas."

13  A.  "Heh.  I'm learning.  I'm learning.  Anyway, let me

14  get off here and start rounding up money.  Okay?"

15  Q.  "Have fun."

16  A.  "18 TR, period, and thanks again."

17            MR. EICHELBERGER:  And, Your Honor, again, the

18  stipulation between the parties is, is that the account

19  number and name that is referenced in this chat is, in

20  fact, the account that is opened with information

21  provided by Mr. Giannone and that he is the owner of

22  that account.

23            THE COURT:  All right.  We need to take our

24  afternoon break now.

25            MR. EICHELBERGER:  Thank you.

```
 1            THE COURT:  Ladies and gentlemen, you may leave

 2  the pads in your seats, just turn them over.  Do not

 3  discuss the case while you are on break.  We will take

 4  10 minutes.

 5            (Jury not present)

 6            THE COURT:  All right, we will take a 10-minute

 7  break.

 8            MR. EICHELBERGER:  Thank you, Your Honor.

 9            (Short recess)

10            THE COURT:  I'm working on the jury

11  instructions.  Are there -- were there any statements

12  allegedly made by the defendant after his arrest to the

13  police or to whoever arrested him?

14            MR. EICHELBERGER:  No, Your Honor.

15            THE COURT:  There is no issue concerning that?

16            MR. EICHELBERGER:  I don't believe there are.

17            THE COURT:  Okay.  All right.  Thank you.

18            All right.  You may bring the jury back in.

19            (Jury present)

20            THE COURT:  All right.  You may continue.

21            MR. EICHELBERGER:  Thank you, Your Honor.

22  BY MR. EICHELBERGER:

23  Q.  All right.  Mr. Kirby, let's move to Government's

24  Exhibit 7, please.  Need to first ask you, what is the

25  date of the chat transcript referenced in Government's
```

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 210 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 205 of 475    Page 210 of 262
KIRBY - DIRECT                                              1-210

1  Exhibit 7?

2  A.  June 6, 2005.

3  Q.  You will read gollumfun, I will read CIA INTEL.

4  A.  "Hey, you online?  Hello, ready to do business

5  here.  Growl.  Pit Boss, I'm ready to deposit funds,

6  want to talk to you quickly first.  Hello, bank's going

7  to close soon."

8  Q.  And it says, "CIA INTEL is away.  I am currently

9  away from the computer."

10  A.  "Now it comes with an away message?  WTF."

11  Q.  "TEA."  And then, "Yeah."

12  A.  "Hello.  Hello."

13  Q.  "Hey."

14  A.  "Okay.  Got dumps?  I might still be able to make it

15  to the bank before they close."

16  Q.  "Sure."

17         MR. EICHELBERGER:  And at this point, Your

18  Honor, we have, I believe, it's 21 dumps from Bank of

19  America, as the track-two data, in connection with -- it

20  appears one, two, three, four, five, six, seven, eight,

21  nine, 10 -- 11 of the 21.  There are names of account

22  owners that are included.  We will not read those into

23  the record, but slide over to where gollumfun begins

24  speaking at 4:25 p.m. on June the 6th of 2005.

25  A.  "Okay.  All right.  If I deposit first thing in the

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 211 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 206 of 475   Page 211 of 262
KIRBY - DIRECT
1-211

```
 1  morning?  I'm not sure if I can make it to the BofA in

 2  25 minutes.  And the ones that aren't valid you

 3  replaced?  Yes?  Hopefully.  Please."

 4  Q.  "Yeah.  Might have to wait a week until the next

 5  batch."

 6  A.  "Good deal.  You will have the funds in the

 7  morning.  I will check dumps and let you know which ones

 8  are good to go.  Okay?"

 9  Q.  You got a dump checker?

10  A.  "Nope, not right now.  Heh.  Check at the terminal.

11  Heh."

12  Q.  "Funny."

13  A.  "I thought you would like that one."

14  Q.  Next page.

15  A.  "You are a D fine man if these dumps work as well as

16  the last ones."

17  Q.  "You remember greywolf, the druggie?"

18  A.  "Yes, I liked the fellow," in parenthesis, "a bad

19  druggie though.  What about him?"

20  Q.  "I was just thinking of him.  Isn't he locked up?"

21  A.  "Yep, for a long time.  Was in on drug charges when

22  he got indicted on the SC busts."

23  Q.  "GD, have you ever been locked up?"

24  A.  "Not yet, let's hope it never comes."

25  Q.  "Not even the drunk tank?"
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 212 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 207 of 475   Page 212 of 262
KIRBY - DIRECT                                          1-212

1  A.  "Nope.  H.  I didn't start drinking until last year

2  and I'm 35."

3  Q.  "GD."

4  A.  "Heh, yeah.  Former wife not a drinker and therefore

5  neither was I.  Ew girl is -- and I love it.

6          "So what made you think of greywolf?"  And we

7  have a failed to send message.  "So what made you think

8  of greywolf?"

9  Q.  Now, at this point we have got 21 dumps that came

10  through referenced in the 6-6-05 transaction.

11          In connection with preparation for this case,

12  Mr. Kirby, I want to put before you what is marked as

13  Government's Exhibit 7A.  That's in evidence.

14          If you would tell the jury what Government's 7A

15  is?

16  A.  It's a spreadsheet of the summary of the dumps that

17  we received, three on the 5-31 and the 21 from June 6.

18  Q.  All right.  And if you would just explain to the

19  jury what the information is that is contained on

20  Government's Exhibit 7A?

21  A.  Far left column, we have the date that we actually

22  received it.  Of course, the sender name in the second

23  column, who we actually received them from, the issuing

24  bank for all of the cards that we received -- all of

25  them were Bank of America -- followed by the account

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 213 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 208 of 475    Page 213 of 262
KIRBY - DIRECT                                                    1-213

1  number.  And the account name is after that.  That's

2  actually the account number associated with the card

3  number, and then the available balance.

4  Q.  Now, when you have available -- I'm sorry.  When you

5  have an available balance on these Bank of America

6  numbers, what does that mean?

7  A.  That's the amount of available credit that would

8  have been available from using those numbers.

9  Q.  This is available credit or were these debit cards?

10  A.  They were debit cards.

11  Q.  All right.  So, again, the numbers that were in

12  there as of the date you checked, what was the

13  cumulative total that a person bent on mischief would

14  have been able to make with the information that came

15  from either Pit Boss 2600 or CIA INTEL?

16  A.  $132,327.17.

17          MR. EICHELBERGER:  Your Honor, at this time we

18  have two stipulations I would like to read into

19  evidence.

20          THE COURT:  All right.

21          MR. EICHELBERGER:  First stipulation is that

22  the parties hereby stipulate that if any of the account

23  holders referred to in the indictment were called to

24  testify, they would state that the accounts and account

25  information referenced in paragraphs 3A, 3B, and 3C of

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 214 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 209 of 475    Page 214 of 262
KIRBY - DIRECT                                           1-214

1   count 1; paragraph 2 of count 3; and paragraph 2 of

2   count 4 of the indictment were transmitted and used

3   without the authorization of the account owners.

4           And then, secondly, the next stipulation states

5   that the defendant, Jonathan Giannone, and the

6   government stipulate that the communications referenced

7   in paragraph 4 of count 1, paragraph 2 of count 3, and

8   paragraph 2 of count 4 each involved a wire transmission

9   in interstate commerce.

10          Those are the remaining two stipulations in

11  this case, Your Honor.  I would like to have them marked

12  and entered into evidence as, I believe, Government's 25

13  and 26.  Am I correct?  26 and 27, respectively.

14          THE COURT:  All right.  Granted.

15  BY MR. EICHELBERGER:

16  Q.  All right.  Let's move on to Government's

17  Exhibit 8.  And what was the date of the chat referenced

18  in Government's 8?

19  A.  June 7th, 2005.

20  Q.  Again, you will be reading gollumfun and I will be

21  reading CIA INTEL.

22  A.  "Greetings.  Funds deposited.  Please confirm.

23  gollum."

24  Q.  "Yep.  Did they give you any problems?"

25  A.  "None at all.  I'll be checking those dumps out

1   ASAP, putting on matching plastic."

2   Q.  "Oh, so you're going out hard this evening?"

3   A.  "Well, probably tomorrow.  Plastic will be done

4   tomorrow morn or the next day.  Taking them all out at

5   once."

6   Q.  "Nice.  Best Buy?  If you find a cotton candy

7   machine anywhere" --

8   A.  "Heh.  I never had any luck at est Buy."

9   Q.  -- "I will buy it off you."

10  A.  "LOL.  A cotton candy machine.  What the H you going

11  to do with that?"

12  Q.  "My girl loves cotton candy."

13  A.  "Hee, too funny.  You seriously want a cotton candy

14  machine?  I do not want to look for one of those D

15  things and then get stuck with it.  And what do they

16  cost?"

17  Q.  "Anywhere from 100 to $1200."

18          And we can stop publishing Government's 8 at

19  that point and let's go just to page 4, please, of

20  Government's 8.

21          And all I want to ask you right now, Mr. Kirby,

22  is at what time did this chat in which CIA INTEL was

23  advised that funds were deposited, what time did it end?

24  A.  2:15 p.m.

25  Q.  And was that clock accurate?

```
 1   A.  Yes, sir.

 2           MR. EICHELBERGER:  And again, Your Honor,

 3   there's a stipulation that Mr. Giannone on this same

 4   date appeared and withdrew $500 at approximately

 5   3:50 p.m. that same day.

 6           THE COURT:  All right.

 7   BY MR. EICHELBERGER:

 8   Q.  With respect to the $600, you have Government's

 9   Exhibit 6 -- 8A with you -- excuse me --

10   Government's 8A?

11   A.  Yes, sir.

12   Q.  And what is Government's 8A?

13   A.  It's a customer receipt from Bank of America for

14   deposit for $600.

15   Q.  And who made that deposit?

16   A.  Agents of this service along with gollum.

17   Q.  Okay.  And what account was the $600 deposited into?

18   A.  The account that was given in the chat.  Most of it

19   here, the numbers are asterisked out except for the last

20   four, 2565.

21   Q.  It would be the A&W Auto Clinic account at Bank of

22   America?

23   A.  Correct.  Correct.

24   Q.  The information that was provided by CIA INTEL

25   during one of our chats?
```

1  A.  Correct.

2  Q.  Moving on now, please, to the chat that bears

3  Government's Exhibit Number 9, and please note we are

4  going to pick up quite a bit of speed on these now.

5           First off, Government's 9, what is the date?

6  A.  June 8th, 2005.

7  Q.  Again, you are gollumfun.

8  A.  "Well, you have fun with that $600 yet?"

9  Q.  "Heh, not yet.  You have funds with the numbers

10 yet?"

11 A.  "Well, weekend is coming up, heh, not yet."

12 Q.  And then Pit Boss says, "You find my cotton candy

13 machine?"

14 A.  "LOL.  Not yet, I'm looking though.  Can't believe

15 you really want one of those."

16 Q.  "Mark don't kid around."

17 A.  "LOL."

18 Q.  Then back to CIA INTEL at 5:06 p.m.  "Shortman:  But

19 will you hit up when I'm back?"

20          CIA INTEL says, "I need a cotton candy machine,

21 see if you can find one of those."

22          And that's where we will end publishing

23 Government's Exhibit 9.

24          At this point we can move on to Government's

25 Exhibit 10.  And let's establish, please, the date for

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 218 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 213 of 475   Page 218 of 262
KIRBY - DIRECT                                                      1-218

1  the chat reflected in Government's Exhibit 10.

2  A.  June 10th, 2005.

3  Q.  CIA INTEL says, "How are the numbers?"

4  A.  "Two have been good so far, one dead.  They are

5  going out later with some more."

6  Q.  "How much did you get off two?"

7  A.  "400 off one, 1200 off the other.  Good deal so

8  far."

9  Q.  "You're only going for $400 bucks, you stupid?"

10  A.  "Not me, one of the Fs I sent out.  I fixed his A

11  over it too."

12  Q.  "Did you find the cotton candy machine?"

13  A.  "Why F no, found one on samsclub.com.  Thinking

14  about COBing it or I can shoot you over a COB and you

15  can do it yourself."

16  Q.  "I have COBs, I'm just lazy.  I got my legit AmEx

17  Platinum today."

18  A.  "AmEx Plat, mmm, yummy."

19  Q.  "Same card number as my goldc."

20          And that's where we'll stop.  I want to refer

21  you please to Government's Exhibit 10.  What is

22  Government's Exhibit 10 -- 10A?  I'm sorry.

23  A.  10A is actually a statement for Jonathan Giannone,

24  American Express account.

25  Q.  And for -- what is the closing date for Government's

1  Exhibit 10A?

2  A.  May 13th, 2005.

3  Q.  So that's the statement that predates the chat in

4  Government's Exhibit 10; is that correct?

5  A.  Correct.

6  Q.  And what is the level of the American Express card

7  for Jonathan Giannone prior to 6-10-05?

8  A.  It's a Rewards Plus Gold Card.

9  Q.  And then with respect to Government's Exhibit 10B,

10  what is Government's 10B?

11  A.  The American Express statement in the name of

12  Jonathan Giannone, closing date June 14th, 2005.

13  Q.  Following this chat?

14  A.  Correct.

15  Q.  And what's the level of privileges on the American

16  Express card referenced in Government's Exhibit 10B?

17  A.  Platinum card.

18  Q.  We can move forward, please, to Government's

19   Exhibit 11.  What's the date of the chat referenced in

20  Government's 11?

21  A.  June 17th, 2005.

22  Q.  This one Pit Boss starts out saying, "Yo."

23  A.  "Yo."

24  Q.  "CC Suppliers stole $600 of my cash and three

25  powerbooks.  How about that?"

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 220 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 215 of 475   Page 220 of 262
KIRBY - DIRECT                                              1-220

```
 1  A.  "I'm a bit busy with these Fs that have jacked my

 2  account right now.  Hey, you still have info on David

 3  Renshaw Thomas?"

 4  Q.  CIA INTEL responds, "Yeah, somewhere."

 5  A.  "I need everything you have."

 6  Q.  "But at the moment I'm searching for a Christopher

 7  James Branca."

 8  A.  "Heh.  Who the H is that?"

 9  Q.  "CC Suppliers."

10  A.  "All right.  Good deal."

11  Q.  "He stole from me, dude.  I tried to help him out

12  and he robs me blind.  Now I'm in the hole big time."

13  A.  "Branca, as in C. Branca?"

14  Q.  "Yeah.  That's his name, Chris Branca, 30 Hintz

15  Street.

16          "Ooh, now, I'm even more P'd.  Wallingford,

17  Connecticut.  Why?"

18  A.  "C. Branca ripped me for a NetBank account about

19  four years ago."

20  Q.  "How much?"

21  A.  "A couple grand from what I remember.  Also screwed

22  a few others.  Not happy to know that he is C. Branca as

23  well."

24  Q.  "He's an F'ing chump.  I'm about to screw him over

25  royally."
```

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 221 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 216 of 475    Page 221 of 262
KIRBY - DIRECT                                        1-221

```
 1  A.  "Heh."

 2  Q.  "I just prank called his house, told his parents

 3  that I'm the Secret Service and that we have a warrant

 4  and he should turn himself in."

 5  A.  "D, that's cold-hearted."

 6  Q.  "Now I'm going to call the SS and tell them he's

 7  coming."

 8  A.  "D, man, you should at least give him a chance."

 9  Q.  "Dude, he trashed the hotel room, caused damage,

10  ordered 50 movies."

11  A.  "Ah."

12  Q.  "Took all the laptops and disappeared.  I went out

13  of my way to help him and this is how he repays me.  F

14  that.  Remember who was beat for over 6,000."

15  A.  "Yeah.  From el and the Fs either hacking my account

16  or doing a session-ID takeover."

17  Q.  "El prob did it for sure."

18  A.  "Yeah, 6K.  Good chunk of change.  How the F did you

19  let him beat you out of it?  You knew him, yes?"

20  Q.  "Yes, I put him in a hotel with all the stuff and he

21  bounced with it all this morning.  I just scared the S

22  out of his father and brother."

23  A.  "Oh, LOL.  I thought you were talking about that

24  3700 from the shortman deal.  You mean you actually had

25  the products?  D."
```

KIRBY - DIRECT                                           1-222

```
 1  Q.  "Yes.  So add shortman over 10,000.  F.  Do me a
 2  favor, post CC Suppliers info all over the place."
 3  A.  "Oh, I will, I sure as F'ing will.  You should
 4  contact him and tell him to message me.  I'm already
 5  pissed at other things.  If I take it OT on him also, it
 6  will go hard.  Gollum."
 7  Q.  "He is MIA."
 8  A.  "What do you mean MIA?  He will show up."
 9  Q.  "Just post his info all over the place."
10  A.  "Good deal.  Since I can't see what you posted, what
11  did they say?"
12  Q.  "I didn't post."
13  A.  "Oh, I will, don't worry about that.  Gollum."
14  Q.  "You will?"
15  A.  "I said I would."
16  Q.  "Under gollumfun?"
17  A.  "And you feel uneasy doing this yourself because?"
18  Q.  "Mr. 3,000 isn't well known."
19  A.  "Let me guess, he knows your real name as well?"
20  Q.  "Of course -- well, sorta."
21  A.  "Yep, I thought as much.  I will take care of
22  things.  Okay?"
23  Q.  "Okay."
24          Moving on, please, to Government's Exhibit 12.
25  And first, what's the date of the chat transcript
```

1  referenced in Government's Exhibit 12?

2  A.  June 18, 2005.

3  Q.  CIA INTEL says, "You get your account back?"

4  A.  "Not yet.  Got an ICQ message from casino.  Says

5  he's waiting n smash.  Heard that a couple of other

6  names were compromised as well.  Not sure if a session

7  hack or what at this point.  You still pissed at

8  Mr. Branca?"

9  Q.  "Of course.  I just posted his info."

10  A.  "Oh, well, I wish you hadn't done that.  I was

11  wanting him to reimburse my A for that bank account he

12  owes me on.  Growl.  He's the dude with the BofA

13  debits?  I figured I could get an A of those in return

14  before I posted his info."

15  Q.  "He is the dude with the BoA debits?"

16  A.  "I don't know; I was asking you.  I figured that's

17  where you got those debits and the F owes me money from

18  way the H back, so" --

19  Q.  "No, he has nothing cool.  He's a brook as convicted

20  felon."

21  A.  "Ah, okay."

22  Q.  "Well, err, he sure as F isn't broke anymore.

23  Growl."

24  A.  "F.  I would agree with that.  Got a phone number

25  for him?  I might dial him up and ask where my funds

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 224 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 219 of 475   Page 224 of 262
KIRBY - DIRECT
1-224

1  are.  Growl.  LOL."

2  Q.  Next page.  It's a posting.  "Registered; group:

3  readers; posts:  18; member number:  1893; join:

4  27 March '05.

5          "Here is complete information of a long time

6  ripper on ShadowCrew, carderplanet, and who knows

7  many -- and who knows how many other sites.

8          "User names: CC Suppliers, CBranca,

9  VendingMachine, who knows how many others.

10          "Location: Wallingford, Connecticut.

11          "Full legal name: Chris Branca.

12          "Legal address: 30 Hintz Drive, Wallingford,

13  Connecticut.

14          "Date of birth: 7-17-1986.

15          "Cell phone number: 203-368-8740.

16          "Home phone: 203-284-5825.

17          "Other useful information:  He is currently on

18  probation.  Probation officer's name: Patricia Warren;

19  probation officer's phone number: 203-877-1253; AIM

20  screen name: Chris SBBK."

21  A.  "D.  Ain't you a bit scared he will post the same

22  about you?"

23  Q.  "No."

24  A.  "LOL.  Okay."

25  Q.  "He doesn't have my real name."

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 225 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 220 of 475   Page 225 of 262
KIRBY - DIRECT                                    1-225

1    A.   "Ah, good deal."

2    Q.   "He thinks he does, which is 10 times even better.

3    Besides I'm sure someone on IAACA got burned by him and

4    would be interested in using his information."

5    A.   "Amen.  Me."

6    Q.   "What are you doing?  I have already called his

7    probation officer many times giving her all sorts of

8    useful information."

9    A.   "Heh.  You really are going to F him over."

10   Q.   "Of course."

11          And we will stop publishing Government's 12 at

12   that point.

13          And if we could, let's move on, please, to

14   Government's Exhibit 13.

15   BY MR. EICHELBERGER:

16   Q.   To start out, what is the date of the chat

17   referenced in Government's Exhibit 13?

18   A.   June 20th, 2005.

19          MR. EICHELBERGER:  And, Mr. Daley, if we could,

20   we'll go to Exhibit 13, page 3, to start publishing this

21   chat.  And I will begin with the line of CIA INTEL at

22   10:15 p.m.

23   BY MR. EICHELBERGER:

24   Q.   "Did you ever find that mother F'ing cotton candy

25   machine?"

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Pg: 221 of 475
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 221 of 475    Page 226 of 262
KIRBY - DIRECT
1-226

1  A.  "LOL.  Not yet."

2  Q.  "Just booked my travel arrangements thanks to CC

3  Suppliers."

4  A.  "Heh.  Meaning?"

5  Q.  "Meaning, I'm highly doubting I'll get my S back."

6  A.  "Ah, I would agree with that.  Spoke to F lately?"

7          MR. EICHELBERGER:  And we'll stop publishing

8  there and move over, please, to Exhibit 13, page 8, at

9  the very bottom.  If we can go to the very bottom where

10  it's 11:59 p.m.  It looks like we've got one page too

11  many.  If we could go back one page, please.  Should be

12  able to do it with the arrow.  There we go.

13  BY MR. EICHELBERGER:

14  Q.  At the bottom CIA INTEL at 11:59 p.m. says, "Hey,

15  you know what I'm going to school for, right?"  Next

16  page.

17  A.  "No.  What"?

18  Q.  "Law."

19  A.  "School.  I figured you were older."

20  Q.  "Grad school now."

21  A.  "Ah, good deal."

22  Q.  "Would like to be a DA for a few years.  Wanna get

23  the nickname."

24  A.  "LOL.  What H would you cause?"

25  Q.  "No deal Johnny."

KIRBY - DIRECT                                    1-227

1  A.  "Ah."

2  Q.  "Actually, most lawyers start as assistant DAs."

3  A.  "Ah, I didn't know that.  I figured a load started

4  out as public defenders."

5  Q.  "Yeah.  You can go either route.  DA is less work

6  though."

7  A.  "Ah."

8  Q.  "I'd go real easy on carding cases, though."

9  A.  "LOL."

10  Q.  "Don't they go pretty easy on them anyway these

11  days?"

12  A.  "Really?"

13  Q.  "Yeah.  CCF got 30 days."

14          MR. EICHELBERGER:  We'll stop publishing here.

15          If we could go back at the first part, I

16  believe it was page 3 of Government's 13, Mr. Daley, if

17  we could go there.

18  BY MR. EICHELBERGER:

19  Q.  And at the top where it said that CIA INTEL said

20  that he just booked travel arrangements through CC

21  Suppliers, Agent Kirby, Government's 13A, what does it

22  reflect?

23  A.  American Express credit card statement in the name

24  of Jonathan Giannone.

25  Q.  And are -- is there anything related to travel?

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 228 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 223 of 475   Page 228 of 262
KIRBY - DIRECT                                                    1-228

1  A.  On 6-20 with Independence Airlines the ticket was

2  purchased from JF Kennedy airport in New York to Dulles

3  Airport in D.C., date of departure, June 21st; passenger

4  name, Jonathan Giannone.

5  Q.  That's the same date as the chat for

6  Government's 13, 6-20-2005?

7  A.  Yes, sir.

8  Q.  Thank you.  Moving on, please, to Government's

9  Exhibit 14.  First thing, what is the date of the chat

10  in Government's Exhibit 14?

11  A.  June 28th, 2005.

12  Q.  Gollum starts.

13  A.  "It's down right now, should be back up in two to

14  three days, probably sooner."

15  Q.  "Ah, okay.  Did they give you your account back?"

16  A.  "Yep.  And I have been hearing some reports about

17  generous.  Any idea about that?"

18  Q.  "What kind of reports?"

19  A.  "Tron," in parentheses, "if it's the real one, said

20  that generous ripped them."

21  Q.  "No idea.  What's Tron's ICQ?"

22  A.  "41781, but it wasn't through ICQ, it was posted on

23  carders."

24  Q.  "Carders"?

25  A.  "Carders.ws."

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 229 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 224 of 475    Page 229 of 262
KIRBY - DIRECT                                                    1-229

1  Q.  "Under what forum?"

2  A.  "Hall of shame."

3  Q.  And then the conversation skips over to Pit Boss

4  2600.  "Sup."  This is bottom of the first page of

5  Government's 14, if we can go back.  "Sup."

6  A.  "How goes it?"

7  Q.  "I registered on that forum.  Not much."

8  A.  "Which one?"

9  Q.  "On my Sidekick, carder.ws."

10  A.  "Ah, got you."

11  Q.  And we'll stop publishing at that point.

12          What is a Sidekick?

13  A.  It's a T-Mobile device.  It's a telephone, slash,

14  electronic device.  You can send text messages, that

15  sort of thing.

16  Q.  Sort of like a fancy telephone?

17  A.  Right.

18  Q.  Moving on, please, to Government's Exhibit 15.  The

19  date of Government's 15?

20  A.  July 1st -- and on here is 2006, but I think that's

21  2005.

22  Q.  Were there any transactions on -- in July 1st of

23  2006, at all respecting this investigation?

24  A.  No, sir.

25  Q.  If -- it's a typographical error; it should be 2005?

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 145    Page 230 of 262
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 225 of 475    Page 230 of 262
KIRBY - DIRECT                                          1-230

```
 1   A.  Correct.

 2   Q.  And just for the record, that's the date that you

 3   put in.  Was it generated by the computer itself in

 4   terms of working together these chat transcripts?

 5   A.  No, it was not.  I put the header date when I was

 6   trying to organize into dates.

 7   Q.  All right.  We're going to read a very short portion

 8   of this starting with gollumfun.

 9   A.  "Hello.  Just checking in.  Gollum."

10   Q.  "Hey."

11   A.  "Greetings.  How goes it?"

12   Q.  "Good.  Visiting a friend in CA" -- or California.

13           We'll stop there.  With respect to Government's

14   Exhibit 15 did you check -- referring to

15   Government's 15A, what is that?

16   A.  It is a statement from Dollar's Thrifty Car Rental.

17   A car rental was made in the name of Jonathan Giannone,

18   checked out on June 30th, 2005, in Santa Ana,

19   California, and it was returned on July 4th, 2005, in

20   Santa Ana, California.

21   Q.  And that was Thrifty Car Rental?

22   A.  Yes, sir.

23   Q.  And who is the person that is identified as having

24   rented the car at that time?

25   A.  Jonathan Giannone.
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 231 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 226 of 475   Page 231 of 262
KIRBY - DIRECT                                              1-231

1   Q.  Similarly, with respect to Government's Exhibit 15B

2   in evidence, what does it reflect?

3   A.  It is the Fleet One Premier joint checking account

4   in the name of Jonathan Giannone or Jordan Giannone.

5   Q.  And what does it reflect, sir?

6   A.  Get there -- on July 5th, 2005, there was a debit

7   card purchase at the China Village restaurant in

8   Fullerton, California.

9   Q.  With respect to Government's 15C, what does it

10  reflect?

11  A.  It's a statement of travel activity for Jonathan

12  Giannone.  On 6-30-2005, Jonathan Giannone boarded a

13  flight from JFK going to LAX, which is Los Angeles, and

14  then a connecting flight from Los Angeles to SNA, which

15  is Santa Ana, California.

16  Q.  What was the date of arrival in Santa Ana,

17  California?

18  A.  6-30-2005.

19  Q.  All right.  And with respect to Government's

20   Exhibit 15D, what does it reflect?

21  A.  American Express credit card statement in the name

22  of Jonathan Giannone.

23  Q.  Any transactions around this time in California?

24  A.  Yes.  On June 27th, 2005, United Airlines from New

25  York, New York, to Los Angeles, California, and then to

1  Santa Ana, California, and the return flight from Los

2  Angeles, California, to New York, New York.  Date of

3  departure 6-30 of 2005, passenger name, Jonathan

4  Giannone.

5  Q.  Thank you, sir.  Moving on, please, to Government's

6  Exhibit 16.  Again, let's establish the date of the

7  transaction on June -- of Government's Exhibit 16.

8  A.  July 2nd, 2005.

9  Q.  Gollumfun starts.

10  A.  "Sup."

11  Q.  "Yo."

12  A.  "Yo.  Yo.  Yo."

13  Q.  "Nothing.  You?"

14  A.  "Same here.  Need an iPod, one of those nifty photo

15  deals like I saw at Best Buy last night."

16  Q.  "So go to Apple and card one."

17  A.  "I need to, but you said you were out in Cali."

18  Q.  "Yes, I am, walking around, trying to find a

19  passport photo place."

20  A.  "Kinko's."

21  Q.  "Yeah, that's a good point.  Don't see one around,

22  though."

23  A.  "Phone book."

24  Q.  "Hey."

25  A.  "Question mark."

1   Q.  "Get me the phone number for the Sheridon in

2   Pasadena, California."

3           And we can stop publishing at that point.  The

4   records we referred to back in Government's 15, 15A,

5   15B, 15C, or 15D, what did they reflect with respect to

6   presence in California, specifically to the Pasadena,

7   California area?

8   A.  There were transactions in California on each --

9   you're talking about from 15?

10  Q.  From 15.  Same time frame.  This is the day after.

11  A.  Right.

12  Q.  According to those records -- according to those

13  records is Mr. Giannone still in California?

14  A.  Yes.

15  Q.  Moving on, please, to Government's Exhibit 17.  And

16  at this point we will start publishing -- the first

17  thing we will do is establish the date of this chat.

18  A.  July 6, 2005.

19          MR. EICHELBERGER:  Mr. Daley, if we could go to

20  the second page of Government's 17.

21  BY MR. EICHELBERGER:

22   Q.  And we will start at 1:26 with the gollumfun line,

23  "So where is generous?"

24  A.  "So, where the H is generous now?  I haven't heard

25  from him in a while, though I did hear from Branca

1    yesterday."

2    Q.   "What did he say?"

3    A.   "Oh, he remembered ripping me and said he had to go

4    and would be back later.  I told him I would keep an eye

5    out for him.  Funny, he left before I had a chance to

6    issue a threat.  Kind of made me sad."

7    Q.   "Yeah.  He's supposedly in Cali."

8    A.   "Yeah.  Well, I would like a few more words with the

9    dip S."

10   Q.   "Yeah.  He's, like, I'm in Cali.  Yo, I'm like

11   cool.  So am I.  Let's hang out."

12           And we can stop there.  I want to refer,

13   please, to Government's Exhibits 17A and 17B.

14   Government's 17, the chat, indicates that CIA INTEL is

15   in California.  What does 17A show?

16   A.   It's the Fleet One Premier checking account -- joint

17   checking account in the name of Jonathan Giannone or

18   Jordan Giannone, shows a debit card purchase on 7-5 in

19   Fullerton, California.

20   Q.   All right.  And how about Government's Exhibit 17B?

21   A.   That is the American Express statement for the card

22   number in the name of Jonathan Giannone.  On 7-5 of

23   2005, Thrifty Car Rental at John Wayne airport in

24   California for the dates June 30th, 2005, until

25   July 4th, 2005.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 235 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 230 of 475
KIRBY - DIRECT

1-235

1   Q.  Thank you.  Let's continue on, please, to

2   Government's Exhibit 18.  Government's 18, what is the

3   date of the chat session?

4   A.  September 25th, 2005.

5   Q.  We will read the first part, about midway down the

6   page, beginning at the top at 2057 with gollumfun's

7   line.

8   A.  "Hello.  Hello.  How goes it?"

9   Q.  "Hey, rough weekend."

10  A.  "Really?  Mine has been pretty sweet.  Sorry to hear

11  you had woes."

12  Q.  "Well, I was just in the wrong area."

13  A.  "Ah, I gotcha.  So nice profit this weekend?"

14  Q.  "No, just lots of traffic."

15  A.  "Gotcha, sorry to hear it."

16  Q.  "Bush protest, lame S."

17  A.  "LOL.  What kind of F protest?"

18  Q.  "A big one.  Watch the news."

19  A.  "LOL.  Don't catch much TV."

20  Q.  "It was, quote, one of the largest, end quote,

21  protest in years."

22  A.  "Hee.  Hee."

23  Q.  "Since the hotel I picked was right on the same

24  street as the White House, it was shut down."

25  A.  "Guess I missed out on that one.  Too F'ing busy I

1   guess."

2   Q.  "With thousands of protestors."

3   A.  "Hee.  Hee."

4   Q.  And we will stop reading Government's 18 at that

5   point.

6          I want to refer you, please, Agent Kirby, to

7   Government's Exhibit 18A.  What is Government's 18A?

8   A.  It says Dollar Thrifty Car Rental statement for a

9   car rented by Jonathan Giannone from Baltimore,

10  Maryland, DWI airport.  Time of checkout was

11  September 15th, 2005; time of return was October 13th,

12  2005.

13  Q.  And Baltimore airport is how close to Washington

14  D.C.?

15  A.  Fairly close.

16  Q.  All right.  With respect to Government's

17  Exhibit 18B, what does it reflect?

18  A.  The American Express credit card statement in the

19  name of Jonathan Giannone.

20  Q.  And?

21  A.  On 9-26 of 2005, there's a -- an electronic payment

22  to the Marriott in Washington, D.C.  Arrival date was

23  June 23rd, 2005; departure date 9-24-2005, in the amount

24  of $1,004.62.

25  Q.  And, again, that was an AmEx or American Express for

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 237 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 232 of 475   Page 237 of 262
KIRBY - DIRECT

1-237

1    Jonathan Giannone; is that correct?

2    A.  Correct.

3    Q.  Let's move on, please, to Government's Exhibit 19.

4    Let's start with the -- establishing the date of the

5    chat transcript for Government's 19.

6    A.  October 23rd, 2005.

7            MR. EICHELBERGER:  Mr. Daley, if we could go to

8    page 4 of Government's 19.

9    BY MR. EICHELBERGER:

10   Q.  Beginning at the top.  "Teenagers get light S.  You

11   know the original enhance?"

12   A.  "No, I don't think so anyway."

13   Q.  "The enhance from way back in the day?"

14   A.  "I remember the name."

15   Q.  "The guy who sold me his user name.  He was a kid."

16   A.  "But not the product or the posts."

17   Q.  "Like 17."

18   A.  "Yeah, that was it."

19   Q.  "He got busted while on probation."

20   A.  "And" --

21   Q.  "On probation for a carding related, six months, aka

22   time served."

23   A.  "Six months was all he got"?

24   Q.  "Couldn't make bail.  Yes."

25   A.  "D."

 1          MR. EICHELBERGER:  At this point, Mr. Daley,

 2   could we go back to Government's Exhibit 1, page 1?

 3   Here we have CIA INTEL talking about enhanced.  Let's go

 4   back to Government's 1, page 1.  And if you could scroll

 5   down, please.  Stopping right there.

 6   BY MR. EICHELBERGER:

 7   Q.  Let's begin reading in the line about midway down

 8   for Pit Boss 2600, says, "Remember enhance, the kid I

 9   bought the name from?"

10   A.  "It's been a D long time since we spoke.  Yep, I

11   remember enhance.  He went down too.  F."

12   Q.  "He's sitting in jail right now in New Hampshire.

13   Got picking up on a carding charge by SS.  Can't get

14   bail because of probation, made the news."

15          And that's all we need to read at this point.

16          And now, if we could, let's refer, please, to

17   Government's Exhibit 20.  Again, let's establish the

18   date of the chat, Government's 20.

19   A.  November 8th, 2005.

20   Q.  And let's move down, please, to the second session,

21   start where it references Tuesday, November the 8th,

22   8:21:05.  CIA INTEL says, "Hey, nosa is such a F'ing

23   ripper."

24   A.  "I agree.  Not much I can do though with zoomer's

25   sorry A calling the shots."

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 239 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 234 of 475
KIRBY - DIRECT

1-239

```
 1   Q.  "Scarface just gave me a tracking number."

 2   A.  "I love Scarface."

 3   Q.  "For TNT."

 4   A.  "One of the best vendors ever."

 5   Q.  "Posted instantly with the correct destination."

 6   A.  "Heh."

 7   Q.  "Scarface rocks."

 8   A.  "Yep."

 9   Q.  "I'm going to Hawaii tomorrow."

10   A.  "Sweet.  Need a buddy?  Heh."

11   Q.  "Cheap flight."

12   A.  "How much"?

13   Q.  "First class all the way, plus Hyatt, four nights,

14   $2300."

15   A.  "Not bad."

16   Q.  "Gonna do some work down there."

17   A.  "Good deal."

18   Q.  That's it for that chat transcript.

19           I'm going to refer you, please, to Government's

20   Exhibit 20A.  What is Government's 20A?

21   A.  It is a travel statement for Jonathan Giannone from

22   United Airlines.

23   Q.  And where is Jonathan Giannone going and what is the

24   date?

25   A.  Let me get the right one.  On 11-9-2005, Jonathan
```

1  Giannone booked a flight from JFK in New York to LAX,

2  Los Angeles, and from LAX to HNL, which is Honolulu,

3  Hawaii.

4  Q.  You said booked the flight on 11-9, or is that the

5  date of leaving?

6  A.  That's actually the date he boarded the plane.

7  Q.  All right.  On 11-9?

8  A.  Correct.

9  Q.  All right.  And where was he flying to?

10  A.  Honolulu, Hawaii.

11  Q.  With respect to Government's Exhibit 20B, what does

12  20B reference?

13  A.  It's a car rental statement from Dollar Thrifty Car

14  Rental in the name of Jonathan Giannone.  A car was

15  rented on November 9th, 2005, in Honolulu, Hawaii, and

16  returned on November 14th, 2005, also in Honolulu.

17  Q.  9 through 14, how many nights would that be?

18  A.  Six.

19  Q.  10, 11, 12, 13?  Checked out on the 9th --

20  A.  Oh, yeah, car returned on the 14th.

21  Q.  Okay.  And Government's Exhibit 20C, please?

22  A.  American Express statement in the name of Jonathan

23  Giannone.

24  Q.  Does it reflect where Mr. Giannone was going to stay

25  while in Hawaii?

1  A.  Correct.  On 11-13 of 2005, there is a payment to

2  Hyatt Hotels Waikiki, Honolulu, Hawaii, in the amount

3  658.98.  There is also on 11-15 of '05, a Thrifty Car

4  Rental payment for a car rented in Honolulu on 11-9 of

5  '05 to 11-14 of '05, in the name of Jonathan Giannone in

6  the amount of 246.51.

7  Q.  Any records regarding the cost of the United

8  Airlines tickets from the United States over to Hawaii?

9  A.  I do not see United on here.

10  Q.  Is it on Government's 20A?  Is the information

11  contained on Government's 20A?

12  A.  20A was just the back for the United statement.

13  Q.  Does the statement from United, does not give the

14  price?

15  A.  No, sir.

16  Q.  All right.  Thank you.  Just a few more things and

17  then we will wrap up.

18          In connection with preparation for this case

19  did you do some work with respect to a purported chat

20  transcript between a imakemovies4free and a person who

21  went by the name of ElevenOnee?

22  A.  Yes, sir.

23          MR. EICHELBERGER:  Your Honor, at this time we

24  would like to read the excerpt that we had discussed

25  before the jury came out this morning.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 242 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 237 of 475   Page 242 of 262
KIRBY - DIRECT                                        1-242

```
 1              THE COURT:  You may proceed.

 2              MR. EICHELBERGER:  May I approach, briefly?

 3              THE COURT:  Yes.

 4              (Bench conference)

 5              MR. EICHELBERGER:  My proposal, Your Honor, is

 6    to say that in pleadings filed in connection with the

 7    case, the defendant had made the following

 8    representations, or something along that line, just to

 9    identify who they are attributed to.

10              THE COURT:  Just say "the defense."

11              MR. EICHELBERGER:  Defense, I will.

12              (In open court)

13              MR. EICHELBERGER:  If I could read for the

14    record that in pleadings that were filed in connection

15    with this case the defense has made the following

16    statements:

17              "Chris Cutler is undoubtedly the individual who

18    sold the credit card numbers in question to Brett

19    Johnson and subsequently told Brett Johnson to deposit

20    the $600 into Jonathan's Bank of America business

21    account as a deposit on a Ford F-150 truck which Cutler

22    had arranged to purchase from Jonathan's A&W Auto

23    Clinic.  Jonathan conducted business at 395 Maple

24    Street, Holyoke, Massachusetts 01040, for several months

25    prior to going out of business.
```

 1              "Jonathan conducted a surreptitious online
 2   conversation with the aforementioned Chris Cutler.
 3   Jonathan utilized a newly-developed program called
 4   Camtasia Studio.  This program is designed to save what
 5   occurs on the screen in real time.
 6              "During that online conversation, Jonathan
 7   appears as imakemovies4free.  During the online
 8   conversation a discussion regarding a May 2005 attempted
 9   sale of a car through A&W Auto Clinic ensued.
10              "The back story of this sale involves a mutual
11   acquaintance of both Jonathan and Cutler, an individual
12   named Chris Branca.  It is Branca who referred Cutler to
13   Jonathan's car dealership.
14              "Cutler was interested in purchasing an F-150
15   Ford truck.  Jonathan told Cutler that he had one on
16   consignment from the previous owner of the dealership
17   and a 20 percent deposit, or $600, was required to hold
18   the truck.
19              "Because Jonathan's business was a new eBay
20   business, he had not set up a PayPal system for
21   accepting payments.  Therefore he would simply give a
22   potential purchaser his business account number.
23   Cutler, having been the individual who sold the credit
24   cards to Johnson, simply had Johnson deposit the $600
25   into Jonathan's account."

1          Your Honor, that concludes the reading of the

2   material from the defense pleadings.

3          THE COURT:  All right.

4          MR. EICHELBERGER:  If we could, I would like to

5   bring Government's Exhibit 21 up on the screen.

6   BY MR. EICHELBERGER:

7   Q.  Agent Kirby, in connection with this case did you

8   retrieve and obtain from the defense pleadings a

9   transcript of the purported transcript -- of the

10  purported conversation between imakemovies4free and

11  ElevenOnee?

12  A.  Yes, sir.

13  Q.  And is that what we have up on the screen now,

14  Government's Exhibit 21?

15  A.  It is.

16  Q.  Do you know the date that the chat actually took

17  place?

18  A.  November 13th, 2006.

19  Q.  November 13th of 2006.  In this case I will read

20  imakemovies4free and if you would read ElevenOnee.

21          "Yo."

22  A.  "Who's this?"

23  Q.  "John."

24  A.  "Question mark, John who?"

25  Q.  "John, Branca's friend, the guy you met at the car

1   lot."

2   A.   "Last year around May-ish."

3   Q.   "Yeah, what up" -- I'm sorry that's your line.

4   A.   "Yeah, what up."

5   Q.   Before we go any further, in connection with your

6   preparation, this is actually the exact transcript that

7   the defense prepared; is that correct?

8   A.   Correct.

9   Q.   Did you have a chance to compare this transcript

10  with the Camtasia file that's referenced?

11  A.   Yes, we did.

12  Q.   Is this chat transcript actually accurate in all

13  respects?

14  A.   No, sir.  There are some errors.

15  Q.   In what respect?  For instance, if we can refer

16  to -- after imakemovies4free says, "John, Branca's

17  friend, the guy you met at the car lot."  Who, in fact,

18  said the next line, "Last year around Mayish"?

19  A.   Imakemovies4free.

20  Q.   So that should have been my line, although it's

21  attributed to your character, that is, the Chris Cutler

22  character?

23  A.   Correct.

24  Q.   All right.  So let's back up and I will read that

25  line.  Is there another instance of that having

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Page 246 of 262
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 241 of 475   Page 246 of 262
KIRBY - DIRECT                                      1-246

```
 1  happened, by the way?
 2  A.  To the best of my recollection there's a line left
 3  out between 6 and 7.
 4  Q.  All right.
 5  A.  From ElevenOnee where he actually says, "Ah, Okay."
 6  Q.  How about line 13?
 7  A.  I can't really remember line 13.
 8  Q.  Okay.  Well, let's start back at line 6.
 9  A.  Okay.
10  Q.  "John, Branca's friend, the guy you met at the car
11  lot last year around Mayish."
12  A.  "Yeah.  What up?"
13  Q.  "Nothing much, chilling.  You?"
14  A.  "Funny.  FM."
15  Q.  "Yeah.  I have since taked up film at school after I
16  closed the car dealership business."
17  A.  "Kind of, umm, it was becoming a hassle."
18  Q.  "BRB."
19  A.  "I can see why.  Probably BC you take people's bread
20  and doesn't call back.  I sent you like C notes for a
21  car in your BoA account."
22  Q.  "Back.  What, question mark.  WTF are you talking
23  about?  Oh, I remember you saying you wanted to buy that
24  beat-up truck for your fishing boat stuff.  Your cell
25  was cut off" -- I'm sorry that's your line.
```

```
 1   A.   "Your cell was cut off."

 2   Q.   "Question mark."

 3   A.   "I tried calling."

 4   Q.   "I will give you your cash back.  No problem.  My

 5   bad."

 6   A.   "Naw, it's straight, doggie."

 7   Q.   "You sure?  Can I send you a check back?  I remember

 8   now you saying you were going to do it and, yeah, I

 9   changed my cell phone number shortly after."

10   A.   "Yeah, it's cool."

11   Q.   "But my screen name never changed.  You should have

12   IMed me or something."

13   A.   "I was on a boat."

14   Q.   "Oh, okay.  Well, all right.  How is the fishing

15   going?  Catch anything good this year besides a cold?"

16   A.   "Fine."

17   Q.   "Yo.  Did you ever try to message me from the screen

18   name Pit Boss?  Pit Boss 2600?"

19   A.   "Yeah, that was me and John."

20   Q.   "Generous?"

21   A.   "Yeah."

22   Q.   "I never saw that name before, weird.  So, what up?

23   Where you at?  Still living in Southington or whatever

24   it was called?"

25   A.   "Naw, MA."
```

```
 1  Q.  "Mass?"

 2  A.  "Yep, that's where I fish out of."

 3  Q.  "Oh, cool.  I go to MA a lot.  My bro goes to school

 4  there."

 5          Next page please.

 6          "Maybe we can grab a drink or something on

 7  me."

 8  A.  "Sure, hit me up.  I GG though."

 9          MR. EICHELBERGER:  Mr. Daley, can we go back to

10  the first page of Government's Exhibit 21?

11  BY MR. EICHELBERGER:

12  Q.  Now, with respect to line 6 and 7 where it says,

13  "John, Branca's friend, the guy you met at the car lot

14  around -- last year around Mayish," Agent Kirby, in

15  connection with preparations for this case, did you

16  obtain Government's Exhibit 21A from Southwest Airlines?

17  A.  Yes, sir, we did.

18  Q.  This chat took place on November the 13th, 2006; is

19  that correct?

20  A.  Yes, sir.

21  Q.  What does Government's Exhibit 21A reference as a

22  connection between Mr. Chris Cutler and Mr. Jonathan

23  Giannone?

24  A.  It shows Southwest tickets to be -- for a departure

25  date of February 4th, 2005, from Islip, New York, to
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 145   Pg: 244 of 475
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 244 of 475   Page 249 of 262
KIRBY - DIRECT                                                          1-249

1  Orlando, Florida, for both Jonathan Giannone and

2  Christopher Cutler and paid for by Mr. Jonathan

3  Giannone.

4  Q.  Both tickets?

5  A.  Yes, sir.

6  Q.  Three months before Mr. Cutler purportedly met

7  Mr. Giannone for the first time at the car lot?

8  A.  Correct.

9  Q.  If we can clear the screen.  Go, please, to

10  Government's Exhibit 22 which is in evidence.  There is

11  a reference to Mr. Cutler being a fisherman.  Can you

12  tell us what Government's 23 is -- 22?  Excuse me.

13  A.  It's a manifest for a Sea Harvest, Inc., vessel

14  operator -- vessel, Captain Bob.  It's actually a crew

15  manifest.

16  Q.  And is this a record that was obtained from the Sea

17  Harvest, Inc., the operator of the vessel the Captain

18  Bob?

19  A.  Yes, sir.

20  Q.  Again, this is a business record?

21  A.  Correct.

22  Q.  What's the date and time out for the Captain Bob?

23  A.  November 9th, 2006.

24  Q.  And what's the date and time in for the Captain Bob?

25  A.  November 20th, 2006.

KIRBY - DIRECT                           1-250

1   Q.  It goes out before the chat, comes in after this

2   purported chat?

3   A.  Correct.

4   Q.  If we could go to page 2 of Government's

5    Exhibit 22 -- excuse me, we need to go to page 3.  What

6   are we looking at on page 3?

7   A.  A listing of the crew.

8   Q.  And we have just blown up a name.  Who was on that

9   ship between November the 9th and November the 20th of

10  2006?

11  A.  Chris Cutler.

12  Q.  If we could, let's go forward now to Government's

13  Exhibit 23.  Again, what are we dealing with here?

14  A.  Sea Harvest, Inc., fishing vessel settlement

15  release.  The vessel was the Captain Bob.

16  Q.  Again, this is document -- business document that

17  was obtained from Sea Harvest reflecting the Captain

18  Bob?

19  A.  Correct.

20  Q.  What does it reflect as the date out for the ship --

21  fishing expedition?

22  A.  November 9th, 2006.

23  Q.  And ending on what date?

24  A.  November 20th, 2006.

25  Q.  And whose name is contained on line 3?

```
 1   A.   Christopher H. Cutler.

 2           MR. EICHELBERGER:  Agent Kirby, thank you.  My

 3   voice is tired.  That's all I have.

 4           THE WITNESS:  Thank you.

 5           THE COURT:  All right.

 6           Mr. Liotti, you may cross-examine.

 7           We will break at 5:30.

 8           MR. LIOTTI:  Judge, I was going to suggest -- I

 9   know it's a half hour of wasted time -- but I was going

10   to suggest that we had been through a lot this afternoon

11   and I do have some legal matters that I would like to

12   take up with the court also.

13           THE COURT:  All right.

14           All right.  Ladies and gentlemen, I will excuse

15   you, then, until tomorrow morning at 9:30.  Remember,

16   tomorrow we will be starting at 9:30.  Please take your

17   pads and leave them in the jury room, and do not discuss

18   the case with each other or with anyone else, or allow

19   anyone to discuss it with you this evening.  And please

20   be in the jury room at 9:30 tomorrow morning.  Have a

21   safe drive.  Thank you.

22           (Jury not present)

23           THE COURT:  All right.  Agent Kirby, you may

24   step down.  You may not discuss your testimony with

25   anyone over the evening recess.
```

3:06-cr-01011-CMC   Doc# 26   Date Filed 05/02/08   Entry Number 146   Page 23 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 247 of 475   Page 23 of 285
KIRBY - DIRECT                                    2-23

```
 1              MR. EICHELBERGER:  Thank you, Your Honor.

 2         (Short recess)

 3              THE COURT:  Okay.  All right.  I think we are

 4    ready now.  You may bring the jury in.

 5              And, Agent Kirby, you may come back up.

 6         (Jury present)

 7              THE COURT:  Good morning, ladies and gentlemen.

 8              THE JURY:  Good morning.

 9              THE COURT:  We are having a few little computer

10    problems this morning, but we are trying to get

11    underway, so hopefully things are settled down.

12              Agent Kirby had finished his direct yesterday,

13    but Mr. Eichelberger remembered something else and so

14    he's been asked -- he's asked for permission to go back

15    into his direct and add a little bit, and Mr. Liotti has

16    graciously agreed to that.  And so Agent Kirby is going

17    to continue on direct for a few more minutes.

18                   BOBBY JOE KIRBY, JR., RESUMED

19                   DIRECT EXAMINATION - CONTINUED

20    BY MR. EICHELBERGER:

21    Q.  Good morning, Mr. Kirby.

22    A.  Good morning.

23    Q.  We will be very short.

24              I neglected to ask you yesterday, in connection

25    with the deposit of $600 into the A&W account -- I
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 24 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 248 of 475   Page 24 of 285
KIRBY - CROSS                                           2-24

1  believe it was on June 6th of 2005; is that correct?

2  A.  Yes, sir.

3  Q.  -- did you obtain and review bank records for the

4  A&W account leading up to that deposit?

5  A.  Yes, I did.

6  Q.  And if you would, just tell the jury how much money

7  was in that account prior to the $600 deposit?

8  A.  If I remember correctly, it was at a zero balance.

9  The statement had cleared and there was at least a zero

10 balance, or close to that, for the month prior, I would

11 say.

12 Q.  Thank you.

13          MR. EICHELBERGER:  That's all I have.

14          THE COURT:  All right.  Mr. Liotti, you may

15 cross-examine.

16          MR. LIOTTI:  Thank you.

17                    CROSS-EXAMINATION

18 BY MR. LIOTTI:

19 Q.  Good morning, Agent.

20          MR. LIOTTI:  Good morning, ladies and

21 gentlemen.

22 A.  Good morning.

23          MR. LIOTTI:  And good morning, Your Honor.

24          THE COURT:  Good morning.

25 BY MR. LIOTTI:

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 25 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 249 of 475   Page 25 of 285
KIRBY - CROSS                                          2-25

1   Q.  If I may, Agent, I would like to just ask you a few

2   questions about your testimony yesterday.  Now, being a

3   novice as I am concerning computers, I looked at these

4   exhibits and I noted that you had dates on the top of

5   each one of the government exhibits, correct?

6   A.  Correct.

7   Q.  Now, did you have any e-mail addresses on these

8   things or any other address as to the location from

9   whence they came?

10  A.  Those -- that's not really applicable.  An e-mail

11  address isn't involved with instant messaging and chats.

12  Q.  Okay.  But there is no identifying information

13  concerning where this chat is emanating from; isn't that

14  correct?

15  A.  The only identifying information is the name or ICQ

16  number, or ICQ name, associated with that person.

17  Q.  Right.  So an e-mail address would provide

18  information about the source of the chat, right, the

19  location from which it emanated, correct?

20  A.  You are referring to e-mails?

21  Q.  Yes.

22  A.  Which are not involved in this chat.

23  Q.  I understand, but I'm just pointing out that we

24  don't have an address, do we, as to where these things

25  came from?

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 26 of 285
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 250 of 475    Page 26 of 285
KIRBY - CROSS                                                        2-26

```
 1   A.   That is true.

 2   Q.   So, anywhere in the universe of the Internet,

 3   someone by the name of Pit Boss 2600 could be

 4   communicating with the other person on the other end of

 5   this chat who's referred to as gollumfun; isn't that

 6   correct?

 7   A.   That is correct.

 8   Q.   Okay.  And gollumfun could be anywhere also,

 9   correct?

10   A.   That is correct.

11   Q.   Okay.  Now, do I have it right that when you

12   referred to gollumfun you are referring to in the

13   government exhibits as Brett Johnson?

14   A.   Correct.

15   Q.   Okay.  So it's the government's contention here that

16   Pit Boss 2600 -- you believe to be Jonathan Giannone --

17   was involved in these chats, as you describe them, with

18   Brett Johnson?

19   A.   Correct.

20   Q.   Okay.  Anywhere in here among these exhibits do you

21   see a reference to the actual name Brett Johnson?

22   A.   No, you don't.

23   Q.   Okay.  Anywhere in here -- I think, except for

24   perhaps the last chat that I saw yesterday -- do you see

25   a reference to Jonathan Giannone?
```

1  A.  Not as I recall.

2  Q.  Okay.  So, it is at least a possibility that

3  somebody who has that name Pit Boss 2600 could be saying

4  they are Pit Boss 2600 and not be Pit Boss 2600; is that

5  correct?

6  A.  I would say that is incorrect.

7  Q.  Couldn't happen?  There's only one person who can

8  use that name?

9  A.  That's not what I'm saying.

10  Q.  I'm sorry?

11  A.  That's not what I'm saying.

12  Q.  Okay.  What are you saying?

13  A.  More than one person can use that name.  That name

14  has a user name and a password.  If the original owner

15  for that account gives someone that user name and

16  password, they could use that account.

17  Q.  Okay.  So that is more precise and I appreciate

18  that.  So, the caveat that you are adding is that

19  anybody can use that name except they have to have a

20  password, correct?

21  A.  That's correct.

22  Q.  Okay.  So, if the person who originated that name

23  Pit Boss 2600 decided to give out the name and the

24  password, or if other people learned of it, then those

25  people could use that name, correct?

```
 1  A.  That is correct.

 2  Q.  Okay.  And the same thing with gollumfun, correct?

 3  A.  Correct.

 4  Q.  Okay.

 5          THE COURT:  Mr. Liotti, excuse me just a

 6  moment.

 7          We must have a major hearing going on in the

 8  ceremonial courtroom and a lot of people out there in

 9  the hall.  Would you mind stepping out and asking them

10  if they could be quiet?

11          THE CSO:  Yes, ma'am.

12          THE COURT:  Thank you.

13          MR. LIOTTI:  Thank you, Judge.

14          THE COURT:  Thank you.

15          MR. LIOTTI:  Should I continue?

16          THE COURT:  You may proceed.

17          MR. LIOTTI:  Thank you.

18  BY MR. LIOTTI:

19  Q.  All right.  So that's by virtue of just addresses

20  and names.  And the same thing would be true of the

21  other name that you mentioned here, which is CIA INTEL,

22  correct?

23  A.  That's true.

24  Q.  In order to use that name somebody would have to

25  have the name and the password, right?
```

3:06-cr-01011-CMC  Doc. 26  Date Filed 05/02/08  Entry Number 146  Page 29 of 285
USCA4 Appeal: 25-6132  Doc: 26  Filed: 09/19/2025  Pg: 253 of 475  Page 29 of 285
KIRBY - CROSS                                              2-29

1  A.  Correct.

2  Q.  Okay.  Now, let's go on a little bit further.  Now,

3  in this case it's the government's theory that

4  Mr. Giannone is Pit Boss 2600 and he is CIA INTEL,

5  correct?

6  A.  Correct.

7  Q.  Okay.  And you are endeavoring to establish that by

8  offering these government exhibits and showing travel

9  plans are referred to by Pit Boss 2600, or CIA INTEL,

10  and then offering some travel records for Mr. Giannone

11  which may coincide with what's referred to in the chats

12  in the way of travel; isn't that so?

13  A.  Travel is one means.

14  Q.  Okay.  But that's what you have in these 24

15  government exhibits, right?

16  A.  We have travel, also credit card statements,

17  personal banking accounts.

18  Q.  Okay.  But that's the identity part of it that you

19  are trying to show.  That's how you are trying to link

20  Mr. Giannone up with the wire fraud and the identity

21  theft, that's how you are trying to show it's him,

22  correct?

23  A.  That is one means we are showing it's him.

24  Q.  Right.  And that will be -- and the Court will

25  charge the jury on this -- but that would be in the

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 30 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 254 of 475   Page 30 of 285
KIRBY - CROSS                                                    2-30

```
 1  nature of circumstantial evidence, correct?

 2  A.  It's according to how you look at it.

 3  Q.  Okay.  Because you don't have in the chats

 4  themselves Jonathan Giannone saying, "It's me.  This is

 5  who I am," correct?

 6  A.  That's correct.

 7  Q.  All right.  So, let's go a little bit further.  Now,

 8  the first chat that we have a record of, I believe, is

 9  on or about May 26 of '05.

10  A.  I think it's May 23rd.

11  Q.  23rd?  May 23rd of '05.  Now, at that point

12  Mr. Johnson is in custody and he's out on bail and he's

13  working with the Secret Service; isn't that right?

14  A.  He's working with us.

15  Q.  And there are agents who are seated right next to

16  him while he's on the Internet, correct?

17  A.  Correct.

18  Q.  And the agents are there and they are suggesting to

19  him, among other things, what he should say to

20  Pit Boss 2600 in the form of a chat, right?

21  A.  That's incorrect.

22  Q.  Okay.  But Brett Johnson, a/k/a -- also known as

23  gollumfun, is involved in the chat activity with Pit

24  Boss 2600?

25  A.  He's the person at the keyboard.
```

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 31 of 285
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 255 of 475    Page 31 of 285
KIRBY - CROSS                                                      2-31

1   Q.  As part of the investigation?

2   A.  Correct.

3   Q.  Which you, that is the Secret Service, is

4   monitoring?

5   A.  Correct.

6   Q.  Right?  So, as we look at the chats, Brett Johnson

7   is essentially being fed information by the Secret

8   Service to elicit responses from Pit Boss 2600; isn't

9   that right?

10  A.  That is incorrect.

11  Q.  Well, as we look at the chats, you tell me, didn't

12  Brett Johnson most of the time either restate what Pit

13  Boss 2600 said or raise a question about that?

14  A.  I can't really answer that question without looking

15  back at the chats.  Give me a specific --

16  Q.  But what you said to Brett Johnson, that is the

17  Secret Service, was to try and get Pit Boss to talk a

18  lot on the chat, right?

19  A.  That is incorrect.

20  Q.  Try and get Pit Boss 2600 or CIA INTEL or whomever

21  else you may have been investigating at the time to

22  implicate themselves in a crime; isn't that right?

23  A.  That is incorrect.

24  Q.  So, is it your testimony here that the Secret

25  Service did not provide any portion of a script or the

1  content of any statements made by Brett Johnson in

2  connection with these various chats?

3  A.  That's correct.

4  Q.  Nothing?

5  A.  We did not tell him what to say, there was no

6  script.

7  Q.  Okay.  But Brett Johnson was advised of the content

8  of the investigation.  He knew what you guys were going

9  after; isn't that right?

10 A.  It was an investigation.

11 Q.  Okay.  And you informed him that he could help

12 himself if he was able to get the goods on some other

13 people, implicate other people in criminal activity;

14 isn't that right?

15 A.  I really can't speculate.  I did not have that

16 conversation with Mr. Johnson.

17 Q.  So, it's your testimony here that that would be

18 speculation on your part to suggest that Brett Johnson

19 was trying to help himself in these chats?

20 A.  I'm testifying that I did not have a conversation

21 with Brett Johnson prior to the investigation beginning.

22 Q.  All right.  But you have been doing this for four

23 years, right?

24 A.  That's correct.

25 Q.  Okay.  So you know how these investigations go down,

1  right?

2  A.  I would hope so.

3  Q.  Okay.  And you are involved in a computer fraud

4  investigation and you want to know who is involved in

5  computer fraud, right?  Who Brett Johnson knows?  You've

6  got somebody who is working the inside of computer

7  fraud, you believe, right?

8  A.  That's correct.

9  Q.  He's cooperating.  You want him to get the goods on

10  people, don't you?  You want him to make cases, and he

11  knows he's got to make cases because if he doesn't he

12  doesn't get credit for it, correct?

13  A.  It's an investigation.

14  Q.  Right.  So there's no doubt in your mind, there's no

15  speculation here about what Brett Johnson was

16  endeavoring to do when he was speaking with or chatting

17  with Pit Boss 2600, right?

18  A.  It's an investigation.

19  Q.  Is there speculation about it?

20  A.  Not that it's an investigation.

21  Q.  It's a criminal investigation, right?

22  A.  I agree.

23  Q.  By the federal government?

24  A.  Correct.

25  Q.  Okay.  And by the way, when you say chat, chat to me

1  connotes speaking, right?

2  A.  Internet chat is typing.

3  Q.  Right.  Okay.  We are talking about written

4  documents and only written documents here, right?

5  A.  Correct.

6  Q.  So, for example, a chat would not enable you, if you

7  are sitting next to Brett Johnson while he's chatting

8  with somebody over the Internet, to tape record a

9  conversation with that person, right?

10 A.  I'm not sure if I understand your question.

11 Q.  Well, tape recording has to do with the spoken word,

12 okay?  The chat, even though it sounds like people are

13 speaking, it really relates to typing, right?

14 A.  Correct.

15 Q.  So you couldn't tape record a conversation based on

16 these chats, right?

17 A.  The conversation is words typed on a screen which is

18 being recorded via Camtasia, as we spoke about

19 yesterday.

20 Q.  You don't want to answer my question?

21 A.  That it -- it was your question.

22 Q.  Okay.  Are there any tape recordings of

23 conversations, actual voice conversations, between Brett

24 Johnson and Jonathan Giannone?

25 A.  Tape is audio.  There is no audio; there is video.

1   Q.  Okay.  So, this is it, right, no tape recordings?

2   A.  Video recordings of the chats that took place of the

3   conversation.

4   Q.  But just the actual written documents?

5   A.  All they were, were words typed on the screen and

6   that's what you had.

7   Q.  I heard you say that three or four times now.

8   A.  Correct.

9   Q.  Okay.  Now, during the course of your investigation

10  were you concerned about zeroing in on the address of

11  Pit Boss 2600?

12  A.  Define "address."

13  Q.  Okay.  Location where Pit Boss 2600 actually was

14  when he was chatting with Brett Johnson?

15  A.  The first thing we wanted to do was find out who was

16  behind the name.  Once you do that, you find a physical

17  address associated with that person, yes.

18  Q.  Okay.  So, this started on May 23rd or thereabouts.

19  When is the first time that Brett Johnson says, "I'm

20  Brett Johnson, who are you?"

21  A.  I can't recall if that was said.

22  Q.  Do you know if that was ever suggested by the Secret

23  Service during the course of this investigation?  You

24  know, let's get the names out there.  Let's try and get

25  his name, whoever this person is?  Was that suggested?

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 36 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 260 of 475   Page 36 of 285
KIRBY - CROSS                                                    2-36

1    A.  We never suggested anything to Mr. Johnson.

2    Q.  Well, wasn't that kind of an obvious part of the

3    investigation?  You just told me that that's the first

4    thing that you look for, you want to get the actual name

5    of the person, right?

6    A.  That's the investigation.

7    Q.  And as the investigation, you want to get the actual

8    name of the person, correct?

9    A.  That is the purpose of the investigation.

10   Q.  All right.  That's the first order of business, get

11   the name out there.  So, do you think you can get the

12   name out there a little more quickly if Mr. Johnson

13   said, "I'm Brett Johnson, who are you?"

14   A.  That's not the way these operations work.

15   Q.  Oh, I understand.  Computer people don't want to

16   reveal their identity, but you need to know the identity

17   as part of the investigation, correct?

18   A.  That's what we do during the investigation.  That's

19   our job.

20   Q.  I know.  I know.  I'm just asking you whether you

21   posed that question or Mr. Johnson poses the question in

22   that fashion just to see what you may get back?

23   A.  Actually, that was -- that question was posed, the

24   first three -- the second chat.

25   Q.  It was posed?

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 37 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 261 of 475   Page 37 of 285
KIRBY - CROSS                                                    2-37

1  A.  Yes, it was.

2  Q.  Okay.  Do you remember which government exhibit

3  that's in?

4  A.  The first one.

5  Q.  Okay.  Could I see that please?

6          MR. EICHELBERGER:  I will show it to you.

7  BY MR. LIOTTI:

8  Q.  Let's take a look at Government Exhibit No. 1.  And

9  this is with Mr. Eichelberger's assistance, pointing out

10  a particular sentence, he was kind enough to provide you

11  with a copy of Government Exhibit 1, take a look at the

12  first page of that document.  Do you have it, sir?

13  A.  Yes, sir.

14  Q.  All right.  Now, down at the bottom you will see Pit

15  Boss 2600.  That's the person who's chatting, correct?

16  A.  Correct.

17  Q.  If I misstate anything, Agent, please tell me.

18  Okay?

19  A.  Yes, sir.

20  Q.  Right after that "You know his real name, right?"

21  And then we go to gollumfun, "No, I never ask real names

22  and told people never to tell me.  Little rule of

23  mine."  Okay.  Who were they referring to in that

24  conversation?

25  A.  I guess they would be referring to Enhance since it

 1  was a couple of lines before that.

 2  Q.  Someone else, correct, other than that Pit Boss 2600

 3  or gollumfun; is that right?

 4  A.  Correct.

 5  Q.  Okay.  So, the actual question -- I think you can

 6  give that back --

 7  A.  May I interrupt you one second?

 8  Q.  Sure.

 9  A.  Your original question is addressed at the top of

10  the page, where we actually asked, "Who are you?"  That

11  was your original question.

12  Q.  Okay.  Let's focus on that.  You can hold on to that

13  for a moment.

14  A.  Okay.

15  Q.  Let's focus on that.  The question is, "Who are

16  you?"  Okay?  And the initial response was a name that

17  you had mentioned yesterday, which is Mark Rich; is that

18  correct?

19  A.  Correct.

20  Q.  Now, do you know that name Mark Rich?

21  A.  I did not know that name at the time.

22  Q.  But Mark Rich is a pretty well-known name; isn't it?

23  A.  I know it now, learned it through the investigation.

24  Q.  Wasn't there a Mark Rich who was pardoned by

25  President Clinton on the last days of his

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 39 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 263 of 475   Page 39 of 285
KIRBY - CROSS                                        2-39

1  administration, a Mark Rich?

2  A.  I couldn't answer that.

3  Q.  You are not sure?

4  A.  I couldn't answer that.

5  Q.  All right.  In any event, those two references that

6  we see here, are those the references that you are

7  talking about or referring to as far as names are

8  concerned?

9  A.  You asked a direct question, did we ever ask who was

10  on the other end, and that first conversation, the one

11  we just spoke of, that question was asked.

12  Q.  My question to you is:  Is this the only time that

13  that was done, as far as you can recall?

14  A.  I cannot answer that question.

15  Q.  Because you don't recall?

16  A.  It's 170 pages of chats.

17  Q.  I can understand that.  I'm just asking you if you

18  recall or not?

19  A.  I do not recall.

20  Q.  If you don't recall, just tell me you don't recall.

21  A.  I think there's one more instance that I can think

22  of, but I can't recall exactly where it is.

23  Q.  I'm not asking you to memorize everything.  I just

24  want to know if you can recall it or not.

25  A.  I cannot recall any specific --

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 40 of 285
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 264 of 475    Page 40 of 285
KIRBY - CROSS                                            2-40

1  Q.  When that name Mark Rich was thrown out there on the

2  first page of that first exhibit, did the Secret

3  Service, to the best of your knowledge, do anything at

4  that stage to investigate the veracity of that

5  statement, the truthfulness of that statement?  The

6  existence of Mark Rich?  Did you do any --

7  A.  There was no need to.

8  Q.  Sir --

9          MR. LIOTTI:  Your Honor, I have to -- I'm

10  sorry.  I have to ask that the witness be admonished

11  because he's not responding to my questions.  My

12  question is, did he, and he gives me an answer of,

13  "There was no need to."  It's a yes or no question.

14          THE COURT:  Answer yes or no, if you can.

15          THE WITNESS:  No.

16  BY MR. LIOTTI:

17  Q.  All right.  So the answer is no?

18  A.  Correct.

19  Q.  All right.  Now, can we stick by that little ground

20  rule, if I ask you a question which calls for a yes or

21  no response, can I have a yes or no response?

22  A.  If it's yes or no.

23  Q.  Thank you.  All right.  In Government Exhibit 2, and

24  I should give you that --

25          THE COURT:  He has the whole packet.

3:06-cr-01011-CMC   Doc. 26   Date Filed 05/02/08   Entry Number 146   Page 41 of 285
USCA4 Appeal: 25-6132   Doc: 26       Filed: 09/19/2025   Pg: 265 of 475   Page 41 of 285
KIRBY - CROSS                                                    2-41

 1          MR. LIOTTI:  Again, you are using the judge's

 2   copy.

 3          Judge, I don't know if you need the originals

 4   or whatever, I'll be happy to provide you with what we

 5   have.

 6          THE COURT:  That's all right.

 7   BY MR. LIOTTI:

 8   Q.  Now, the jurors do not have copies of some of these

 9   things in front of them so I will try to identify them,

10   and if the jurors are taking notes they may wish to make

11   notes on some of these matters.  We'll try to be as

12   clear as possible.

13          All right.  In this conversation of May 26,

14   '05, you are monitoring and supervising and watching

15   over Brett Johnson and he's involved in this

16   conversation with Pit Boss 2600 and one of the things

17   that you are looking at during the course of the

18   investigation is any leads that you can spot, anything

19   at all that may allow you to further your investigation

20   and determine the actual identity of Pit Boss 2600;

21   isn't that right?

22   A.  Correct.

23   Q.  Okay.  So in doing that, you see a reference, the

24   guy -- this is Pit Boss 2600 now chatting, "The guy came

25   out from the back with the laptops and everything" --

1   continuing -- "all laughing and" -- pardon the

2   expression.  I'll follow his S language.

3           MR. LIOTTI:  Judge, I don't know if we should

4   be reading accurately or just --

5           THE COURT:  It's fine.  They are in evidence.

6           MR. LIOTTI:  Okay.

7   BY MR. LIOTTI:

8   Q.  And Pit Boss 2600, "And is like, 'Anything else you

9   want, sir?  We got printers, scanners, all kinds of

10  S.'"

11          Okay.  So, when you see things like that as

12  part of the investigation, don't you want to know about

13  the scanners, the laptops, any product, anything that

14  may have been stolen out there, or where someone's

15  credit card has been improperly used to buy some

16  product?  Yes or no.

17  A.  Yes.

18  Q.  Okay.  So when you see things like that throughout

19  the transcripts, was there a part of the investigation

20  concerning those matters wherein the Secret Service is

21  attempting to find out about theft of product, for

22  example?

23  A.  Yes.

24  Q.  Okay.  So, what if anything was done with regard to

25  that statement:  "Printers, scanners, all kinds of S"?

 1  Anything at that point that you can recall?

 2  A.  I cannot recall at that exact point.  We contacted

 3  Apple many times, but that's a very broad statement.

 4  Q.  Again, the answer to my question would be either a

 5  yes or a no; if you don't recall, the answer would be

 6  no.

 7          THE COURT:  It wasn't a yes or no question.  It

 8  was:  What if anything was done?

 9          MR. LIOTTI:  I think there was one after that,

10  but, okay, I don't want to argue with the Court.

11  BY MR. LIOTTI:

12  Q.  Let's go down further on Government Exhibit 2.

13  Government Exhibit 2 at the bottom, Pit Boss 2600,

14  "2K" -- that would be $2,000, right?

15  A.  Yes.

16  Q.  -- "for 200 --" credit cards?  Is that right?  Or

17  credit card information?

18  A.  Credit card information.

19  Q.  Dumps?

20  A.  Dumps.

21  Q.  Okay.  Dumps.  So, here's a situation where the

22  Secret Service can allegedly buy 200 dumps for $2,000,

23  and we heard later on in the case that there's a $600

24  transaction that takes place, right?

25  A.  Correct.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 44 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 268 of 475   Page 44 of 285
KIRBY - CROSS                                                    2-44

1   Q.   And 21 dumps, that's the government's case, right?

2   A.   Correct.

3   Q.   Okay.  Yes or no would be good.

4   A.   Yes.

5   Q.   Okay.  But here, there's a situation where you can

6   buy 200 dumps for $2,000, right?  So, again, the Secret

7   Service doesn't say anything to Mr. Johnson like, "We

8   will front the two grand, let's get the 200 dumps in

9   here."  Nothing like that, right?  Yes or no, sir;

10  nothing like that, right?

11  A.   No.

12  Q.   So, that was a lead, apparently, that was not

13  pursued during the chat, right?

14  A.   I would disagree, but I have to answer yes or no.

15  Can I disagree?

16  Q.   You can say you disagree.

17  A.   Thank you.

18  Q.   Does that make you feel better?

19          Then Pit Boss 2600 says, "My guy got 9K off one

20  yesterday.  9K off one yesterday.  Dumps by Mark Rich,"

21  you see that?

22  A.   Yes.

23  Q.   Again, did the Secret Service do anything to follow

24  that lead, to pursue that investigation?  "9K, Mark

25  Rich"?

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 45 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 269 of 475

KIRBY - CROSS                                              2-45

 1  A.  No.

 2  Q.  Now, was that because the Secret Service had

 3  concluded that there was no Mark Rich; yes or no?

 4  A.  No.  Can I explain why?

 5  Q.  I'm not asking for your explanation.

 6  A.  Okay.

 7  Q.  I'm asking for a yes or no.

 8          Okay.  Now, going to the second page of

 9  Government Exhibit 2, about three quarters of the way

10  down on that page there is this language:  Pit Boss

11  2600, "Yeah.  I flew down to JAX yesterday to take care

12  of some stuff," right?

13  A.  Yes.

14  Q.  Okay.  Now, the government believes that that would

15  be Jacksonville, Florida, correct?

16  A.  Correct.

17  Q.  And the government at some point pulled up some

18  records from Jonathan Giannone, and these were flight

19  records that you obtained from American Express; isn't

20  that correct?

21  A.  Correct, but that wasn't what we pulled up for this

22  statement.

23  Q.  Okay.  Let me ask you -- take a look at 2B if you

24  would, please.

25  A.  Okay.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 46 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 270 of 475   Page 46 of 285
KIRBY - CROSS                                          2-46

1   Q.   You see 2B?

2   A.   Yes, sir.

3   Q.   Is there a reference on 2B to Jonathan Giannone?

4   A.   Yes, sir.

5   Q.   I think you may have to go to the second page.

6   A.   I'm there.

7   Q.   Now, are these American Express records for Jonathan

8   Giannone?

9   A.   Yes, sir.

10  Q.   Okay.  And this follows -- 2B, of course, follows

11  Government Exhibit 2.  So what I'm asking you now is, is

12  there a reference on 2B to a flight to Jacksonville,

13  Florida?

14  A.   There's a reference to a flight from Jacksonville,

15  Florida.

16  Q.   Where is that?

17  A.   Third down, 5-24-05, a Delta Airlines flight from

18  Jacksonville, Florida to JFK in New York, passenger

19  name, Jonathan Giannone.

20          THE COURT REPORTER:  Could you repeat the date?

21  A.   Oh, 5-24 of '05, Delta Airlines, from Jacksonville,

22  Florida, to JFK, New York, passenger name, Jonathan

23  Giannone, date of departure 5-25.

24  BY MR. LIOTTI:

25  Q.   Now, do you also see on the same day a flight from

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 47 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 271 of 475   Page 47 of 285
KIRBY - CROSS                                        2-47

1  Ft. Lauderdale, Florida, also 5-25?

2  A.  Southwest Airlines?  That the one you are

3  referring --

4  Q.  I think it's jetBlue, isn't it?  The next one down?

5  A.  Oh, right below -- right above that is Southwest

6  Airlines, 5-25-05.

7  Q.  Well, that's Jacksonville.  I'm asking you about the

8  one underneath that.

9  A.  But you said Ft. Lauderdale.  That is from

10  Jacksonville, Florida to Ft. Lauderdale also.

11  Q.  Jacksonville to Ft. Lauderdale, and then

12  Ft. Lauderdale to New York; is that correct?

13  A.  Correct.

14  Q.  Okay.  So, we left out, I believe, Ft. Lauderdale

15  from that little scenario.  And then, also -- by the

16  way, when did you secure this American Express bill?

17  A.  It was probably a couple of weeks ago.  We didn't do

18  this in the beginning, this was done in preparation for

19  trial.

20  Q.  So, you didn't have this until a couple of weeks

21  ago?

22  A.  Approximately a month ago, maybe.

23  Q.  Okay.  All right.  So in any event, what you are

24  hanging your hat on here, in one respect, in terms of

25  the identity of Jonathan Giannone, is a conversation via

1  chat which occurred on 5-26-05, where a Pit Boss 2600

2  says he flew down to JAX yesterday to take care of some

3  stuff; is that right?

4  A.   Correct.

5  Q.   Okay.  So that statement, "I flew down to JAX,"

6  relates to the identity of Jonathan Giannone, but --

7  which you corroborated, you believe, a month ago; is

8  that right?

9  A.   Yes, sir.

10 Q.   Now, let's go to the next page, Government Exhibit

11 2.   Pit Boss 2600 refers to someone with an MBA, you see

12 that at the bottom of the page?  Go all the way down at

13 the bottom, three lines up from the bottom.

14 A.   Oh, the third page, yes.

15 Q.   Okay.  So, there's a reference to someone with an

16 MBA, a master's in business administration, who is

17 sentenced to eight years, and the statement on the last

18 line indicating that people in India were cheap; do you

19 see that?

20 A.   Yes, sir.

21 Q.   Okay.  Referring to the same person, correct?  Is

22 that correct?

23 A.   As far as the "people in India work cheap" and the

24 "MBA"?

25 Q.   Or maybe Pit Boss 2600 is talking about outsourcing,

 1  correct?

 2          MR. EICHELBERGER:  Calls for speculation,

 3  objection.

 4          THE COURT:  Sustained.  You can ask him what it

 5  says.

 6  BY MR. LIOTTI:

 7  Q.  In any event, with that information in hand about a

 8  person probably of Indian extraction who was convicted

 9  or given eight years and who had received an MBA, did

10  the Secret Service do any investigation of that person

11  to see if such a person was in the federal system

12  somewhere?

13          MR. EICHELBERGER:  Your Honor, I'm going to

14  object under 403.  I would like to be heard at sidebar

15  if I could?

16          THE COURT:  All right.

17          (Bench conference)

18          MR. EICHELBERGER:  I would just like to make my

19  objection known that -- I mean, I understand what

20  Mr. Liotti is doing, but if we go through each and every

21  one of the instances of what wasn't done, it's going to

22  take forever, and that's certainly going to be a waste

23  of the jury's time.  So, we ask that the Court place a

24  reasonable limitation on it under Rule 403.

25          THE COURT:  Overruled.

```
 1              MR. EICHELBERGER:  Thank you.

 2              (In open court)

 3  BY MR. LIOTTI:

 4  Q.  So my question stands, sir.  Did you do anything --

 5  did the Secret Service do anything as far as that

 6  individual is concerned?

 7  A.  Not to my knowledge.

 8  Q.  Now, just to go back a little bit.  As far as

 9  Mr. Johnson is concerned, how does the government set

10  him up in this chat system that you devised?  How was

11  that all established?  What was done exactly by the

12  government to provide Mr. Johnson with the necessary

13  equipment so he could reach out to people in the

14  Internet?

15  A.  One computer was purchased for use by Mr. Johnson,

16  another computer was purchased for use by the agents who

17  were monitoring, also a large-screen television where

18  the agents could watch what was happening on the

19  television rather than having to look at his computer

20  screen.

21  Q.  And how would people be attracted to Mr. Johnson?

22  What would be their vehicle for finding out that he

23  existed and was engaged in some type of business?

24  A.  He had a very well-known name in that community so

25  most people came to him when they recognized his name.
```

1  Q.  And that would be gollumfun?

2  A.  Correct.

3  Q.  Okay.  So did he have a Web site?

4  A.  Not at the time we were dealing with him.

5  Q.  Okay.  So it was just gollumfun?

6  A.  That's the name we used in the investigation, yes.

7  Q.  Okay.  And I guess you are telling us that other

8  people aside from Pit Boss 2600 communicated with

9  Mr. Johnson over that gollumfun name?

10  A.  Yes.

11  Q.  Okay.  And are some of them named in this case, such

12  as Chris Branca?

13  A.  Yes.

14  Q.  And also Chris Cutler?

15  A.  Yes.

16  Q.  They communicated with Mr. Johnson?

17  A.  Yes.

18  Q.  And they are not reflected -- their communications

19  with Mr. Johnson aren't reflected in any of these chats,

20  right?

21  A.  That is correct.

22  Q.  Now, there's a reference in the chats to -- let's go

23  to page -- I guess this would be the fourth page.  At

24  the bottom it says page 12 of 170, but it's actually the

25  fourth page on this particular exhibit, which is

 1  Government Exhibit 2.  Do you have that?

 2  A.  Yes, sir.  Yes, sir.

 3  Q.  All right.  There's something called a forum.  Do

 4  you see that in the middle of the page, about three

 5  quarters of the way down?  Pit Boss says, "I'm thinking

 6  of starting my own forum."

 7  A.  Yes, sir.

 8  Q.  Okay.  What is a forum?

 9  A.  A forum is -- the simple way of putting it, it's a

10  Web site.

11  Q.  And you mentioned later in your testimony about an

12  auto company or auto sales company.  A&W, was it?

13  A.  A&W Auto Clinic.

14  Q.  Right.  Now, if that was a Web site, that would be a

15  forum, correct?

16  A.  A forum is a little bit different than a basic Web

17  site.  It's just a simple way of explaining it.

18  Q.  But you sell product or you can sell product over

19  eBay and on a Web site, correct?

20  A.  Yes.

21  Q.  All right.  Now, let's go to the next page.  All

22  right.  Pit Boss 2600 in the first quarter of the page

23  talks about $6 a dump.  So, I just did the math on $6 a

24  dump times 21 of these dumps that the government says

25  were sold by Mr. Giannone and that's $126, right?  Six

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 53 of 285
USCA4 Appeal: 25-6132   Doc: 26   Date Filed 05/02/08   Filed: 09/19/2025   Pg: 277 of 475   Page 53 of 285
KIRBY - CROSS                                              2-53

1  times 21, 126; correct?

2  A.  Correct.

3  Q.  So Pit Boss 2600 is telling Mr. Johnson that you can

4  get a dump for $6; isn't that right?

5  A.  Well, actually, if you look at the bottom of the

6  page prior, he just says that he ordered 100 AmEx dumps,

7  so that's where it comes into the conversation.

8  Q.  He's also saying that dumps are available for $6 a

9  dump, correct?

10  A.  To him from his supplier, that's correct.

11  Q.  Okay.  So doesn't that present the question to the

12  Secret Service, which I'm sure was asked of Mr. Johnson,

13  well, why should you or we pay $600 for 21 dumps when

14  you can get them for six bucks each?  I'm asking.

15  That's my question.

16  A.  Well, there were a lot -- we spoke with a lot of

17  different people.  There were different dumps -- prices

18  for different vendors.  It's just like any business.

19  You are going by the validity, the success rate, that

20  sort of thing.  That drives price.

21  Q.  But didn't it seem a little bit foolish in that

22  scenario that you should overpay by over $400 -- over

23  $450 -- $470 for dumps?  Doesn't that seem incredulous

24  to you at the time?

25  A.  Not really.

1    Q.  Yes or no?

2    A.  No.

3    Q.  No.  Okay.  Now, going to the last page of

4    Government Exhibit 2, Pit Boss refers to South

5    Carolina.  Now, you had told us, and I think your fellow

6    agent told us earlier, that when you were monitoring

7    Mr. Johnson he was here in Columbia, right?

8    A.  Yes.

9    Q.  But Pit Boss in the first four or five lines of that

10   chat says that he "never tried S" -- to use your word or

11   letter -- "there," right?

12   A.  Yes.

13   Q.  Now, just going to Government Exhibit 2B, Government

14   Exhibit 2B, of course, as you just mentioned, it is an

15   American Express billing statement from June of '05

16   covering the previous month of May of '05, right?

17   A.  Yes.

18   Q.  Okay.  Since you just got this a month ago, you

19   didn't really expect to find that Jonathan Giannone, who

20   you contend is involved in computer fraud, mail fraud,

21   computer theft, ID, and so on, would be involved in

22   using his own name and his own credit card back then in

23   May of '05?  You didn't expect to find that, right?

24           MR. EICHELBERGER:  Objection.

25   BY MR. LIOTTI:

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 55 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 279 of 475   Page 55 of 285

KIRBY - CROSS                                    2-55

```
 1   Q.  Isn't that why you waited until one month ago to

 2   subpoena American Express records?

 3          MR. EICHELBERGER:  Objection, Your Honor, calls

 4   for speculation.

 5          THE COURT:  Overruled.

 6          MR. LIOTTI:  Was that sustained?

 7          THE COURT:  It was overruled.

 8   BY MR. LIOTTI:

 9   Q.  Can you answer my question?

10   A.  Can you repeat it?

11   Q.  Yes, sir.

12   A.  Thank you.

13   Q.  You say you got the American Express records a month

14   ago, here is Jonathan Giannone supposedly, according to

15   you, advertising to Brett Johnson that he can buy 21

16   dumps for $600.  Why would someone like Jonathan

17   Giannone -- it's a why question -- okay?  You can

18   answer.  Why would someone like Jonathan Giannone use

19   his own name and his own credit card after having that

20   chat --

21          MR. EICHELBERGER:  Objection --

22   BY MR. LIOTTI:

23   Q.  -- back in '05?

24          MR. EICHELBERGER:  -- calls for speculation.

25   BY MR. LIOTTI:
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Pg: 280 of 475   Page 56 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 280 of 475

KIRBY - CROSS                                          2-56

1   Q.  Why would he do that?

2            THE COURT:  Sustained.  You've changed the

3   question and it is now objectionable.

4   BY MR. LIOTTI:

5   Q.  Going back to my original question, you didn't

6   expect that somebody who had access to all of these

7   dumps would use his own credit card to make a flight,

8   would you?

9   A.  I can't really say if I expected to or not, it was

10  just one way of tying him to those chats.

11  Q.  But if we follow what you are saying, sir, you are

12  telling me that people involved in this enterprise, in

13  this business of computer fraud and identity theft,

14  don't want anyone to know who they are, so they hide

15  their names, right?  They try to secrete their names,

16  and your first order of business is to find out what you

17  can about who they are.  Okay?  Didn't occur to you in

18  '05 or '06, didn't occur to you until '07, a month ago,

19  to look at American Express records for Jonathan

20  Giannone; isn't that right?

21  A.  That was for preparation for trial, yes.

22  Q.  Right.  And Mr. Giannone was charged in this case

23  back in -- what?  August of last year?

24  A.  That's correct, I believe.

25  Q.  So, no subpoenas were issued to American Express in

1   August, September, October, November, December, maybe

2   January, right?

3   A.  Correct.

4   Q.  Okay.  Because somebody who is involved in credit

5   card fraud would most likely, if they are trying to hide

6   their identity and, as you say, wouldn't use their own

7   American Express card to take a flight anywhere, right?

8   A.  You are asking for me to speculate as to about why

9   he did it.  People make mistakes.  We see it in a lot of

10  investigations.

11  Q.  Okay.  In any event, it is undisputed that with

12  respect to that flight that you testified about,

13  Jonathan Giannone used his own American Express card,

14  not a dump, to fly somewhere; isn't that right?

15  A.  Yes.

16          MR. LIOTTI:  All right.  Judge, I'm going to

17  try to speed up because it's becoming a little tedious

18  for everyone.  I'm sorry.  But a couple of things I do

19  have to cover, though.

20          THE COURT:  All right.

21  BY MR. LIOTTI:

22  Q.  Now, I just want to go back briefly to Government

23  Exhibit 1 for a second because you did give us some

24  testimony about that yesterday.  There's a reference

25  about a quarter of the way down to 529allite; do you see

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 58 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 282 of 475   Page 58 of 285
KIRBY - CROSS                                                    2-58

1   that?

2   A.  Yes, sir.

3   Q.  Okay.  When that name -- that's another chat name, I

4   take it, right?

5   A.  Yes.

6   Q.  Okay.  Used by someone, correct?

7   A.  Yes.

8   Q.  Not, as far as you know, Jonathan Giannone or Brett

9   Johnson, right?

10  A.  Correct.  I would not know who that name belonged

11  to.

12  Q.  Okay.  But when you get names like that and they are

13  popping up, doesn't the Secret Service want to know who

14  these people are?

15  A.  Yes.  Yes, sir.

16  Q.  Was there any investigation conducted on 529allite?

17  A.  No, not at that time.

18  Q.  Okay.  Because, realistically, it would help your

19  investigation if you could identify who the actual

20  people were behind these screen names and then, perhaps,

21  go to them with the information that you have at your

22  disposal and say, "Look.  Here's a photograph of Brett

23  Johnson, do you know him?  Do you know Chris Branca?  Do

24  you know Chris Cutler?  Do you know Jonathan Giannone?"

25  Okay?  "Have you had any dealings with them?"  That

USCA4 Appeal: 25-6132   Doc: 26   Date Filed: 05/02/08   Entry Number: 146   Page 59 of 285
3:06-cr-01011-CMC   Filed: 09/19/2025   Pg: 283 of 475

```
 1   would help your investigation, right?

 2   A.  Yes.

 3   Q.  Okay.  But the Secret Service didn't do anything

 4   along those lines, correct?

 5   A.  When all you have is a screen name, it's very

 6   difficult.  If that's all you have, there's no starting

 7   point.

 8   Q.  Now, on the same page there's a reference to someone

 9   by the name of NH, right?  About three quarters of the

10   way down --

11           MR. EICHELBERGER:  Could I inquire which page

12   we are on?

13           MR. LIOTTI:  Yes.  I'm sorry.  It's Government

14   Exhibit 1.

15           MR. EICHELBERGER:  Thank you.

16           MR. LIOTTI:  Sure.

17   BY MR. LIOTTI:

18   Q.  Government Exhibit 1, about three-quarters of the

19   way down, "NH"?

20   A.  Correct.

21   Q.  And then "SS," right?

22   A.  Yes.

23   Q.  Okay.  And then reference to one or both of those

24   individuals being on probation and not being able to get

25   bail and so on, right?
```

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 60 of 285
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 284 of 475    Page 60 of 285
KIRBY - CROSS                                                    2-60

```
 1  A.  NH actually refers to a place.

 2  Q.  Okay.  New Hampshire?

 3  A.  Yes, sir.  I would --

 4  Q.  And SS is a person, right?

 5  A.  SS, Secret Service.

 6  Q.  Okay.  But they are talking about some person, not

 7  Brett Johnson and not Pit Boss, correct?

 8  A.  They are talking about Enhance, a couple of lines

 9  above.

10  Q.  Somebody else in the system, right?

11  A.  Correct.

12  Q.  And there's a reference to a chump CC, right?

13  A.  Yes, CC -- chump CC Suppliers.

14  Q.  A Cumba also, C-u-m-b-a?

15  A.  Yes, sir.

16  Q.  Were there any investigations done with respect to

17  any of those screen names?

18  A.  Yes.

19  Q.  And what was done, as far as you know, with respect

20  to chump CC?

21  A.  I couldn't tell you on that exact name.

22  Q.  Okay.

23  A.  Of those names that you just called, we identified

24  two that I know of.

25  Q.  Now, it's fair to say, right, that the Secret
```

1  Service has access not only to screen names but also to

2  passwords; isn't that so?

3  A.  I would say --

4  Q.  Passwords?

5  A.  Our own passwords, not a user's passwords.

6  Q.  So, during the course of your investigation you are

7  telling us that you never learned of passwords, for

8  example?

9  A.  You mean in a person we are chatting with, their

10  personal passwords?

11  Q.  Yes, sir.

12  A.  I would say no.

13  Q.  So, did you know the password for Brett Johnson, if

14  he was making a call to somebody and wanted to chat with

15  somebody, did you know his password?

16  A.  We did.  We set that password.

17  Q.  And it would be right to say that whenever you get

18  information about passwords, the Secret Service, the

19  FBI, the DEA, anybody who is involved in criminal

20  investigations keeps a log and that information, right,

21  password information you withhold; isn't that so?

22  A.  Of our own passwords?

23  Q.  Your own passwords, and any other passwords that you

24  learn during the course of an investigation, such as

25  Mr. Johnson's, for example?

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 62 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 286 of 475   Page 62 of 285
KIRBY - CROSS                                              2-62

1  A.  Well, it's our password.  I mean, a lot of times it

2  might be in our head.  It's our password.

3  Q.  My question to you is:  If you learn of someone

4  else's password -- let's say you learned of Pit Boss

5  2600's password, you would keep that as part of your

6  investigation; isn't that right?

7  A.  I really think that's -- we don't have any access of

8  coming across that password.  I mean, if we did, we

9  wouldn't be able to use it because that is getting into

10  some areas that we can't go down as law enforcement.

11  Q.  You are saying that you can subpoena American

12  Express records but the federal government would have

13  some difficulty as part of a criminal investigation to

14  use a password that they learned of?  Is that what you

15  are telling us?

16  A.  Yes, if we -- if we tried to log into someone else's

17  account.

18  Q.  Okay.  So, if we go past all of that -- and let's

19  just assume that you do have access to some passwords

20  for a moment, you keep a record of those, do you not?

21  A.  It's hypothetical, but I mean, we would probably

22  make reference to it.

23  Q.  You have never seen a case in your four years as a

24  Secret Service agent investigating computer fraud where

25  passwords are kept and stored as part of an

1   investigation?  You have never seen that?

2   A.  Our own passwords I have seen.

3   Q.  Just your own, that's it?

4   A.  Or if we have someone that gives us access, they

5   sign over their account to us, we have that password

6   logged.

7   Q.  Voilà, that's what I'm asking you.

8   A.  Yes, but they assign that account over, that is

9   true.

10  Q.  You keep that information, you keep it?

11  A.  Yes.

12  Q.  Okay.  So certainly if you had the password for Pit

13  Boss 2600, you would have kept that, right?

14  A.  In some fashion we would have.  We'd have made

15  reference to it.

16  Q.  Well, you know the password for Pit Boss 2600 now,

17  right?

18  A.  I do not know.

19  Q.  You don't know it?

20  A.  No.

21  Q.  You don't have any record of that?

22  A.  No, sir.

23  Q.  Did you ask Mr. Branca if he had that information?

24  A.  I never did.

25  Q.  Well, let me correct myself again.  How about the

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 64 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 288 of 475   Page 64 of 285
KIRBY - CROSS                                                2-64

1  Secret Service, do you know if they asked Mr. Branca

2  during the course of this investigation if he had a

3  password for Pit Boss 2600?

4  A.  I would speculate that question probably wasn't

5  asked.  I mean, to get someone's password is very --

6  Q.  Listen to my question, please.  Okay?  I said, do

7  you know whether the Secret Service asked Mr. Branca if

8  he had a password for Pit Boss 2600?  Do you know?  Yes

9  or no, sir.

10  A.  No, sir.

11  Q.  Thank you.  Did you ask that same question of Chris

12  Cutler?  Yes or no -- the Secret Service, you -- when I

13  say you, that's what I mean.  You know that?

14  A.  I can only answer for me, but I would say no for

15  myself.

16  Q.  Thank you.

17          MR. LIOTTI:  Bear with me, Judge.

18  BY MR. LIOTTI:

19  Q.  Yesterday you made reference to something called

20  ICQ.  Do you remember that?

21  A.  Yes, sir.

22  Q.  What was that referring to?

23  A.  An Internet chat client--

24  Q.  An Internet chat -- the last word?

25  A.  I said client.  That's what -- it's just a program

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 65 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 289 of 475   Page 65 of 285
KIRBY - CROSS                                          2-65

1   someone uses to communicate online, real-time chats.

2   Q.  Now, on page 3 of Government Exhibit 1, it's 3 of

3   170, all the way down near the bottom, about six lines

4   up, gollumfun is chatting, he says, "Well, I can try his

5   ICQ.  If you don't mind.  He must have had an S-load of

6   money saved."  Do you see that?

7   A.  Yes, sir.

8   Q.  Okay.  So, there was a program available to

9   Mr. Johnson that he could use; is that correct?  This

10  ICQ program that you are talking about?

11  A.  Right.  To communicate with other individuals.

12  Q.  Okay.

13  A.  Yes.

14  Q.  Was that done as part of the investigation?

15  A.  Yes, sir.

16  Q.  What individuals did Mr. Johnson communicate with as

17  part of the ICQ?

18  A.  That would be very hard to say.  I mean, it's an

19  Internet chat client.  We had its own -- I mean, it has

20  its own buddy list.  The buddy list probably had 50 or

21  60 individuals in it, so I can't really tell you which

22  ones and who --

23  Q.  Now, on these chats -- by the way, you can also have

24  a three-way chat, can't you, or a four-way chat?

25  A.  Usually it's one-on-one.  If there's three way,

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 66 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 290 of 475   Page 66 of 285
KIRBY - CROSS                                        2-66

1   someone that we are talking to, if they are talking with

2   someone else, they would cut and paste a part of their

3   chat where we could read it.

4   Q.  So, were there any three-way chats or any

5   communications made by Mr. Johnson with the ICQ program,

6   or whatever he was using, to communicate with Chris

7   Branca and/or Chris Cutler and/or Pit Boss 2600?

8   A.  Did we communicate with those?  Is that what you are

9   asking?

10  Q.  Yes.

11  A.  Yes.

12  Q.  Using that program?

13  A.  Well, using that -- it's according to what they were

14  registered on.  If they were registered on ICQ, we spoke

15  with them through ICQ, but if they were registered on

16  AIM, America Online, we spoke to them through AIM or

17  America Online.  It's all according to what they were

18  registered on.

19  Q.  Okay.  Now, let's go to page 5 of the same exhibit,

20  Government Exhibit 1. You conducted an investigation of

21  Mr. Johnson and, in fact, he was charged for sending out

22  phony cashier's checks, right?

23  A.  He was actually arrested by the locals for that.

24  Q.  Right.  But for that, correct?

25  A.  For counterfeit cashier's checks.

1  Q.  Okay.  So he's actually been charged and he's out on

2  bail and he's with you when this conversation of

3  May 23rd of '05 occurs, right?

4  A.  He's working for us at that time, yes.

5  Q.  And Mr. Johnson is having this discussion with Pit

6  Boss 2600 and he's telling Pit Boss 2600 that he's doing

7  precisely that, right?  "Got them doing cashier's checks

8  for COD orders."  That's what he says in the middle of

9  the page, right?

10 A.  Let me get there.  Oh, I see.

11 Q.  Correct?

12 A.  What was the question again?

13 Q.  Right in the middle of the page.

14 A.  I found it.

15 Q.  That's what he's saying in this chat.

16 A.  Where he's talking about the Rolexes?

17 Q.  No.  Right in the middle of the page.

18 A.  That's where I am, but I mean --

19 Q.  Right here, sir.  Take a look.

20 A.  Right.  They begin talking about a Rolex gig.

21 Q.  But gollumfun is speaking, "Got them doing cashier's

22 checks for COD orders."  You see that, right?

23 A.  Yes, sir.

24 Q.  Okay.  So that's what Mr. Johnson is doing and he's

25 telling people that.  In this case telling Pit Boss 2600

1  that, and Pit Boss is referring to laptops and dumps and

2  Rolex watches, or phony Rolex watches that he could get

3  access to; isn't that right?

4  A.  Yes.

5  Q.  Okay.  So there's also reference on here to

6  something called a Simon card at the top of the page.

7  Do you see that?

8  A.  Yes, sir.

9  Q.  And that's -- that's in big-type letters.  What's a

10 Simon card?

11 A.  Best of my knowledge a Simon card is a stored-value

12 card.  It's about the size of a credit card where you

13 can place money on that card and go to an ATM machine

14 and withdraw it.

15 Q.  Okay.  So, you buy it for cash, in other words; is

16 that right?

17 A.  Yes, sir, you would purchase the card.

18 Q.  You go in and if you need, let's say, to make some

19 international phone calls or what have you, you pay $50

20 and you get a card that allows you to use minutes up to

21 $50; isn't that right?

22 A.  Well, that would be a phone card, but this isn't

23 actually a phone card.

24 Q.  But it's like that; it works like that?

25 A.  Similar.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 69 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 293 of 475   Page 69 of 285
KIRBY - CROSS                                              2-69

1  Q.  Except you can buy, actually, merchandise, let's

2  say?

3  A.  Right.  A lot of stored-value cards -- a lot of

4  people don't have bank accounts.  You can get a stored-

5  value card and have money placed on that card and use it

6  at an ATM machine so --

7  Q.  So then Pit Boss says that for $2,000 he could get

8  150 to 180 dumps, right?

9  A.  Yes.

10  Q.  Okay.  So does Brett Johnson take him up on that?

11  Instead of that $600 transaction, does he say, "Gee,

12  that sounds like a good idea.  Why don't I just send you

13  two grand, and send me the 150 to 180 dumps?"  Then the

14  Secret Service would have a much bigger case, wouldn't

15  they?  Instead of $600 and 21 dumps, you would have 150

16  to 180 dumps, right?

17  A.  Well, taking it out of the context of the chat I'm

18  not sure if that was an offer or not at that time.

19  That's what he said he was getting them for from his

20  supplier, that wasn't actually offered to us.

21  Q.  Wouldn't it make sense to not wait -- if the Secret

22  Service has got all this information about alleged crime

23  taking place out there in the community and you find out

24  about this in May of '05, doesn't it make sense for the

25  Secret Service to say, "Whoops, we got a crime going on

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Pg: 294 of 475   Page 70 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 294 of 475   Page 70 of 285
KIRBY - CROSS                                    2-70

1   out there.  We've got to speed up this investigation.

2   Let's bring it to a head.  Let's close it down.  Let's

3   offer them two grand and let's get 150 to 180 dumps and

4   see if we can conclude the investigation that way"?

5   Doesn't that make sense, instead of waiting until 2006

6   to do this, the 21 dumps and $600?

7   A.  If it worked like that, that would be the best

8   route.

9   Q.  But it wasn't even tried in this case, right?  There

10  wasn't a single instance where the Secret Service said

11  to Mr. Johnson, "We will front the $2000," right?  You

12  didn't do that, did you, the Secret Service?

13  A.  That's not correct.

14  Q.  Okay.  Is there anywhere in the chats where

15  Mr. Johnson says, "I will buy 150, 180, 160 dumps for

16  $2,000.  I got the money"?

17  A.  No.

18  Q.  So with respect to chats, the communications are

19  running over some kind of a phone line, aren't they?

20  A.  Yes.

21  Q.  Okay.  So it goes from one phone line to another, or

22  a receiver, right?  A call is originated at one end and

23  it goes to somebody here, let's say Columbia, South

24  Carolina, comes from somewhere out there, right?

25  A.  Comes from somewhere out there.

1  Q.  Okay.  Is there a way to tap into that phone line

2  and find out where the call is coming from?

3  A.  That's not really a phone line.  I mean, that's one

4  way.  If you had a modem that's how you dial out to the

5  Internet, but then once you get on the Internet -- I

6  mean, it's a little more complicated than that.  It's

7  not like a direct connection.

8  Q.  What I'm asking you is this:  Can you -- if you

9  know, mechanically, and you may not, but if you do -- is

10  it possible to come before Her Honor, Judge Currie, for

11  example, with a wiretap order and a request for a taping

12  of conversations or chats, or tracing a chat, and you as

13  an agent would come before the judge and swear to

14  certain allegations that you believe a computer crime is

15  occurring and you want a search warrant and you want to

16  be able to trace that call and put a tap on

17  Mr. Johnson's modem or phone line, whatever, is that

18  physically possible?  Can that be done to trace a chat?

19  A.  It's not the same as the telephone call so I would

20  say the two aren't the same.  It's not like a wiretap

21  issue.

22  Q.  Okay.  But you -- I know it's not a wiretap issue,

23  but I'm asking you if that can be done, mechanically,

24  with all the state of the art that the federal

25  government has at its disposal, can that be done?

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 72 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 296 of 475   Page 72 of 285
KIRBY - CROSS                                              2-72

 1  A.  Not to my knowledge.

 2  Q.  Was that ever discussed in the context of this

 3  investigation, what could be done or not done along

 4  those lines?

 5  A.  Yes, many times.

 6  Q.  Now, while you gave us some very important technical

 7  information yesterday, you are not testifying as an

 8  expert, at least that's what Mr. Eichelberger has

 9  informed us; is that correct?

10  A.  That's correct, yes.

11  Q.  Were there experts involved in this investigation

12  for the Secret Service and were consulted on that very

13  subject, if you know?

14  A.  I couldn't answer that question.

15  Q.  Is that because you don't know?

16  A.  I don't know the answer, right.  Correct.

17  Q.  You don't know?

18  A.  Correct.

19  Q.  Right?  Okay.  So you can tell me that.

20  A.  I did, I thought.  Sorry.

21  Q.  Thank you.  Now, I would like to go to Government

22  Exhibit 5, which would be page 32 for Mr. Eichelberger.

23        Pit Boss 2600 says something about his age.

24  Now we've got a little identification information, at

25  least according to the chat, and this occurs on June 3rd

```
 1  of '05, right?

 2  A.  Correct.

 3  Q.  So, Pit Boss 2600 says, "I'm 22."  Do you see that?

 4  A.  Yes.

 5  Q.  Okay.  And we are not saying that's a truthful

 6  statement made by the alleged Pit Boss 2600, but do you

 7  know how old Jonathan Giannone was on June 3rd of '05?

 8  A.  No, I do not.

 9  Q.  How old was Chris Branca?

10  A.  I do not know.

11  Q.  How about Chris Cutler?

12  A.  Do not know.

13  Q.  Well, if I tell you that Jonathan Giannone's

14  birthday is January 2nd, 1986, does that surprise you?

15  A.  No, sir.

16  Q.  So he was not 22 back then?

17  A.  Correct.  But if you -- you take it out of context

18  of the chat again.  A couple of lines earlier he talks

19  about rental cars don't verify anything.  He talked

20  about real ID --

21  Q.  Sir, you answered my question, now you are

22  volunteering.  You are going past the answer that I

23  asked you for.

24  A.  Yes, sir.

25  Q.  And you keep doing that.
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 74 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 298 of 475   Page 74 of 285
KIRBY - CROSS                                          2-74

1            MR. LIOTTI:  And, Judge, I would most

2    respectfully, once again, ask that you admonish the

3    witness and please tell him not to volunteer.

4            THE WITNESS:  Sorry.

5            THE COURT:  That's the only volunteering we've

6    had since you asked for that last admonition.

7            MR. LIOTTI:  All right.

8            THE COURT:  Mr. Liotti, how much longer do you

9    need on this witness?

10            MR. LIOTTI:  I would say an hour, Judge.

11            THE COURT:  Okay.  We will go ahead and take

12    the morning break.

13            Ladies and gentlemen, you should turn your pads

14    over, leave them in your seats.  Do not discuss the case

15    while you are on break and we will take 10 minutes.

16            Agent Kirby, you are still on cross so you may

17    not discuss the case.

18            THE WITNESS:  Thank you.

19            (Short recess)

20            THE COURT:  All right, folks.  We are going to

21    get underway, have a seat, please.

22            (Jury present)

23            THE COURT:  All right.  We are ready to

24    continue with the cross-examination of Agent Kirby.

25            MR. LIOTTI:  Thank you.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 75 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 299 of 475   Page 75 of 285
KIRBY - CROSS                                    2-75

1   BY MR. LIOTTI:

2   Q.  Agent Kirby, if I may, back in August of last year

3   you submitted an affidavit to this court --

4          MR. EICHELBERGER:  Objection to hearsay, Your

5   Honor.

6          MR. LIOTTI:  I didn't finish the question.

7          THE COURT:  Go ahead.

8          MR. LIOTTI:  Thank you.

9   BY MR. LIOTTI:

10  Q.  You submitted an affidavit to this court that would

11  cause the court to issue an arrest warrant for Jonathan

12  Giannone; isn't that correct?

13  A.  Yes.

14  Q.  And that affidavit that you submitted to a judge of

15  this court authorizing the issuance of a warrant for the

16  arrest of Jonathan Giannone was dated, approximately,

17  August 14th, 2006; isn't that right?

18  A.  I can't recall -- yes.

19  Q.  And much of the information referred to in your

20  affidavit and indeed the information that you have told

21  us about here occurred back in May and June of 2005;

22  isn't that right?

23  A.  Yes.

24  Q.  And essentially there was no new information

25  gathered after, approximately, June of 2005; isn't that

1  right?

2  A.  Any new information?

3  Q.  Well, let's take chats, for example.  When was the

4  last chat that Pit Boss 2600 and gollumfun had?

5  A.  Right off the top of my head I think it was maybe

6  February of 2006.

7  Q.  Okay.  When did the transaction -- the $600

8  transaction transpire?

9  A.  June 2005.

10  Q.  June of 2005?

11  A.  Yes.

12  Q.  And that's the transaction that has been testified

13  about where $600 was deposited into a Bank of America

14  account, correct?

15  A.  Correct.

16  Q.  And at some point -- I think your fellow agent told

17  us -- 11 months following May of '05, Mr. Johnson was

18  removed from his position as a confidential informant;

19  isn't that right?

20  A.  That is incorrect.  He was removed in March of '06,

21  if I recall correctly.

22  Q.  Okay.  So, maybe it was 10 months; is that what you

23  are saying?

24  A.  The investigation?

25  Q.  Yes.

```
1   A.  It was 10 months.

2   Q.  10.  Okay.  Not 11, that's your correction?

3   A.  Oh, I must have misunderstood.  That's right.

4   Q.  Okay.  Now, in authorizing the arrest of -- or

5   commending to a federal judge here in this district the

6   arrest of Mr. Giannone, you indicated that was the case

7   that he was removed --

8            MR. EICHELBERGER:  Your Honor, objection to

9   hearsay, relevance, both.  May we approach?

10           THE COURT:  Yes.

11           (Bench conference)

12           MR. EICHELBERGER:  I just want to make sure we

13  don't get too far down this, Your Honor.  Where we seem

14  to be heading is bringing out statements that were made

15  in the affidavit and arrest warrant.  Of course, we are

16  trying this case based on an indictment and not an

17  arrest warrant.

18           So first off, statements that the agent may

19  have made in the affidavit, even though they were under

20  oath are, in fact, hearsay.  And furthermore, statements

21  that were made in connection with the affidavit --

22  hearsay is permitted in such affidavits, so we are

23  actually getting into a situation here where we have the

24  very real danger of putting hearsay in front of this

25  jury merely because -- it's taken from a document that
```

3:06-cr-01011-CMC  Doc: 26  Date Filed 05/02/08  Entry Number 146  Page 78 of 285
USCA4 Appeal: 25-6132  Doc: 26  Filed: 09/19/2025  Pg: 302 of 475  Page 78 of 285
KIRBY - CROSS                                                2-78

1    is not relevant.  That is the affidavit in support of an

2    arrest warrant which incorporates hearsay, so it's not

3    relevant and there's hearsay.

4              THE COURT:  So what -- where are you going?

5              MR. LIOTTI:  Judge, there are some statements

6    that he made about the investigation and so on.  I'm not

7    going that far afield.  I'm not going to be asking all

8    of this.  Some of it is highlighted.  There's just a

9    couple of areas about the $600 and the deposit, and I'm

10   using that information and when that happened.

11             On June 7th, for example -- and that he did not

12   or the Secret Service did not commend the arrest until

13   August of '06.  So there was this hiatus of, you know,

14   all this time when they had all this information at

15   their disposal.

16             THE COURT:  Well, you can do that without

17   publishing statements that are in the affidavit in

18   support of a warrant, can't you?

19             MR. LIOTTI:  I think I can, but I really do

20   dispute the fact that this is hearsay.  We have the

21   declarant on the stand.  This is a document that is

22   filed with the court.  These are his statements, made

23   under oath before a neutral magistrate.  I don't see how

24   that's hearsay.

25             MR. EICHELBERGER:  If I can respond.  That does

1   not make an exception to the hearsay rule.  What it

2   makes it is an out-of-court declaration and the only

3   way, in my view, to get to those is if there's a prior

4   inconsistent statement, and there's been no showing of a

5   prior inconsistent statement, therefore the hearsay

6   objection, in our view, still stands.

7          MR. LIOTTI:  With all due respect it's not an

8   out-of-court statement.  If a document is filed with the

9   courthouse, it's an in-court statement.

10         THE COURT:  I disagree.  It's an

11  out-of-this-court statement, out of this proceedings,

12  therefore you -- you can use it if you have what you

13  think is an inconsistency, you can use it to ask him

14  questions about facts that are cited in there, but you

15  can't just publish.

16         MR. LIOTTI:  I'm not going to read.  I haven't

17  read any portion of the actual affidavit.  I have asked

18  him questions about statements that he may have made and

19  he can admit or deny that.  I can use the document to

20  refresh his recollection, that's all I'm doing.  I'm not

21  reading from it.

22         THE COURT:  If you have an inconsistency.  At

23  this point, I haven't heard any inconsistency.

24         MR. EICHELBERGER:  And our relevance objection

25  still stands as well, Your Honor, in that this is an

1    indictment.  We don't try cases on complaints, we try

2    them on indictments.

3              MR. LIOTTI:  But it's a prior statement.

4              THE COURT:  I understand that, but it can be

5    used to show a prior inconsistency.  Okay?

6              MR. LIOTTI:  Okay.  But in order to get

7    there -- if I was going to do that -- I still have to

8    ask him a foundational question about, you know, "Did

9    you make the statement?  Do you recall saying this?"

10             THE COURT:  "Have you ever said this?"

11             MR. LIOTTI:  Yes.

12             THE COURT:  And then if he says yes, then you

13   stop.

14             MR. LIOTTI:  Exactly.  No problem with that.  I

15   have no problem with that.

16             MR. EICHELBERGER:  Thank you, Your Honor.

17             (In open court)

18   BY MR. LIOTTI:

19   Q.  Did you, as part of this investigation and this

20   case, indicate that Mr. Johnson was removed as a

21   confidential informant?

22   A.  Yes.

23   Q.  Did you also indicate that Mr. Johnson was a

24   fugitive with an outstanding federal arrest warrant?

25   A.  Yes.

```
1              MR. EICHELBERGER:  Objection as to relevance,

2   Your Honor.

3              THE COURT:  Overruled.

4   BY MR. LIOTTI:

5   Q.  Did you also indicate that he had an outstanding

6   state bench warrant?

7   A.  Yes.

8   Q.  And did you also indicate that all activities under

9   your investigation were monitored by agents of the U.S.

10  Secret Service?

11  A.  Yes.

12  Q.  Now, since Mr. Johnson kind of pulled the wool over

13  your eyes during that 10-month period, or 11-month

14  period, was there an investigation done on Mr. Johnson

15  when you learned that he had done that?

16  A.  Yes.

17  Q.  And in that regard, aside from speaking to

18  Mr. Johnson, did you speak to other people?

19  A.  During the Johnson investigation?

20  Q.  Yes.

21  A.  Yes.

22  Q.  And you spoke to people who had received cashier's

23  checks and so on; is that right?

24  A.  I can't really answer that one.  I did not.

25  Q.  Again, I sort of misspeak and I may be
```

 1  mis-describing what I'm really asking you.  When I say
 2  "you," I'm referring to the Secret Service.
 3  A.  Well, I'll just say this once, I mean, just kind of
 4  to explain things.  It was kind of a joint effort, so
 5  one thing that another agent might have been doing, it
 6  was in the investigation, but I don't have direct
 7  knowledge of the details to that.
 8  Q.  I'm just asking you that question and all others, if
 9  you have knowledge.
10  A.  No.
11  Q.  If you don't have knowledge you can just tell me you
12  don't?  Okay?
13  A.  Okay.
14  Q.  All right.  Now, did you also indicate that on or
15  about June 7th, 2005, Johnson made a deposit of $600
16  into an account, 950552565, at the Bank of America
17  located at 301 Harbison -- that's H-a-r-b-i-s-o-n --
18  Boulevard, Columbia, South Carolina, at 1:26 p.m.  Did
19  you say that?
20  A.  Yes.
21  Q.  Now, as of June 7th, '05, you had knowledge of a
22  bank account at the Bank of America where Mr. Johnson
23  had sent his $600, correct?
24  A.  Yes.
25  Q.  And at that point in time you could trace the

1   location of that account; isn't that right?

2   A.  Yes.

3   Q.  Where it was opened and who had opened it, correct?

4   A.  Yes.

5   Q.  Okay.  So when, in relation to June 7th of '05, did

6   you, meaning the Secret Service, if you know, trace that

7   account?

8   A.  Trace that account, it was almost immediately.

9   Q.  That was done immediately?

10  A.  Very short --

11  Q.  You have say yes or no.

12  A.  Yes, a very short time frame after we learned of

13  that account.

14  Q.  Your best recollection is that happened around June

15  of '05?

16  A.  Yes.

17  Q.  And in June of '05, in that regard, the Secret

18  Service did what?

19  A.  Determined the owner of the account, who opened the

20  account, whose name it was in, that sort of thing.

21  Q.  Okay.  And the $600 you said -- the government says

22  was paid for 21 dumps, correct?

23  A.  Yes.

24  Q.  Okay.  That being the case in June of '05, at least

25  according to the government, you had knowledge that an

1  alleged crime had been committed, a federal crime,

2  right?

3  A.  Yes.

4  Q.  And yet it wasn't until August of '06 that the

5  Secret Service acted on that information and pursued a

6  an arrest warrant against Mr. Giannone; isn't that

7  correct?

8  A.  Correct.

9  Q.  And when you pursued that arrest warrant on

10 Mr. Giannone, you advised the court here that you knew

11 where Mr. Giannone was located; isn't that right?

12 A.  We had an address, yes.

13 Q.  Okay.  So the answer to my question would be yes?

14 A.  Yes.

15 Q.  At that time, in August of '06, when you are

16 applying for the arrest warrant, did you also apply to

17 the court for a search warrant?

18 A.  No.

19 Q.  But a search warrant, differentiated from an arrest

20 warrant, authorizes you, with the imprimatur of a

21 federal judge, to go to a certain location and make a

22 certain search --

23         MR. EICHELBERGER:  Your Honor, I have to

24 object.  It's not relevant.

25         MR. LIOTTI:  That's Mr. Eichelberger saying

1   it's not relevant.

2         MR. EICHELBERGER:  I object, relevance.

3         THE COURT:  Overruled.

4         MR. LIOTTI:  Thank you.

5  BY MR. LIOTTI:

6  Q.  So the search warrant would define the area to be

7  searched, and you had a location for Mr. Giannone,

8  right?  You knew where he could be found, in other

9  words, right?

10  A.  Yes, sir.

11  Q.  That's why you got the arrest warrant.  But for some

12  reason not explained to us here, you did not apply for a

13  search warrant; isn't that correct?

14  A.  That is correct.

15  Q.  And a search warrant would allow you to go to

16  Mr. Giannone's location and, if the court granted it,

17  search whatever area is permitted, correct?

18  A.  Correct.

19  Q.  And by doing that you could, for example, seize

20  computers, seize hard drives in computers, seize DVDs,

21  disks, all sorts of information that might be there, but

22  at least you could make the search, right?

23  A.  Yes.

24  Q.  Okay.  You could, for example, make a search for

25  chats, right?

```
 1   A.  Yes.

 2   Q.  Now, if you found a chat, let's say, at

 3   Mr. Giannone's location labeled 26 -- Pit Boss 2600 or

 4   CIA INTEL, that might give you additional corroboration

 5   for a claim that Mr. Giannone is Pit Boss 2600 or CIA

 6   INTEL; isn't that right?

 7   A.  Yes.

 8   Q.  But you didn't do that?

 9   A.  No.

10   Q.  Basically, you relied on what Mr. Johnson gave you?

11   A.  That's not correct.

12   Q.  Now, another point, if I may.  You had the location

13   of the bank, Bank of America.  Okay?  You had the

14   account number and you also had the account name; isn't

15   that right?

16   A.  Yes.

17   Q.  What was the account name that the $600 from

18   Mr. Johnson was deposited into?

19   A.  A&W Auto Clinic.

20   Q.  And that bank account originated where?

21   A.  The bank account?  It was opened in New York, I

22   believe it was.

23   Q.  In Rockville Center, Long Island, New York, the name

24   of the account being A&W Auto Clinic; isn't that

25   correct?
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 87 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 311 of 475   Page 87 of 285
KIRBY - CROSS                                    2-87

1  A.  Yes, to the best of my knowledge.

2  Q.  Okay.  And that account was opened in

3  approximately -- see if this refreshes your recollection

4  now -- April 15th of '05; is that correct?

5  A.  I remember it was early '05.

6  Q.  Now, when did your field office in Columbia, South

7  Carolina relay the information that you had from June in

8  '05 to the New York field office so you could find out

9  who opened that account here -- well, there in New York?

10 A.  I can't recall.

11 Q.  Does it refresh your recollection that that was not

12 done until approximately August of '06?

13 A.  I think we had it before then, I'm pretty sure.  I

14 mean, I can't be -- I can't give you a date.

15          MR. LIOTTI:  Your Honor, could I have this

16 marked just for identification, please?

17          THE COURT:  Yes.

18          MR. LIOTTI:  Thank you.

19 BY MR. LIOTTI:

20 Q.  Agent Kirby, I'm placing before you now a document

21 that has been marked as Defense Exhibit 5 for

22 Identification and I ask you in looking at that,

23 particularly -- particularly the lower portion of it,

24 item No. 26, does that help you refresh your

25 recollection as to when the Columbia field office

1  communicated with the New York field office?

2  A.  Yes.

3  Q.  When was that?

4  A.  August 10th, 2006.

5  Q.  Thank you, sir.  May I have that back?

6  A.  (Handing).

7  Q.  So you got all this information on Pit Boss 2600 and

8  it's not communicated -- and the bank account

9  information is not communicated for over a year; is that

10  right?

11  A.  I would say that's not correct.

12  Q.  Well, you had the bank information in June of '05

13  and you communicate to the New York field office in

14  August of '06.  Am I wrong, or is that 14 months?  Yes

15  or no.

16  A.  That would be yes.

17  Q.  Okay.  So, it was 14 months.  All right.

18       Now, when was Mr. Johnson re-arrested?

19  A.  By the Secret Service?

20  Q.  Well, however you got custody of him, either by the

21  state or by the Secret Service.  I'm not sure who made

22  the arrest.

23  A.  Well, the last arrest was September 2006 by the

24  Secret Service.

25  Q.  All right.  And is Mr. Johnson cooperating with

```
 1  either federal or state authorities at this juncture?
 2  A.  He signed a plea agreement.
 3  Q.  I'm asking you if he is cooperating with federal or
 4  state authorities at this juncture?
 5  A.  It's hard to define cooperation, but I would say no.
 6  Q.  Is he represented by counsel?
 7  A.  Yes.
 8  Q.  Do you know if the government is going to provide a
 9  5K1 letter for Mr. Johnson?
10          MR. EICHELBERGER:  Objection, Your Honor.
11  Objection.  Speculation.
12  BY MR. LIOTTI:
13  Q.  Do you know?
14          THE COURT:  Sustained.  Sustained.
15          MR. LIOTTI:  Sustained?
16          THE COURT:  Yes.
17  BY MR. LIOTTI:
18  Q.  Do you know whether the federal government has
19  any -- has had any discussions at this juncture with
20  Mr. Johnson about cooperation from September, when he
21  was re-arrested, until now?
22  A.  I couldn't answer that.
23  Q.  You are not sure?
24  A.  I'm not sure.
25  Q.  Do you know if he has been asked to cooperate
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 90 of 285
USCA4 Appeal: 25-6132   Doc: 26      Filed: 09/19/2025   Pg: 314 of 475

KIRBY - CROSS                                    2-90

1   against Jonathan Giannone?

2   A.  Again, I'm going to say I'm not sure.

3   Q.  Do you know if he's entered into any kind of a

4   cooperation agreement with state authorities?

5   A.  The state charges are rolled into the federal case.

6   Q.  So there are no state charges presently?

7   A.  Right.

8   Q.  Do you know whether the United States Government

9   plans on giving him credit --

10          MR. EICHELBERGER:  Objection, calls for

11   speculation.

12          MR. LIOTTI:  May I finish the question?

13          THE COURT:  Yes, go ahead.

14   BY MR. LIOTTI:

15   Q.  Do you know if the United States Government plans on

16   giving him credit for any cooperation that he may have

17   given to state authorities pursuant to Federal

18   Sentencing Guidelines Section 5K2.2?

19          MR. EICHELBERGER:  Objection.  Calls for

20   speculation.

21          THE COURT:  Sustained.

22   BY MR. LIOTTI:

23   Q.  Now, you have mentioned the name -- the screen name

24   CIA INTEL.  When did you become aware of that name?

25   A.  As we saw, that first chat yesterday, on May 23rd,

```
 1   they were introduced at the same time -- almost the same
 2   time, Pit Boss and CIA INTEL.
 3   Q.  Would that have been on or about June 7th of '05?
 4   A.  No, that would have been May 23rd of '05.
 5   Q.  CIA INTEL?
 6   A.  Yes.
 7   Q.  Okay.  Now, I think it's the government's case that
 8   you are saying Pit Boss 2600 and CIA INTEL are the same
 9   person and they are both Jonathan Giannone, right?
10   A.  Yes.
11   Q.  And Jonathan Giannone was is both, right?
12   A.  Or was both at the time that this went on.
13   Q.  Okay.  Now, yesterday Mr. Eichelberger was sharing
14   with us in Government Exhibit 8, and I believe some
15   exhibits thereafter, something about a cotton candy
16   machine.  Do you remember that?
17   A.  Yes, sir.
18   Q.  Okay.  Is that code language for something other
19   than cotton candy?
20   A.  I just assumed it to be a cotton candy machine.
21   Q.  Okay.  So we are not talking about credit cards when
22   you testified about cotton candy?
23   A.  No, sir.
24   Q.  Okay.  Because I was just wondering what that had to
25   do with the investigation of anything.  I guess it was
```

 1  just part of the chat that was then taking place, some

 2  discussion about a cotton candy machine that Pit Boss or

 3  CIA INTEL wanted to buy for his girlfriend; is that

 4  right?

 5  A.  Yes.

 6  Q.  And apparently was not successful in doing that,

 7  right?

 8  A.  Well, it wasn't a top priority, so I would say

 9  right.

10  Q.  Apparently there's a scarcity of cotton candy

11  machines out there, right?

12          MR. LIOTTI:  Just want the Court to know I'm

13  winding down, Judge.

14          THE COURT:  All right.

15          MR. LIOTTI:  It will take me about 15 to 30

16  minutes to fully wind down, but I'm getting there,

17  Judge.

18  BY MR. LIOTTI:

19  Q.  Now, I would like to direct your attention, if I

20  may, to Government Exhibit 9.

21          MR. LIOTTI:  This would be, Mr. Eichelberger,

22  page 46.

23          MR. EICHELBERGER:  Thank you.

24          MR. LIOTTI:  You're welcome.

25  BY MR. LIOTTI:

1  Q.  Let's go to the first quarter of that page.  Pit

2  Boss 2600 refers to gollumfun as Mark; is that right?

3  A.  That's incorrect.

4  Q.  Is that a typo?

5  A.  No, sir.

6  Q.  Is that gollumfun referring to Pit Boss, is that

7  what you are saying?

8  A.  No, that's not what I'm saying.

9  Q.  By the way, you weren't a party or weren't present

10 for each and every one of these chats, were you?

11 A.  That's correct.

12 Q.  I'm sorry?

13 A.  That is correct.

14 Q.  So I don't know exactly how many chats we have here,

15 out of let's say these 20 exhibits that we have got on

16 the chats, how many were you present for?

17 A.  I have no way of answering that.

18 Q.  Okay.  And some of your testimony -- I'm not saying

19 all of it, Agent, but at least some of it -- has to do

20 with your interpretation of some of the language that's

21 used, right, in the chats?  Correct?

22 A.  There's not really a lot to interpret, sir.  I mean,

23 as far as, like, acronyms and that sort of thing:  SS,

24 NH, that sort of thing, I would say --

25 Q.  Yes.  You are trying to figure out what's actually

1  being communicated?

2  A.  Yes.

3  Q.  This would be your version or the government's

4  version of what you believe is being said in the chats?

5  A.  Yes.

6  Q.  Correct?  So, for example, JAX you are saying is

7  Jacksonville, right, or things of that nature?

8  A.  Can I explain that one a little, or do you want a

9  yes or no?

10  Q.  Just answer my question, if you would.

11  A.  Yes.

12  Q.  Okay.  Thank you.  Now, I would like to go to

13  Government Exhibit 11, if I may.

14        MR. LIOTTI:  Page 69 of your paperwork,

15  Mr. Eichelberger.

16  BY MR. LIOTTI:

17  Q.  Agent, is this the first time, and this is

18  June 17th, '05, that at least in these chats we see the

19  name Christopher James Branca appearing?

20  A.  I'm not sure if that was the first instance or not

21  without reviewing all the chats.

22  Q.  You think it may have occurred before that, but in

23  any event it does appear in this one, correct?

24  A.  Yes, sir.

25  Q.  All right.  Thank you.  Now, gollumfun, Brett

1  Johnson says, with respect to Christopher James Branca,

2  "Who the hell is that?"  Right?

3  A.  Yes.

4  Q.  And CIA INTEL refers to Branca as a supplier; is

5  that right?

6  A.  Actually, he refers to him as CC Suppliers, which is

7  a screen name.

8  Q.  Okay.  That was one of the names that Mr. Branca

9  had.  He may have had more than that, but that was at

10 least one name that CIA INTEL says he had, correct?

11 A.  Yes.

12 Q.  Okay.  And then CIA INTEL says that Branca stole

13 from him; isn't that right?  If you go down just past

14 the middle of the page.

15 A.  I see that line.  What was the question again?

16 Q.  CIA INTEL says that Branca stole from him; isn't

17 that right?

18 A.  Yes.

19 Q.  Okay.  And then if we go to the next page, this is

20 page 70, gollumfun indicates that "Branca ripped me for

21 a NetBank account about four years ago," right?

22 A.  Yes.

23 Q.  So now in this conversation, or this chat, you've

24 got CIA INTEL and gollumfun both saying that they are

25 ripped off by Chris Branca, right?

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 96 of 285
USCA4 Appeal: 25-6132   Doc: 26      Filed: 09/19/2025   Pg: 320 of 475   Page 96 of 285
KIRBY - CROSS                                          2-96

```
 1   A.  Yes.

 2   Q.  Mr. Branca, we have already learned, is going to be

 3   a witness for the government in this case, correct?

 4   A.  Yes.

 5   Q.  Okay.  And then CIA INTEL indicates the following,

 6   if you go about -- almost to the half-page mark, there's

 7   an indication that CIA INTEL called Mr. Branca's parents

 8   and said that he was the Secret Service, right?

 9   A.  Yes.

10   Q.  And also further down, about three quarters of the

11   way down, CIA INTEL says he's going to call the Secret

12   Service on Branca, right, because CIA INTEL says he's

13   ripped off by Branca, right?

14   A.  Yes.

15   Q.  Okay.  And he says, among other things, that Branca

16   trashed a hotel room, caused damage, ordered 50 movies,

17   took laptops, and then disappeared, right?

18   A.  Yes.

19   Q.  So CIA INTEL is pretty well upset with Chris Branca

20   and he says that to gollumfun, a/k/a Brett Johnson, who

21   says he's ripped off also by this guy, right?

22   A.  Yes.

23   Q.  And CIA INTEL --

24          MR. LIOTTI:  Further down on page 71,

25   Mr. Eichelberger, about three quarters of the way down.
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 97 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 321 of 475   Page 97 of 285
KIRBY - CROSS                                    2-97

```
 1  BY MR. LIOTTI:

 2  Q.  -- indicates that he's ripped off by Mr. Branca over

 3  10K, $10,000, right?

 4  A.  That's actually a cumulative between a deal he had

 5  with --

 6  Q.  No.  About three quarters of the way down, right

 7  here, sir.

 8  A.  I see it.

 9  Q.  See it?

10  A.  Yes.

11          THE COURT:  What's your pending question?

12          MR. LIOTTI:  I'm sorry?

13          THE COURT:  What is your pending question?

14          MR. LIOTTI:  No.  I just asked him if it was

15  over $10,000.

16  BY MR. LIOTTI:

17  Q.  And that's what CIA INTEL indicated, right?

18  A.  He said over $10,000.

19  Q.  Okay.  And then the same thing in the next

20  government exhibit.  The next government exhibit, which

21  is 12.  Mr. Johnson, with the Secret Service sitting at

22  his side and monitoring these conversations or chats,

23  asked a question of CIA INTEL, the question being, "Are

24  you still pissed off at Mr. Branca?"  CIA INTEL, "Of

25  course."
```

```
 1              And then there's some indication in Government
 2  Exhibit 12 about Mr. Branca having apparently been
 3  convicted of something, that he's from Connecticut --
 4              MR. LIOTTI:  It's page 74, Mr. Eichelberger.
 5  BY MR. LIOTTI:
 6  Q.  -- and that he's from Connecticut.
 7              And then CIA INTEL says -- and this is on page
 8  74, page 2 of the exhibit that you have before you,
 9  sir.
10  A.  Yes, sir.
11  Q.  Okay?  CIA INTEL says, "He doesn't have my real" --
12  and then it's left blank.  "My real" -- you would
13  interpret from that --
14              MR. EICHELBERGER:  Objection as to what --
15  calls for speculation.
16              MR. LIOTTI:  Well, he's already indicated that
17  he's interpreted certain things, I just asked him?
18              THE COURT:  Go ahead.
19  BY MR. LIOTTI:
20  Q.  Would you interpret from that that CIA INTEL was
21  saying that he, meaning Branca, doesn't have his real
22  name?
23              MR. EICHELBERGER:  Objection, calls for
24  speculation.
25              THE COURT:  Sustained.
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 99 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 323 of 475   Page 99 of 285
KIRBY - CROSS                                           2-99

1  BY MR. LIOTTI:

2  Q.  But in any event, it says, "He doesn't have my

3  real -- "  Okay?  And then it goes down, Mr. Johnson

4  indicates, "Ah, good deal."  CIA INTEL says, "He thinks

5  he does."  Is that correct?

6  A.  That is correct.

7  Q.  Okay.  Now, in some of these transcripts we also see

8  language about escrow or escrow accounts.  Do you see

9  that, sir?

10  A.  I recall escrow being discussed.

11  Q.  Okay.  And with respect to credit card transactions,

12  what is an escrow account?

13  A.  I really can't speak about -- as far as the escrow

14  accounts.  I know it's the way people do business, but

15  as far as in this aspect I would be guessing.

16  Q.  And in this one, if you go to page 77, about three

17  quarters of the way down, it's probably page 4, I think,

18  in the exhibit before you, sir, CIA INTEL says, "I might

19  call the Secret Service on Mr. Branca," correct?  Is

20  that correct?

21  A.  Where was that again?

22  Q.  "I might call the Secret Service on Mr. Branca."

23          MR. EICHELBERGER:  Objection.  It misstates the

24  document.

25  BY MR. LIOTTI:

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 100 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 324 of 475   Page 100 of 285
KIRBY - CROSS                                          2-100

 1   Q.  "I might call the Secret Service;" is that what it

 2   says?

 3   A.  Yes.  Yes.

 4   Q.  He's referring to Mr. Branca there, isn't he?

 5   A.  Without reading the whole chat I wouldn't be able to

 6   speculate off the top of my head.

 7   Q.  You don't remember that?

 8   A.  It's 170 pages of chat.

 9   Q.  Okay.  And now, after this information -- now, this

10   conversation takes place on June 18th of '05, right?

11   That's what it says on the front page, page 73.

12   A.  Yes.

13   Q.  Now, you have information about an individual by the

14   name of Branca.  Does Mr. Johnson do anything to try and

15   stir up some business with Mr. Branca?

16   A.  I can't recall if Mr. Branca was the subject of the

17   investigation.

18   Q.  So you are not sure if he tried to set him up,

19   Branca, in a little government sting?  You know, you

20   call him up, "Hey, what's happening?  You remember me?

21   You ripped me off for $4,000 a few years back.  You got

22   any dumps available?  How much do you want for them?"

23   Nothing like that?

24   A.  Without viewing the chats with Mr. Branca I couldn't

25   answer that.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 101 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 325 of 475   Page 101 of 285
KIRBY - CROSS                                    2-101

1   Q.  But as far as you can recall you can't remember

2   anything like that happening?

3   A.  We had several chats with Mr. Branca.

4   Q.  Okay.  But I'm asking, did you do a little

5   government sting on Mr. Branca to try and catch him?

6   A.  He was part of our investigation, yes.

7   Q.  The answer is yes?

8   A.  He was part of our investigation, yes.

9   Q.  Okay.  So when, in all of this, did you finally

10  arrest Mr. Branca?

11  A.  We never actually arrested Mr. Branca.

12  Q.  How did Mr. Branca come to be arrested or in

13  custody?

14  A.  In -- actually, in preparation for this trial.

15  Q.  So does that mean in the last month or so he's been

16  in custody?

17  A.  He's -- he's never been in custody.

18  Q.  Ah, so he hired a lawyer?

19          MR. EICHELBERGER:  Objection, relevance.

20          THE COURT:  Overruled.

21  BY MR. LIOTTI:

22  Q.  Did he hire a lawyer?

23  A.  I'm not sure if he hired one.  I think one was

24  appointed.

25  Q.  But he's been cooperating with you?  Mr. Branca?

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 102 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 326 of 475   Page 102 of 285
KIRBY - CROSS                                          2-102

1   A.   Yes.

2   Q.   People don't just come in and pop into your office

3   and say, "Hey, can I cooperate with the federal

4   government today?  I have nothing else to do.  You know,

5   I'm kind of out of work, things have been slow, I would

6   like to cooperate with the federal government," that

7   kind of thing?

8   A.   Does that happen?

9   Q.   Yes.

10  A.   No.

11  Q.   No.  So Mr. Branca had his own problems, didn't he?

12  A.   He does.

13  Q.   He does.  And he's been working with you folks in an

14  effort to try and work those off, right?

15  A.   He's been cooperating with us on this investigation.

16  Q.   But is he charged federally?

17  A.   The details of that I would have to go to

18  Mr. Eichelberger on that.  I know something has been

19  done, but the extent, I'm not sure.

20  Q.   I'm just asking if you know whether he's been

21  charged.

22  A.   To my knowledge not officially charged.

23  Q.   Not officially charged?

24  A.   To my knowledge.

25  Q.   But the heat was on.  You know what I mean by heat,

1    right?  The heat.  You know, you are the heat;

2    Mr. Eichelberger is the heat, right?  The heat was on

3    Mr. Branca and maybe you showed up with a business card

4    and said, "Please call us," and then he got an attorney,

5    then the attorney calls you, and so far -- what?  He's

6    out of jail and he hasn't been charged, right?

7    A.   He was not in jail.

8    Q.   Right.  I'm saying he's out of jail, that means he's

9    on the street at liberty, walking around out there.

10   A.   Correct.

11   Q.   Okay.  Conducting business, doing whatever he wants

12   to do, and he's working with you guys.  And so far he

13   hasn't been charged federally; is that right?

14   A.   Best of my knowledge.

15   Q.   Okay.  And that's after you investigated everything

16   relating to Government Exhibit 12, wherein all of this

17   activity is indicated in 12 and 11 and so on about

18   Mr. Branca, and not charged, right?

19   A.   That is correct.

20   Q.   Pretty good lawyer, huh, that he has?  Pretty good

21   lawyer, right?

22   A.   Well, that doesn't come into play.

23   Q.   You just want to give him a pass because he's a nice

24   guy and he's cooperating?

25   A.   That's not the case either.

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 104 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 328 of 475   Page 104 of 285
KIRBY - CROSS                                                    2-104

1   Q.  All right.  Let's go to Government Exhibit 13.  Let

2   me see if I have anything here.

3            By the way, do you know if the federal

4   government has imparted to Mr. Branca the contents of

5   these chats where CIA INTEL, for example, says these

6   things about him, that he's going to call the Secret

7   Service and call his parents and all that?

8   A.  I -- I don't know the answer to that.

9   Q.  You know, just kind of to bait him a little bit, you

10  know --

11           MR. EICHELBERGER:  Objection, argumentative.

12           THE COURT:  Sustained.

13           MR. LIOTTI:  I didn't finish the question.

14  BY MR. LIOTTI:

15  Q.  Just to bait him a little bit --

16           THE COURT:  Sustained.

17           MR. LIOTTI:  Okay.

18  BY MR. LIOTTI:

19  Q.  By the way, Agent, while I'm searching for my next

20  question here, yesterday you testified about how you

21  were born and raised in Columbia, South Carolina -- no?

22  But you --

23  A.  No.

24  Q.  You had two degrees from Columbia, South Carolina,

25  or at least South Carolina, right?

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 105 of 285
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 329 of 475    Page 105 of 285
KIRBY - CROSS                                        2-105

```
 1  A.  It's not correct.

 2  Q.  Okay.

 3  A.  I have one degree from South Carolina.

 4  Q.  Okay.  Where was the other one from?

 5  A.  Francis Marion University.

 6  Q.  Okay.  And you have lived here for how long?

 7  A.  Four years.  I moved here when I came on with the

 8  service.

 9  Q.  That doesn't have anything to do with this

10  investigation, does it?  How long you have lived here in

11  Columbia, South Carolina?

12  A.  I would think not.

13  Q.  Okay.  I just wasn't sure.

14          MR. LIOTTI:  Almost done, Judge.  Just double

15  check.

16  BY MR. LIOTTI:

17  Q.  Okay.  Government Exhibit 16, page 102.  Do you have

18  that before you?

19  A.  Yes, sir.

20  Q.  Thank you.  Going to the next to the last line on

21  that.  Again, this is a conversation or a chat on

22  July 2nd of '05.  In this particular chat Pit Boss 2600

23  refers to, "I'm on my Sidekick."  Do you know what a

24  Sidekick is?

25  A.  It's a mobile device, telephone.
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 106 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 330 of 475   Page 106 of 285
KIRBY - CROSS
2-106

```
 1   Q.  Now, can you have a chat on a Sidekick?

 2   A.  I have never had one but I've heard you can.

 3   Q.  Now, did I hear you right yesterday, or maybe it was

 4   your fellow agent the other day -- yesterday -- who made

 5   reference to Mr. Branca being at sea at some point?

 6   A.  Yes, at some point.

 7   Q.  Okay.  In fact, we can jump ahead just a little bit,

 8   if you don't mind, and I may have to come back to some

 9   of these exhibits, but I would like to jump ahead to --

10   let's see, this is Government Exhibit 22.

11           MR. LIOTTI:  It doesn't have a page reference,

12   Mr. Eichelberger.

13   BY MR. LIOTTI:

14   Q.  And also Government's Exhibit 23, also without a

15   page reference.  Do you have those before you?

16   A.  I have -- yes, sir.

17   Q.  Okay.  Now, a Sidekick -- a Sidekick, like a mobile

18   phone and so forth, can be used to communicate even at

19   sea, can it not?

20   A.  I would say there's a lot of factors involved with

21   that.  You have to have a tower close.

22   Q.  All I want to know if it's possible.  Is it possible

23   for that to happen?  For example, you have a

24   ship-to-shore phone that works, right?

25   A.  Yes.
```

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 107 of 285
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 331 of 475

KIRBY - CROSS                                           2-107

```
 1   Q.  Okay.  So if that works, that primitive device, a

 2   ship-to-shore phone works, then certainly a mobile phone

 3   would work, right, or a Sidekick might work in terms of

 4   communicating with land, so to speak, right?

 5   A.  Of my knowledge, based on distance.

 6   Q.  You are not sure how far out at sea it might work,

 7   right?

 8   A.  Correct.

 9   Q.  Okay.  But depending upon the distance it could

10   work?

11   A.  It could.

12   Q.  Yes.  Thank you.  So, was it your testimony

13   yesterday that either Mr. Branca or Mr. Cutler were out

14   at sea at a certain time and they could not have

15   communicated as Pit Boss 2600 or CIA INTEL because they

16   didn't have access to a communication device, a

17   laptop --

18          MR. EICHELBERGER:  Objection, Your Honor,

19   misstates the evidence from yesterday.

20          MR. LIOTTI:  I asked if that was his testimony.

21   BY MR. LIOTTI:

22   Q.  Was that your testimony?

23          THE COURT:  You may answer.

24   A.  Can you repeat the question?

25   BY MR. LIOTTI:
```

1  Q.  Sure.  I'm really directing your attention, in

2  particular, to Government Exhibits 22 and 23, the vessel

3  Captain Bob and so on, the crew manifest, all of that.

4  And No.3, crew member Christopher Cutler appears on

5  Government Exhibit Number 23 as No. 3 among the crew and

6  he's out at sea, according to this document, at least,

7  from November 9th, '06, until November 20th, '06.  Am I

8  right so far?

9  A.  Yes, sir.

10 Q.  Okay.  And I thought it was your testimony that he

11 could not communicate from where he was out at sea.  He

12 could not send a chat or an e-mail and so on because he

13 just didn't have the requisite equipment from where he

14 was?

15 A.  I would still say that.

16 Q.  You would still say that?

17 A.  Yes.

18 Q.  Okay.  I thought I was on the right track but I

19 wasn't sure.  Okay.  But now you would say that if he

20 had the right equipment, such as a Sidekick, for

21 example, he could have done that, right?

22 A.  As I said, it was based on distance.  Deep-sea

23 fishing, probably not.

24 Q.  Okay.  But in these two documents that you have,

25 that would be 22 and 23, we don't know exactly where he

USCA4 Appeal: 25-6132    Doc: 26    Date Filed: 09/19/2025    Pg: 333 of 475
3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 109 of 285
KIRBY - CROSS

2-109

 1  was, right?

 2  A.  That is correct.

 3  Q.  Okay.  Thank you.  Now, let me direct your attention

 4  to Government Exhibit 17, and in particular page 104 in

 5  that document.  And now about a little more than halfway

 6  down -- and this, by the way, is a chat that occurred on

 7  7-6-05; is that right?

 8  A.  Yes, sir.

 9  Q.  Okay.  Now, on 7-6-05, were you able to ascertain

10  where Mr. Giannone was on or about that date?

11  A.  I can't recall if that was one of the dates that we

12  spoke about yesterday or not.

13  Q.  All right.  Well, let's go to -- in the first

14  exhibit I was just asking you about, that's Government

15  Exhibit 17, CIA INTEL says that he's going to the

16  Bahamas, right?  Now, let's just take a look at -- I'm

17  just trying to find it.

18  A.  I can answer your original question if you want

19  me --

20  Q.  I'm just trying to find out -- at some point did you

21  learn that on or about July 6 and July 7th, those dates,

22  that Mr. Giannone was in Fullerton, California?

23  A.  Yes.

24  Q.  You did learn that?

25  A.  Yes.

```
 1   Q.  Thank you.

 2           MR. LIOTTI:  Almost done, Judge.

 3   BY MR. LIOTTI:

 4   Q.  Let me direct your attention, if I may, to

 5   Government Exhibit 19.

 6           MR. LIOTTI:  Which would be page 142,

 7   Mr. Eichelberger.

 8           MR. EICHELBERGER:  Thank you.

 9           MR. LIOTTI:  You're welcome.

10   BY MR. LIOTTI:

11   Q.  Again, about halfway down on that page, CIA INTEL

12   refers to, "Yeah, W.A. has better dumps."  Do you see

13   that?

14   A.  Halfway down?

15   Q.  About halfway down, sir.  Again, without flashing it

16   in front of the jury.  Do you see it right here, sir?

17           MR. EICHELBERGER:  Which page again?  Sorry.

18           THE WITNESS:  137, is that the page number?

19   BY MR. LIOTTI:

20   Q.  142.

21   A.  Oh, I'm sorry.

22   Q.  Do you have that?

23   A.  Yes.

24   Q.  Did you ascertain who W.A. is?

25   A.  I'd say that was a screen name but that was all we
```

```
 1  knew at the time.

 2  Q.  So in answer to my question, did you ascertain who

 3  W.A. is --

 4  A.  No.

 5  Q.  Thank you.  Now, let me direct your attention to

 6  Government Exhibit 20.  There's a reference -- and there

 7  was some reference to this yesterday about CIA INTEL

 8  going to Hawaii.  Do you remember that?

 9  A.  Yes.

10  Q.  Did Mr. -- did you learn whether Mr. Giannone used

11  his own credit card for a trip to Hawaii?

12  A.  Yes.

13  Q.  And he did?

14  A.  Yes.

15  Q.  Also in that same -- on that same chat, we have a

16  reference to someone by the name of Nosa, N-o-s-a.  Did

17  you ascertain who Nosa is?

18  A.  True identity, no.

19  Q.  The answer would be no?

20  A.  No.

21  Q.  Thank you.  There's also a reference to --

22  withdrawn.

23          And did you also learn that in that trip to

24  Hawaii that you testified about yesterday that

25  Mr. Giannone used his own AmEx card to rent a car?
```

```
 1   A.  Yes.

 2   Q.  And also -- withdrawn.

 3        Did you ever ask or did -- when I say you,

 4   again, the Secret Service -- did they ever ask, as far

 5   as you know, or make an inquiry or an investigation

 6   regarding whether Mr. Cutler had a Sidekick with him on

 7   his sea cruise or whatever that was?  Did you ask him

 8   about that?

 9   A.  That might have been discussed with Mr. Cutler

10   during interviews, but I wasn't there, so I would have

11   to say no.

12   Q.  Did the Secret Service inquire about whether

13   Mr. Cutler ever used a Sidekick or a mobile phone?

14   A.  Again, I wasn't there to speak with Mr. Cutler.

15   Q.  Okay.  Now, directing your attention, if I may, to

16   Government Exhibit 21A.

17        MR. LIOTTI:  That is just labeled as page 1,

18   Mr. Eichelberger.

19   BY MR. LIOTTI:

20   Q.  And in particular A-1 -- I think is the page

21   reference -- did you learn at some point that

22   Mr. Giannone had used his own -- not only his own credit

23   card, his AmEx card, but also his frequent flyer miles

24   to travel?

25   A.  Yes.
```

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 113 of 285
USCA4 Appeal: 25-6132   Doc: 26      Filed: 09/19/2025   Pg: 337 of 475   Page 113 of 285
KIRBY - CROSS                                              2-113

1  Q.  And those were his, not someone else's, correct?

2  A.  Correct.

3          MR. LIOTTI:  Judge, may I have just one moment,

4  please?

5          THE COURT:  Yes.

6          MR. LIOTTI:  No further questions.  Thank you.

7          THE COURT:  Redirect?

8          MR. EICHELBERGER:  Prior to redirect may we

9  have a brief sidebar?

10          THE COURT:  Yes.

11          (Bench conference)

12          MR. EICHELBERGER:  There are a lot of questions

13  about Mr. Giannone using his true identification on

14  travel.  I have been advised by the agents that as a

15  juvenile Mr. Giannone was actually stopped at an airport

16  for using a false identification.  Now, that's not on

17  his NCIC, so that's part of the reason I wanted to raise

18  it as an issue, but it certainly would lay the

19  foundation for why Mr. Giannone -- notwithstanding the

20  security concerns at airports -- but it would certainly

21  explain why Mr. Giannone would be using his own name and

22  own credit card information for travel.

23          THE COURT:  No.

24          MR. EICHELBERGER:  I anticipated that, but --

25          MR. LIOTTI:  Thank you.

 1              MR. EICHELBERGER:  Thank you.

 2              (In open court)

 3                      REDIRECT EXAMINATION

 4   BY MR. EICHELBERGER:

 5   Q.  Mr. Kirby, I'm going to ask you, first off, a couple

 6   of questions about your experience as a Secret Service

 7   agent in connection with the travel that you have

 8   undertaken in some of the various missions.  In

 9   connection with that, would I safely assume you have to

10   go through airport security rather regularly?

11   A.  Yes, sir.

12   Q.  In connection with going through airport security,

13   what type procedures does a traveler have to go through,

14   particularly with respect to current -- or I should

15   refer to, security precautions that were in place around

16   2005?

17   A.  Main thing, verification of identity.

18   Q.  Okay.  To your knowledge do airport security

19   officers check one's identification?

20   A.  Yes.

21   Q.  Do they compare that with the name that is being

22   used for travel?

23   A.  Yes.

24   Q.  What if anything would happen, based upon your

25   experience, if those did not match up?

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 115 of 285
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 339 of 475    Page 115 of 285
KIRBY - REDIRECT                                                    2-115

1  A.  There's a problem --

2          MR. LIOTTI:  Objection.  Calls for speculation

3  on the part of the witness, beyond the scope

4  cross-examination.

5          THE COURT:  Sustained as to speculation.

6  BY MR. EICHELBERGER:

7  Q.  In connection with this online undercover

8  investigation which lasted -- what was it?  11 months?

9  A.  10 or 11 months.

10  Q.  While the investigation was going on, while it was

11  active, were there any people who were arrested?

12  A.  During the investigation?

13  Q.  While the investigation was actively operating?

14  A.  We brought about all of ours at the same time.

15  Q.  Now, why would that be?

16  A.  That was -- it was a -- wanted to get all the people

17  involved in the online undercover investigations.  There

18  was a certain time given where -- that was the time

19  where we would act --

20          MR. LIOTTI:  Objection.  Calls for speculation

21  and move to strike the testimony.

22          THE COURT:  Overruled.

23  BY MR. EICHELBERGER:

24  Q.  Specifically with respect to June 7th, 2005, based

25  upon your understanding, your experience with undercover

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 116 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 340 of 475   Page 116 of 285
KIRBY - REDIRECT                                    2-116

1  investigations, if an arrest was effected then, what

2  impact would that have on the ability to pursue an

3  undercover investigation?

4          MR. LIOTTI:  Objection.  Calls for

5  speculation.

6          THE COURT:  Sustained.

7  BY MR. EICHELBERGER:

8  Q.  You have testified that arrests for people who were

9  caught up in this investigation were done at

10 approximately the same time?

11 A.  Yes.

12 Q.  Could you tell us the reason for that?

13         MR. LIOTTI:  Objection to the form of the

14 question.

15         THE COURT:  Overruled.

16 A.  If one person was arrested that was a major part of

17 our investigation, it would virt -- it would be the end

18 of the investigation.

19 BY MR. EICHELBERGER:

20 Q.  With respect to Mr. Johnson and his operations, his

21 activities during the course of this investigation, if

22 Mr. Johnson had in his head an intent to accomplish

23 something illegal or something in his own interests,

24 what if any impact would that have on the integrity or

25 the accuracy of the chat transcripts that we've

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 117 of 285
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 341 of 475    Page 117 of 285
KIRBY - REDIRECT                                                    2-117

```
 1  discussed here?

 2           MR. LIOTTI:  Objection, calls for speculation.

 3           THE COURT:  Sustained.

 4  BY MR. EICHELBERGER:

 5  Q.  With respect to the chat transcripts, did

 6  Mr. Johnson have any ability to affect what went into

 7  them?

 8           MR. LIOTTI:  Objection.

 9           THE COURT:  Overruled.

10  A.  There was no way he could act -- go in and change

11  the chats, if that's what you are asking.

12  BY MR. EICHELBERGER:

13  Q.  That is what I'm asking.

14  A.  Whatever was typed while we were monitoring him,

15  that is what shows in the transcripts.

16  Q.  In the course of this investigation did you have to

17  rely in any respect on Mr. Johnson's honesty to have

18  confidence in the integrity or the accuracy of the

19  chats?

20           MR. LIOTTI:  Objection to the form of the

21  question.

22           THE COURT:  Sustained.

23  BY MR. EICHELBERGER:

24  Q.  Did Mr. Johnson have anything to do with how the

25  chats are generated?
```

1          MR. LIOTTI:  Objection, asked and answered.

2          THE COURT:  Overruled.

3   A.  No.

4   BY MR. EICHELBERGER:

5   Q.  Now, with respect to Government's Exhibit 2, we were

6   talking -- there was a question raised about 200 dumps

7   for $2,000.  Do you recall that?

8   A.  Yes.

9   Q.  Could you grab Government's Exhibit 2 again,

10  please?  Do you have it in front of you?

11  A.  Yes.

12  Q.  I would specifically like you to read the line that

13  comes immediately prior to the statement about 200 for

14  2K.  What does Pit Boss 2600 say?

15  A.  "If you like them."

16  Q.  "If you like them"?

17  A.  Correct.

18  Q.  Does that mean that -- well, strike that.

19          I would be asking you to interpret.  The words

20  speak for themselves.

21          MR. LIOTTI:  Objection, move to strike.

22          THE COURT:  Overruled.

23  BY MR. EICHELBERGER:

24  Q.  With respect to Mr. Johnson's activities during the

25  course of this undercover investigation you testified

1  that you did not feed information to Mr. Johnson for him

2  to use.  What was Mr. Johnson's function in this

3  undercover investigation?

4  A.  To actually get into the world where he was -- his

5  nickname was well known, and to speak with people as he

6  usually would.

7  Q.  And based upon your dealings with Mr. Johnson

8  throughout the course of this investigation, did he

9  appear to be fluent in the language that was used by

10  people in this undercover investigation?

11          MR. LIOTTI:  Objection to the form of the

12  question.

13          THE COURT:  Overruled.

14  A.  He was very familiar.

15  BY MR. EICHELBERGER:

16  Q.  With respect to the various people that Mr. Johnson

17  had contact with, people -- did at any time during this

18  investigation, do you recall whether people used their

19  true names?

20  A.  None that I can recall.

21  Q.  In connection with your experience in dealing with

22  this investigation, do people generally use their true

23  names --

24          MR. LIOTTI:  Objection.  The witness hasn't

25  been qualified as an expert.  This goes beyond the res

1  gestae.

2          MR. EICHELBERGER:  Actually, I asked whether --

3  within connection with this investigation people used

4  their true identifications with respect to the

5  investigation.

6          THE COURT:  He's already -- that's been asked

7  and answered.

8          MR. EICHELBERGER:  Thank you.

9  BY MR. EICHELBERGER:

10 Q.  With respect to whether or not Mr. Giannone ever

11 identified himself by name, do you recall a transaction

12 where -- whether it was Pit Boss 2600 or CIA INTEL --

13 was talking about his desires to go to school?

14 A.  Yes.

15 Q.  Do you recall what nickname that person wanted to

16 get?

17 A.  Yes.

18 Q.  In the chosen profession?

19 A.  Yes.

20 Q.  What was that nickname?

21 A.  No-deal Johnny.

22 Q.  No-deal Johnny.

23          MR. LIOTTI:  Objection.  Beyond the scope of

24 cross-examination.  Move to strike.

25          THE COURT:  Denied.

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 121 of 285
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 345 of 475    Page 121 of 285
KIRBY - REDIRECT                                      2-121

1  BY MR. EICHELBERGER:

2  Q.  With respect to -- I want to -- I feel like we had a

3  little bit of confusion about what ICQ is.  Again, tell

4  us what is ICQ.

5  A.  It's a means of communicating on the Internet with

6  another individual, online chat.

7  Q.  Is it analogous to an instant message service by

8  AOL?

9  A.  Yes.

10 Q.  In connection with the two identities in this case

11 that are linked, Pit Boss 2600 and CIA INTEL, do those

12 names have a link to a particular means of communication

13 over the Internet?

14 A.  I'm not sure if I understand your question.

15 Q.  Where did the name CIA INTEL first appear?  Was it

16 in an AIM message or was it in an ICQ message?

17 A.  CIA INTEL's, ICQ.

18 Q.  Okay.  So CIA was an ICQ name?

19 A.  Right.

20 Q.  And what was Pit Boss 2600?

21 A.  AIM.

22 Q.  AOL Instant Messenger?

23 A.  Right.

24 Q.  With respect to having three-way communications -- I

25 wanted to make sure we didn't have a misunderstanding

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 146   Page 122 of 285
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 346 of 475   Page 122 of 285
KIRBY - REDIRECT                                        2-122

1  there -- during the investigation dealing with Pit Boss

2  2600 and/or CIA INTEL, to your knowledge was there ever

3  any three-way communications involving gollumfun and

4  either of those two names?

5  A.  It was one-on-one chat between gollumfun and CIA

6  INTEL or gollumfun and Pit Boss.

7  Q.  So, the answer would be there was no three-way

8  communications?

9  A.  Correct.

10 Q.  Thank you.  With respect to questions regarding

11 whether the Secret Service had ever paid $2,000 in

12 connection with any one person offering goods, services,

13 information.  To your knowledge did the Secret Service

14 ever pay that amount to anyone during the investigation?

15 A.  Not to my knowledge.

16 Q.  With respect to this ongoing, online investigation,

17 if you had to estimate, how many user names came up,

18 came within the scope of this investigation?

19 A.  Hundred -- hundreds.

20 Q.  Hundreds, plural?

21 A.  Some users had two to three user names, yes.

22 Q.  With respect to those user names, if all you have is

23 the user name, without more, does that provide you with

24 sufficient information to identify that person in the

25 real world?

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 123 of 285
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 347 of 475

KIRBY - REDIRECT                                              2-123

```
 1  A.  No.

 2  Q.  With respect to the monitoring of Mr. Johnson's

 3  activities, did you monitor Mr. Johnson 24 hours a day?

 4  A.  No, we did not.

 5  Q.  With respect to the use of a cell phone, have you

 6  ever had occasions driving down the road where a cell

 7  phone stops working?

 8  A.  Yes.

 9          MR. LIOTTI:  Objection.

10          THE COURT:  Overruled.

11  BY MR. EICHELBERGER:

12  Q.  And why would that be?

13  A.  Loses the signal.

14  Q.  That's on major highways?

15  A.  Yes.

16          MR. LIOTTI:  Judge, is the witness testifying

17  as an expert?

18          THE COURT:  No.

19  BY MR. EICHELBERGER:

20  Q.  With respect to Government's Exhibit 17, if you

21  would turn to that please, it will be referenced as page

22  104.  And, again, I want to follow up on a question that

23  was asked about CIA INTEL's statement, "Naw, I'm going

24  to the Bahamas."  Do you see that?

25  A.  Yes.
```

1  Q.  Do you see that's in quotes?

2  A.  Yes.

3  Q.  Do you have any way of knowing whether CIA INTEL is

4  making that as a statement for himself or merely

5  recounting a statement that another person made to him?

6  A.  No.

7            MR. LIOTTI:  Objection to the form of the

8  question.

9            THE COURT:  The answer was no.

10  BY MR. EICHELBERGER:

11  Q.  With respect to documentation that was pulled

12  together during the course of this investigation -- I'm

13  just going to wrap up with this final series of

14  questions -- were you able to establish that there were

15  transactions on Mr. Giannone's account in Jacksonville,

16  Florida, on or about May 25th of 2005?

17            MR. LIOTTI:  Objection.

18            THE COURT:  Overruled.

19  A.  Yes.

20  BY MR. EICHELBERGER:

21  Q.  Were you able to establish that there were

22  transactions on Mr. Giannone's accounts reflecting

23  travel in or around California at or about the same time

24  as chats reflected him saying that he's in California?

25  A.  Yes.

1  Q.  Similarly, were you able to establish travel for

2  Mr. Giannone about the time he said he was in

3  Washington, D.C.?

4          THE COURT:  Let's step back a minute.  About

5  the time who said?

6  BY MR. EICHELBERGER:

7  Q.  About the time Mr. Giannone -- I'm sorry.  The time

8  that Pit Boss 2600 and/or CIA INTEL said that he was in

9  Washington, D.C. --

10 A.  Yes.

11 Q.  -- were you able to establish that?

12 A.  Yes.

13 Q.  At or about the time that Mr. -- that Pit Boss 2600

14 and/or CIA INTEL said that he had just received his

15 Platinum American Express card, were you able to

16 determine whether he had, in fact, received a Platinum

17 American Express card?

18 A.  Yes.

19          MR. LIOTTI:  Objection.

20          THE COURT:  Overruled.

21 BY MR. EICHELBERGER:

22 Q.  With respect to travel involving a trip from Boston

23 to New York that was reflected within the chat

24 transcript attributed either to CIA INTEL or Pit Boss

25 2600, the records reflect a trip of that nature?

3:06-cr-01011-CMC    Doc: 26    Date Filed 05/02/08    Entry Number 146    Page 126 of 285
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 350 of 475    Page 126 of 285
KIRBY - REDIRECT

2-126

1   A.  Yes.

2           MR. EICHELBERGER:  Thank you.  That's all I

3   have.

4           THE COURT:  All right.  Thank you, sir.  You

5   may step down.

6           All right.  Ladies and gentlemen, I'm going to

7   go ahead and send you to lunch now.  I need to take up a

8   matter of law with the attorneys and ask you to be back

9   at 2:15.

10          MR. LIOTTI:  Judge, just for the record, I have

11  no recross-examination.

12          THE COURT:  I didn't see a basis for any.

13          Anyway, you may take your pads.  Leave them in

14  the jury room.  Do not discuss the case with your --

15  with each other or with anyone else, or allow anyone to

16  discuss it with you, and please be back at 2:15.

17          Thank you.

18          (Jury not present)

19          THE COURT:  Are you calling Mr. Branca as your

20  next witness?

21          MR. EICHELBERGER:  We do plan to call

22  Mr. Branca as our next witness.

23          THE COURT:  Is he here?

24          Mr. Small, are you representing him?

25          MR. SMALL:  Yes, Your Honor.

3:06-cr-01011-CMC  Date Filed 05/02/08  Entry Number 147  Page 150 of 234
USCA4 Appeal: 25-6132  Doc: 26  Filed: 09/19/2025  Pg: 351 of 475

3-150

1  morning.  That will be a decision that will be made once

2  we see what time it is at the point in time you are

3  ready to begin your deliberations.

4         Remember, as you listen to the lawyers, that

5  the lawyers are not witnesses.  What they say is not

6  evidence.  It is intended to help you interpret the

7  evidence, but the evidence is what came from the witness

8  stand, from the witnesses who testified, and from the

9  exhibits and stipulations that have been admitted.

10         Mr. Eichelberger.

11         MR. EICHELBERGER:  If it please the Court.

12         THE COURT:  Yes.

13         MR. EICHELBERGER:  Mr. Liotti, Mr. Smith.

14         Three days later, here we are, just like I said

15  on Monday.  I'm going to take my watch off here, stick

16  it right here.  I really do want to respect your time in

17  this.  I know we have had some perhaps even tedious

18  sections in this case.  But I appreciate your attention

19  as I talk to you about the testimony that we have had in

20  the case; perhaps more importantly, the evidence -- the

21  evidence in this case, the chat transcripts, the

22  documentation from Mr. Giannone's own financial records

23  that apply in this case.

24         Before I get started talking too much about

25  that, I'm going to kind of reverse the order the way I

1    normally do this and talk just briefly about some of the

2    witnesses that you have seen in this case.

3            Of course, you had Mr. Oussama Awkal, that's

4    the owner of the A&W Auto Clinic up in Boston,

5    Massachusetts, who came in and testified how he's the

6    actual owner of A&W Auto Clinic.

7            He told you about how he had some negotiations

8    with Mr. Giannone for the purchase of that business, but

9    that negotiation never went through.  I'm going to

10   comment a little bit later about some of the specifics

11   of his testimony as he addressed the defense, one of the

12   angles of the defense.

13           And then I want to talk about -- I call them

14   the Chris twins -- Chris Cutler and Chris Branca, and

15   the testimony they had coming in here.

16           Now, both of these young men came in here and

17   they sat on the witness stand and they looked you folks

18   in the eye and they told you that they had been engaged

19   in illegal activities.  In fact, they told you that they

20   are both having to deal with their responsibility for

21   that illegal activity at this very time.

22           And the fact that they are facing those

23   consequences and that they come in here and they sit in

24   this courtroom, having taken an oath to tell the truth

25   and acknowledge that activity, I submit to you is a

1   factor that you should consider in evaluating the

2   testimony.

3          Well, what essentially did they testify to?

4   The central core, important fact that comes from their

5   testimony is that they both know from personal

6   experience that Jonathan Giannone, in fact, uses the Pit

7   Boss 2600 online user identification.  Both of them

8   testified to that from personal experience.

9          And we know from the chat transcripts, that we

10  will discuss at some length in a bit, that there are

11  some internal consistencies with that.  By that I mean

12  there is some specific information about Christopher

13  Branca that is contained within the chat transcripts.

14         That he sat on that witness stand and he said,

15  "You know what?  Yep, that's actually true.  I stole

16  money from Jonathan Giannone.  I stole three laptops

17  from Jonathan Giannone."

18         Those are things that are referenced in those

19  chat transcripts.  And those are things that Mr. Branca

20  admitted to on the witness stand.  Again, that's one of

21  those corroborating facts that you can look to in

22  connection with this case.

23         Now, one of the things I think that you can

24  reasonably conclude from Mr. Branca, who acknowledged

25  that he has engaged in drug use over a period of years,

3:06-cr-01011-CMC Doc: 26 Date Filed 05/02/08 Entry Number 147 Page 153 of 234
USCA4 Appeal: 25-6132 Doc: 26 Filed: 09/19/2025 Pg: 354 of 475

3-153

1  including interestingly during the time period that he

2  was dealing with Mr. Giannone -- and we also see this

3  young man, Chris Cutler, who has some educational --

4  some learning issues, ADD and ADHD, and you have to ask

5  yourself why would Jonathan Giannone choose to associate

6  with these particular people?

7          I submit to you, ladies and gentlemen, that the

8  reason Jonathan Giannone chooses to associate with those

9  two people is because they are easy to control.  They

10 are people who are willing to do his bidding.  They are

11 people who share an interest with Mr. Giannone in

12 illegal activities.

13         Now, we know that from the chat transcripts.

14 CC Suppliers is all over the place in those chat

15 transcripts right from the very first day.

16         So we got these two guys to come in that are

17 easy to control and they know certain things about

18 Jonathan Giannone.  Indeed, one of the things that's

19 very fascinating is that Christopher Branca knew that

20 Jonathan Giannone uses that Mark Rich name.  Do you

21 remember that?  And he remembers that from bygone days.

22         But if you recall the very first chat

23 transcripts, when we had that sequence of introductions,

24 started out with AIM, went to ICQ, went back to AIM,

25 what did Pit Boss 2600 say was his name?  It was Mark

 1  Rich.

 2          And you will have those transcripts, and I

 3  suggest that you may want to take a look at that very

 4  first one, it's Government's Exhibit 1.  Because you

 5  will see that as soon as that Mark Rich name came out

 6  there was instant recognition and instant desire to chat

 7  about the old times, to reminisce about people, about

 8  schemes, about opportunities, and that's really what

 9  this case is about.

10          Now, I want to talk about one other person that

11  I'm quite certain that you are going to hear a lot about

12  from the defense and that's Brett Johnson.  Now, I

13  really do think that perhaps in that -- in closing, to

14  the extent that Brett Johnson is talked about, we should

15  ask counsel to tell us something we don't know about

16  him.

17          Is he a crook?  Absolutely.  Is Brett Johnson a

18  liar?  Of course he is.  Is Brett Johnson an unreliable

19  person?  No doubt about it.  I told you that in opening

20  statement, didn't I?

21          You see, the reality is, despite the

22  characterization that counsel has for Mr. Brett Johnson

23  as a government informant or a snitch, he's anything

24  but.  Think about that term for a second, an informant.

25  By definition an informant has to be someone who informs

```
1   or tells us something we don't otherwise know, doesn't
2   he?
3           I will rely upon your recollection in this
4   case, but I don't think you will find that there is one
5   single syllable in this case that depends upon the
6   credibility, the honesty, the believability of Brett
7   Johnson.  You see, Brett Johnson was, for lack of a
8   better term, merely a tool.  He was a commodity that
9   could be used in connection with an online, undercover
10  investigation.
11          Brett Johnson is someone who had established
12  for himself a highly known identity among people who
13  think it's a wonderful game to go out and to steal
14  people's lives, to steal their identity, to use their
15  credit card, to destroy, to frustrate financial
16  activity.
17          Brett Johnson had established that gollumfun
18  name, and when he ran afoul of the law down in
19  Charleston, South Carolina, ripping off honest people
20  who wanted to sell something on eBay, law enforcement
21  found out about that history and they saw that as an
22  opportunity to lay a situation where people such as
23  Jonathan Giannone would want to reconnect with their old
24  friend gollumfun.  And we know that's exactly what
25  happened here.
```

3:06-cr-01011-CMC    Date Filed 05/02/08    Entry Number 147    Page 156 of 234
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 357 of 475

3-156

1          So, the real question in this case with respect
2     to Brett Johnson is not, is he a crook, is he a liar, is
3     he unreliable?  The real question in this case is, does
4     any of that have anything to do with the reliability of
5     Government's Exhibits 1 through 20?  Not the
6     alphabetical subdesignations, but those chats.
7          I don't know about you, but I'm kind of happy
8     we didn't have to read all 170 pages.  I know, it got
9     dry; it got dull.  It happens for me too.  But it was
10    very important because those were words that were spoken
11    by Jonathan Giannone in the course of this transaction,
12    and the accuracy of those words on those pieces of
13    paper, paper that you will have, has absolutely nothing
14    whatsoever to do with Brett Johnson.
15         You know back in the Cold War Era, the
16    President of the United States, when they were
17    negotiating between the United States and Russia for
18    disarmament for some of the ballistic missiles had a
19    saying, "Trust, but verify."
20         Well, in this case you've heard the agents talk
21    about how this was set up.  It was set up as "Don't
22    trust, and verify," because they knew exactly what they
23    were dealing with.  There's no doubt about that.  They
24    knew they were dealing with a fraudster.  Somebody who,
25    if he had an opportunity, would turn tail on them.

1        So what did they do?  They set this thing up in

2  the bullpen in the United States Secret Service office

3  with a laptop computer for gollumfun, one that he had no

4  ability to change the settings on, because there was a

5  hot-key combination and password to be able to activate

6  some of these functions.  And there was a second

7  computer for the purposes of monitoring what was going

8  on.

9        As if that wasn't enough, there is a large TV

10  screen so that at any time the agents can look over at

11  that screen and they can see everything that's going

12  on.  But even that wasn't enough, because the computers

13  were set up in such a way that the words, the keystrokes

14  that were made on that typewriter keyboard, whether by

15  Brett Johnson or Jonathan Giannone, on either end of

16  that transaction, those words flew automatically to the

17  computer and they were kept in the transcript.

18        The accuracy of the transcript, ladies and

19  gentlemen, has no bearing whatsoever on whether Brett

20  Johnson is an honest person.  The only question is, did

21  he push the key, put the words on the screen, and did

22  the words go to the computer?  We know that they did.

23        And it wasn't just a situation where we had

24  chat transcripts automatically being generated by

25  operation of the computer.  There was Camtasia

1  essentially taking a movie of the video screen while it

2  was going on.  Redundant.  Redundant.  Redundant.

3  Because, "Don't trust, and verify."

4        Now, what that does is it brings us to the very

5  basic point -- again, Brett Johnson was a tool to be

6  used.  Mr. Kirby said it best, I think.  He said if you

7  want to catch a crook, you've got to use a crook.  So in

8  that very real respect, Brett Johnson's function in this

9  case was chosen not by the United States Secret Service,

10 but by people like Jonathan Giannone.  People who are

11 out there committing fraud, chatting online under

12 anonymous names, talking about the wonderful fraud

13 schemes that they can do, dumps, skimming, COBs, full

14 infos.  All of that stuff was going on in connection

15 with this case.

16        And that brings us down to the accuracy, of the

17 authenticity of those chats, accuracy that -- I

18 respectfully submit to you folks -- is unchallenged in

19 the record of this case.

20        Now, let's consider what that means.  That

21 means that we have that record, that written record that

22 you will have of those chats.  And I told you at the

23 beginning of this case that we were going to prove the

24 linkage to Jonathan Giannone through steps.

25        The first step, we've got Pit Boss 2600, we've

1   got CIA INTEL.  The first step in that is to establish

2   they are one and the same person.  We did that from the

3   very first chat, didn't we?

4           May the 23rd of 2005.  Remember that one?  It

5   starts out -- the one in Camtasia, we showed you -- it

6   started out with a dialogue box.  That's a little box

7   that comes up, where it says, "Pit Boss 2600 has sent

8   you a message, will you accept it?"

9           And you recall that the response was, "No.

10  Don't know you.  Don't want to talk to you."  Almost

11  immediately on the ICQ -- that's just another way of

12  chatting on the Internet -- CIA INTEL pops up.  "Hey,

13  nice name you got.  Hit me on AOL, Pit Boss 2600."

14          Within those few short lines, ladies and

15  gentlemen, CIA INTEL and Pit Boss had established that

16  they were one and the same, "Hit me up, call me on Pit

17  Boss 2600."

18          But it's way more than that.  Because later on

19  during the chats, again, we had a situation where there

20  was a confirmation, "Who is this?"  "Mark?"  This is CIA

21  INTEL talking at this point.  It's probably -- maybe

22  Government's Exhibit 3, but you will see it is on the

23  top of the page.

24          It says, "Are you Mark?"  That's the Mark Rich

25  name.  And he said, "Yeah," and then "Pit Boss 2600."

1  So, again we have that same internal linking.

2          And you remember how I told you to be on the

3  watchout for that cotton candy machine?  You see,

4  Mr. Giannone's girlfriend apparently has a sweet tooth.

5  So both under the Pit Boss 2600 and under the CIA INTEL

6  name, he was asking gollumfun to find him a cotton candy

7  machine.  Those are the words that are on the paper, and

8  again we don't have to rely upon any credibility of

9  Brett Johnson to know that those words are accurate.

10          And then there's talking about Enhanced on one

11 of the very first chats.  CIA INTEL is talking about --

12 perhaps it's Pit Boss.  I think it was Pit Boss, is

13 talking about how, "You remember Enhanced, the kid in

14 New Hampshire?  He's in jail.  He can't make bond.  He

15 got busted by the Secret Service."

16          And then later on CIA INTEL, toward the end of

17 the chats, says the exact same thing, characterizes

18 Enhanced as a kid and the person he bought a name from

19 and said that he was in jail, couldn't make bond.  So we

20 have established through these steps that CIA INTEL and

21 that Pit Boss 2600 are one and the same.

22          That raises us to the second phase of the proof

23 in this case and that is that this unified identity --

24 and again, to avoid confusion, I'm just going to refer

25 to this unified identity as Jonathan Giannone or Pit

3:06-cr-01011-CMC    Date Filed 05/02/08    Entry Number 147    Page 161 of 234
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 362 of 475

3-161

1  Boss.

2           Pit Boss in this case chats extensively, and

3  for whatever reason, arrogance gets ahold of him.  He

4  wants to brag about things that he's doing in the real

5  world.  "Yesterday I was in Jacksonville."  You remember

6  that one?  That was on May the 26 of 2005, that was a

7  chat.  "I was in Jacksonville yesterday."

8           And what did you see in those financial

9  records?  You saw in those financial records that on May

10 the 25th, 2005, Jonathan Giannone was in Jacksonville,

11 Florida.  Exactly as he said in the transcript.

12           But there's a lot more than that.  You remember

13 them.  I'm not going to go through all the gory details

14 of it, but there was California, out in California

15 visiting with people; Washington, D.C., when there was a

16 protest going on at the White House; Boston, trips from

17 Boston to New York.  I mean, so many records showing

18 that -- he had rented a car in one.  He had started in

19 New York, flew to Boston, rented a car, came back to New

20 York.  An incredibly complicated series of events, but

21 a series of events that is exactly as it is described in

22 the chats.

23           Also -- I love this one -- I would like to go

24 to Hawaii but I can't afford it.  I don't engage in this

25 kind of fraud.

```
1              But Mr. Giannone, he talks about, "I'm going to
2   Hawaii.  I'm going to stay there four days, and I'm
3   going to pay for it all."  This is first class.  And
4   what did he say?  He said he was going to go to Hawaii,
5   he was going to stay at the Hyatt.  You will have the
6   records, but where did he go?  Went to Hawaii, stayed at
7   the Hyatt, exactly as reflected in there.
8              And then there's one more of these things,
9   because he's really proud of his ability to get an
10  American Express Platinum card.  They don't give those
11  things away for free, they really don't.  You have to
12  bill an awful lot and pay an awful lot to get an
13  American Express Platinum card.
14             And again, arrogance took hold on Jonathan
15  Giannone and he brags about, "I got my Platinum card
16  today," and he says it's the same number as my other,
17  and he went one step further.  In a chat he said that
18  it's got the same -- he said that those numbers were --
19  the last, 1001.  The records bear every bit of that out.
20             Within the very same time frame he's talking
21  about himself getting his Platinum card.  You better
22  believe it, Jonathan Giannone received his Platinum card
23  from American Express and it was the exact same number
24  on his gold card and the exact same number on his
25  Platinum card, and those cards ended with 1001.
```

```
 1              Now, is it a coincidence, perhaps, that
 2   somebody traveled to Jacksonville, Florida, using
 3   Mr. Giannone's identification.  After all, he's stealing
 4   people's identity, perhaps somebody stole his.  Once,
 5   maybe; twice, highly unlikely; three times, no way;
 6   four, five, six times, absolutely strains credibility to
 7   suggest seriously that that's even a remote possibility.
 8              You know what else?  Not only did all of this
 9   activity take place and get paid for by Mr. Giannone's
10   credit card, Platinum American Express, but he paid all
11   those bills.  Every one of those bills were paid.  Did
12   you hear that testimony?  Every one of those bills were
13   paid by Mr. Giannone, because he's the one who was doing
14   the traveling.
15              He's the one who was doing the chatting.  He's
16   the one that was offering the dumps.  He's the one that
17   was destroying lives.  And he's the one that thought
18   that it was just a great game to engage in.  To put
19   people through the frustration, the anger, the pain of
20   having to deal with their financial lives that have been
21   messed up by some kid who thinks it's a game.
22              Ladies and gentlemen, he should be held
23   accountable.  Now counsel at one point said that
24   Jonathan Giannone at no point during these chats ever
25   identified himself by name, but that's not true, is it?
```

1          Because at one point he was bragging about what
2    he wanted to do with his life and said, "I'm going to go
3    to law school.  I'm going to be a DA.  I might have to
4    work a little bit harder, but I will go easy on
5    carders.  And I'm going to get me a name for myself."
6    And what was that name?  No-deal Johnny.
7          Well, Mr. Giannone wants to sell you a bill of
8    goods about this case.  I think we could reasonably
9    conclude that perhaps by your verdict you could give him
10   that nickname, except instead of being No-deal Johnny,
11   it's "No deal, Johnny."  We are not buying what you've
12   got to offer.
13         So, those are the circumstantial facts in this
14   case that show that Mr. Giannone is the one who engaged
15   in those transactions.  And, you know, it's kind of
16   interesting when you characterize those financial
17   records as circumstantial facts, because the reality is
18   they are perhaps even more reliable and more beneficial
19   in proving his link in this case than anything any
20   witness testified to from that stand.  And why is that?
21         If there's one thing we know about credit card
22   companies is they want to get paid.  In order for them
23   to get paid, they are going to keep those records and
24   they are going to be accurate records.  And they are
25   going to send them out on a regular basis and they are

1  going to require people to pay those bills on a regular

2  basis.

3          And it was those records, the records that

4  businesses maintain to document his travel, his spending

5  with other people's money that comes so powerfully

6  together to show that Jonathan Giannone, you are Pit

7  Boss 2600; you are CIA INTEL.

8          But there's more.  June the 7th, 2006 -- excuse

9  me, 2005 -- there's a chat session that is going on.

10  The agents have gone to the A&W bank account here in

11  Columbia, South Carolina.  They have deposited $600 as

12  requested in the chat for 21 sets of financial

13  information.

14          Chat session ends at about 2:15 p.m.  There is

15  a stipulation in this case, ladies and gentlemen, that

16  at about 3:50 on that same day, one hour and 35 minutes

17  later, Jonathan Giannone was at an ATM getting his

18  grubby little fingers on ill-gotten gain.  Money he had

19  stolen.  One hour and 35 minute later.

20          Now, that's a very inconvenient fact, so he had

21  to come up with an explanation.  "Let's see, how can we

22  possibly explain this away?  Ah, I got it.  Chris Cutler

23  is the real crook.

24          "But it's not enough for me to say that Chris

25  Cutler is the crook, we have to explain some way of

3:06-cr-01011-CMC    Date Filed 05/02/08    Entry Number 147    Page 166 of 234
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 367 of 475

3-166

1    pointing the finger."

2              So he says, does Mr. Giannone, "I was going to

3    sell him a pickup through A&W Auto Clinic, a place where

4    I had done business.  Not for just a mere short period

5    of time but for an extended period of time."  Words

6    submitted by the defense.

7              Jonathan conducted business at 395 Maple

8    Street, Holyoke, Massachusetts, for several months prior

9    to going out of business.  Mr. Awkal, the person who

10   owns that, said, "Sure, there were some negotiations.

11   He paid me $2500 in a check and he sent me $1700 by

12   PayPal."  Several months.  You be the judge of the

13   credibility of that statement.

14             And then he said that he had conducted a

15   surreptitious online communication with Chris Cutler in

16   which he proved that Chris Cutler, in fact, was that

17   person.  Let's take a quick look at that on your monitor

18   if we could, Government's Exhibit 21.

19             Because what you'll see is absolutely

20   inconsistent with the objective facts as we know them to

21   be, and that is from the very beginning in this chat the

22   introduction says:

23             "Who are you?

24             "I am John" -- John Giannone -- "Branca's

25   friend."

USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 368 of 475

3:06-cr-01011-CMC   Date Filed 05/02/08   Entry Number 147   Page 167 of 234

1          Now look at that last line, "The guy you met at

2    the car lot around May of 2005, May-ish last year."

3          You can clear the screen.

4          There is one small problem.  He didn't really

5    think we were going to find that travel bill from

6    February of 2005, three months before this chat

7    purportedly took place -- I mean, before this

8    transaction took place.  The transaction is supposedly

9    May of 2005.

10          We can prove to you that in February of 2005

11   Jonathan Giannone paid for airline tickets for Chris

12   Cutler to fly down to Florida.  So the claim that, "That

13   was the first time we met" is absolutely, absolutely

14   destroyed.

15          But there's more.  Because Mr. Cutler wasn't

16   even available at the time this chat was supposed to

17   have been taking place, November the 13th of 2006.

18   November just of last year.  You see Mr. Cutler sitting

19   right back here right now.

20          He's a fisherman and he's now out on that

21   boat.  Now, he was honest.  He sat on that witness stand

22   and he said, "Look, we come back and forth."  It would

23   have been so easy for him so say, "We go out.  We stay

24   out.  We don't come back."  But he didn't do that.  He

25   said, "We are out there.  We are working.  And when we

3:06-cr-01011-CMC   Doc: 26   Date Filed 05/02/08   Entry Number 147   Page 168 of 234
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 369 of 475

3-168

1    come back, we are working.  And when we are at sea, we

2    are working.  We are working 24 hours a day."

3           Absolutely incredible hours these guys have to

4    work because, you understand, that if you are not

5    fishing you are not earning money.  So that's what is

6    going on in this case.

7           And he further testified to you that even when

8    he's at the docks, it's hit and miss as to whether he

9    can get service; but as soon as they leave, no service

10   whatsoever.  Was he on a fishing trip from the 9th and

11   the 20th?  Absolutely.  Got two records to show it.

12          Did he come back in?  Hey, even if we assume he

13   came back at the exact date, the exact time of this

14   chat, he testified unequivocally, "I never purchased a

15   pickup truck."

16          Now, let's be clear on something, it is not

17   possible for Mr. Giannone now to suggest, "Well, maybe I

18   was mistaken."  Perhaps it was someone else who was

19   using his name, because there were face-to-face

20   meetings, according to Mr. Giannone's pleadings, in

21   Holyoke, Massachusetts in connection with this vehicle.

22   So it has to be him or it has to be false.  It can't be

23   him; therefore, it has to be false.

24          There's another thing, because in that

25   information, Mr. Giannone, as imakemovies4free, he said

1    the reason he had to give the bank account was because

2    he didn't have a PayPal account.  That's another one of

3    those inconvenient facts, though, isn't it?  Because how

4    did he pay Mr. Awkal for part of that in about April of

5    2005?  By PayPal.  So clearly he had PayPal.  It was

6    available to him.

7            So, what we have got down through here is that

8    all of this defense that's been put up, this notion that

9    it's Chris Cutler is absolutely destroyed.  And why does

10   somebody create such a convoluted story if not for the

11   fact that they are concerned about the truth?  Because

12   they know that the truth is that he is guilty, guilty,

13   guilty, as charged.  That is the only possible reason

14   for him to come up with such a convoluted story.

15           All right.  That brings me to a point here, but

16   what I would like to do is say the only real issue in

17   this case that we have to concern ourselves with, is

18   Jonathan Giannone CIA INTEL and Pit Boss?

19           Now, here's why.  There are three counts of

20   wire fraud which requires participating in a scheme to

21   defraud in interstate wire transmission and acting with

22   an intent to defraud.  You will hear the judge talking

23   about those elements.

24           Well, in this case you have got the words where

25   they are talking so much about, "Here is what we are

3:06-cr-01011-CMC   Date Filed 05/02/08   Entry Number 147   Page 170 of 234
USCA4 Appeal: 25-6132   Doc: 26   Filed: 09/19/2025   Pg: 371 of 475

3-170

1   going to do, here are the dumps, you can take them out,

2   you can get money" -- clearly those words establish that

3   there is a scheme that's out there to cheat people, to

4   get money from banks, to get money from innocent people

5   whose identities have been compromised.

6           There is a stipulation that the communications

7   involved a transaction or transmission in interstate

8   commerce.  All you have to do is read the words on a

9   piece of paper to establish that there is an intent to

10  defraud and that they understand exactly what's going

11  on.  So, again, the only issue you -- that really needs

12  to concern us is, is the person who said those things

13  Jonathan Giannone?

14          Now, similarly, when it comes to the counts

15  dealing with aggravated identity theft, that's counts 2

16  and 5, the issue there is, was the name of some

17  individual, means of identification, that includes a

18  name, was that used in connection with a wire fraud?

19          Well, you will have the documentation, the

20  chats are there, and that's where you will see fairly

21  long strings of numbers.  But with respect to count 1

22  you will see that there were five numbers that were sent

23  through, I believe, that five names were associated with

24  those.

25          For counts 3 there were some numbers sent

1   through and there were no names, so there's not an

2   associated 1028(a), or aggravated identity theft.

3           For count 4, that's where the 21 came through.

4   And with connection to that 21, just go through and

5   count them up.  You will see that there are 11 names

6   that were used.

7           And then if you look at Government's Exhibit

8   7A, Government's 7A shows that there's an accounting

9   that's done for the accounts that Mr. Giannone provided

10  to gollumfun.  Should be on the screen in front of you.

11  You see on the right-hand column it identifies the

12  individual amounts of money that were available and it

13  tallies up to $132,927.17.

14          Thank you, Mr. Daley.

15          That is the amount of money that Jonathan

16  Giannone had no problems with allowing someone who was

17  bent on mischief to steal from innocent people.

18          But don't be deceived into thinking that this

19  is a case only about $600 that was paid to Mr. Giannone

20  in exchange for these 21.  Don't be deceived into

21  thinking that this is a zero-loss case, because there's

22  two responses to that.

23          One, that is not a defense.  Listen to what the

24  judge says on that point.  The fact that no loss

25  occurred is not a defense.  But the more important point

USCA4 Appeal: 25-6132   Doc: 26   Date Filed: 05/02/08   Entry Number: 147   Page 172 of 234
Filed: 09/19/2025   Pg: 373 of 475
3:06-cr-01011-CMC   Date Filed 05/02/08   Entry Number 147   Page 172 of 234

3-172

 1   is Mr. Giannone knew, he understood.  He intended for

 2   gollumfun to use those for illegal purposes and to get

 3   his grubby hands on $132,000.

 4          There's another defense that's raised up in

 5   here and that's that somehow the agents failed to

 6   investigate some other people.  Maybe; maybe not.

 7   That's not the question.

 8          The question in this case is whether the

 9   evidence that's been introduced proves beyond a

10   reasonable doubt that this defendant, Jonathan Giannone,

11   committed the crimes that he's charged with, not whether

12   or not somebody else committed a crime.  It's a very

13   narrow inquiry.

14          And, you know, the judge will tell you that

15   there is not even an obligation on the part of the

16   government to use every investigative technique that is

17   out there.

18          Now, in this case the techniques that were

19   employed started out on May the 23rd of 2005, and by

20   June the 7th of 2005, Mr. Giannone had been identified

21   because he's the one who showed up to take that $500

22   from his bank account.

23          So, the question is raised, "Well, why did you

24   wait so long to issue an arrest warrant for him?"  Easy

25   answer to that too.  It is a small world that these

3:06-cr-01011-CMC    Date Filed 05/02/08    Entry Number 147    Page 173 of 234
USCA4 Appeal: 25-6132    Doc: 26    Filed: 09/19/2025    Pg: 374 of 475

3-173

1    people travel in.  Isn't it ironic to think that in this

2    case we have three people that testified that know about

3    the specific facts -- excuse me -- two that testified

4    that know about specific facts: Mr. Cutler, Mr. Branca.

5    And then we have the evidence that shows that

6    Mr. Giannone was involved.

7          These three people know each other.  They know

8    each other.  And yet the Cutler -- the Chris twins

9    weren't involved with Mr. Giannone in this transaction.

10   That means that in this small world people talk to a

11   fairly small number of people and you know that in a

12   situation like that word gets out so quickly.

13         What that means is, if you have gone to the

14   trouble of setting up the bullpen with those computers,

15   with that monitor, with expending these funds designed

16   to catch people who are engaged in this type fraud, you

17   wait until the investigation is over before you make any

18   arrests.

19         THE COURT:  You have five minutes left.

20         MR. EICHELBERGER:  Thank you, Your Honor.

21         As soon as the first arrest goes out, the word

22   flies out over the electrons, over the Internet, and

23   people shut down.  People shut down.  As a matter of

24   fact, if you read the chats between Mr. Gollumfun and

25   Mr. Giannone, Pit Boss, that type stuff had happened

USCA4 Appeal: 25-6132    Doc: 26    Date Filed: 05/02/08    Entry Number: 147    Page 174 of 234
Filed: 09/19/2025    Pg: 375 of 475
3:06-cr-01011-CMC

3-174

1  before where people had gotten really nervous and they

2  are only now starting to come out of retirement.  That's

3  a term gollumfun used.  So that's what we are dealing

4  with here.

5          The failure to use some sort of tech tools --

6  at one point Mr. Liotti was asking about wiretaps,

7  things of that nature.  I mean, the reality is you don't

8  need a wiretap when you are a party to a communication.

9          The Secret Service is sitting there, they are

10  recording their end of the communication, absolutely

11  proper within the law.  They don't need a wiretap to do

12  that.  What they do is, they do the standard

13  investigative techniques that a good cop does to pull

14  together the facts and circumstances so that the finger

15  of accusation -- not because of a person's say so, that

16  because the records of Jonathan Giannone say so, that he

17  is, in fact, the person who engaged in all of these

18  chats.

19          So here is what we have.  In reality you think

20  about it, it's a very simple case.  It's a series of

21  chats.  In the course of those chats Mr. Giannone sends

22  a number of sets of identification information to

23  gollumfun, that in response he was paid $600, and he

24  shows up within an hour and a half, hour and 35 minutes,

25  to pick up his ill-gotten gain.

1          The chats in and of themselves, even if we had

2    never put up Chris Branca, never put up Chris Cutler,

3    those chats by themselves are sufficient to convict

4    Jonathan Giannone.

5          Because they are internally consistent to

6    establish that those two identities are one, and when

7    compared with the financial records of Mr. Jonathan

8    Giannone himself proves conclusively that Jonathan

9    Giannone is Pit Boss 2600 and is CIA INTEL, and that he

10   is guilty as charged.

11         So your function, according to the oath that

12   you have taken, is to use your collective recollection,

13   to use your common sense, to bring those tools that we

14   use in our everyday lives to go back and talk through

15   the evidence in this case, to discuss among yourselves

16   the factors that I have talked about here.

17         And to let those facts lead you to the truth

18   because, ladies and gentlemen, that's exactly what a

19   verdict is.  Verdict is a conclusion of a body such as

20   yourself that speaks the truth.

21         Thank you.

22         THE COURT:  All right, Mr. Liotti.

23         MR. LIOTTI:  Yes, Your Honor.

24         Good afternoon ladies and gentlemen.

25         Ladies and gentlemen, let me begin by reminding

UNITED STATES DISTRICT COURT
District of South Carolina
Columbia Division

THE UNITED STATES OF AMERICA

Vs.

BRETT SHANNON JOHNSON

Case Number: 3:06 – 1129
Declaration of Brett Shannon Johnson RE:
Statement of Mitigation
Prepared for Sentencing

I, Brett Shannon Johnson, declare as follows:

I
**Statement of Facts**

Defendant, Brett Shannon Johnson, referred to herein as "Johnson", was arrested by South Carolina Law Enforcement Officials on or about February 8, 2005 in Charleston, South Carolina on state charges of Computer Crime, Forgery, and Obtaining Goods Under False Pretense.

Because of Johnson's unique knowledge and experience among certain large-scale online criminal internet groups, The United States Secret Service, referred to herein as "USSS", contacted Johnson with an offer to assist the law enforcement agency in their investigations and educate USSS members concerning all aspects, techniques, etc. of these online criminal enterprises. Johnson was informed by various members of the USSS that his work would result in his state charges being "worked off". Johnson agreed.

As a result, and after 90 days incarceration at the Charleston County Detention Center, Johnson's state bond was lowered to $10,000. The lowered bond came without condition.

Johnson posted bond through a bonding company and was released. Approximately 30 days later Johnson began work for the USSS. Johnson was advised before starting work that the job would not last more three months. Johnson moved to Columbia, South Carolina.

USSS paid Johnson a per diem rate OF $50 and also agreed to pay Johnson's rent and electricity bills.

Johnson worked 10 months for the USSS providing invaluable assistance and insight into the online criminal activities; his work resulted in several indictments, continuing investigations, and irreparable damage to several major online criminal enterprises.

3 months into Johnson's USSS employment, the USSS computer Johnson was using was compromised, "hacked", by a member of the online criminal enterprises Johnson had been enlisted to help investigate. This was through an error on the part of the USSS. As a result all of Johnson's personal information, and those of his fiancé were published publicly online across the internet and on all major criminal internet group websites. Initially, members of the USSS accused Johnson of orchestrating the USSS breach in an attempt to terminate his employment with the USSS. It was later determined that Johnson had nothing to do with the compromise.

( Despite Johnson's personal information being publicly disseminated and being labeled a "snitch" and "confidential informant" within these groups, usually a career ending and life threatening gesture among criminal groups, Johnson was such an invaluable asset that his work continued an additional 7 months.)

Fearing for Johnson's safety and citing a very real possibility that one of these online criminals was likely to attempt to kill Johnson or his fiancé , since his home address had been published, USSS advised and forced Johnson to relocate. Johnson did so.

While quickly determining that Johnson had no part in the USSS computer breach, members of the USSS already harassing Johnson, from that point on ramped up their harassment concerning Johnson and his fiancé, calling her a "slut", "whore", and "harlot" among other derogatory names, and commenting such things as "How much does Elizabeth charge for a blow-job?" Unable to defend himself or his fiancé against the comments and assaults of these individuals for fear of being sent back to jail- and being told as much by USSS members – and Johnson's fear for the safety of Elizabeth Sadler; Johnson ended his relationship with his fiancé and moved her back to Charleston, South Carolina.

Devastated, depressed, and suicidal, Johnson an alcohol and cocaine addict since 2000 and already using cocaine, relapsed hopelessly back into his addictions worse than ever in his life- as a direct result of these circumstances.

Feeling hopeless and to feed Johnson's increasing need for cocaine and cash, Johnson was submitting fraudulent tax returns in the names of deceased individuals and collecting the funds.

Defendant Johnson slid further into his world of drugs and alcohol, becoming increasingly depressed and suicidal because of the events of his life and because of the actions mentioned previously of the USSS. The USSS further compounded the problem by depriving Johnson of many of his basic civil liberties and rights throughout his USSS employment.

On or about March 26, 2006, Johnson had his state bond improperly revoked after Johnson divulged following a polygraph, that he had been in contact with a New York Times Reporter regarding a book offer and possible future employment opportunities after leaving the USSS. The deal was for nothing to be published until the investigations were over.

As a result, Special Agent Neal Dolan of the Columbia USSS Field Office contacted Johnson's bail bondsman and informed him that he wanted Johnson's bond revoked. Bond was revoked without any additional charges filed at that time. Johnson's bail bondsman informed Johnson that he was revoking bond because the USSS had requested such and the bondsman wasn't comfortable doing so and didn't wish to do so, but felt obligated to comply.

On or about March 29, 2006, Johnson was visited while incarcerated at the Charleston County Detention Center by USSS Special Agent Bobby Joe Kirby, herein referred to as "Kirby", and Special Agent Jim Rammicone, herein referred to as "Rammicone", of the Columbia Field Office. Johnson was told by Kirby that they wished to ask him questions concerning items found in Johnson's apartment following a search after Johnson's bond revocation. Rammicone, before questioning began and before Johnson was advised of his Miranda Rights, threatened Johnson by informing Johnson that (Johnson) was going to tell (them) everything (he) had done over the past 6 years, or (Rammicone was) going to make it ( his) mission in life to fuck over (Johnson) and

(his) family. Rammicone further stated that he wasn't just speaking about existing and future charges, but was intent on "hounding" Johnson after his release to make Johnson and his family's life "hell". Rammicone then gestured to a Miranda Rights Waiver and asked Johnson if he wished to talk. Johnson's response was "I don't want to talk to you". Agent Rammicone immediately got up to leave and as he and Agent Kirby exited, Rammicone told Johnson "Fuck you very much".

Approximately 3 weeks after being threatened by the USSS, Johnson's bond was reinstated. Johnson bonded out again.

Johnson could have fled at any point during his 10 month employment with the USSS. He did not. Even at this point he did not initially plan on fleeing. After much deliberation and fearing for the future welfare of himself and his family due to threats from the Usss, Johnson decided to flee.

Feeling hopeless, depressed, and lost-Johnson also resumed heavy cocaine and alcohol use.

## II
## Substantial Assistance

On September 16, 2006, members of the USSS effectuated the arrest of Johnson in Orlando, Florida, Alleging violations of USC section 1803. Specifically- Aggravated Identity Theft, Wire Fraud, Access Device Fraud, and Misuse of Social Security Numbers.

Johnson willingly disgorged property and funds equal to or in excess of $230,000.
USSS confiscated the following items, including but not limited to:
- A) Over $150,000 cash
- B) 2000 Jeep Cherokee valued over $9000
- C) Furniture and electronics valued in excess of $55,000
- D) DVD collection valued in excess of $22,000

Further, Johnson provided substantial assistance to Law Enforcement.
- A) Johnson provided invaluable training, and insight to members of the USSS enabling them to start new investigations and infiltrate online criminal groups that would have been impossible without Johnson's help.
- B) Johnson's assistance was responsible for stopping in excess of $3.0 million in fraud. This would have been impossible without Johnson
- C) Johnson consulted with and assisted USSS operations across the country, including operations in Atlanta, Georgia; Rochester, New York; Nashville, Tennessee and others.
- D) Johnson consulted with members of the Atlanta, GA. USSS on how to properly set up and run an undercover online investigation for maximum benefit and how to avoid detection by criminal elements.
- E) Johnson provided insight, suggestions, and invaluable knowledge to companies such as Bank of America and upper echelon USSS and their associates such as, but not limited to Jake Jacobs and Tom Villancizvo.

F) Johnson's substantial assistance resulted in the indictments of over 8 individuals across the country and Canada

G) Because of Johnson's work a number of individuals across the globe are currently being investigated with more arrests to follow.

H) Of these already indicted, some have now become USSS confidential informants, with likely more to follow. The information and arrests these individuals yield are a direct result of Johnson's substantial assistance to the USSS.

I) Johnson educated numerous members of different law enforcement agencies on all aspects of online fraud. Because of the invaluable information Johnson departed to law enforcement, law enforcement is now better equipped to handle, investigate, and circumvent online crime in countless areas for the foreseeable future.

J) Johnson's work and efforts with law enforcement has left several major online criminal organizations in such a state of disrepair and damage that they no longr operate at the level they did prior to Johnson's involvement. Several of these organizations were decimated because of Johnson's work.

K) Johnson's Substantial Assistance to law enforcement continues to be felt among these online criminal enterprises and will continue to do so well into the future.

## III
## Substance Abuse and Rehabilitation / Mental State

Defendant Johnson has been a cocaine addict since approximately 2000. Mr. Johnson is also a daily user of marijuana.

A) Cocaine addiction has been a problem in Mr Johnson's life for well over 5 years leading up to his September 16, 2006 arrest. Mr. Johnson was using in excess of 3.5 grams of cocaine daily. As a result, Mr. Johnson's behavior and decision making processes were greatly impaired.

B) Further, Johnson associates his drug addiction to the very online criminal organizations the USSS recruited Johnson to work on and within. MR. Johnson's reintroduction to these online criminal organizations was much the equivalent of taking an unrehabilitated crack or heroin addict and placing him in a drug environment, telling him not to use drugs and to assist law enforcement. Mr. Johnson was once again around the people, places and things he associated with his addiction. Thus it became easier for Johnson to succumb to his drug addiction once again and his breaking the law to feed that addiction. Mr. Johnson's reintroduction to these criminal groups and their environments helped pushed him into his past abuses and enforced his failures as a man and human being.

C) Further, Johnson, at the time, was in a state of mental depression with feelings of hopelessness and despair. Johnson sustained a number of psychological factors resulting in his depression, drug abuse, and poor judgement. These include:

   a. Johnson's wife left him after 9 years of marriage in December 2003. This prompted Johnson to seek professional help in Mount Pleasant, South Carolina.

    b. Johnson's subsequent meeting and falling in love with Elizabeth Sadler, only to later discover her to be a cocaine addict herself.

    c. Johnson's discovery shortly thereafter that Elizabeth was prostituting herself in order to feed her addiction.

    d. Johnson's feelings that he needed to do whatever was necessary to fix Elizabeth's addictions- even as Johnson, himself, was addicted ( which amounted to spending vast sums of money and getting money however he could).

    e. Johnson's arrest on state charges 3 weeks before his scheduled marriage to Elizabeth.

    f. Johnson's becoming a USSS confidential informant and coping with the guilt associated with being a "snitch".

    g. Johnson constantly being verbally and mentally harassed by USSS members.

    h. The compromise of Johnson's USSS computer. The initial accusations leveled at him for it. The publishing of both Johnson's and Elizabeth's personal details and information, and the subsequent fear for Mr. Johnson's life-causing him to relocate.

    i. The USSS assaults on Johnson by openly and frequently calling Elizabeth a "slut", "whore", and "harlot", and also asking Johnson such questions as "how much does Elizabeth charge for a blow-job?"

    j. Johnson's increased anxiety and guilt over his own drug use.

    k. The deprivation and systematic removal of many of Johnson's basic civil liberties and rights by the USSS.

    l. Johnson's only sister and closest relative disowning him because of his current circumstances.

    m. Johnson's break up with his fiancé Elizabeth over fears for her safety and the verbal abuse of the USSS.

    n. Johnson's continued guilt over his being a CI, over his drug addictions, and over the way he went about acquiring money to support his drug habit and need for cash.

    o. Johnson's improper bond revocation and the subsequent threats made by the USSS against Mr. Johnson and his family.

    p. Mr. Johnson's feelings that he was being forced to go on the run and avoid prosecution out of fear for the welfare of he and his family.

    q. Mr. Johnson's feelings of abandonment, hopelessness, and being completely lost at being forced to leave his family and home over said USSS threats.

Coupled with Johnson's addiction, the above series of circumstances helped contribute to Johnson's poor judgment and unwise choice of actions.

Defendant Johnson recognizes his desperate need for rehabilitation and help. He has actively been seeking such. It is Mr. Johnson's sincere wish that the court will recognize his need and order appropriate action.

## **Conclusion**

Johnson's addictions and mental problems, coupled with a tragic set of circumstances led him to exercise poor judgment which resulted in his unlawful activities. These activities were exacerbated by actions and threats from the USSS against Mr. Johnson and his family. Mr. Johnson was subjected to substantial abuse and harassment and deprived of the Civil Liberties and rights guaranteed to all Americans.

Johnson realizes his mistakes and wishes the opportunity to make amends. He is sorry for his actions and wishes to apologize to those he has hurt and brought anguish to. Johnson also wishes to apologize to this court.

What Johnson needs is rehabilitation, not incarceration. He would like to get on with his life, receive the help he needs, and be a productive, valuable citizen. Johnson wishes nothing more than to be a good man and to have a family. He wishes to start a family before it is too late. He believes everyone deserves a second chance and prays he be given one. Johnson asks that this court allow him the ability to redeem himself and have a family.

Wherefore the defendant prays that, if additional custody time is contemplated, that the execution of said custody time be stayed, that the defendant be given credit for time served. As evidence of the defendant's remorse, defendant would be amendable to whatever fines or restitution this court might deem appropriate.

I declare, under penalty of perjury, pursuant to the laws of the United States of America and South Carolina, that the foregoing is true and correct.

Executed _April 6, 2007_ at _LCDC, Lexington, South Carolina_

Respectfully Submitted

Brett Shannon Johnson

Witness:

Brett Johnson
P.O. Box 2019
Lexington, SC 29071

ITEM X-RAYED BY
USMS
4-11-07

COLUMBIA SC 292
10 APR 2007 PM 2 L

Judge Cameron McGowan Currey
901 Richland Street
Columbia, SC 29201

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

UNITED STATES OF AMERICA    )    Criminal No: 3:06-1011(CMC)
                            )
    V.                      )
                            )
**JONATHAN GIANNONE**       )
                            )

## AFFIDAVIT OF SPECIAL AGENT BOBBY J. KIRBY, UNITED STATES SECRET SERVICE

This Affidavit letter is being prepared in connection with the response of the government to the motion of the Defendant, Jonathan Giannone, for a new trial. The facts in this affidavit are based on my personal knowledge, my review of investigative materials relating to this and other matters stemming from Operation Anglerphish, or from other agents with whom I worked during the investigation and prosecution of this matter.

1.    I am a Special Agent with the United States Secret Service. I was directly involved in Operation Anglerphish, an investigation that was conducted out of the Columbia, South Carolina, office of the Secret Service;

2.    Operation Anglerphish was an online undercover operation designed to identify, investigate, and prosecute persons engaged in online fraud activities, including identity theft, credit card fraud, and wire fraud;

3.    Operation Anglerphish utilized Brett Shannon Johnson as a cooperating individual. Johnson's function was to go online to chatrooms and online forums known to be frequented by persons interested in discussing illegal activities. Once in the chatroom or forum, Johnson would identify himself as "Gollumfun." This name was a recognized persona in the realm of persons committing fraudulent acts over the internet, and due to the notoriety, numerous

1

persons approached Gollumfun to chat about fraudulent activities.

4. Chat sessions with persons who approached Gollumfun were recorded by two (2) separate methods. First, a transcript of each chat was automatically and contemporaneously generated through the use of computer software. The second method of recording the chat sessions was through the use of Camtasia, a software program that records as a video file all activity depicted on the computer screen. At times there were several chat conversations occurring simultaneously. In such circumstances, the Camtasia files contained information relating to all of the chats. Camtasia video files were backed up to an external hard drive on a daily basis.

5. Based upon a letter that he received from Brett Johnson, after Johnson was sentenced by this Court, Giannone claims that the government computer used in his investigation was "hacked" by a third party. This incident did not occur during the portion of the investigation that led to the prosecution of Giannone. Giannone's first contact with the undercover investigation was on May 23, 2005. Monies to pay Giannone for twenty-one (21) unlawfully obtained Bank of America debit card numbers were transferred to Giannone on June 5, 2005. While Giannone and Gollumfun periodically continued to chat following this payment, these further chats were not part of the prosecution.

The incident referenced by Johnson in his letter to Giannone did not happen until over two (2) months after Giannone had been paid $600. Commencing on August 7, 2005, Gollumfun was contacted by an individual who later identified himself as "deuce" (AKA "deus" / "Manus Dei"). On this date, this individual gained access to two (2) email accounts utilized by the investigation. These accounts had been established with third party service providers. On September 4, 2005, Gollumfun again communicated with "deuce" in response to a request for advice on how to fraudulently make money. During this chat, "deuce" gained access to an online

2

**JA383**

monetary account utilized by the investigation. None of the activities relating to "deuce" affected the investigation into Giannone.

5. In his Motion for New Trial, Giannone claims that the presence of a tax return document in the Camtasia files provided to him in discovery proves that Brett Johnson utilized government computers to file fraudulent tax returns. During the same general time period of the investigation into Giannone, a subject located in California was in near daily contact with Gollumfun. This individual and Gollumfun chatted extensively about the filing of fraudulent tax returns, looked at websites that could be used to gather information for use in filing fraudulent returns, and discussed programs that would aid in the fraudulent filings. On several occasions, data was sent to and from this subject via online chat and email. As pointed out in Paragraph 4 of this Affidavit, the Camtasia files would include any chats between Gollumfun and this subject that overlapped a chat between Gollumfun and Giannone. This would account for the presence of a tax return on the video files or the presence of any information relating to the filing of fraudulent tax returns. Information about this subject that was gathered during Operation Anglerphish was subsequently used to prosecute this subject for filing fraudulent tax returns.

Bobby Joe Karby

Sworn to and Subscribed before me this
25th day of July, 2008

Notary Public for the State of South Carolina
My Commission Expires: September 20, 2016

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| United States of America, | ) | CRIMINAL NO. 3:06-1011-CMC |
| | ) | |
| v. | ) | **ORDER DENYING MOTION for** |
| | ) | **NEW TRIAL and ADDRESSING** |
| Jonathan Giannone, | ) | **OTHER PENDING MOTIONS** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on Defendant's *pro se* motion for new trial pursuant to Federal Rule of Criminal Procedure 33. Defendant contends he is entitled to a new trial based upon newly discovered evidence. The Government has responded in opposition to Defendant's motion, and Defendant has filed a reply to the Government's response.

Defendant asserts he is entitled to a new trial based upon several alleged instances of the Government withholding evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and additional "new" evidence. Defendant also maintains that the Government used false and misleading testimony to secure his conviction.

A motion for a new trial based on newly discovered evidence should be granted only if: (1) the new evidence is in fact newly discovered; (2) facts are presented from which the court may infer due diligence on the part of the movant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues involved; and (5) the evidence is "of such a nature that it would probably result in an acquittal at a new trial." *United States v. Lofton*, 233 F.3d 313, 318 (4th Cir. 2000) (internal quotation marks and citation omitted); Fed. R. Crim. P. 33. In other words, does the new evidence "so marginalize[ ] and overshadow [ ] the inculpatory evidence that it would likely raise reasonable doubt in jurors' minds" as to Defendant's guilt. *United States v. Belyea*, 159 Fed.

1

Appx. 525, 533 (4th Cir. 2005). "Unless the answer to each of these inquiries is affirmative, a new trial is not appropriate." *United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989). For evidence to be "newly discovered," it must be "discovered since the trial" and must bring to light new facts which add a dimension to the evidence presented which was not previously known. *See United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001).

### Standard

Defendant maintains that some of the "newly discovered evidence" results from alleged *Brady* violations by the Government. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Both impeachment evidence and exculpatory evidence "fall[ ] within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). In order to prove a *Brady* violation, a defendant must show that the undisclosed evidence was (1) favorable to the defendant; (2) material; and (3) that the prosecution had the materials and failed to disclose them. *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972); *Maynard v. Dixon*, 943 F.2d 407, 417 (4th Cir. 1991). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (internal quotation marks omitted).

When a *Brady* violation forms the basis of a Rule 33 motion, a new trial may be warranted even though the new evidence is merely impeaching. *See Bagley*, 473 U.S. at 676. However, the evidence, whether impeaching or not, still must be such that, at a new trial, its disclosure would result in a reasonable probability of a different result, which is "shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Whitley*, 514 U.S. at

2

JA386

434.

**Discussion**

None of the alleged instances of *Brady* violations by the Government or any of the "newly discovered evidence" satisfies all the elements of the test above, nor does any of the evidence, whether considered singly or as a whole, undermine the confidence in the outcome of the trial.

First, Defendant contends that a video demonstration, created by Government agents in preparation for trial, would have undermined the entire evidentiary basis of the Government's case, allegedly calling into question the validity of the internet instant messenger "chats" which formed the foundation of the Government's case. Even assuming Defendant was entitled to production of this evidence,[1] this demonstration does not undermine the evidence presented which linked the information conveyed in the chats with certain real-life activities of Defendant, such as travel, purchases, and hotel room rentals on certain days and in certain locations.

Furthermore, Defendant's counsel was aware of this demonstration and in fact objected to its introduction and use by the Government. "One does not 'discover' evidence after trial that one was aware of [during] trial. To hold otherwise stretches the meaning of the word 'discover' beyond its common understanding." *United States v. Owen*, 500 F.3d 83, 90 (2d Cir. 2007).

Second, Defendant maintains two letters from Brett Johnson (Johnson) fall within the "newly discovered evidence" category.[2] Johnson, the informant in this matter and a defendant in a separate indictment in this court, wrote a letter to this court dated March 1, 2007 (hereinafter "March 1

---

[1] The Government contends that Federal Rule of Criminal Procedure 16(a)(2) does not require the production of this demonstration, as it was prepared by government agents in preparation for trial. This court agrees.

[2] Defendant alleges that the first letter, dated March 1, 2007, was not produced to him by the Government in violation of *Brady*. However, the Government was not aware of or in possession of this letter, and therefore it can only be considered, if at all, as newly discovered evidence.

3

**JA387**

Letter"). This letter was received in chambers on March 13, 2007, *after* Defendant was convicted. On March 16, 2007, this court ordered that the March 1 Letter be filed in the record of Mr. Johnson's separate criminal case. *See* D.S.C. Cr. No. 3:06-1129-CMC (Dkt. # 54, filed Mar .16, 2007). Not only was the March 1 Letter not material produced or maintained by the Government, it was not received by this court until after Defendant was convicted. Therefore, Defendant's contention regarding the Government's alleged *Brady* violation as to this letter is without merit.

Defendant also contends that another letter written by Johnson is newly discovered evidence which should result in a new trial for Defendant. This letter, dated June 11, 2007 (hereinafter "June 11 Letter"), offers no evidence, let alone "new" evidence, which might warrant a new trial in this matter.

Third, Defendant claims that the Government allegedly committed another *Brady* violation in failing to produce a police report from an arrest of Chris Branca (Branca) in Costa Mesa, California. However, Defendant himself was also arrested and questioned by Costa Mesa law enforcement officers during this same incident. "The strictures of *Brady* are not violated . . . if the information allegedly withheld by the prosecution was reasonably available to the defendant. '[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine.'" *Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996) (citation omitted). Moreover, Defendant's counsel cross-examined Branca regarding the California arrest, and counsel made no mention of not having received or not having been aware of the report.

Finally, Defendant asserts that the government violated *Brady* in allegedly failing to produce the grand jury testimony of Agent Kirby prior to the trial of this matter.

Grand jury testimony may be disclosed to a defendant "upon a showing that grounds may

4

exist for a motion to dismiss the indictment because of matters occurring before the grand jury."
Fed.R.Crim.P. 6(e)(3)(C)(ii). Defendant made no such showing in this case. Additionally, to the
extent that Defendant alleges a Jencks Act (18 U.S.C. § 3500) violation because the Government
did not produce Kirby's grand jury testimony, his claim fails because he did not move for the
production of such statements. See 18 U.S.C. § 3500(b) (where defendant so moves, court shall
order government to produce relevant portion of grand jury testimony of government witness).

Moreover, the Jencks Act provides that the Government is only required to produce
requested materials "[a]fter a witness called by the United States has testified on direct
examination." 18 U.S.C. § 3500(b); see *United States v. White*, 750 F.2d 726, 729 (8th Cir.1984) (
"Although in many cases the government freely discloses Jencks Act material to the defense in
advance of trial, the government may not be required to do so." ). Furthermore, an order to produce
the material should be made "on motion of the defendant." 18 U.S.C. § 3500(b). Because there was
no such motion in this case, the Government was not required to produce the grand jury transcript
in question. Moreover, even if this court found a Jencks Act violation, notwithstanding Defendant's
failure to make an appropriate motion, he has not shown that the error was anything other than
harmless. See *United States v. Lewis*, 35 F.3d 148, 152 (4th Cir. 1994).

Defendant's final argument relates to the Government's alleged use of false testimony and
representations based upon the purported *Brady* violations and newly discovered evidence. This
claim is utterly without merit and, for the reasons stated by the Government in its response to
Defendant's motion, provides no relief to Defendant.

**Conclusion**

For all these reasons, Defendant's motion for an evidentiary hearing and a new trial is **denied**.

**Other Pending Motions**

**Motion for Disclosure** (Dkt. # 170)

Defendant's motion for disclosure seeks "disclosure of undisclosed evidence" in the possession of the Government. The Government has responded in opposition to Defendant's motion, and Defendant has filed a reply to the Government's response. For the reasons stated by the Government in its response filed July 21, 2008, with which this court agrees, Defendant's motion for disclosure is **denied**.

**Motion for Bond** (Dkt. 172)

This is Defendant's second motion for bond. The Government has again responded in opposition to Defendant's motion. For the reasons stated by the Government, with which the court agrees, Defendant's motion for bond is **denied**.

**Motion to Compel** (Dkt. # 175)

Defendant has filed a motion to compel the Government to provide him access to the computer used by Johnson during the Government's investigation. The Government has responded in opposition to Defendant's motion. This motion is **moot**.

**Motion for Writ of Habeas Corpus ad Prosequendum** (Dkt. # 176)

As the court has determined an evidentiary hearing is not necessary to determine Defendant's motion, this motion is **moot**.

**Motion for Disclosure** (Dkt. # 177)

Defendant seeks production of a "Camtasia video demonstration." The Government has

responded in opposition to Defendant's motion.  For the reasons stated by the Government, with

which this court agrees, Defendant's motion is **denied**.

       **Motion for Appointment of Counsel for Evidentiary Hearing** (Dkt. # 192)

       Defendant's motion for appointment of counsel (Dkt. # 192) for an evidentiary hearing is

**moot**.

       **IT IS SO ORDERED.**

                      s/ Cameron McGowan Currie
                      CAMERON McGOWAN CURRIE
                      UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
September 9, 2008

C:\Documents and Settings\baw58\Local Settings\Temp\notesE1EF34\06-1011 USA v. Giannone e denying motion for new trial and addressing other pending motions.wpd

7

**JA391**



Garden City, NY 11530
714-200-8567

*From e-Gold 2338668*
23 maple
mountain view, CA 94043
415-888-2732

*From e-Gold 631958*
70 E At Highway 135
Boonville, MO 65233
660-882-6030

*From e-Gold 758624*
123 Boreland Ave
New York, NY 10111
660-619-3412

**IP Addresses**
**From USPIS ICQ Trap and Trace – ICQ 296632892**
12.129.244.124 (Los Angeles, CA)
12.129.245.130 (Los Angeles, CA)
12.129.245.32 (Los Angeles, CA)
148.4.3.200 (Greenvale, NY)
166.180.39.13 (Dallas, TX)
172.157.76.146
198.31.242.97 (Oak Brook, IL)
207.234.146.162 (Ft Lauderdale, FL)
208.54.15.1 (Bellevue, WA) (matches in ICA – proxy?)
208.54.15.129 (Bellevue, WA) (matches in ICA – proxy?)
208.54.95.129 (Atlanta, GA) (Spam) (matches in ICA)
24.185.211.157 (Freeport, NY) (Also used by ICQ 194847840)
24.185.216.231 (Freeport, NY)
24.185.96.51 (New York, NY)
24.189.252.67 (Freeport, NY) (e-Gold 1666412 transaction)
63.164.145.161 (Ventura, CA)
63.200.197.131 (San Diego, CA)
63.240.218.124 (Redmond, WA)
64.134.228.246 (Orlando, FL)
65.169.98.198 (Plano, TX)
66.134.161.234 (Los Angeles, CA)
66.240.104.102 (Atlanta, GA)
68.106.217.222 (Orange County, CA) (Also used by ICQ 245114454 - royalscam)
68.165.179.118 (Los Angeles, CA)
68.195.60.14 (Lynbrook, NY)
68.5.249.67 (Orange County, CA)

69.177.101.81 (Meriden, CT)
70.212.148.148 (Dallas, TX)
70.213.16.177 (Newark, NJ)
72.255.12.63 (South Jordan, UT)
72.255.7.69 (South Jordan, UT)

*From ICQ Trap and Trace – ICQ 194847840*
24.185.211.157 (Freeport, NY) (Also used by ICQ 296632892)

In Cardercrew, [(b)(6), (b)(7)c] sent the following private message to [(b)(6), (b)(7)c] on 3/24/2004:

That information you found on my subject before. I have heard they have had a change of address. I was wondering if you could pick it up. Here is the target information [(b)(6), (b)(7)c]
[(b)(6), (b)(7)c]          [(b)(6), (b)(7)c]
————————— Name Owner 1 ——————————— Name Owner 2 -
Property Address [(b)(6), (b)(7)c]                    Owner Address - [(b)(6), (b)(7)c]
[(b)(6), (b)(7)c]                         Seller Name [(b)(6), (b)(7)c]      Land Usage
- SFR If you can find anything let me know. Thank you

The above Rockville, NY address matches a historical address for the target. [(b)(6), (b)(7)c] is the father.

(b)(6), (b)(7)C

**From:** CSC [csc@officialmail.usss.dhs.gov]
**Sent:** Monday, February 12, 2007 8:34 AM
**To:** 'CID'
**Cc:** 'ISD'; ROC; IND; SFO; OTW; NSH; MIA; CHI; CLT; PIT; NYC; MEL; MCH; NHV; LAX; 'CSC'
**Subject:** CT 775.700 (J-117-775-30769-S) REPORT OF CONTINUING INVESTIGATION: OPERATION ANGLERPHISH

```
              U.S. SECRET SERVICE INVESTIGATIVE REPORT

FROM:  COLUMBIA FIELD OFFICE              FILE:   J-117-775-030769-S
TO:    CRIMINAL INVESTIGATIVE DIVISION    X-REF:  412-769-023750-S
       (ATTN: CRIMINAL INTELLIGENCE SECTION,      194-769-000067-S
       SA (b)(6), (b)(7)C                         J-117-771-030864-S
INFO:  INVESTIGATIVE SUPPORT DIVISION             403-775-169655-S
       ROCHESTER RESIDENT OFFICE          SEIZURE: N/A
       INDIANAPOLIS FIELD OFFICE
       SOUTH BEND DOMICILE
       SAN FRANCISCO FIELD OFFICE
       OTTAWA FIELD OFFICE
       MONTREAL DOMICILE
       NASHVILLE FIELD OFFICE
       MIAMI FIELD OFFICE
       CHICAGO FIELD OFFICE
       CHARLOTTE FIELD OFFICE
       PITTSBURGH FIELD OFFICE
       NEW YORK FIELD OFFICE
       MELVILLE RESIDENT OFFICE
       MANCHESTER RESIDENT OFFICE
       NEW HAVEN RESIDENT OFFICE
       LOS ANGELES FIELD OFFICE

SUBJECT: REPORT OF CONTINUING INVESTIGATION

       ACTUAL LOSS:  TBD       POTENTIAL LOSS:  $1,027,855.21

CASE TITLE:        OPERATION ANGLERPHISH
CASE TYPE:         775.700 - INTERNET/NATIONAL INFORMATION
                   INFRASTRUCTURE
SECONDARY TYPES:   848.930, 848.950, 848.191
REPORT MADE BY:    CASE SA (b)(6), (b)(7)C         (803) 772-4015
DATE CASE OPENED:  5/03/05
PREVIOUS REPORT:   NOTIFICATION OF FEDERAL ARREST - 01/24/07
REPORTING PERIOD:  10/20/06 - 02/05/07
STATUS:            CONTINUED
```

SYNOPSIS:

Numerous IOD Reports have been sent to various offices since the last Report of Continuing Investigation, dated 11/07/06.

A Federal Arrest Warrant has been served on (b)(6), (b)(7)C
(b)(6), (b)(7)c            for violation of 18 USC 1343, Wire Fraud.

(b)(6), (b)(7)c                            has been indicted and arraigned for violation of 18 USC 1343, Wire Fraud, and 1028A(a)(1), Aggravated Identity Theft.

Federal subpoenas have been issued to Verizon Wireless, American Express, and the New York Division of Motor Vehicles.

Federal subpoenas have been issued to, and complied with, by AT&T, United Airlines, and

Bank of America.

This report is being sent to the Rochester Resident Office, San Francisco Field Office, Ottawa Field Office, Montreal Domicile, Nashville Field Office, Miami Field Office, Los Angeles Field Office, Charlotte Field Office, Pittsburgh Field Office, New York Field Office, Melville Resident Office, Manchester Resident Office, New Haven Resident Office, and the Los Angeles Field office for informational purposes only.

DETAILS OF INVESTIGATION

Reference is made to all previous reports in this case.

References are made to the following items and events:

The numerous telephone calls SA (b)(6), (b)(7)C and I had with SA (b)(6), (b)(7)C New Haven Resident Office, regarding (b)(6), (b)(7)C

The Report of IOD, dated 11/24/06, from SA (b)(6), (b)(7)C New Haven Resident Office, regarding the outstanding Federal arrest warrant obtained in the District of South Carolina against (b)(6), (b)(7)C

The telephone calls and email correspondences between SA (b)(6), (b)(7)C and SA (b)(6), (b)(7)C Boston Field Office, regarding Jonathan Giannone and A&W Auto Clinic.

The Request for IOD, dated 01/11/07, sent to the Boston Field Office regarding the interview of (b)(6), (b)(7)C and his relationship with Jonathan Giannone.

The Notification of Federal Arrest, dated 01/19/07, from SA (b)(6), (b)(7)C New Haven Resident Office, reporting the arrest of (b)(6), (b)(7)C (b)(6), (b)(7)C pursuant to the Federal arrest warrant from the District of South Carolina.

The Report of IOD and Closing Report, dated 01/23/07, from SA (b)(6), (b)(7)C Boston Field Office, regarding the interview of (b)(6), (b)(7)C and his relationship with Jonathan Giannone.

The Latent Print Examination Supplemental Report, dated 01/24/07, from Fingerprint Specialist (b)(6), (b)(7)C Forensic Services Division regarding the analysis of counterfeit credit cards received from (b)(6), (b)(7)C

On 10/20/06, S (b)(6), (b)(7)c and I interviewed (b)(6), (b)(7)C (b)(6), (b)(7)C under proffer in the presence of (b)(6), (b)(7)C The following is a synopsis of the interview:

(b)(6), (b)(7)c stated that (b)(6), (b)(7)c introduced him to the online criminal boards and forums such as iaaca.com. (b)(6), (b)(7)c stated that he read the boards and forums and posted a couple of threads about his ability to manufacture counterfeit identification documents. (b)(6), (b)(7)c further stated that he did not have the equipment necessary to manufacture counterfeit identification documents.

(b)(6), (b)(7)c provided the following information on individuals he had done illegal business with:

(b)(6), (b)(7)c Received stolen goods and was arrested by local or state authorities.

(b)(6), (b)(7)c Sold counterfeit identification documents.

(b)(6), (b)(7)c Reshipped items purchased with stolen credit cards and was arrested by the Secret Service in California.

(b)(6), (b)(7)c and is a Western Union "confirmer" who would verify Western Union transactions.

2

[(b)(6), (b)(7)c] Manufactures counterfeit identification documents. In addition, was a major player in a Western Union scheme where he would wire funds from a stolen credit card to individuals via Western Union in return for a percentage of the funds.

[(b)(6), (b)(7)c] stated that he participated in a Western Union scheme with him. [(b)(6), (b)(7)c] further stated that [(b)(6), (b)(7)c] would only accept egold as payment.

[(b)(6), (b)(7)c] A provider of holograms and counterfeit identification documents.

[(b)(6), (b)(7)c] Provides counterfeit identification documents.

[(b)(6), (b)(7)c] stated that the Western Union scheme would begin with [(b)(6), (b)(7)c] and/or obtaining stolen credit card numbers and initiating a Western Union wire transfer. [(b)(6), (b)(7)c] stated that all transfers would be less than $1,000. [(b)(6), (b)(7)c] further stated that Western Union did not require proof of identification from the individual receiving the transfer if it was less than $1,000. [(b)(6), (b)(7)c] would confirm the Western Union transfer and the funds would be picked up by [(b)(6), (b)(7)c] would then wire [(b)(6), (b)(7)c] his percentage of the funds. [(b)(6), (b)(7)c] further stated that his average percentage of funds received from participating in this scheme was approximately $300 - $400 per week. [(b)(6), (b)(7)c] stated that he participated in this scheme for a "couple of months".

On 11/01/06, I was contacted by SA [(b)(6), (b)(7)c] New Haven Resident Office, regarding the outstanding Federal arrest warrant obtained in the District of South Carolina for [(b)(6), (b)(7)c] advised that subsequent investigation had revealed that [(b)(6), (b)(7)c] had provided erroneous information to Agents of his office regarding the location of [(b)(6), (b)(7)c] SA [(b)(6), provided two (2) telephone numbers, [(b)(6), (b)(7)c] as being registered to [(b)(6), (b)(7)c] father. SA [(b)(6), requested subpoenas be served on these two (2) telephone numbers in an attempt to locate [(b)(6), (b)(7)c]

On 11/24/06, this office received a Report of IOD, dated 11/24/06, from SA [(b)(6), (b)(7)c] New Haven Resident Office, regarding the outstanding Federal arrest warrant obtained in the District of South Carolina for [(b)(6), (b)(7)c] The Report of IOD reiterated the facts discussed on 11/01/06, and stated that investigative efforts would continue in the New Haven District to locate and arrest [(b)(6), (b)(7)c]

On 12/11/06, I received subpoenaed documentation from AT&T regarding subscriber information and calling records for AT&T telephone numbers [(b)(6), (b)(7)c] both registered to [(b)(6), (b)(7)c]

On 12/12/06, I forwarded, via email, the AT&T telephone records obtained on 12/11/06 to SA [(b)(6), (b)(7)c] New Haven Resident Office.

Continuing on 12/12/06, I received, via fax, a copy of a Declaration filed by Jonathan Giannone's attorney, Thomas Liotti, from AUSA Dean Eichelberger, District of South Carolina. The document stated that Giannone was not the individual who used the screen names "Pit Boss 2600" and "CIA INTEL" during this investigation.

Continuing on 12/12/06, I contacted [(b)(6), (b)(7)C] Legal Department, Dollar Thrifty Automotive Group, regarding car rentals made by Giannone. [(b)(6), provided documentation, via fax, of all Dollar Thrifty car rentals for Giannone using New York Driver's License number 257064728. Giannone's car rentals ranged from the dates 06/02/05 through 07/16/06 and covered several cities throughout the United States.

On 12/14/06, I contacted [(b)(6), (b)(7)C] Legal Department, Dollar Thrifty Automotive Group, regarding car rentals using Giannone's Visa debit card number. [(b)(6), (b)(7)C] provided documentation of two (2) rentals using Giannone's Visa debit card number. The first was in Fort Lauderdale, FL, under the name [(b)(6), (b)(7)c] [(b)(6), (b)(7)c] on 05/16/05 through 05/18/05. Credit card number [(b)(6), (b)(7)c] was presented at the time of the car rental. The second was in Orlando, FL, under the name [(b)(6), (b)(7)c]

11/10/06 through 11/14/06. Credit card number (b)(6), (b)(7)c was presented at the time of the car rental.

On 01/19/07, this office received the Notification of Federal Arrest from SA (b)(6), (b)(7)C New Haven Resident Office, regarding the arrest of (b)(6), (b)(7)C (b)(6), (b)(7)C pursuant to the Federal arrest warrant obtained in the District of South Carolina. Refer to the Notification of Federal Arrest, dated 01/19/07, for details.

01/22/07, I received subpoenaed documentation from United Airlines regarding travel records for Jonathan Giannone, United Airlines Mileage Plus account numbers 00477915329 and 03129128673, and any tickets purchased with American Express account number account 371703400451001 or debit card number 4117730009078209. These records will be examined with other subpoenaed documents to correlate Giannone's travel with Internet chats with "Pit Boss 2600" and "CIA INTEL".

On 01/23/07, this office received the Report of IOD and Closing Report, dated 01/23/07, from SA (b)(6), (b)(7)C Boston Field Office, regarding the interview of (b)(6), (b)(7)C and his relationship with Jonathan Giannone. SA (b)(6), (b)(7)C advised that (b)(6), (b)(7)C was located and interviewed on 01/09/07, at (b)(6), (b)(7)c business, (b)(6), (b)(7)c (b)(6), (b)(7)c SA (b)(6), (b)(7)C further advised that (b)(6), (b)(7)C from a photo lineup, provided consent to search for a computer left at his business by Giannone, and provided a written statement detailing his relationship with Giannone. Refer to the Report of IOD and Closing Report, dated 01/23/07, for details.

On 01/24/07, I received subpoenaed documentation from Bank of America regarding account statements from the time period 06/11/05 through 05/01/06 for Bank of America account numbers 9494910645 and 9505552565 belonging to Giannone. These records will be examined with other subpoenaed documents to correlate Giannone's travel with Internet chats with "Pit Boss 2600" and "CIA INTEL".

On 01/29/07, this office received a Latent Print Examination Supplemental Report, dated 01/24/07, from (b)(6), (b)(7)C Fingerprint Specialist, Forensic Services Division, for counterfeit credit cards received from (b)(6), (b)(7)C This report provided additional information not reported on the initial examination report, dated 08/07/06. The supplemental report stated that no identification was effected and the AFIS search met with negative results.

JUDICIAL ACTION

On 11/16/06, I requested a Federal subpoena from AUSA Dean Eichelberger, Judicial District of South Carolina, Columbia, SC, for subscriber information and calling records for AT&T telephone numbers (b)(6), (b)(7)c registered to (b)(6), (b)(7)c

REFERREDEOUSA

(b)(6), (b)(7)C

(b)(6), (b)(7)c

On 12/11/06, AT&T complied with subpoena number 2006/0537, served on 11/27/06, regarding the telephone records for (b)(6), (b)(7)c Refer to the DETAILS OF INVESTIGATION section for details.

On 01/08/07, I requested a Federal subpoena from AUSA Dean Eichelberger, Judicial District of South Carolina, Columbia, SC, for account statements for the time period 06/11/05 through 05/01/06 for Bank of America account numbers (b)(6), (b)(7)C belonging to Jonathan Giannone.

Continuing on 01/08/07, I requested a Federal subpoena from AUSA Dean Eichelberger, Judicial District of South Carolina, Columbia, SC, for subscriber information and calling records for Verizon Wireless telephone number (b)(6), (b)(7)c for November 2005.

Continuing on 01/08/07, I requested Federal subpoenas from AUSA Dean Eichelberger,

Judicial District of South Carolina, Columbia, SC, for the New York State Department of Motor Vehicles for New York Driver's License number [(b)(6), (b)(7)C] in the name of [(b)(6), (b)(7)C] and New York Driver's License number in the name of [(b)(6), (b)(7)C]

Continuing on 01/08/07, I requested a Federal subpoena from AUSA Dean Eichelberger, Judicial District of South Carolina, Columbia, SC, for account holder information and account statements for the time period 04/15/05 through 01/01/07 for American Express credit card number 371703400451001 in the name of Jonathan Giannone.

Continuing on 01/08/07, I requested a Federal subpoena from AUSA Dean Eichelberger, Judicial District of South Carolina, Columbia, SC, for travel records from United Airlines regarding Jonathan Giannone, United Airlines Mileage Plus account numbers 00477915329 and 03129128673, and any tickets purchased with American Express account number 371703400451001 or debit card number 4117730009078209.

On 01/10/07, I served two (2) Federal subpoenas, via mail, to the New York State Department of Motor Vehicles for New York Driver's License number [(b)(6), (b)(7)c] in the name of [(b)(6), (b)(7)C] and New York Driver's License number in the name of [(b)(6), (b)(7)C]

Continuing on 01/10/07, I served a Federal subpoena, via mail, to the Bank of America for account statements from the time period 06/11/05 through 05/01/06 for Bank of America account numbers 9494910645 and 9505552565 belonging to Jonathan Giannone.

Continuing on 01/10/07, I served a Federal subpoena, via mail, to American Express for account holder information and account statements for the time period 04/15/05 through 01/01/07 for American Express credit card number 371703400451001 in the name of Jonathan Giannone.

Continuing on 01/10/07, I served a Federal subpoena, via fax, to United Airlines for travel records regarding Jonathan Giannone, United Airlines Mileage Plus account numbers 00477915329 and 03129128673, and any tickets purchased with American Express account number 371703400451001 or debit card number 4117730009078209.

Continuing on 01/10/07, I served a Federal subpoena, via mail, to Verizon Wireless for subscriber information and calling records for Verizon Wireless telephone number [(b)(6), (b)(7)C] for November 2005.

On 01/19/07, Attorney Jack Swerling appeared for Jonathan Giannone in Columbia, SC, before Federal District Court Judge Cameron Currie for the purpose of a pretrial conference. Judge Currie ruled on several motions filed by Thomas Liotti, Giannone's attorney. Judge Currie made the following rulings regarding Giannone: (1) judicial proceedings will remain in South Carolina and not be transferred to New York; Giannone would not be tried as a juvenile, as he was over the age of eighteen (18) when the offenses occurred; and that the Arrest Warrant and Affidavit would not be quashed because the government had shown, through the evidence presented thus far, that there was probable cause to believe that Giannone did commit the offenses charged. Judge Currie [REFERREDEOUSA] [REFERREDEOUSA] A final pretrial conference was scheduled for 02/16/07, and it was ordered that Giannone and Liotti, Giannone's attorney in the District of New York, be present for the proceeding.

On 01/22/07, [(b)(6), (b)(7)c] appeared in Columbia, SC, before Federal Magistrate Judge Joseph R. McCrorey for the purpose of an arraignment for violation of 18 USC 1343, Wire Fraud, and 1028A(a)(1), Aggravated Identity Theft. [(b)(6), (b)(7)C] was released on a $100,000 unsecured bond.

Continuing on 01/22/07, United Airlines complied with a Federal subpoena, served on 01/10/07, regarding travel records for Jonathan Giannone, United Airlines Mileage Plus account numbers 00477915329 and 03129128673, and any tickets purchased with American Express account number account 371703400451001 or debit card number 4117730009078209. Refer to the DETAILS OF INVESTIGATION section for details.

5

On 01/24/07, Bank of America complied with a Federal Subpoena, served on 01/10/07,
regarding account statements from the time period 06/11/05 through
05/01/06 for Bank of America account numbers 9494910645 and 9505552565 belonging to
Jonathan Giannone. Refer to the DETAILS OF INVESTIGATION section for details.

SUSPECTS / DEFENDANTS:

(b)(6), (b)(7)c - SUSPECT
        AKA:        (b)(6), (b)(7)c
        1599:       Yes
        1599A:      No

(b)(6), (b)(7)c - SUBJECT
        AKA:        (b)(6), (b)(7)c

        1599:       Yes
        1599A:      No

(b)(6), (b)(7)c - DEFENDANT - ARRESTED (FEDERAL)
        AKA:        (b)(6), (b)(7)c
        (b)(6), (b)(7)c
        1599:       Yes
        1599A:      No

(b)(6), (b)(7)c - SUBJECT
        AKA:        N/A
        1599:       No
        1599A:      No

(b)(6), (b)(7)c - SUSPECT
        AKA:        (b)(6), (b)(7)c
        1599:       Yes
        1599A:      No

(b)(6), (b)(7)c - DEFENDANT - ARRESTED (FEDERAL)
        AKA:        (b)(6), (b)(7)c
        1599:       Yes
        1599A:      No

(b)(6), (b)(7)c - SUBJECT
        AKA:        (b)(6), (b)(7)c
        (b)(6), (b)(7)c
        1599:       Yes
        1599A:      No

Giannone, Jonathan - DEFENDANT - ARRESTED (FEDERAL)
        1599:       Yes
        1599A:      No

(b)(6), (b)(7)C - SUBJECT - INTERVIEW COMPLETED
        AKA:        (b)(6), (b)(7)c

        1599:       Yes
        1599A:      No

(b)(6), (b)(7)c - ELIMINATED AS A SUSPECT
        AKA:        (b)(6), (b)(7)c
        1599:       Yes
        1599A:      No

(b)(6), (b)(7)c - SUSPECT

6

JA399



```
                    AKA:        (b)(6), (b)(7)c
                    1599:           Yes
                    1599A:          No

(b)(6), (b)(7)c          - DEFENDANT - SENTENCED (STATE)
                    AKA:        (b)(6), (b)(7)c

                    1599:           Yes
                    1599A:          No

(b)(6), (b)(7)c             - DEFENDANT - ARRESTED (FEDERAL)
                    AKA:        (b)(6), (b)(7)c

                    1599:           Yes
                    1599A:          No

(b)(6), (b)(7)c      - SUSPECT
                    AKA:        (b)(6), (b)(7)c
                    1599:           No
                    1599A:          No

(b)(6), (b)(7)c      - SUBJECT
                    AKA:           N/A
                    1599:           Yes
                    1599A:          No

(b)(6), (b)(7)c       - SUSPECT
                    AKA:        (b)(6), (b)(7)c
                    1599:           Yes
                    1599A:          No

Unknown Subject - SUSPECT
                    AKA:        (b)(6), (b)(7)c
                    1599:           No
                    1599A:          No

Unknown Subject - SUSPECT
                    AKA:        (b)(6), (b)(7)c

                    1599:           No
                    1599A:          No

Unknown Subject - SUSPECT
                    AKA:        (b)(6), (b)(7)c
                    1599:           No
                    1599A:          No

Unknown Subject - SUSPECT
                    AKA:        (b)(6), (b)(7)c
                    1599:           No
                    1599A:          No

Unknown Subject - SUBJECT
                    AKA:        (b)(6), (b)(7)c
(b)(6), (b)(7)c
                    1599:           Yes
                    1599A:          No

Unknown Subject - SUSPECT
                    AKA:        (b)(6), (b)(7)c
                    1599:           No
                    1599A:          No

Unknown Subject - SUSPECT
```

7

**JA400**

```
         AKA:          (b)(6), (b)(7)c
         1599:         No
         1599A:        No

Unknown Subject - SUSPECT
         AKA:          (b)(6), (b)(7)c
         1599:         Yes
         1599A:        No

Unknown Subject - SUSPECT
         AKA:          (b)(6), (b)(7)c
         1599:         No
         1599A:        No

Unknown Subject - SUSPECT
         AKA:          (b)(6), (b)(7)c
         1599:         No
         1599A:        No

Unknown Subject - SUBJECT
         AKA:          (b)(6), (b)(7)c
(b)(6), (b)(7)c
         1599:         Yes
         1599A:        No

Unknown Subject - SUBJECT
         AKA:          (b)(6), (b)(7)c
         1599:         No
         1599A:        No

Unknown Subject - SUSPECT
         AKA:          (b)(6), (b)(7)c

         1599:         Yes
         1599A:        No

Unknown Subject - SUSPECT
         AKA:          (b)(6), (b)(7)c
         1599:         No
         1599A:        No

Unknown Subject - SUSPECT
         AKA:          (b)(6), (b)(7)c
         1599:         No
         1599A:        No

Unknown Subject - SUSPECT
         AKA:          (b)(6), (b)(7)c
         1599:         No
         1599A:        No

Unknown Subject - SUSPECT
         AKA:          (b)(6), (b)(7)c
(b)(6), (b)(7)c
         1599:         No
         1599A:        No

Unknown Subject - SUBJECT
         AKA:          (b)(6), (b)(7)c
(b)(6), (b)(7)c
         1599:         Yes
         1599A:        No

Unknown Subject - SUSPECT
         AKA:          (b)(6), (b)(7)c
```

8

**JA401**

```
1599:                      No
1599A:                     No

Unknown Subject - SUSPECT
      AKA:          (b)(6), (b)(7)c
      1599:                No
      1599A:               No

Unknown Subject - SUSPECT
      AKA:          (b)(6), (b)(7)c
      1599:                No
      1599A:               No

Unknown Subject - SUSPECT
      AKA:          (b)(6), (b)(7)c
      1599:                No
      1599A:               No

Unknown Subject - SUSPECT
      AKA:          (b)(6), (b)(7)c
      1599:                No
      1599A:               No

Unknown Subject - SUSPECT
      AKA:          (b)(6), (b)(7)c
      1599:                No
      1599A:               No

Unknown Subject - SUSPECT
      AKA:          (b)(6), (b)(7)c
      1599:                No
      1599A:               No

Unknown Subject - SUBJECT
      AKA:          (b)(6), (b)(7)c

      1599:                Yes
      1599A:               No

Unknown Subject - SUSPECT
      AKA:          (b)(6), (b)(7)c

      1599:                No
      1599A:               No
```

EVIDENCE / CONTRABAND / PERSONAL PROPERTY:

```
EVIDENCE SSF 1544 S/N:     117 2007 CE 000022
      DATE OF INVENTORY:   01/09/07
      INVENTORY MADE BY:   SA (b)(6), (b)(7)C
      DESCRIPTION OF ITEMS: Photospread, statement, documents
      SEIZED / OBTAINED FROM: (b)(6), (b)(7)C
      LOCATION:            Columbia FO Evidence Vault
      DISPOSITION:         Held pending judicial action

EVIDENCE SSF 1544 S/N:     117 2007 CE 000024
      DATE OF INVENTORY:   01/09/07
      INVENTORY MADE BY:   SA (b)(6), (b)(7)C
      DESCRIPTION OF ITEMS: Mail
      SEIZED / OBTAINED FROM: (b)(6), (b)(7)C
      LOCATION:            Columbia FO Evidence Vault
      DISPOSITION:         Held pending judicial action

EVIDENCE SSF 1544 S/N:     117 2007 CE 000025
      DATE OF INVENTORY:   01/16/07
```

9

JA402

```
INVENTORY MADE BY:        SA  [(b)(6), (b)(7)C]
DESCRIPTION OF ITEMS:     Maxtor Hard Drive
SEIZED / OBTAINED FROM:   [(b)(6), (b)(7)C]
LOCATION:                 Columbia FO Evidence Vault
DISPOSITION:              Held pending judicial action
```

All other evidence remains secured in the Columbia Field Office evidence vault.

DISPOSITION:

This case is continued pending further investigation and judicial action.

CASE SA [(b)(6), (b)(7)C]  ATSAIC [(b)(6), (b)(7)C]  SAIC DOLAN

10

[(b)(6), (b)(7)c] Manufactures counterfeit identification documents. In addition, was a major player in a Western Union scheme where he would wire funds from a stolen credit card to individuals via Western Union in return for a percentage of the funds.

[(b)(6), (b)(7)c] stated that he participated in a Western Union scheme with him. [(b)(6), (b)(7)c] further stated that [(b)(6), (b)(7)c] would only accept egold as payment.

[(b)(6), (b)(7)c] A provider of holograms and counterfeit identification documents.

[(b)(6), (b)(7)c] Provides counterfeit identification documents.

[(b)(6), (b)(7)c] stated that the Western Union scheme would begin with [(b)(6), (b)(7)c] and/or obtaining stolen credit card numbers and initiating a Western Union wire transfer. [(b)(6), (b)(7)c] stated that all transfers would be less than $1,000. [(b)(6), (b)(7)c] further stated that Western Union did not require proof of identification from the individual receiving the transfer if it was less than $1,000. [(b)(6), (b)(7)c] would confirm the Western Union transfer and the funds would be picked up by [(b)(6), (b)(7)c] would then wire [(b)(6), (b)(7)c] his percentage of the funds. [(b)(6), (b)(7)c] further stated that his average percentage of funds received from participating in this scheme was approximately $300 - $400 per week. [(b)(6), (b)(7)c] stated that he participated in this scheme for a "couple of months".

On 11/01/06, I was contacted by SA [(b)(6), (b)(7)c] New Haven Resident Office, regarding the outstanding Federal arrest warrant obtained in the District of South Carolina for [(b)(6), (b)(7)c] advised that subsequent investigation had revealed that [(b)(6), (b)(7)c] had provided erroneous information to Agents of his office regarding the location of [(b)(6), (b)(7)c] SA [(b)(6), provided two (2) telephone numbers, [(b)(6), (b)(7)c] as being registered to [(b)(6), (b)(7)c] father. SA [(b)(6), requested subpoenas be served on these two (2) telephone numbers in an attempt to locate [(b)(6), (b)(7)c]

On 11/24/06, this office received a Report of IOD, dated 11/24/06, from SA [(b)(6), (b)(7)c] New Haven Resident Office, regarding the outstanding Federal arrest warrant obtained in the District of South Carolina for [(b)(6), (b)(7)c] The Report of IOD reiterated the facts discussed on 11/01/06, and stated that investigative efforts would continue in the New Haven District to locate and arrest [(b)(6), (b)(7)c]

On 12/11/06, I received subpoenaed documentation from AT&T regarding subscriber information and calling records for AT&T telephone numbers [(b)(6), (b)(7)c] both registered to [(b)(6), (b)(7)c]

On 12/12/06, I forwarded, via email, the AT&T telephone records obtained on 12/11/06 to SA [(b)(6), (b)(7)c] New Haven Resident Office.

Continuing on 12/12/06, I received, via fax, a copy of a Declaration filed by Jonathan Giannone's attorney, Thomas Liotti, from AUSA Dean Eichelberger, District of South Carolina. The document stated that Giannone was not the individual who used the screen names "Pit Boss 2600" and "CIA INTEL" during this investigation.

Continuing on 12/12/06, I contacted [(b)(6), (b)(7)c] Legal Department, Dollar Thrifty Automotive Group, regarding car rentals made by Giannone. [(b)(6), provided documentation, via fax, of all Dollar Thrifty car rentals for Giannone using New York Driver's License number 257064728. Giannone's car rentals ranged from the dates 06/02/05 through 07/16/06 and covered several cities throughout the United States.

On 12/14/06, I contacted [(b)(6), (b)(7)c] Legal Department, Dollar Thrifty Automotive Group, regarding car rentals using Giannone's Visa debit card number [(b)(6), (b)(7)c] provided documentation of two (2) rentals using Giannone's Visa debit card number. The first was in Fort Lauderdale, FL, under the name [(b)(6), (b)(7)c] on 05/16/05 through 05/18/05. Credit card number [(b)(6), (b)(7)c] was presented at the time of the car rental. The second was in Orlando, FL, under the name [(b)(6), (b)(7)c]

3

(b)(6), (b)(7)C

11/10/06 through 11/14/06. Credit card number (b)(6), (b)(7)c            was presented at the time of the car rental.

On 01/19/07, this office received the Notification of Federal Arrest from SA (b)(6), (b)(7)C New Haven Resident Office, regarding the arrest of (b)(6), (b)(7)C (b)(6), (b)(7)C            pursuant to the Federal arrest warrant obtained in the District of South Carolina. Refer to the Notification of Federal Arrest, dated 01/19/07, for details.

01/22/07, I received subpoenaed documentation from United Airlines regarding travel records for Jonathan Giannone, United Airlines Mileage Plus account numbers 00477915329 and 03129128673, and any tickets purchased with American Express account number account 371703400451001 or debit card number 4117730009078209. These records will be examined with other subpoenaed documents to correlate Giannone's travel with Internet chats with "Pit Boss 2600" and "CIA INTEL".

On 01/23/07, this office received the Report of IOD and Closing Report, dated 01/23/07, from SA (b)(6), (b)(7)C            Boston Field Office, regarding the interview of (b)(6), (b)(7)C            and his relationship with Jonathan Giannone. SA (b)(6), (b)(7)C advised that (b)(6), (b)(7)C was located and interviewed on 01/09/07, at            business. (b)(6), (b)(7)c (b)(6), (b)(7)C            SA (b)(6), (b)(7)C further advised that (b)(6), (b)(7)C from a photo lineup, provided consent to search for a computer left at his business by Giannone, and provided a written statement detailing his relationship with Giannone. Refer to the Report of IOD and Closing Report, dated 01/23/07, for details.

On 01/24/07, I received subpoenaed documentation from Bank of America regarding account statements from the time period 06/11/05 through 05/01/06 for Bank of America account numbers 9494910645 and 9505552565 belonging to Giannone. These records will be examined with other subpoenaed documents to correlate Giannone's travel with Internet chats with "Pit Boss 2600" and "CIA INTEL".

On 01/29/07, this office received a Latent Print Examination Supplemental Report, dated 01/24/07, from (b)(6), (b)(7)C            Fingerprint Specialist, Forensic Services Division, for counterfeit credit cards received from (b)(6), (b)(7)C            This report provided additional information not reported on the initial examination report, dated 08/07/06. The supplemental report stated that no identification was effected and the AFIS search met with negative results.

JUDICIAL ACTION

On 11/16/06, I requested a Federal subpoena from AUSA Dean Eichelberger, Judicial District of South Carolina, Columbia, SC, for subscriber information and calling records for AT&T telephone numbers (b)(6), (b)(7)c            registered to (b)(6), (b)(7)c

REFERREDEOUSA

(b)(6), (b)(7)c                                                                    (b)(6), (b)(7)c

On 12/11/06, AT&T complied with subpoena number 2006/0537, served on 11/27/06, regarding the telephone records for (b)(6), (b)(7)c            Refer to the DETAILS OF INVESTIGATION section for details.

On 01/08/07, I requested a Federal subpoena from AUSA Dean Eichelberger, Judicial District of South Carolina, Columbia, SC, for account statements for the time period 06/11/05 through 05/01/06 for Bank of America account numbers (b)(6), (b)(7)c            belonging to Jonathan Giannone.

Continuing on 01/08/07, I requested a Federal subpoena from AUSA Dean Eichelberger, Judicial District of South Carolina, Columbia, SC, for subscriber information and calling records for Verizon Wireless telephone number (b)(6), (b)(7)c            for November 2005.

Continuing on 01/08/07, I requested Federal subpoenas from AUSA Dean Eichelberger,

4

**JA405**

Continuing on 08/14/06, a copy of the Federal arrest warrant for Jonathan Giannone was emailed to ATSAIC [(b)(6), (b)(7)C] New York Field Office.

[(b)(3)]

On 08/15/06, this office sent a Request for IOD to the New York Field Office requesting the arrest of Jonathan Giannone (AKA "Pit Boss 2600", "CIA INTEL") pursuant to the Federal arrest warrant for violation of 18 USC 1343, Wire Fraud, obtained in the District of South Carolina. Refer to the Request of IOD, dated 08/15/06, for details.

On 08/17/06, this office received the Notification of Federal Arrest from SA [(b)(6), (b)(7)C] Melville Resident Office, regarding the arrest of Jonathan A. Giannone (AKA "Pit Boss 2600"/"CIA INTEL") pursuant to the Federal arrest warrant obtained in the District of South Carolina. Refer to the Notification of Federal Arrest, dated 08/17/06, for details.

On 08/18/06, I received documentation regarding the arrest of [(b)(6), (b)(7)C] [(b)(6), (b)(7)C] from SA [(b)(6), (b)(7)C] South Bend Domicile, to include SSF 1599, SSF 1599A, fingerprints, photographs, and criminal history information.

On 08/21/06, this office received the Report of IOD from SA [(b)(6), (b)(7)C] New York Field Office, regarding the presentation of a photo line-up containing the picture of Jonathan Giannone (AKA "Pit Boss 2600", "CIA INTEL") to [(b)(6), (b)(7)C] [(b)(6), (b)(7)C] the Bank of America employee who opened the checking account where this office forwarded funds to Giannone. [(b)(6), (b)(7)C] positively identified Giannone as the individual who opened the Bank of America A&W Auto Clinic account. Refer to the Report of IOD, dated 08/21/06, for details.

On 08/24/06, this office received the Notification of Federal Arrest from SA [(b)(6), (b)(7)C] [(b)(6), (b)(7)C] Pittsburgh Field Office, regarding the arrest of [(b)(6), (b)(7)C] pursuant to the Federal arrest warrant obtained in the District of South Carolina. Refer to the Notification of Federal Arrest, dated 08/24/06, for details.

Continuing on 08/24/06, this office received the Report of IOD from SA [(b)(6), (b)(7)C] [(b)(6), (b)(7)C] Chicago Field Office, regarding the interview of [(b)(6), (b)(7)C] [(b)(6), (b)(7)C] [(b)(6), (b)(7)C] advised that [(b)(6), (b)(7)C] admitted to using the screen names [(b)(6), (b)(7)C] [(b)(6)] SA [(b)(6), (b)(7)C] further advised that [(b)(6), (b)(7)C] using the screen name [(b)(6), (b)(7)C] admitted to posting [(b)(6), (b)(7)C] personal information on the Fedwatch Google group. Refer to the Report of IOD, dated 08/24/06, for details.

On 08/29/06, SA [(b)(6), (b)(7)C] and I interviewed [(b)(6), (b)(7)C] [(b)(6), (b)(7)C] at the Chicago Field Office. Prior to the interview, [(b)(6), (b)(7)C] was advised that he was not under arrest and was free to leave at anytime. [(b)(6), (b)(7)C] stated that he understood he was not in custody and voluntarily agreed to be interviewed. The following is a synopsis of the interview:

[(b)(6), (b)(7)C] stated that he moved to the United States from [(b)(6), (b)(7)C] approximately thirteen (13) years ago. [(b)(6), (b)(7)C] further stated that he is fluent in the [(b)(6), (b)(7)C]

[(b)(6), (b)(7)C] stated that he became interested in fraudulent schemes conducted over the internet in 2004. [(b)(6), (b)(7)C] further stated that his interest was directed towards advance fee, or 419, schemes and that he would attempt to gain access to the computers of the perpetrators of these types of crimes to warn potential victims.

[(b)(6), (b)(7)C] stated that he became interested in online carding forums, such as shadowcrew and theftservices, with the same intent, which was to warn potential victims of these types of crimes. [(b)(6), (b)(7)C] further stated that he

7

**JA406**

installed a keylogger on the computer used by [(b)(6), (b)(7)c, (b)(7)d]. With this keylogger, [(b)(6), (b)(7)c] stated that he took control of [(b)(6), (b)(7)c] email accounts. In addition, [(b)(6), (b)(7)c] stated that he posted [(b)(6), (b)(7)c] personal information, obtained from emails, on the Fedwatch Google group.

[(b)(6), (b)(7)c] stated that he initially wanted to expose [(b)(6), (b)(7)c] but later attempted to obtain money from several compromised accounts, from a Bank in Indiana, with [(b)(6), (b)(7)c] assistance. [(b)(6), (b)(7)c] stated that he was unsuccessful in obtaining fraudulent funds from these compromised accounts.

[(b)(6), (b)(7)c] stated that he would cooperate in the furtherance of this and other Secret Service investigation. [(b)(6), (b)(7)c,]
[(b)(6), (b)(7)c]

[(b)(6), (b)(7)c] admitted that he was the subject who used the screen names [(b)(6), (b)(7)c] when communicating online with [(b)(6), (b)(7)c] and other subjects. Therefore, [(b)(6), (b)(7)c] has been eliminated as a suspect in this investigation.

Continuing on 08/29/06, I received subpoenaed documentation from the New York State Department of Motor Vehicles regarding the photograph and signature of Jonathan Giannone. This was the photo identification used by Giannone to open a bank account in New York where this office deposited funds in return for twenty-five (25) stolen Bank of America platinum debit card numbers.

On 09/12/06, this office received a Closing Report from SA [(b)(6), (b)(7)c] South Bend Domicile, regarding the judicial action (initial appearance) of [(b)(6), (b)(7)c] in the Northern District of Indiana. Refer to the Report of IOD/Report of Judicial Action/Closing Report, dated 09/12/06, for details.

On 09/16/06, [(b)(6), (b)(7)c] was arrested by agents of the Columbia Field Office and the Orlando Field Office at his residence, [(b)(6), (b)(7)c] [(b)(6), (b)(7)c] pursuant to the execution of an outstanding Federal Arrest warrant issued in the District of South Carolina for violations of 18 USC 1343, Wire Fraud; 1028A, Aggravated Identity Theft; 1029, Access Device Fraud; and 371, Conspiracy; and 42 USC 408(a)(7)(B), Misuse of a Social Security Number.

On 09/22/06, this office received the Notification of Federal Arrest and Notification of Seizure, dated 09/22/06, from SA [(b)(6), (b)(7)c] Orlando Field Office, regarding the Federal Arrest of [(b)(6), (b)(7)c] and the seizure of $150,911.67 from [(b)(6), (b)(7)c] residence following the arrest. Refer to the Notification of Federal Arrest and Notification of Seizure, dated 09/22/06, for details.

On 09/25/06, I received subpoenaed documentation from Verizon Wireless regarding Jonathan Giannone's telephone number 516-880-4527. Documentation revealed that on 05/15/06, this wireless account was activated. Subscriber information for this telephone number is listed below:

Name:        [(b)(6), (b)(7)c]
Address:

Telephone:
SSN:

On 09/26/06, this office received a Report of IOD from SA [(b)(6), (b)(7)c] New Haven Resident Office, regarding the arrest of [(b)(6), (b)(7)c] pursuant to the Federal arrest warrant for violation of 18 USC 1343, Wire Fraud, obtained in the District of South Carolina. SA [(b)(6),] advised that [(b)(6), (b)(7)c] was employed as a [(b)(6), (b)(7)c] [(b)(6), (b)(7)c] [(b)(6),]. The case is continued in the New Haven Resident Office district. Refer [(b)(7)c] the Report of IOD, dated 09/26/06, for details.

On 10/18/06, [(b)(6), (b)(7)c] listed as a subject in this investigation for being known as [(b)(6), (b)(7)c] has been replaced with the true identity of [(b)(6), (b)(7)c]

8

| From: | CSC [csc@officialmail.usss.treas.gov] |
|---|---|
| Sent: | Wednesday, December 21, 2005 1:11 PM |
| To: | CID; IND |
| Cc: | ISD; CSC |
| Subject: | CT 775.700 (117-775-30769-S) REQUEST FOR IOD: OPERATION ANGLERPHISH |

U.S. SECRET SERVICE
05 DEC 21 PM 2: 37
COLUMBIA, S.C.

U.S. SECRET SERVICE INVESTIGATIVE REPORT

FROM: COLUMBIA, SC FIELD OFFICE                   FILE: ▓▓▓▓▓▓▓▓
TO:   CRIMINAL INVESTIGATIVE DIVISION             X-REF: N/A
      (ATTN: CRIMINAL INTELLIGENCE SECTION)        SEIZURE #: N/A
      INDIANAPOLIS FIELD OFFICE
INFO: INVESTIGATIVE SUPPORT DIVISION SEIZURE #: N/A

SUBJECT: REQUEST FOR IOD

        ACTUAL LOSS: TBD     POTENTIAL LOSS: $ 514,155.35

CASE TITLE:        OPERATION ANGLERPHISH
CASE TYPE:         775.700 - INTERNET/NATIONAL INFORMATION
                   INFRASTRUCTURE
SECONDARY TYPES:   848.930, 848.950, 848.191
REPORT MADE BY:    CASE SA BRADLEY S. SMITH (803) 772-4015
DATE CASE OPENED:  5/03/05
PREVIOUS REPORT:   REPORT OF CONTINUING INVESTIGATION - 11/04/05
REPORTING PERIOD:  12/01/05-12/15/05
STATUS:            O▓▓▓▓▓

SYNOPSIS:

Yevgeniy Likhtenshteyn (aka "deuce") obtained numerous bank account log-ins
from First National Bank & Trust, Indiana, and has attempted to withdraw money from those
accounts.

The Indianapolis FO is requested to serve a Grand Jury subpoena on First
National Bank & Trust to obtain information regarding those accounts.

DETAILS OF INVESTIGATION:

Reference is made to all previous reports in this case.

Reference is also made to the telephone conversation I had with SSA Douglas Lehman,
Indianapolis Field Office, regarding the service of this subpoena,
which has been sent under separate cover.

CI # 05001118 has been in contact with "deuce" (aka Yevgeniy Likhtenshteyn)
who claims to have hacked a server for First National Bank & Trust Indiana. "deuce"
explained that he was able to obtain over 200 accounts that contained Certificate of
Deposit (CD) applications. Full account and personal
information was available to him. "deuce" further stated that he is able
to apply for on-line banking and telephone banking capabilities with this information. He
claims to have done this with a few accounts. By doing
this, he is able to order either a bill pay or electronic funds transfer. "deuce"
requested CI # 05001118's assistance in determining how to withdrawal
the funds. "deuce" provided the following username and password that he
created to let CI # 05001118 probe the account: username: ronman1933,
password: fortunal.

CI # 05001118 used the login and password provided by "deuce" and accessed a checking
account and CD account owned by Ronald Feigen. The total value of
the account equaled $12,550.73. CI # 05001118 stated that he would review
the account and respond in a day as to whether or not money could be withdrawn from the
account.

1

JA408

On 12/8/05, the Federal Grand Jury Subpoena for First National Bank & Trust was sent to the Indianapolis Field Office via Fed Ex Tracking # 8534 7137 9148.

I have had numerous conversations with Paul Brinker, First National Bank & Trust, regarding this compromise. Brinker confirmed that numerous accounts had been compromised and that his company would provide information regarding those accounts once they received a subpoena. Brinker added that the subpoena should be directed to Steve Wilson, 765-236-4107, 101 West Sycamore Street, Kokomo, IN 49901.

JUDICIAL ACTION:

On 11/15/05, the Columbia Field Office received a Federal Grand Jury Subpoena for all records associated with the compromised accounts belonging to First National Bank & Trust, Kokomo, Indiana.

No judicial action has occurred during this reporting period.

SUSPECTS / DEFENDANTS:

Yevgeniy Likhtenshteyn - SUSPECT
| | |
|---|---|
| AKA: | deuce, ManusDei |
| RACE: | White |
| SEX: | Male |
| DOB: | 01/07/55 |
| SSN: | 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 |
| FBI: | N/A |
| SID: | N/A |
| HT: | 5'6" |
| WT: | 135 |
| EYES: | Unknown |
| HAIR: | Black |
| 1599: | No |
| 1599A: | No |
| PHOTO: | No |
| PRINTS: | No |
| POB: | Unknown |
| DL/STATE: | L23596555007 / Illinois |
| ADDRESS: | 1845 Westleigh Drive, Glenview, IL 60025 |
| EMAIL: | ylikh@comcast.net |
| DATABASE CHECKS: | 11/01/05 |
| OTHER: | N/A |

EXAMS CONDUCTED:

No exams were conducted during this reporting period.

DATABASE SEARCHES CONDUCTED:

    ISD SEARCHES:   09/13/04

EVIDENCE / CONTRABAND / PERSONAL PROPERTY:

All evidence remains secured in the Columbia FO evidence vault.

DISPOSITION:

The Indianapolis Field Office is requested to serve a Grand Jury subpoena on Steve Wilson, First National Bank & Trust, requesting all information on the accounts compromised by Yevgeniy Likhtenshteyn. Steve Wilson can be contacted at 765-236-4107.

Any questions regarding the facts of this case should be directed to SA Brad Smith, 803-772-4015.

This case is continued pending further investigation.

2

**BIGGEST HEIST EVER - NETFLIX TRANSCRIPT**

**Chris Janczewski** [00:00:22] Executing search warrants is pretty stressful. You're on high alert for security and safety. In this case, we were looking for $4 billion of stolen Bitcoin. You can prepare for many things, but that can only get you so far. You don't know what someone's reaction is going to be when you're standing between them and freedom. You never know what you're going to encounter until you get in through the door. There's always going to be some level of surprise, but these were some of the more unique people we encountered. They were the first aspiring rappers that I arrested, that's for sure.

**Razzlekhan** [00:01:09] Everyone worries too much about what's proper. But not Raz, no shame. That don't stop her.

**News reporter** [00:01:15] The Department of Justice announcing the arrest of two individuals in Manhattan this morning.

**News reporter** [00:01:20] Back in 2016, hackers broke into an online currency exchange stealing 120,000 bitcoin, which at the time was worth $70 million. But today it's worth a staggering 4 billion.

**News reporter** [00:01:33] Federal agencies seized the tokens from digital wallets belonging to husband and wife, Ilya Lichtenstein and Heather Morgan.

**Nick Bilton** [00:01:40] When you talk about the arrest of people involved in a $4.5 billion heist, you think that the criminals behind it are going to be these serious, hardened people. But in reality, the people behind this particular case, they are these wacky, cringy individuals who are posting these totally insane videos on social media while they are trying to pull off this incredible crime.

**Razzlekhan** [00:02:07] Razzlekhan! I'm a motherfucking bad bitch. Go on, make me a sammich.

**YouTuber** [00:02:13] That was cringe. That was trash.

**YouTuber** [00:02:16] Holy hell.

**YouTuber** [00:02:18] It can't be real.

**YouTuber** [00:02:20] It's so bad that it might be good.

**Rachel Siegel** [00:02:24] It was incredibly shocking to see that she had been living so publicly for so long.

**Ari Redbord** [00:02:31] How could this person possibly have engaged in this level of sophisticated on-chain money laundering?

**Brett Johnson** [00:02:38] That absolutely does not make sense. It doesn't.

**Gianni Martire** [00:02:41] I know criminals. I know real life criminals. This guy is not a criminal.

**Nick Bilton** [00:02:45] There's still so many questions in this case. There are informants, secret agents, issues of national security, theories that stretch all the way to the Kremlin

BIGGEST HEIST EVER - NETFLIX TRANSCRIPT

and back to the 80s, and hackers who may be working for the government. And at the center of it all is this couple who are posting the most bizarre, insane videos.

**Brett Johnson** [00:03:06] Lies, deceit.

**Gianni Martire** [00:03:08] There's holes that we don't know. The FBI is not saying things. There's a lot of things that don't make any sense in this case. I smell bullshit.

**Interviewer** [00:03:27] He's led some of the nation's most important cryptocurrency related criminal investigations. Please welcome Chris Janczewski.

**Chris Janczewski** [00:03:36] As a special agent with the Internal Revenue Service, I was in charge of investigating cases with money laundering. So my spectrum of cases went from child exploitation investigations to terrorist financing to North Korea hacks. My last case as an agent was the investigation into the 2016 hack of Bitfinex, which got the attention of news media from around the world.

**News reporter** [00:04:03] More than $70 million worth of Bitcoin, the online digital currency has been stolen in the second largest hack of its kind. The hack targeted Bitfinex, a Hong Kong based platform where customers can exchange bitcoins for US dollars.

**Sheel Kohli** [00:04:20] Bitfinex is one of the top ten cryptocurrency exchanges in the world. This was a period when there had been other hacks of other exchanges and those exchanges had declared bankruptcy. So this was a devastating moment for this company. This hack could end all the hopes and dreams of the founders and indeed many of the customers.

**Frankie Cavazos** [00:04:45] The day of the hack, I logged in to Bitfinex. As soon as I logged in, I saw a big 000 on my account. I was in complete shock. I had anxiety, like hot sweats. I looked on Reddit and there was lots of buzz about how there potentially might been a hack. I had put in $10,000. It was a significant portion of my net worth. I spent years saving up this money so that I could have a shot at buying a house and going to school. It was a gut punch when it disappeared, and I was just one of many victims.

**Nick Bilton** [00:05:20] When these multi-million dollar hacks happen, it's often a rogue country. It's Russia, it's Ukraine, it's Iran, North Korea, it's ISIS. And then they use this money to try to fund terror groups or destabilize governments, which is why these hacks are often an issue of national security.

**Chris Janczewski** [00:05:40] Homeland Security initiated an investigation shortly after the hack took place in 2016, but were only able to get so far because the hack of Bitfinex itself seemed very complicated.

**Brett Johnson** [00:05:55] With Bitfinex, you've got a very competent attack. The way that I know is because of my experience as a criminal. The United States Secret Service, they called me the original Internet Godfather. I was placed on the United States most wanted list. Credit card schemes, phishing attacks, stimulus fraud, synthetic fraud, you name it. I was on the ground for developing, refining, outright doing it. When I look at the Bitfinex hack, if I'm an attacker, I'm scanning that environment for any known exploits. The person who broke into Bitfinex had access to their servers for months. This hacker modified the back end code so it sends them customers passwords as people log into the system.

**Chris Janczewski** [00:06:47] Once the hacker was able to gain access, they executed the script to automatically transfer over funds and then took actions afterwards to delete a lot of the access logs. Think it was like trying to erase fingerprints after the scene of a crime.

**Brett Johnson** [00:07:01] Knowing how to cover your tracks, that's something that you learn from trial and error. We're talking about a very competent criminal who understood what needed to be done to be successful.

**Nick Bilton** [00:07:15] Criminals usually are at the forefront of some of these technologies, and it takes a long time for the government to even understand how it works. And they're always a step behind. And so with this particular case, they kind of hit a dead end and the case went completely cold until the crypto boom.

**News reporter** [00:07:31] Overnight, the price of Bitcoin went through $11,000 for the very first time.

**Nick Bilton** [00:07:37] The crypto boom during these years was, without question, the most insane moment in financial history.

**YouTuber** [00:07:43] Five years ago, I was actually a taxi driver. Then I found crypto.

**YouTuber** [00:07:47] I was still working in a grocery store. Three years later, I got my Bugatti.

**Rachel Siegel** [00:07:52] I'm no different than anyone else who walked in off the street and decided to buy Bitcoin. There was no way for anybody to prepare for how fast and furious the technology was going to come at us, for how much money we were going to make in such a short period of time. It was just insanity. At that time, the stolen Bitfinex funds were growing and growing, and the Bitfinex hacker was sitting on the fortune of a lifetime.

**Nick Bilton** [00:08:20] To give you a sense of how much money $4.5 billion is, if you spent $100,000 every single day for 100 years, you'd still have close to $1 billion left over.

**Rachel Siegel** [00:08:33] You don't sit on that much money for that long without moving it, without withdrawing it.

**Chris Janczewski** [00:08:38] In 2020, some of the funds from the Bitfinex hack started to move, and that caught my attention. At that point, the hack had been a bit of a cold case, so I thought, let's give it a whirl and see if we can make some progress here. I think what's unique about cryptocurrency investigations is that the public blockchain is the crime scene. The blockchain is a public ledger where you can go and see the transactions but you can't see who is responsible.

**Nick Bilton** [00:09:08] The money that was stolen from the Bitfinex hack went into a wallet, which is essentially like a bank account that's visible to everyone on the blockchain. So law enforcement can watch this Bitcoin wallet and they can try to monitor it to see if any of the Bitcoin is taken out. But they can't seize the money without the password.

**Chris Janczewski** [00:09:29] You can think of it as like a bank robbery where the money came and sat outside. You can see it sitting there on the curb, but you can't physically touch it and you just watch it move to the next block and keep kind of, you know, running

away from you. So I went on the blockchain and just clicked around on the website and tried to follow the money. But after hundreds of thousands of transactions, it could be very hard to keep track. Around 2020, Blockchain analytics software started to peak and companies like TRM Labs were able to help with our investigation.

**Ari Redbord** [00:09:59] At TRM Labs, we trace and track the flow of funds in cryptocurrency to build investigations. Bitcoin lives and moves outside of the traditional financial system in these virtual currency exchanges. These exchanges are essentially banks in the cryptocurrency space. The Bitfinex hackers used automated transactions to move these stolen funds from exchange to exchange in order to evade law enforcement detection. But we were able to help identify that the hacker put some of the funds into the darknet market called Alphabay.

**Brett Johnson** [00:10:40] Alphabay is basically the eBay of criminal goods and services. Things like trafficking drugs and laundering cryptocurrency. So if I'm the guy who hacked Bitfinex, I'm taking my Bitcoin and I'm throwing it in a tumbler, a mixer like Alphabay, where it's mixing with other bitcoins and hopefully it's going to give me bitcoin that's not connected to that Bitfinex hack.

**Chris Janczewski** [00:11:06] Alphabay broke up the trail on the Bitcoin blockchain, so think of it as you walk into a bank with $100 bill and you've got to the ATM and pull out a different hundred dollar bill. Like if you're following that first bill, the serial numbers, you'd be found the wrong trail. And so a darknet market like Alphabay can be a black hole for information for following the flow of funds.

**Brett Johnson** [00:11:27] If you're law enforcement, you realize that, hey, a lot of the information's on Alphabay. So what do you do?

**Jeff Sessions** [00:11:35] Today, the Department of Justice announces the takedown of the dark web market Alphabay.

**Ari Redbord** [00:11:44] Once Alphabay was taken down, law enforcement was able to seize their servers, and ultimately those servers provided a treasure trove of data for investigators. You're talking about millions or billions of records.

**Chris Janczewski** [00:11:58] With the records from Alphabay, a lot of the momentum in the case started to pick up. I started mapping the flow of the funds and making this spider web of tens of thousands of transactions and various accounts.

**Nick Bilton** [00:12:10] And one of those accounts tied back to two people at 75 Wall Street in New York City.

**Chris Janczewski** [00:12:17] There's this level of excitement of like, okay, we've got a really good breakthrough, but it's also the beginning of when a lot more work starts. You know, you go back, you start going through all the evidence, seeing what other leads you've uncovered. But the thing that just kept happening every time we got to the center of the spider web, we had accounts that were in the name of Mr. Lichtenstein and Ms. Morgan.

**Nick Bilton** [00:12:39] When I first went to Heather's social media, the thought that went through my head, it was like, "Holy shit. The federal government got it wrong. There's no way these two stole all that money."

BIGGEST HEIST EVER - NETFLIX TRANSCRIPT

**Nick Bilton** [00:12:53] If I know that there is a potential that I could go to jail for the rest of my life, I wouldn't post bizarre, eccentric, fucking insane videos.

**Razzlekhan** [00:13:02] What! I like trash. I like cash. I like my potatoes mashed.

**Nick Bilton** [00:13:09] I've talked to people who were investigators on the case who literally said, holy shit, when they first saw Heather's videos.

**Razzlekhan** [00:13:17] If my lovely husband does, I will have plenty of fuckboys.

**Chris Janczewski** [00:13:23] I felt some level of surprise seeing all the videos, but the mass amount of social media posts was actually a benefit for us because they're shooting videos inside of their apartment.

**Razzlekhan** [00:13:33] Going for that Crazy Rich Asians vibe meets creepy museum. I have a lot of weird stuff in here, you want to see?

**Chris Janczewski** [00:13:41] They're giving you an opportunity to look inside and see what's going on that you otherwise would not get. You could see potentially there's furniture in the background. Did somebody buy furniture at one point using stolen Bitcoin? Despite maybe not wanting to watch all the videos, you have to go and get all the evidence you can. We started looking into their backgrounds to see if they actually had the means to carry out the crime they're alleged to be doing. And we learned that Ms. Morgan had connections to Silicon Valley.

**Heather Morgan** [00:14:09] I learned from some really smart people in Silicon Valley when I lived there. All of them were entrepreneurs in the tech space.

**Miguel Asuzano** [00:14:20] Heather was always looking for the next best thing and how she could get involved with it. I became good friends with her during university. We both studied international relations and economics and she wanted to break into her career.

**James** [00:14:41] I got the sense from numerous conversations that she just wanted to be as big, as well known, as powerful as she could be. It seemed like Heather was going to do something big and she wanted to show the whole world who she was.

**Nick Bilton** [00:14:57] When Heather shows up in Silicon Valley, it's in the modern day gold rush. You could see people who would literally go from being worth nothing to being worth millions of dollars overnight. At the time, there was this group that was developed called 500 Startups, and the idea was that these investors would find 500 different startups to invest in, and if they were lucky, one of them would be the next Facebook. Heather desperately wanted to break into this fold, and she tried all these different approaches to try to get in. It wasn't easy, but she zeroed in on one specific founder who was willing to give her a chance.

**Hussam Hammo** [00:15:34] Hello, my name is Hussam. I'm the CEO and founder of Tamatem.

**Hussam Hammo** [00:15:39] I was one of the first companies from the Middle East to join 500 Startups. And I wrote on Twitter that I am very excited to be in this program. And

BIGGEST HEIST EVER - NETFLIX TRANSCRIPT

Heather replied to my tweet saying that she had some experience by living in Jordan. And this is how we actually decided to meet.

**Heather Morgan** [00:16:00] The Middle East is huge with great potential, but people don't know about that here. And we're changing that.

**Giancarlo V.** [00:16:06] She was not quite like everyone else. She kind of marched to the beat of her own drum, I suppose. She was always the center of attention. She thrived in that kind of environment.

**Hussam Hammo** [00:16:17] She had like this waffle maker that she would bring to the office and she would create so many different types of waffles. She seemed happy, especially that she was starting to form new relations and new friendships. She was really good at identifying people, figuring them out, and then pursuing them to close the doors.

**Ilya Lichtenstein** [00:16:41] So my name is Ilya Lichtenstein. I'm the cofounder of...

**James** [00:16:45] Heather and Ilya met when Heather had gone to a conference and had seen Ilya speak in person. And I remember her talking about being captivated by what he was saying.

**Hussam Hammo** [00:16:58] So Ilya was a mentor at 500 Startups. He used to have a startup that was acquired at one point.

**Ilya Lichtenstein** [00:17:07] I'm here in San Francisco with Ilya, who is the co-founder and CEO of MixRank.

**Gianni Martire** [00:17:12] I met Ilya on the phone. He was a typical Silicon Valley, like, nerdy co-founder. MixRank was actually one of my first angel investments that I made as an entrepreneur. I remember like a week after I invested, he had told me all exactly like, Hey, Mark Cuban just invested. So I had a lot of expectations for the company.

**Ilya Lichtenstein** [00:17:28] So MixRank is a giant database of ads. We analyze hundreds of thousands of sites every day, pick up all the ads on them, and try to figure out what the most effective ones are for any advertiser.

**Miguel Asuzano** [00:17:39] When Heather sort of introduced me to Ilya...

**Heather Morgan** [00:17:42] So my first question...

**Miguel Asuzano** [00:17:44] I thought, yeah, this is a sort of mysterious guy. I don't really know anything about you, but he definitely has ambition. Definitely Heather's type.

**Giancarlo V.** [00:17:52] Heather referred to Ilya as Dutch. We never really knew why he had that nickname, but our group kind of came to know him as Dutch.

**Heather Morgan** [00:17:59] Dutch? The fuck are you doing?

**Hussam Hammo** [00:18:02] I remember he brought a gift to her at that time. It was like a basket of chocolate. She was excited, but at the same time, she did not want anyone to know more details.

**James** [00:18:15] I think he wanted to pursue her in a romantic way, and she didn't want that initially. And I think after much persistence, they finally got together.

**Pierce Larick** [00:18:24] I was originally connected with Heather and Ilya through a dear friend of mine who worked for MixRank. In San Francisco, it's a tough market, so to get talent, you really have to do a recruiting video. People want to hear about making money. They want to hear about growth opportunity.

**Ilya Lichtenstein** [00:18:44] We are at a point where we have initial product market fit. We have good revenue growth. We have over 100 customers.

**Pierce Larick** [00:18:50] We're not your workplace. We're your family. You know, the same shtick.

**MixRank Recruitment Video** [00:18:54] We're not just a kind of company where you come in and you have your coworkers. We're friends.

**Gianni Martire** [00:19:01] MixRank finally started to expand, hiring more people, getting more clients. They actually moved to bigger office spaces.

**Ilya Lichtenstein** [00:19:08] We made seven figure revenues last year.

**Gianni Martire** [00:19:11] I remember going to San Francisco and seeing the new office space and being excited.

**Pierce Larick** [00:19:16] I was in communication with their team to do a product video, to do a bunch of other kinds of deliverables for them. But during that time, Ilya disappeared. Not really saying anything to anyone, not talking to anyone afterwards. It was just he was there one day and he was gone the next.

**Gianni Martire** [00:19:34] It was so weird. It seemed like the company was doing well. And after all that hard work, you would think you would kind of stay a little bit longer.

**Nick Bilton** [00:19:42] I spoke to lots of people that worked with Ilya at MixRank. Silicon Valley is a place where 95% of all startups fail. And here was one that was on its way to being one of the successes, if not already a success. It makes you wonder what is the drive to leave all of this work behind?

**Ilya Lichtenstein** [00:20:01] When you have that mindset where you say, Well, I'm free to do anything now. I don't have to stress about paying the bills. I think that's the richest you'll ever feel. It's basically just an incredible sense of freedom.

**Pierce Larick** [00:20:14] When Ilya exited MixRank, it would have been the end of 2016. So it would have been kind of right there.

**Chris Janczewski** [00:20:32] They had gone on vacation shortly after the 2016 hack, which seemed, you know, in my mind, maybe this was like a celebration trip.

**Miguel Asuzano** [00:20:43] Heather had mentioned that they've been successful in their business and that she was going to be moving to New York with Ilya. Because they want to be the center of the culture of America.

**Heather Morgan** [00:20:54] Just in front of a little New York brownstone, that's what's up.

**Christine Erfe** [00:20:58] I thought the move to New York was pretty abrupt. I thought maybe they needed a change of scenery, a change of pace.

**Director** [00:21:06] Did they seem wealthy?

**Gianni Martire** [00:21:08] No. Everybody in tech is a little comfortable. So, like, in terms of like the average American. Yes, slightly above that. But -- no. No. No. Not for $4 billion in the bank. No, no, no. No, no.

**Rachel Siegel** [00:21:22] Bitcoin is very bad for crime because every single human being in the world with a phone or a computer can see exactly what transactions you're making and you can follow them, right?

**Ari Redbord** [00:21:35] It's almost this perfect storm. They have so much money. And the hack itself was so public that it made it almost impossible to ultimately off ramp the funds.

**Brett Johnson** [00:21:47] In order to convert bitcoins into cash, I must go through a centralized exchange. These centralized exchanges, a lot of them require a verified identity in order to set up that account and to cash that account out.

**Nick Bilton** [00:22:04] They found themselves in the situation where they couldn't go and get the money because it would mean that they would have to show who they really were. They would have to show their real IDs and their real photos and their Social Security cards and all these things, which would, of course, have tied the hack back to them. So as they're trying to launder this money, it appears that it keeps getting stuck in all these different accounts.

**Ari Redbord** [00:22:27] So they just kept moving them around. It was almost like they were thwarted at every turn.

**Chris Janczewski** [00:22:33] Trying to launder these proceeds becomes like a full time job. But while we were tracing the transactions, we did see legitimate business activity.

**Heather Morgan** [00:22:43] I'm going to get back to work because I have a lot of work to do right now.

**Chris Janczewski** [00:22:49] We found Miss Morgan had the business Salesfolk. We wanted to dig in to see, what is this company?

**Heather Morgan** [00:22:56] Hey, Heather from Salesfolk here. A lot of people wonder, you probably are, too. Heather, how do you manage so many people when you're the only co-founder? Well, I'm going to tell you my secret. Vietnamese coffee with goat milk! Just kidding.

**Pierce Larick** [00:23:11] Salesfolk, from hearing the spiel over and over and over, is a particular cold email marketing technique that will get you more responses than maybe your standard cold email.

**Heather Morgan** [00:23:27] Hi, I'm Heather Morgan, the CEO and founder of Salesfolk. And in the last ten years, I've written more than 10,000 cold emails.

**Martin Molina** [00:23:34] Heather and I met when she was looking for a marketing intern. My first impression of Heather, she was elegant, she was professional. She was very well versed in what she knew about the industry. I saw her articles on Forbes and Inc Magazine, and I like the way she wrote those articles. At first I was just going to manage Heather's posts on Twitter and Instagram. But then after a couple of weeks, Heather introduced Razzlekhan to me, and that's when everything shifted.

**Razzlekhan** [00:24:06] Don't hate, this ain't a debate. We ain't going to date. Even though I make you want to masturbate, you just stagnate. No, thanks. What? Razzle dazzle.

**Martin Molina** [00:24:19] It was very raunchy, so my only reaction was like, All right, cool. And then she mentioned something like, it's supposed to be funny, supposed to be out there, supposed to be even ridiculous at some point. And I remember agreeing with her. I told her there's brilliance in stupidity, too.

**Nick Bilton** [00:24:38] Heather ended up posting a video explaining why she created this persona called Razzlekhan.

**Razzlekhan** [00:24:44] A couple of years ago, I was working a lot and I got really burnt out. I think I was pretty unhappy. I don't know. I think I was searching for something more and that's probably why I had interviewed Awkwafina.

**Awkwafina** [00:25:05] My vag speaks five different languages, it told your vag, bitch make me a sandwich.

**Razzlekhan** [00:25:09] Basically, she said that Awkwafina is much more confident and more shameless than Nora. That moment definitely solidified this idea to pursue an alter ego.

**Nick Bilton** [00:25:21] If you're Ilya and Heather and you have this money, you're probably kind of terrified of being caught. People deal with anxiety and stress and tension differently. Some people start having panic attacks. Some people start obsessively exercising. It's steam going through you that has to come out some way. I think for Heather, the creation of Razzlekhan and the rapping was the steam valve.

**Razzlekhan** [00:25:48] When I say the word, I'm a tough fucking nerd. Yeah, I might be absurd, flashy like a rare bird.

**Christine Erfe** [00:25:55] Razzlekhan is Heather times 100. Heather was already out there, but Razzlekhan is way out there.

**Razzlekhan** [00:26:05] Making that book. Don't be dumbstruck. Never get stuck. Oyster get shucked.

**Miguel Asuzano** [00:26:11] When Heather developed the persona of Razzlekhan, I wasn't at all surprised. When I was living with her in university, she would actually just try to rap a few bars. She'd like to have a lot of influence with her Turkish background.

**Martin Molina** [00:26:28] After Heather shared her music with me, I told her that I was a filmmaker, and then it occurred to her that we could collaborate and do something together.

**Razzlekhan** [00:26:37] Razzlekhan here walking on set with crew. We should wait here for everyone else.

**Martin Molina** [00:26:44] Funny enough, the Versace Bedouin is the first music video that I have ever directed.

**Razzlekhan** [00:26:48] Razzlekhan, the Versace Bedouin. Come real far, but don't know where I'm headed. Motherfucking crocodile of Wall Street. Silver on my fingers and boots on my feet. Always be a goat, not a goddamn sheep.

**Martin Molina** [00:27:01] I remember a lot of people stopping at Wall Street when Heather was dancing. A lot of tourists were taking pictures because it was kind of wild.

**Razzlekhan** [00:27:14] Signature Razzlekhan move.

**Martin Molina** [00:27:15] Versace Bedouin was her signature music video that was going to launch her career pretty much. And when I showed her the final product, she was happy with it. She said, you know, let's do it. Let's just put it on YouTube and let's let it blow up. Once Versace Bedouin came out, it was not what Heather expected. We didn't have like a million views or anything like that. We had some negative reviews, negative comments, Some people saying, you know, don't do this, don't hurt your image. It was quite tough to read. I usually send off my film work to my parents. Versace Bedouin was the exception of this. I mean, I told them I just made a music video. Just take my word for it. It's pretty nice, but just take my word for it.

**Director** [00:28:04] And what did you think of the song?

**Martin Molina** [00:28:07] You're not going to ask me that.

**Director** [00:28:10] Do you remember the first time you saw the videos?

**Chris Janczewski** [00:28:19] Yeah, it's... Certainly the videos were unique, but like it's still a serious thing. We're still investigating, you know, a felony.

**Nick Bilton** [00:28:29] At this point in the Fed's investigation, the financial picture doesn't add up. Heather is writing for Forbes and she's making maybe $100 to $150 per post. And while she was doing a little bit here and there with Salesfolk, her focus was on Razzlekhan. And then at the same time, Ilya creates a new startup and he calls it Endpass.

**Endpass Video** [00:28:53] Meet Endpass. We protect your funds with multiple layers of security.

**Nick Bilton** [00:28:58] It's unclear if it's making money, and yet they seem to be living a life of luxury.

**Christine Erfe** [00:29:05] I thought they were doing really well in New York, Heather's apartment, it was actually very, very nice.

**Giancarlo V.** [00:29:11] It seemed like she lived this international lifestyle. They're traveling first class and more often than not.

**BIGGEST HEIST EVER - NETFLIX TRANSCRIPT**

**Chris Janczewski** [00:29:17] They weren't exactly living like Pablo Escobar and having gold toilets or something crazy that I knew of. But there was a level of spending money that was potentially outside of their means. Where did the cash come from? I know from my own experience of being a special agent for 13 years. If you have to ask the question, that's probably a good sign of money laundering.

**Nick Bilton** [00:29:38] When you start to dig into it, you start to see that it appears Heather and Ilya have all these fake employees that are working for them. These employees, they have no social media accounts, no references, no posts, anything. Some of them did have fake LinkedIn, but no other job or anything. And yet Heather and Ilya start paying these fake employees millions of dollars in Bitcoin.

**Chris Janczewski** [00:30:01] One of the accounts that was used to launder funds was in the name of a young woman. She had received millions of dollars of a privacy coin, which seemed atypical to me. As part of setting up the account to prove who she was, she submitted a utility bill. But I've been following money to other accounts, and I recognized that utility bill was used in another account. So it was the exact same utility bill, but it was Photoshopped to have a different address. We started seeing that there were connections with Miss Morgan's business Salesfolk. One of the clients was apparently paying in Bitcoin to the tune of tens of thousands of dollars, a substantial amount for marketing services. But then when digging in to see who is this client, who is this company, there was almost no footprint of this person, this company, online, which seems ironic considering you're paying for marketing services. I have this obsession about investigations of like, trying to get the answer. I kind of see it like a hunt. I kind of just keep thinking, what would their next step be and how can I counter that? I go about my day working, maybe watch football and if something clicks, I don't wait until the next day. I want to find out that night. I was determined to figure out what exactly happened. Especially seeing them acting as if they might have gotten away with it.

**Dyrohn Southerland** [00:31:25] When I first met Heather, she was like, I love your mustache. I was the first thing she said. I love partying with my bros, but Heather, she had a different light to her. She didn't want to sound and do anything that you see right now in the music industry. She wanted to be totally weird and different.

**Razzlekhan** [00:31:48] I'm starting to rap about gay men.

**Dyrohn Southerland** [00:31:49] She couldn't rhyme that good. That's why she wanted me to help her, with her rhymes. We literally would just say something and she will write it down and she's like, we're going to use that.

**Razzlekhan** [00:31:58] My family has a history of hanging out in cemeteries for generations.

**Dyrohn Southerland** [00:32:05] The first song we did was High in the Cemetery.

**Razzlekhan** [00:32:08] Getting high in the cemetery next to Grandpa's grave. Fuck the park, fuck boy sex slaves.

**Dyrohn Southerland** [00:32:14] That was the first song we wrote. Can I play the verse of it, of the song? Okay. Wow. I haven't rapped this in forever. But I'm gonna do it. Puff, puff, pass. I love me some great grass.

**Razzlekhan** [00:32:33] Getting high in the cemetary. Getting high in the cemetary.

**Dyrohn Southerland** [00:32:33] Heather wanted to record. So I was like, Hey, I got this little in-house studio. Brooklyn studio. No, no, no. I need, like, something big. Like, pretty much go big, go home. So I was like, Quad. Do you want to do that? She said, Yeah. I gave her the info to Quad. She booked it. She was showing me she can splurge money. She exposed me to that rich life that I never had. She can pay for what I needed. Like if I needed jewelry, if I needed some clothes. Telling me money's not an issue. And I was showing her like, Hey, I got the parties, I got the clubs, I can get us on the VIP list.

**Cavier Coleman** [00:33:21] Heather would show up randomly at, you know, my art shows and we became friends over time. Heather would always bring a six pack or she would bring some champagne. You know, basically create the party. She had an expensive cat. Like $2,000 for sure. I'm like, that's an expensive cat. I was like, I want one, but I don't have the money for one of those.

**Heather Morgan** [00:33:45] So wait, you're telling me that you were buying Clarissa's food?

**Ilya Lichtenstein** [00:33:49] I taste all her cat food. I tasted her Tiki Cat and I'm like, this is pretty good. Needs salt, needs pepper. But other than that, like, it's pretty good. Show her, don't show me.

**Dyrohn Southerland** [00:34:01] Dutch is a quiet and funny man. When I first met him at Heather's house, she was like, Hey, I have a stock boyfriend. He's into stocks. He's big business. Heather told me one time that Dutch closed this big million dollar deal. And I'm like, What? I never even had $1 million, you know? So I'm just like, oh shoot, wow, cool. But I didn't think they were in a serious relationship. She seemed like it was business between them with benefits. A lot of the time I was there, it was just me and Heather. And Dutch would be isolated in his room. He would come out, maybe get a snack, say hey to me, and went right back in the room. If he had friends, yeah, I didn't know about it.

**Nick Bilton** [00:34:49] When I talked to people for the reporting, they tell me, oh I don't think they were a good match. I don't think that they were right for each other. She wanted to go out and party. He wanted to stay home. She was incredibly extroverted. He was incredibly introverted. But then when you start to dig into it more, I think that these are two people that actually have a lot more in common than we actually might think. While the end result of them, the grown up version of them, was incredibly different. I can imagine the two of them as children being very, very similar. They both were clearly outcasts.

**Razzlekhan** [00:35:25] Most people know me for traveling and living all around the world, but what they don't know is I am not the daughter of a diplomat or some trust fund guy. I actually grew up in a small town and it's in the middle of nowhere.

**Kyle Peevers** [00:35:43] Chico has a poor side of town. It's kind of a redneck area.

**Lynn Cannon** [00:35:50] I seem to recall that her living circumstances were different than most of the students, that her parents were living farther away. We offered a lot of AP classes at Pleasant Valley High School, and so she must have chosen our school in order to have a good education.

**JA421**

**Kyle Peevers** [00:36:09] When I first met Heather, I saw her just by the lockers on the way to the cafeteria. I could tell that she was lonely.

**Kitty Davies** [00:36:19] I recall people making fun of her for being awkward or seeming awkward.

**Razzlekhan** [00:36:27] Growing up, I did not have a lot of friends and no one really believed in me, understood me, supported me. This principal, he told me, You're a big fish in a small pond, but if you go to the ocean, you might drown. And I remember thinking, okay, the ocean. Yeah, it's big, but I'm a shark.

**Zach Serota** [00:36:57] Ilya and I grew up in Glenview. It was very, very whitebread. I met him in the fifth grade. We were two little white Jewish kids without much athletic ability. We just kind of naturally hit it off. The program we were in was a very avant garde, experimental learning environment. It was called TREE: technology rich educational environment, and we absolutely gravitated towards computers. As nerdy kids, we were often bullied. People would attack his Russian-ness and Ilya would play along, Oh hello, comrade! Ilya's family moved from Russia and he seemed proud of his Russian heritage. We were a part of this board game club. Ilya was good at strategy games in particular, like Risk. He was very big on pulling one over on his opponent. He had kind of a hunger about him. Like he sought power. He loved to quote Austin Powers, specifically Dr. Evil.

**Dr. Evil** [00:38:22] In exactly five days, we will be $100 billion richer.

**Zach Serota** [00:38:29] $100 billion. It's almost like he did grow up into Dr. Evil just a little bit.

**James** [00:38:40] When I first met him, I got the assumption that Ilya was a genius because the first thing that I saw Ilya do, he's playing Overwatch. But then on his other screen, he's flipping to writing code and he's just going back and forth between matches and coding. I had never seen anything like that.

**Kyle Peevers** [00:39:00] Gamer knows gamer. I'm a gamer. I don't think anyone else picked up on this, but Dutch is a character from a game called Red Dead Redemption 2. He's kind of like the protagonist the entire time until you find out he wasn't friends with anyone. He was the antagonist the whole time at the end. He's a bad guy. I think Ilya liked the moniker Dutch because of that game. Maybe he thought it was similar to himself.

**Red Dead Redemption 2** [00:39:27] But we got a whole lot of money. Everything is coming together exactly as I planned.

**Nick Bilton** [00:39:37] It's very clear that Ilya has got this computer background. He understands technology. He understands coding. But the big question is, what's Heather's role in all of this? There are so few instances where couples commit crimes together. Bonnie and Clyde are still famous today because they were a couple that went on a murder robbery spree. That doesn't happen all the time. These characters have to agree to do this together. And I keep wondering if Ilya was the mastermind or if the person who was really pulling all the strings all along was Heather. I don't know. I truly don't know.

**Miguel Asuzano** [00:40:22] When I met Heather at the university, she was a worldly citizen. Her father had a lot of travel for his work, and so she had lived in Japan and

BIGGEST HEIST EVER - NETFLIX TRANSCRIPT

various countries around the world. I thought, Wow, she speaks all these different languages and she's white.

**Heather Morgan** [00:40:39] Some of the languages which I have studied include Korean, Japanese, Arabic, Turkish, and currently Cantonese.

**Travis Lybbert** [00:40:48] I first met Heather after having given a guest lecture at UC Davis. She was an exceptional student.

**Heather Morgan** [00:40:56] I earned two Bachelor's, one and international relations and the other in economics.

**Travis Lybbert** [00:41:01] More than anything, I was impressed by the breadth of her knowledge about the Middle East and North Africa. We ended up working together for about 18 months and Heather moved 3 or 4 different times over that window. She was working in Hong Kong, then moved to Cairo, and then at some point she moved to Turkey. In the beginning, her signature said Heather Morgan, economist. At that point, that was kind of aspirational. The second six months, she added "entrepreneur." The very final email I got from her in 2013, she was economist, entrepreneur and hustler. There was a palpable sense of restlessness about her.

**Lynn Cannon** [00:41:50] We have this kind of image of AP kids, the bright kids, as being little angels all the time. I was a gifted student myself, and I'll tell you, they're not immune from getting into trouble. They're better at getting away with it because they're so bright. People don't expect that from them.

**Rachel Siegel** [00:42:10] The interesting part about Heather Morgan is that she was active in crypto. She had articles about operational security.

**Heather Morgan** [00:42:20] I love cyber security a lot. I have to say a lot of very large companies have plenty of security holes, billion dollar ones.

**Giancarlo V.** [00:42:32] It seemed like she was always trying to learn from other people, from other tech leaders.

**Heather Morgan** [00:42:36] Here today, talking with Tim Hurston. Jason Lemkin.

**Chris Janczewski** [00:42:40] It seems that Miss Morgan had skills of being able to influence people and get them to do things.

**Heather Morgan** [00:42:45] How to ask the right kinds of questions to really get through to people and break down their barriers.

**Chris Janczewski** [00:42:52] I saw that Ms. Morgan on various social media posts would say that she spoke other languages.

**Heather Morgan** [00:42:57] *speaking various languages*

**Chris Janczewski** [00:43:04] Having other languages could be helpful in laundering funds. The ability to go to an exchange outside of the country and set up an account or use other services that may not be English centric could be of value.

**BIGGEST HEIST EVER - NETFLIX TRANSCRIPT**

**Rachel Siegel** [00:43:17] She showed up at conferences. She was a speaker, and she talked about things like hacks and safety.

**Heather Morgan** [00:43:25] What we're here for is to teach you how to use social engineering in everyday life.

**Ari Redbord** [00:43:29] One very, very common hacking technique that has been perfected in some ways by North Korea is doing something called social engineering.

**Heather Morgan** [00:43:37] Social engineering is basically, I hate the term manipulating, but it's getting someone to share information or take an action that they otherwise would not.

**Nick Bilton** [00:43:49] So social engineering is when someone pretends to do something in the real world or on the phone or something to get access to a password. People will go and they'll go on YouTube and they will get an audio of a crying baby and then they will get on their phone and they'll say, my God, my baby's crying and I can't remember my password. And the person on the other end of the line, even though they're not supposed to give you the password, feels bad and they will give you the password. And that is essentially a social engineering hack.

**Ari Redbord** [00:44:21] They actually target specific individuals who have access to information that's necessary to carry out a hack.

**Heather Morgan** [00:44:28] Even for the CEO or their virtual assistant or office manager, or whatever, someone lower, they can give you access. It takes more effort. But if you're really determined, it's worth it.

**Nick Bilton** [00:44:41] As she gives this talk, it's kind of clear to me that she has these things she wants to say that she can't and she desperately wants to say them. It's also clear within the music. There is literally a line that she raps about where she says, spear phish your password, all your funds transfer.

**Razzlekhan** [00:44:57] Spear phish your password, all your funds transferred.

**Nick Bilton** [00:45:00] Spear phishing is a type of social engineering attack.

**Chris Janczewski** [00:45:05] Spear phish your password, all the funds transferred. Yeah, that does ring a bell. That is kind of on brand.

**Razzlekhan** [00:45:12] The catfishing queen, my tracks always clean. Social engineer. Meet me at the pier.

**Nick Bilton** [00:45:20] And at the end of Heather's social engineering talk, people in the audience are clearly like, Is this okay, what you're talking about? Like, is this moral? Is this ethical?

**Audience member** [00:45:29] Do you ever have any ethical concerns?

**Heather Morgan** [00:45:32] So I'm a realist. And I do actually believe that the ends justify the means sometimes. But, you know, nothing I do, I think my end goals aren't like bad or

evil. Like, I'm not trying to scam someone out of money or like, like, get someone hurt in any way.

**Nick Bilton** [00:45:53] She pauses for a minute and says, I have my own ethics.

**Heather Morgan** [00:45:58] I have my own ethics, I'll say.

**Nick Bilton** [00:45:59] A few years ago, when I was working on a story, these federal agents told me how building a case is like knitting a sweater. You take all these threads and you start weaving it all together until it's fully done. There are connections between everything with Heather. The investor Heather is interviewing people about cryptocurrencies that someone could invest in to help launder money. Using cold emails and social engineering, they're all tied in together. And having the ability to understand code from Ilya. It's almost like all of the skills they had, there weren't any that were left in the toolbox. And so you can see how maybe they were the masterminds. But with this particular case, it's kind of like a sweater with lots of holes in it. There are all these things that don't add up and don't make any sense.

**John Giannone** [00:47:03] The consensus among the cyber security world is that there's no way Ilya committed this hack. I got involved in this story almost by mistake, by accident. But I actually uncovered documents that shows Ilya Lichtenstein's father was a hacker. When I was a teenager, I was actively involved in the hacking community and I became friends with Brett Johnson.

**Brett Johnson** [00:47:37] I built and ran the first organized cybercrime community. It was called ShadowCrew. ShadowCrew is the genesis of all cyber crime as we know it today. It was the main communication channel that online criminals used at that point in time.

**John Giannone** [00:47:53] But unbeknownst to everybody, Brett was actually working undercover as a Secret Service informant because he had gotten arrested for an eBay scam.

**Brett Johnson** [00:48:03] My job was to target individuals and build up investigations against them.

**John Giannone** [00:48:08] And one of the individuals that came to him was a hacker who used the name Deuce.

**Brett Johnson** [00:48:14] Deuce doesn't know that I was an informant, and he tells me that he'd hacked into the First National Bank of Indiana. But he says, I can't cash out. Can you help me do that? And one day I walk into the office and I'm getting things set up and I've got my laptop in front of me. As I'm opening that up, my burner phone rings and I'm sitting there going, That's odd. No one should have this number. And the individual on the other end of the line was Deuce. What he says is, I know who you are. I know where you are.

**John Giannone** [00:48:59] Deuce hacked into Brett's computer and he discovered that Brett was an informant.

**Brett Johnson** [00:49:05] My impression of Deuce was that he was an apex predator, but I wasn't able to identify this guy.

**BIGGEST HEIST EVER - NETFLIX TRANSCRIPT**

**John Giannone** [00:49:13] Many years later, I was considering writing a book and I put in a blanket request for any documents related to ShadowCrew. Ultimately, I received 1100 documents from the Secret Service, and some of those documents discussed this hack that Brett had mentioned to me.

**Brett Johnson** [00:49:32] John Giannone, he contacts me. He says he knows who hacked into that Secret Service computer that I ran. So he sends me these documents, and I don't think the kid knew what he had at that point of time. The investigative report starts out, Yevgeniy Likhtenshteyn, a.k.a. Deuce. As I'm reading, I'm like, you know, man, I know... I know that goddamn Lichtenstein name from someplace. I know that name. So I googled Lichtenstein and up pops Eugene Lichtenstein. He Americanizes his name. And then I see Ilya Lichtenstein from the Bitfinex hack.

**John Giannone** [00:50:13] Brett and I realized, holy shit, this is Ilya Lichtenstein's dad. We found out the Secret Service identified Eugene Lichtenstein in 2005, and they flew up to Chicago to pay him a visit about hacking into their computer and also about the Indiana Bank hack. Eugene stated that he had moved to the United States from Russia approximately 13 years before, and he admitted to hacking into that Bank of Indiana. But he was never charged with anything because he immediately agreed to cooperate as an informant for the Secret Service. Apparently they never reported it. So he has no criminal record. And it turned out Eugene Lichtenstein became a real estate agent in Chicago.

**Nick Bilton** [00:51:02] What's kind of amazing is thinking about little young Ilya growing up, seeing his dad interact with these federal agents that showed up at his house. And what that might have done to a kid like that. As I investigated this story, several similarities between Ilya and his father's online activities surfaced. Ilya used the online moniker Deus Machina, or Deus for short, whereas his father allegedly used the name Manus Dei, which he also later shortened to Deuce.

**Brett Johnson** [00:51:36] I believe Ilya is trying to pay some sort of respect or homage to Daddy. The father being the hand of God, the son being the machine of God. In my opinion, the Bitfinex hack is awfully similar to what Eugene did way the hell back in 2005 when he compromised the First National Bank of Indiana.

**John Giannone** [00:52:02] Is it possible that Ilya was learning from his dad? Very possible. And actually reading through the government's pleadings, I think it's possible that all this may have some ties to larger forces. One of the things that stood out to me was they had this trip to Ukraine.

**Razzlekhan** [00:52:21] Hey, Razzlekhan here and I'm in Kiev.

**Nick Bilton** [00:52:24] And what they did there, as stated later by an attorney, was, quote unquote, taken out of the pages of a spy novel.

**Chris Janczewski** [00:52:31] We found out they were purchasing stolen passports, debit cards, and other identity documents off the darknet being hand-delivered them in Ukraine.

**John Giannone** [00:52:41] They were picking up parcels at Ukrainian post offices from Russia. And these parcels contained various identity documents and other illicit material.

**Brett Johnson** [00:52:52] They had schematics of those post offices so they would know which way to direct their line of vision so that their faces weren't caught on those cameras. That is not something that a normal criminal does.

**John Giannone** [00:53:09] I'm curious to know how they knew where those security cameras were.

**Brett Johnson** [00:53:14] Those types of schematics, that type of detail indicates a possible intelligence connection.

**John Giannone** [00:53:23] Intelligence agencies are studying passport control procedures, post office procedures for an operative to go into a post office to pick up a package being identified.

**Chris Janczewski** [00:53:35] I'm aware that some people have suggested that Mr. Lichtenstein potentially has connections to Russia and that Mr. Lichtenstein's father also was a hacker himself previously. One of the beauties of a public ledger, you can have these armchair investigators online trying to solve cases, but often can spiral into conspiracy theories. Still throughout the course of investigation, you're always keeping an open mind of like, could they be connected to another government? Could they be doing something else nefarious other than just trying to cash out stolen money?

**Nick Bilton** [00:54:08] When they were in Ukraine, they were trying to set up places to be and live. My belief, and I think the belief of federal authorities, is that that was their escape plan. They could go to Russia. And that's where Ilya's from. He spoke Russian. She spoke Russian. The cat apparently spoke Russian.

**Heather Morgan** [00:54:27] Clarissa. *speaks Russian*

**Gianni Martire** [00:54:33] I wish he had been honest with me, because if Ilya had been honest with me, he's like, Hey, Gianni, I got a bunch of Bitcoin and I don't want to pay taxes on it. What do I do? The obvious answer, I'm like Ilya, you and your wife both have Russian passports. You pull a Snowden, you get the fuck out.

**Nick Bilton** [00:54:48] There are all these oligarchs that do bad stuff and they're really good at hiding stolen money.

**Ari Redbord** [00:54:55] Would they have gotten out of the country, not arrested, and potentially have access to funds? Yeah, I mean, that's the move.

**Chris Janczewski** [00:55:02] There's the opportunity that they potentially could flee the country. But we were still building our case. We weren't ready to apprehend them at that point.

**Nick Bilton** [00:55:10] Heather and Ilya had laid the groundwork for this perfect escape plan, and it appears that they wanted to have essentially a last hurrah because they decided to go get married.

**Heather Morgan** [00:55:19] Hey, we have an announcement, an update for you. We want to tell you that we think we can have the wedding this year in 2021.

**Martin Molina** [00:55:29] When Ilya proposed to Heather, there was in Times Square a whole banner of Heather and her picture and Razzlekhan and all of that.

**Christine Erfe** [00:55:39] The wedding was kind of a surprise for all of us. We didn't know how it was going to be. Knowing Heather and Ilya, it would be different, essentially.

**Ilya Lichtenstein** [00:55:50] I'm really excited for this. It's going to be an amazing event. There's going to be art. There's going to be music, including some new Razzlekhan tracks that are unreleased that'll be dropping.

**Heather Morgan** [00:56:02] It's all about being your real self and celebrating our love and friendship. And we would love to have you come celebrate with us.

**Giancarlo V.** [00:56:12] We got to the studio space the morning of the wedding in Culver City, and immediately we saw pictures throughout the space where, like, their heads are covered in bags. Almost like a hostage situation? And it's like another one. It's similar, but their two tongues are touching each other. And then you hear like the opening notes to the Final Countdown. You see Heather's wedding entourage come in and some of them have these gold and palm fronds that they're holding up like Egyptian style.

**Christine Erfe** [00:56:42] She was carried on the palanquin type of situation.

**Giancarlo V.** [00:56:46] And she was dressed in her own customized outfit that's also like bedazzled. And so we're all taking pictures and video and we're like, of course Heather's going to do this. Of course, this is what her wedding is. She started rapping and everyone stood up and got really into it. So it's like being at an exclusive rap party.

**Cavier Coleman** [00:57:04] It was bizarre. Very bizarre. She was like performing a song. She was jumping around. It was crazy. I was like, you're supposed to be getting married, not like performing, right? It seemed way more like Razzlekhan as opposed to Heather, which I would have thought she would have been more Heather as opposed to Razzlekhan.

**Giancarlo V.** [00:57:23] Heather specifically mentioned she was debuting a new single.

**Razzlekhan** [00:57:26] Moon and stars...

**Giancarlo V.** [00:57:27] It seemed like it was kind of a love rap song.

**Christine Erfe** [00:57:30] I thought it was very sweet that she had wrote a rap about Ilya. You know, if I had that type of talent, I would do it.

**Razzlekhan** [00:57:36] You made my heart melt like jelly. I want to go and tickle your belly.

**Giancarlo V.** [00:57:43] Between Heather's rapping and Ilya's vows and how devoted he seemed to Heather and how much Heather seemed to love him back. It seemed like this couple that was, like, perfect for each other.

**Nick Bilton** [00:57:53] After the ceremony, there's a secret afterparty at a mansion in L.A..

**Christine Erfe** [00:57:57] I remember the house of the after party was very extravagant. That's where all the rich people live.

**JA428**

BIGGEST HEIST EVER - NETFLIX TRANSCRIPT

**Wedding party** [00:58:09] Razzle! Razzle! Razzle!

**Christine Erfe** [00:58:09] I knew that she dabbled in crypto a little bit. People made money off of crypto and a lot of people spend a lot of money on weddings, right? So I didn't really think anything of it.

**Ilya Lichtenstein** [00:58:17] I love that line, oh my god.

**Nick Bilton** [00:58:26] There's a couple of possible scenarios here. One is that the feds are on to them. They know they're going to get caught. And this is them going down in a blaze of glory. Or they think they're about to get away with the perfect crime. In either case, we're seeing them at the wedding giving away expensive prizes to all of their friends and family.

**James** [00:58:47] In the wedding, there was this raffle that happened. Ilya, he announced that he was giving away like an iPhone and a PlayStation. And they also gave away some gift cards.

**Chris Janczewski** [00:58:58] We found out they had purchased prepaid gift cards with Bitcoin.

**Rachel Siegel** [00:59:03] The gift card thing was so dumb. This girl was sending small fragments of $4.5 billion and buying gift cards.

**Ari Redbord** [00:59:13] You realize the desperation is growing because at this point they've been holding on to the stolen bitcoin for about five years. It's like, hey, it doesn't have to be a lot. We just want to move some of this into traditional currency.

**Rachel Siegel** [00:59:26] I think that she was grasping at straws, trying to figure out how to get the money out.

**Chris Janczewski** [00:59:31] It's easy to just look at that and be like, Why on earth would you do that? Everybody knows to not use a gift card that links back to your name and address. But I can imagine with kind of each passing day, the thought of getting caught probably was reduced. Maybe they thought that the money is clean, that it's been laundered, and they can overtly use it. But with laundering, you have to be perfect every time. You have to be correct. You can't make mistakes. I kind of think of it like rock climbing. You can be climbing up a wall and do it right 99 times. But 100th time, if you mess up and fall, all the times you were perfect doesn't matter, right? So we were able to trace the gift cards back to Mr. Lichtenstein and Ms. Morgan.

**Nick Bilton** [01:00:10] At this point, the government has a pretty good idea that Heather and Illya are in some way involved in this hack. But the problem is, law enforcement doesn't have access to the stolen Bitcoin. They can watch this Bitcoin wallet, but they can't seize the money without the private keys.

**Chris Janczewski** [01:00:29] Private keys are just like passwords. If you own those, you own control of cryptocurrency. There can be as many atoms in the known universe as there are potential guesses for the private keys.

BIGGEST HEIST EVER - NETFLIX TRANSCRIPT

**Nick Bilton** [01:00:41] An agent who works for the FBI told me it would take 13 billion years for a computer to guess the right password. So finding that password becomes essentially the holy grail of this case.

**Chris Janczewski** [01:00:54] We determined that we had enough probable cause to be able to do a search warrant on Mr. Lichtenstein in Ms. Morgan's residence. We're hoping we'd find the private keys. It was early in the morning, I believe that we woke them both up. They're probably a little bit disoriented. It was surreal to see them. Up until that point, they only existed on a screen. Now here they are directly in front of you as a person. It was like seeing a movie star in real life.

**Nick Bilton** [01:01:34] They gave Heather and Ilya the option to stay and watch them go through their stuff or to leave and come back in a few hours. And Heather said, Is it okay if I get my cat?

**Chris Janczewski** [01:01:45] Do you want to talk about the cat? Everyone wants to hear about the cat. Apparently, the cat was pretty frightened by everybody making entry. It hid underneath the bed. So we let Ms. Morgan try to get the cat from under the bed.

**Nick Bilton** [01:01:58] But really, what she was doing was she had grabbed her cell phone and she was quickly pressing all the buttons to try to lock it.

**Chris Janczewski** [01:02:05] It just wasn't a good look. The private keys can be hidden just about anywhere within the residence. Could be digital, could just be written down on a piece of paper. Maybe that behind the outlet on the wall, the bottom of a cereal box, refrigerator, wherever.

**Nick Bilton** [01:02:23] And that is when they start to find all these things that genuinely do look like they came from a spy novel or even a bad spy novel. They find currencies from other countries, books that had been hollowed out to be able to hide something, presumably cash or passports or a thumb drive with $5 billion on it. And they found a bag literally labeled burner phones.

**Chris Janczewski** [01:02:49] And I think that was the first time we had a bag that was labeled burner phones. That was a new one. Many people would just assume that you want to arrest those people that day. There's certainly some cases you do, but we were still building our case. You could potentially have everything you need in a Macbook that you just seized. But until you forensically go through it, which is a very systematic process that takes time, you don't necessarily know what you have.

**Nick Bilton** [01:03:20] They've gotten away with this crime for five years, and it's clear that there's an escape plan. But just having a burner phone and all these different currencies didn't mean that they had broken the law. What the government needs to find is the password for this wallet, because without that, they can't do anything.

**Chris Janczewski** [01:03:39] After the search warrant, they were free to go wherever they wanted to go.

**Nick Bilton** [01:03:43] There are a lot of people that wonder why they didn't go and stay in the Ukraine, where they could possibly get access to these billions of dollars in crypto. They had all these fake passports and Ilya's got family in that area of the world. But it

BIGGEST HEIST EVER - NETFLIX TRANSCRIPT

seems like their escape plan was disrupted by massive global events that were beyond their control.

**News reporter** [01:04:04] More than 100,000 Russian troops are now gathered on Ukraine's borders.

**Nick Bilton** [01:04:09] The last place you're going to want to be when you're trying to get rid of multiple billions of dollars in stolen crypto is in the middle of a war zone. But either way, you know, there are so many countries and countries that they have ties to that don't have extradition treaties with the United States that they could have gone to. But Heather and Ilya just continued with their life in New York City as if nothing is going on.

**Chris Janczewski** [01:04:38] After the warrant, things kind of like cooled down. They go back to their lifestyle. They're still living in their apartment.

**Razzlekhan** [01:04:44] AirPods. AirPods. Motherfucking AirPods. Where are my goddamn AirPods? Okay, so, Dutch, can you tell me a little bit what you thought having a pet...?

**Ilya Lichtenstein** [01:04:54] Having a pet is completely different. Okay.

**Nick Bilton** [01:05:03] Who posts videos about pancakes when you're going to go to jail for the rest of your fucking life? It does not add up. How do the feds show up at your front door, raid your apartment, take all of your electronics, which could tie you to billions of dollars in stolen crypto, and then you still go out for several weeks and make these crazy videos?

**Razzlekhan** [01:05:21] Nail salons. I'm sorry, if you're in the business, I just think it's a goddamn scam.

**Nick Bilton** [01:05:26] Part of me wonders if Heather had just become so addicted to the camera that she couldn't turn it off.

**Chris Janczewski** [01:05:33] I remember vividly that at one point Ms. Morgan tweeted again and it said something like, Focus on what impact you have on the world doing good. I remember it just kind of like, stuck with me. It seemed like they were signaling that they were getting away with this crime. And it kind of motivated myself and the team to really like, okay, we can be doing a better job. I'm sure people expect some like CIA nerve center. But it's really just sitting in my home office in Grand Rapids, Michigan, with my headphones on, turn the email off and drinking more coffee than I probably should have. And going back and looking through every email, every picture, every document from the evidence we seized while trying not to fall asleep. And we started finding spreadsheets that were encrypted where other files were not encrypted. And so they just stuck out. And I won't get into how we access the files. We'll leave it for the FBI to tell that story one day. But once we did that, we had this kind of slow burn of like, is this, can't be this. I think it is this. And that's when we finally found the private keys for 2000 or so different addresses.

**Nick Bilton** [01:06:46] After six years, finally they found the keys that unlock billions of dollars of stolen crypto.

**Chris Janczewski** [01:06:53] We moved the Bitcoin to wallets owned by the U.S. government. It was the longest, most exciting time of my career. And I went long into the night, into the morning, because nobody wants to be responsible for hitting the wrong

button and sending $3.6 billion off to the wrong address. Wild neighbors that are oblivious that billions of dollars are being moved to my home office. We were making the largest seizure in the history of the Department of Justice. I believe the judge said it was an electronic smoking gun at that point.

**Frankie Cavazos** [01:07:25] I just was on Twitter one day and people were talking about, hey, there's some wallets involved in the 2016 Bitfinex hack. We got money moving. We're talking about billions of dollars moving. And when I heard that the coins had been confiscated by the government, oh man, I was just ecstatic. I was just vibrant.

**Chris Janczewski** [01:07:47] And so, like, people are aware. And so we assume that Mr. Lichtenstein and Ms. Morgan would know that the funds had been seized. That put us on a clock. So we scrambled to then make sure we can make the arrest. Was like, a little bit of deja vu. We were going back early in the morning, going in to the same door, knocking, announcing, making entry. But this time, it ended differently. We arrested Mr. Lichtenstein and Ms. Morgan right in the hallway area. I put the cuffs on Ms. Morgan. And about that time is when they started speaking to each other in Russian. I don't know what they said and I couldn't repeat it, but certainly they were trying to communicate.

**Dyrohn Southerland** [01:08:37] I remember like getting this text, said, Hey, I'm a writer from New York Mag. Heather and Dutch, the FBI came and got them. I'm like, What?!

**News reporter** [01:08:47] Tonight, the biggest Bitcoin bust in U.S. history.

**Dyrohn Southerland** [01:08:50] I thought it was a scam. I thought it was a joke. He was like, Bro, I'm not kidding.

**Gianni Martire** [01:08:55] It was the first thing in my newsfeed, and the minute I saw it, I'm like, Holy shit, I know Bitcoin Bonnie and Crypto Clyde.

**Rachel Siegel** [01:09:02] The day we found out Razzlekhan got caught, things were insane. It took about 25 minutes to find Heather Morgan's Twitter account and Razzlekhan.

**News reporter** [01:09:12] I went through her Instagram and YouTube account earlier today, and I can't tell you whether that was the best part of the worst part of my day.

**YouTuber** [01:09:20] Heather Morgan should be incarcerated for at least another 25 years purely on the basis of being unbearably cringe.

**Rachel Siegel** [01:09:27] It seems like Rasool Khan had this big dream, right? She wanted to be famous. She really wanted her content to get out there. You don't make 10,000 videos of yourself unless you want people to notice you. And everyone noticed her.

**YouTuber** [01:09:40] Remember when I said prisoners should be able to have their phones in prison and do TikTok? I don't say that anymore.

**Martin Molina** [01:09:47] When Versace Bedouin blew up three years later now, with the whole scandal, that was something else. But I mean, my parents saw the video and they were like, that's the music video that you shot? Yeah, that's the one. I remember reading in a magazine that said, Yeah, that music, it's not good. But the Versace Bedouin video was well-produced. You know, tap on the back.

**JA432**

**BIGGEST HEIST EVER - NETFLIX TRANSCRIPT**

**Dyrohn Southerland** [01:10:09] It shocked me. It really did. It shocked me to death.

**Ilya Lichtenstein** [01:10:13] I mean, don't make it like just me, make it you also.

**Dyrohn Southerland** [01:10:17] They were hackers, man. They were doing that hacking stuff.

**James** [01:10:21] There's a part of this that feels very dishonest. It's like the whole time that we thought that you were one person, you were somebody completely different. With this huge amount of stolen money that you had, that you were using to fund your life and fund your dreams. I got the sense that she just found herself getting in too deep into a place that she couldn't really climb out of.

**Nick Bilton** [01:10:48] Just days before he was arrested, one of her friends posted a picture of a kintsugi pot. This is the Japanese pots that are broken and then they're intentionally put back together with gold. And they're meant to show that you can be broken and put back together, too. And Heather reached out and had said, in a very un-Heather like way, Life is not good. I feel broken.

**Kyle Peevers** [01:11:18] I feel worried for her. I care about Heather. I don't want her to be in trouble.

**Zach Serota** [01:11:24] When I saw Ilya's mugshot, it was like I saw a ghost. It was harrowing. But if I could say anything to Ilya right now, in a way, I'm kind of proud of you, dude. You did something that not many people can say they've done, even if it was against the law.

**Pierce Larick** [01:11:51] Maybe they just got wrapped up in this idea that you're not really hurting anyone. This is fake money. It's monopoly money. It's not real. And if you think about it, who really did they hurt? You know, although valued at a lot of money, did they really put anyone out by taking it? If they took from the poor, it'd be one thing, but they kind of Robin Hood it, if you ask me.

**Lynn Cannon** [01:12:15] I could see where you can get hooked into some kind of a fantasy world, where you might lose that connection between what you're doing and then the impact it has on other people.

**Ari Redbord** [01:12:30] It's so easy just to think to ourselves, Well, that's just internet funny money. But the reality is that these are real individuals who are holding these funds whose lives were changed as a result of that theft.

**Frankie Cavazos** [01:12:44] From the time I was hacked till about six months after the hack, that $10,000 I had invested, which was 15 bitcoins, would have been worth close to $250,000. After the hack, Bitfinex came up with a compensation plan to pay back all their customers.

**Sheel Kohli** [01:13:00] We offered our customers a token, a token that was worth $1. So if you lost $100, we would give you a hundred tokens. And we said that we would redeem those tokens as quickly as we possibly could.

**Frankie Cavazos** [01:13:18] As a victim, I did receive some compensation, but it was nothing compared to the $250,000 I would have had six months later after the hack. I don't want the funds that they're trying to put in my account. I want my bitcoins.

**Chris Janczewski** [01:13:30] You can imagine that any client of Bitfinex that had what was much less in a dollar value, say 1, 2, 3 Bitcoin at the time, would rather to have their 1, 2, 3 bitcoin now that it's more valuable exponentially so.

**Sheel Kohli** [01:13:45] The bitcoin will go back to Bitfinex. As far as Bitfinex is concerned, we've made all our customers whole.

**Frankie Cavazos** [01:13:54] The lawyers for the Department of Justice reached out and they say that during the sentencing I will be able to state my case and because I am a victim, I will have the opportunity to get my seized assets back.

**Chris Janczewski** [01:14:09] After somebody is arrested, generally they are free to go until their trial hearing. There are two exceptions to where somebody can be kept in custody, and that's if you're a flight risk or a danger to the community. The government's argument to the judge was that Mr. Lichtenstein was born in Russia. He had another passport. He had connections to people overseas. And potentially there was other money out there still accessible. And the judge ultimately agreed and kept Mr. Lichtenstein in custody.

**Nick Bilton** [01:14:38] Ilya is incarcerated while Heather was let out and was allowed to work from home.

**Ari Redbord** [01:14:47] The judge released Heather because she had certain health conditions. It was interesting and a bit of a surprise, I think they were essentially pointing the finger during that hearing at Ilya.

**Chris Janczewski** [01:14:57] The government has a very high conviction rate of like 97% or something like that. It's in the defendant's best interest generally to try and negotiate a plea and work down their time.

**Ari Redbord** [01:15:07] The question is, how can they cooperate? I think they can really cooperate in two ways. One, there's still about $1 billion out there. They could give them the location of that billion dollars. That would be very helpful. Another way is to really sort of help the government understand the story of this. So how did you do this? What were you thinking? What were your methods? Were there websites that you used that we should be focused on? That's the type of information that could be very, very useful to the government as they build other cases.

**Brett Johnson** [01:15:40] After Ilya was arrested, if you're law enforcement, you're just happy as shit. Like, we got him. He'll get what's coming to him. But I know that Ilya's dad was this hacker, and none of that has been disclosed in the news in the Ilya Lichtenstein case. I thought that it was a miscarriage of justice. So I thought to myself, By God, it's coming out. Today's episode. Episode number 45. Ilya Lichtenstein. I've got my little show and I start talking. I'm not the least bit convinced that Ilya had the criminal expertise to do this crime, but it turns out there was at least one family member who absolutely had the expertise. So here is the report about Eugene, the father of Ilya Lichtenstein. I've got the documents and I start sending the documents out to everybody that will possibly listen. FBI contacts, the prosecutor, the defense attorney, all these news agencies. Then all of a

BIGGEST HEIST EVER - NETFLIX TRANSCRIPT

sudden, the case started being postponed, postponed, postponed until finally one day it's a matter of national security.

**John Giannone** [01:17:02] All the sudden, the government had this new evidence that they had to turn over to the defense counsel. That information was T. S. Top secret. That's the highest level of classification out there. These documents can only be viewed in these secure rooms where you can't bring cell phones. They have radio jammers. What could that possibly be in this case?

**Brett Johnson** [01:17:24] I don't want to become that conspiracy theory guy, but there was a whole lot of smoke. So there's got to be a fire there someplace.

**Director** [01:17:36] They made an announcement that this was like a national security issue.

**Chris Janczewski** [01:17:39] I definitely can't talk about that.

**Director** [01:17:40] You can't?

**Chris Janczewski** [01:17:41] No.

**Ari Redbord** [01:17:43] I was a federal prosecutor who prosecuted national security cases. And oftentimes criminal investigations will touch some aspects of national security. And sometimes the intelligence community will say, hey, look, that evidence is too sensitive to use in a courtroom. Remember, law enforcement are heads down looking at their one case prosecuting a bad guy. The intelligence community has very, very different interests.

**John Giannone** [01:18:10] I really want to know what the national security is. But we're never going to know.

**Chris Janczewski** [01:18:23] I went to the plea hearing, which took place in August 2023, which was important to myself and team because we had a lot invested in it. But it was even more surreal because that was the day a former president was turning himself in. There was an almost literal circus outside. And when Ms. Morgan and Mr. Lichtenstein got to see each other in the same room, it seemed like there was a certain level of emotion. One of the attorneys for defense asked the judge if Mr. Lichtenstein and Ms. Morgan could talk to each other, a hug or something like that. The request was denied. During a plea hearing, the judge will ask questions of the defendants. The biggest takeaways, I think, for the public was Mr. Lichtenstein admitting that he was the hacker, and during the time that he had access to the Bitfinex infrastructure, he was able to steal username and passwords. I think the biggest thing for me was just kind of like hearing people admit that they were the ones actually guilty of doing what we had alleged. Finally, you have this confirmation that, yes, what you thought during this process is in fact true. During the plea hearing, Mr. Lichtenstein said that he operated alone, and at a certain point Ms. Morgan got involved in the laundering process. At first she said she kind of didn't really know it was going on, but then ultimately learned the source of the Bitcoin was a theft and then actually took proactive steps to help launder the proceeds as well. Ms. Morgan also admitted that she had destroyed some evidence and mentioned a laptop down a trash chute. We also learned about gold coins that were buried underground that were recovered by the government.

**Nick Bilton** [01:20:04] She ends up pleading guilty and then is let go. And Ilya has been in prison for the last several years.

**Reporter** [01:20:12] Heather, any reaction today? How do you feel today coming out of the courtroom? How do you feel today? When you guys stole the cryptocurrency, did you think you were going to get away with it, or do you think you are ultimately going to get caught? Do you feel like you were [inaudible] all that time?

**Nick Bilton** [01:20:27] And now on social media, we're seeing these pictures of her attending crypto conferences? You have the biggest financial heist in human history with all of these issues of national security that we've heard about. And yet he's the one in jail and she's just out having a grand old time.

**John Giannone** [01:20:48] During the plea hearing, the judge had informed Ilya that there was an offer to enroll him in the witness protection program. That actually stood out to me because it's like, why would this guy go into witness protection over a case like this?

**Ari Redbord** [01:21:02] As a prosecutor for a long time, it's very rare to see witness protection as part of a plea agreement. It's very, very rare to see it in a case involving crypto laundering.

**John Giannone** [01:21:14] If they do end up going into the witness protection program, I don't think we'll hear anything more about this case.

**Nick Bilton** [01:21:21] After the feds got access to the wallets, there was still about $1 billion that was missing. And over time, Ilya has pointed the feds to a majority of the billion dollars. But there are still so many questions in this case about who was behind this and how it took place and everyone's involvement. Was it Ilya alone? Was it Heather alone? Was it both of them together? Was there someone else that we don't know about? There are things that just don't add up, and they don't make sense. And I know I'm not the only person who feels that way. Even Ilya says that.

 **A & W AUTO CLINIC** 



EXHIBIT

**B**

| Date | Description | Credit | Debit | Daily Balance |
|---|---|---|---|---|
| 04/15/2005 | Account Opened | | | $0.00 |
| 04/18/2005 | Deposit | $20.00 | | $20.00 |
| 04/20/2005 | Returned Deposited Item | | $20.00 | $0.00 |
| 04/20/2005 | Returned Deposited Item Fee | | $10.00 | -$10.00 |
| 04/21/2005 | Deposit | $100.00 | | $90.00 |
| 04/29/2005 | Account Activity Fees | | $16.30 | $73.70 |
| 05/03/2005 | ATM Withdrawal (Roslyn Height, NY) | | $60.00 | $13.70 |
| 05/31/2005 | Account Activity Fees | | $13.70 | $0.00 |
| 06/07/2005 | Deposit | $600.00 | | $600.00 |
| 06/07/2005 | ATM Withdrawal (Rockville Centre, NY) | | $500.00 | $100.00 |
| 06/07/2005 | Prior Month Service Charges | | $2.25 | $97.75 |
| 06/21/2005 | Deposit | $800.00 | | $897.75 |
| 06/28/2005 | ATM Network Fee | | $1.50 | $896.25 |
| 06/28/2005 | ATM Network Withdrawal | | $41.50 | $854.75 |
| 06/30/2005 | Account Activity Fees | | $15.95 | $838.80 |
| 07/08/2005 | Fleet Bank Plt Trans Rebate Service Charges Ppd | $50.80 | | $889.60 |
| 07/11/2005 | ATM Network Fee | | $1.50 | $888.10 |
| 07/11/2005 | ATM Network Fee | | $1.50 | $886.60 |
| 07/11/2005 | ATM Network Fee | | $1.50 | $885.10 |
| 7/11/2005 | ATM Network Withdrawal (San Francisco, CA) | | $402.00 | $483.10 |
| 7/11/2005 | ATM Network Withdrawal (San Francisco, CA) | | $402.00 | $81.10 |
| 7/11/2005 | ATM Network Withdrawal (San Francisco, CA) | | $82.00 | -$0.90 |
| 07/20/2005 | Funds Transfer Credit (US Debt Freedom, LLC) | $5,010.00 | | $5,009.10 |
| 07/20/2005 | Funds Transfer Credit (b)(6), (b)(7)c | $2,510.00 | | $7,519.10 |
| 07/20/2005 | Service Fee - Funds Transfer | | $10.00 | $7,509.10 |
| 07/20/2005 | Service Fee - Funds Transfer | | $10.00 | $7,499.10 |
| 07/25/2005 | Counter Debit | | $3,600.00 | $3,899.10 |
| 07/25/2005 | ATM Withdrawal (Rockville Centre, NY) | | $20.00 | $3,879.10 |
| 07/25/2005 | Card Account: Withdrawal | | $500.00 | $3,379.10 |
| 07/26/2005 | Card Account: Withdrawal | | $500.00 | $2,879.10 |
| 07/26/2005 | Card Account: Withdrawal | | $20.00 | $2,859.10 |
| 07/29/2005 | International Wire (ORG: (b)(6), (b)(7)c Ebay Pips | $6,259.00 | | $9,118.10 |

 **A & W AUTO CLINIC** 
**0095 0555 2565**

| Date | Description | Deposit | Withdrawal | Balance |
|---|---|---|---|---|
| 07/29/2005 | NY Teller Cash Withdrawal from Check 2565 (Rockville Centre, NY) | | $4,500.00 | $4,618.10 |
| 07/29/2005 | Card Account: <br> Withdrawal | | $500.00 | $4,118.10 |
| 07/29/2005 | Wire Transfer Fee | | $15.00 | $4,103.10 |
| 07/29/2005 | Wire Transfer Fee | | $2.00 | $4,101.10 |
| 07/29/2005 | Monthly Maintenance Fee | | $15.95 | $4,085.15 |
| 08/01/2005 | Card Account: <br> Withdrawal | | $500.00 | $3,585.15 |
| 08/01/2005 | Card Account: <br> Withdrawal | | $200.00 | $3,385.15 |
| 08/04/2005 | Deposit | $3,500.00 | | $6,885.15 |
| 08/04/2005 | American Express Bill Pymt | | $3,300.00 | $3,585.15 |
| 08/08/2005 | American Express Bill Pymt | | $3,300.00 | $285.15 |
| 08/08/2005 | Card Account: <br> Withdrawal | | $100.00 | $185.15 |
| 08/08/2005 | San Diego Counter Withdrawal | | $41.50 | $143.65 |
| 08/08/2005 | San Diego Counter Withdrawal | | $1.50 | $142.15 |
| 08/11/2005 | Counter Debit | | $142.15 | $0.00 |

06/11/05:

gollumfun (02:39 PM) :
GReetings
generous (02:39 PM) :
hi
generous (02:39 PM) :
our mutual friend mentioned you might be interested in track2 skims?
gollumfun (02:40 PM) :
indeed. skims, eh? VERY interested
generous (02:40 PM) :
cool here hang on a sec
gollumfun (02:41 PM) :
GReat
generous (02:43 PM) :
can i ask you a quick question first.. how do you feel about being picky regading type/bin
versus if they are fresh? advantage i have is i have very very fresh stuff but most are
classics.. each batch/day has a mix with a few business, signature, platinum,
gold/premier, and then mostly classics. here is a batch from a few days ago should get no
cfa/pickup at all - all should work as cardholders used them very recently.
generous (02:44 PM) :

generous (02:44 PM) :
and
generous (02:44 PM) :

generous (02:44 PM) :
this batch is typical except
generous (02:44 PM) :
that i pulled the 1 business, 1 signature, and 2 platinum out for our friend about an hour
ago
generous (02:44 PM) :
other batches will of course be complete
gollumfun (02:45 PM) :
Damn. VERY impressive. Are these good to use now?
generous (02:45 PM) :
yep
generous (02:45 PM) :
exclusive direct skims
generous (02:45 PM) :
i only capture track2 so you'd have to made tr1 of course
gollumfun (02:45 PM) :
so how much you charge?
generous (02:45 PM) :
customers used these approval in past week (though i get these every day i'm backlogged
going from oldest->new)
gollumfun (02:46 PM) :
thats goddamn impressive
generous (02:46 PM) :
haven't been approved to vend anywhere so haven't made prices, i figure whatever is fair,

something below market rate and i'll be very happy just try i guess and pay what you
think is fair - i can give you another batch that includes the nicer cards too
gollumfun (02:47 PM) :
Thats a deal.
generous (02:48 PM) :
oh, these are ones the cardholder swiped on .. june 2nd (in case it matters
gollumfun (02:48 PM) :
It will take a few days to run these, but Im sure our mutual friend has told you im good
for the money--heh
generous (02:49 PM) :
yeah if you need some of the other types (platinum etc) to do a valid and normal testing,
let me know i can do that too
gollumfun (02:49 PM) :
And will also lend to the review on iaaca when you start to sell there
gollumfun (02:49 PM) :
I cold use a couple plats. might be fun. heh
generous (02:49 PM) :
here you know what, kid says you're good for it lemme give you another batch, this will
include all types, hang a sec
gollumfun (02:49 PM) :
good deal
generous (02:53 PM) :
ok hopefully these pastes are coming through ok
generous (02:53 PM) :



gollumfun (02:53 PM) :
good deal. can you email as well? gollumfun@mailvault.com
generous (02:53 PM) :

generous (02:53 PM) :
np will do
gollumfun (02:54 PM) :
thanks much. I appreciate it. Will make you happy with payment also. no problem
generous (02:54 PM) :

gollumfun (02:55 PM) :
please email as well. in case something happens to my cut and paste. heh
generous (02:55 PM) :
ok might want to just wait for email its much better formatted

generous (02:55 PM) :
i've got it sending ..
gollumfun (02:56 PM) :
good deal. Again--I appreciate it. will put these to good use
generous (02:57 PM) :
ack need to resend hit wrong button hang
gollumfun (02:57 PM) :
lol. ok. mailvault takes a little while with their servers anyway. Ill receive the list about 2 hours after you send it. so no hurry
generous (02:57 PM) :
ok lemme know if it comes through ok
generous (02:57 PM) :
heh
generous (02:57 PM) :
ok
gollumfun (02:58 PM) :
thanks again. I can see that you and I are going to be doing some good business in the future.
generous (02:58 PM) :
should be 63 in a txt file attachment
generous (02:58 PM) :
excellent
gollumfun (02:59 PM) :
good deal. that include both sets you sent or just the last one?
generous (02:59 PM) :
i included both with small footnote labeling them
gollumfun (02:59 PM) :
EXCELLENT. Just received via email.
gollumfun (03:03 PM) :
Thats damn impressive. I think you now have a steady customer. heh. will advise on how they turn out. and will e more than fair with payment. GOllum
generous (03:04 PM) :
look forward to hearing happy shopping
gollumfun (03:04 PM) :
how old is the second set of skims you sent my way?
generous (03:05 PM) :
ran by customers ~7 days ago
gollumfun (03:05 PM) :
good deal. Ill use the june 2nd ones first
generous (03:05 PM) :
hope you don't mind. i could send from today but thought this would be a good sample
gollumfun (03:06 PM) :
no--this is more than fine. Im sure Ill get a lot of use from them. how are the debits going for you on average?
generous (03:07 PM) :
i have heard keep all classics under 1k/800 per swipe dont try to get big electronics etc..

seems that credit/debit doesn't matter as much as type

gollumfun (03:07 PM) :

good deal. that is my expoerience as well

generous (03:07 PM) :

so for example i've heard platinum debits are rocking in most cases even thouhg debit

gollumfun (03:08 PM) :

heh. indeed. just wanted to compare. So--thanks again. will keep you updated on progress. when are you going to be reviewed on iaaca?

generous (03:08 PM) :

no idea .. asked a long long time ago and no one ever got back to me. also just got into a spat with unauthorized (or some dude who stole his account i can't tell yet) so who knows how that will shake out

gollumfun (03:09 PM) :

well--Ill update Imperium on how these are going as well. we will get you on there asap. Id say you will get a TON of sales

generous (03:09 PM) :

awesome thank you

gollumfun (03:10 PM) :

no prob. and thank you. GOllum


06/13/05:

generous (03:18 PM) :

hi how are things?

gollumfun (03:21 PM) :

Hello hello. Was just signing in to picpay. zero balance. very sad

generous (03:21 PM) :

you had a full account?

gollumfun (03:22 PM) :

lol--oh no. CIA intel said he was gonna send me $50k this morning. I was looking forward to shopping. oh well... Hes a damn criminal

generous (03:22 PM) :

ah

generous (03:22 PM) :

how is picpay funded?

generous (03:23 PM) :

i can control pips funds (like probably a shitload of other people), that are supposedly can be withdrawn to picpay

gollumfun (03:23 PM) :

not a fucking clue on how funded. Pitboss persuaded me in to opening a account yesterday

generous (03:23 PM) :

i have to leave in the next few min to airport..

generous (03:23 PM) :

the picpay thing is real

generous (03:23 PM) :

i've got all the password hashes for pips users

generous (03:24 PM) :
like millions in credits there
generous (03:24 PM) :
but i just don't know how to pull it out
generous (03:24 PM) :
anyway thats not my thing
generous (03:24 PM) :
i just have access
generous (03:24 PM) :
anyway how have the dumps been?
generous (03:24 PM) :
i'm still trying to get reviews
gollumfun (03:24 PM) :
lol. wel--how can i get in on that? would like some funds to withdraw or at least use to
urchase
generous (03:24 PM) :
er, i mean reviewed
gollumfun (03:24 PM) :
will notify on dumps starting tomorrow.
generous (03:24 PM) :
i can't do anything until tomorrow i am literally packing and getting on the way out the
door
gollumfun (03:25 PM) :
LOL. ok--have a safe flight, ok?
generous (03:25 PM) :
k
gollumfun (03:25 PM) :
get up with me when you are rested and such. Take care. GOllum


06/17/05:

generous (04:16 PM) :
hi just checking in on the status with the dumps i sent, hoping you have some feedback
for me please
gollumfun (04:17 PM) :
yep. Got some guys out using them today. Will have payment for you in the next couple
days--ok? Im having some mtrouble with some idiots on iaaca right now. they hijacked
my account
generous (04:19 PM) :
ugh, sucks
generous (04:19 PM) :
ok no problem i'll be patient
generous (04:19 PM) :
though don't let the stupid boards distract you from good business i learned awhile back
to not let them get to me


06/20/05:

gollumfun (04:16 PM) :
hello hello
generous (04:16 PM) :
hi
generous (04:16 PM) :
hey hows it going, hoping i'd hear back
gollumfun (04:16 PM) :
ok. Im ready to pay, but i am unable to find out fair pricing for dumps until I get back on iaaca. Ill
ask you again--what were you going to charge for them?
generous (04:17 PM) :
i have always maintained "below market rates" and i think thats the fairest approach. if you want i
can name some specifics right now but the only thing i have to go by is something like
http://dumpvendor.com/
gollumfun (04:19 PM) :
ok. hold a minute and lemme look at the pricing and such. also--that doesnt appear to handle
debit. just hold and lemme look a sec
gollumfun (04:24 PM) :
ok. this is fidels ricing from carderportal: visa
Gold/Platinum/Signature/Purchasing/Busines/Corporate -30$
classic/MC-20$
amex/discovery-30$
gollumfun (04:24 PM) :
as you can see--a much biggerr price difference
generous (04:24 PM) :
right. i've seen a huge range of prices
generous (04:24 PM) :
which is why i don't have a set price yet
generous (04:24 PM) :
and just said "whatever is fair, i'll beat market rates"
generous (04:24 PM) :

gollumfun (04:24 PM) :
so what do you think of the ablove prices?
generous (04:25 PM) :
looks fine to me, probably cheap end but i don't care thats fine
gollumfun (04:26 PM) :
I would go higher, but cant log on to iaaca right now to determine their prices. SO--I can pay
those rates tomorrow or can wait and log on to iaaca and determine prices there
generous (04:26 PM) :
either way i'm happy
generous (04:27 PM) :
are you ready to do egold
gollumfun (04:27 PM) :
ok. into the bank of america account?
generous (04:27 PM) :
like funded account ,or did you want to use our friend as intermediary
generous (04:27 PM) :
ok thats fine too
generous (04:27 PM) :
cool
gollumfun (04:28 PM) :
our friend is fine with me if ok by you. do you have the account info? I dont keep shit like that
laying around
generous (04:28 PM) :
i don't sorry, he'll have to mesg you

gollumfun (04:29 PM) :
ill get it from him today. funds deposited tomorrow, ok?
generous (04:29 PM) :
sounds good
gollumfun (04:29 PM) :
and are you happy with this transaction?
generous (04:29 PM) :
i'll have more batches ready tomorrow then and we can go forward as much as you want
generous (04:29 PM) :
yes
gollumfun (04:30 PM) :
good deal. Ill also notify Imp when Im back on iaaca of the success rate ad thazt I feel you are a
good vendor
generous (04:30 PM) :
thanks i appreciate it seems very difficult to actually get a review around there
gollumfun (04:31 PM) :
heh. it CAN be. Im surprised its taken this long to just get me back on board after I was hacked.
That tells me the admins are pretty damn busy
generous (04:31 PM) :
true, they must be doing good business well patience is a virtue
gollumfun (04:32 PM) :
heh. amen
generous (04:32 PM) :
ok i'll ttyl i gotta go afk errands
gollumfun (04:32 PM) :
good deal. take care. GOllum
generous (06:41 PM) :
hi i have the account number its BOA 9505552565
generous (06:41 PM) :
i didn't realize fleet and boa had merged.
gollumfun (06:59 PM) :
good deal. Ill deposit tomorrow.
Message was sent. User is Offline.
The message will be delivered when user goes Online.

06/21/05:

gollumfun (04:56 PM) :
35--tested
24 classic 16 good.
10 gold or plat-- 6 good
320 for the classic.
180 for the plats
500 total. $800 deposited

06/23/05:

generousgenerous (10:51 PM) :
hi just got back. yes thank you for the deposit i will check it shortly, have many things
going on let me know when you are ready for more and what types you would like.
thanks

06/28/05:

**JA447**

generous (09:33 PM) :

haha wtf?

generous (09:33 PM) :

i havne't even been able to get in the board

generous (09:34 PM) :

wtf

generous (09:34 PM) :

where are you seeing this?

generous (09:35 PM) :

who is saying what, and WHERE? because i can't even see the boards

gollumfun (04:12 PM) :

its on carders.ws. and, as usual, Im strpping up to say that i wioll take care of things. I dont think you are a ripper from what Ive seen posted.

generous (05:23 PM) :

dude carders.ws is infested by at least that one ripper that was stalking me - didn't you see my posts in the ripping subforum where i pasted the logs of this guy? he impersonates known scene ppl, vendors, etc, makes hushmail accounts like tron1@hushmail.com, etc.. big list of them, and has mailed me "as" all of them

gollumfun (05:24 PM) :

well--it ISNT the real tron that posted that. I just got confirmation of that today.

gollumfun (05:25 PM) :

any idea who it is?

generous (05:25 PM) :

no

generous (05:25 PM) :

i posted most of the emails in that thread on iaaca

generous (05:25 PM) :

which

generous (05:25 PM) :

btw i can't get into now

generous (05:25 PM) :

new banner just says to contact admin

gollumfun (05:25 PM) :

well--you need to sign up over on carders.ws and defend yourself. ok?

gollumfun (05:25 PM) :

which link are you using for ia?

generous (05:26 PM) :

i don't have any link

generous (05:26 PM) :

i tried www.iaaca.com, and clicking links from my email for messages and stuff

generous (05:26 PM) :

but the old urls are wrong now

gollumfun (05:27 PM) :

yeah--they are down for another day or so. it will be back up though. probably change of url also. I will advise when its up again. ok?

generous (05:27 PM) :

ok

gollumfun (05:27 PM) :

in the meantime--get on carders and defend yourself

generous (05:27 PM) :

i'll sign up at carders.ws but thats stupid i should have to go to some shitty board to "defend"

generous (05:27 PM) :

when i've done nothing wrong

generous (05:27 PM) :

but yeah i'll go there now

generous (05:27 PM) :

whats the url of the accusation?

generous (05:27 PM) :

also whats the name of the accuser?

gollumfun (05:28 PM) :

I agree--its stupid. But it needs to be done. Just tell them to fuck off and that you are awaiting review on iaaca. say you never ripped anyone and dont know who the person they are claiming you to be is.

gollumfun (05:28 PM) :

its the fake tron and someone named franco

generous (05:28 PM) :

ah

generous (05:28 PM) :

ok i'll post all the emails there too then i guess

gollumfun (05:29 PM) :

als--cyric makes a mention about it. just read the thread and then respond. yep--post the emails also

generous (05:41 PM) :

uh

generous (05:41 PM) :

dude that forum is RUN BY the ripper

generous (05:41 PM) :

i don't need to defend myself there, i will post but it will do no good

gollumfun (05:41 PM) :

who is it ran by?

generous (05:41 PM) :

the same person assuming all the identities

generous (05:42 PM) :

i posted there pointing out they were trying to trojan carders with fake software and they called that identity "snitch" and labeled it ripper

gollumfun (05:42 PM) :

well--just post and then dont say any more. at least you will have been heard on the matter. Ill handle you coming to ia when its back up tomorrow

generous (05:42 PM) :

but thats 100% bullshit

generous (05:42 PM) :

ok
generous (05:48 PM) :
the fucking thread is closed
generous (05:48 PM) :
dude
gollumfun (05:48 PM) :
growl
generous (05:48 PM) :
that site and ALL of those "people" who posted are the same fuck
generous (05:49 PM) :
that site is RUN by the ripper
generous (05:49 PM) :
he ripped me right off the bat
generous (05:49 PM) :
and then a long term system of harassment
gollumfun (05:49 PM) :
well--thats actually cyric that posted the one post
generous (05:49 PM) :
YES, I was posting there are teamprost1, i sent a shitload of dumps to the admin there
and that piece of shit ripped me
gollumfun (05:49 PM) :
but understandable. I just thought you should know.
generous (05:49 PM) :
so i posted the dumps, and told everyone on the forum about it
generous (05:50 PM) :
you see how they mention "emily's egold"?
generous (05:50 PM) :
its because the ripper using one of his identities sent my $.01 (one penny) that i
demanded to see that he even had egold first before i would send him dumps
generous (05:50 PM) :
he did that so i figured it was ok and i sent dusmp
generous (05:50 PM) :
and so he turned around and ripped me
generous (05:50 PM) :
it was the same guy
gollumfun (05:50 PM) :
ok
generous (05:50 PM) :
i am willing to give you my egold login right now
generous (05:51 PM) :
so you can see the transaction history
generous (05:51 PM) :
or take a screenshot if you'll trust that either way
generous (05:51 PM) :
these guys are talking out their fucking ass
generous (05:51 PM) :

i don't even think its plural
generous (05:51 PM) :
i think its the same one guyt
gollumfun (05:51 PM) :
dude--i trust you--no problem
generous (05:51 PM) :
it's really infuriating
generous (05:51 PM) :
i mean there is no defense when they are running their own board
gollumfun (05:53 PM) :
very true. anyway--a new board is coming up. Ill bring you on over there as well--ok?
generous (05:53 PM) :
sounds good
generous (06:50 PM) :
http://www.carders.ws/forum/index.php?showtopic=1962
gollumfun (06:50 PM) :
LOL. goddamn--thats a long post
Message was sent. User is Offline.
The message will be delivered when user goes Online.


<u>06/29/05:</u>

generous (02:44 PM) :
heh i shut them down by *blowing* on them. i barely touched them, that was literally like
.0001 of my capability and i hadn't even gotten started
generous (02:44 PM) :
teach them to rip i guess
generous (02:44 PM) :
ok well back to work


<u>06/30/05:</u>

generousgenerous (11:54 PM) :
definitely. also i just tried to post about this to carderportal but they banned my account
instantly. i was amazed at how fast they saw it, these guys must be feds just sitting
around full time job running the forum.. because no one doing business has that much
free time. anyway yeah i'm going to kill carderportal next...
generous (11:55 PM) :
i'll seek your advice (and help?) when i get it rolling in the next few days
generous (11:55 PM) :
i have decided to start my own board
generous (11:55 PM) :
btw
generous (11:55 PM) :
"lord cyric" seems to have pull at both places, so both places will suffer badly.
Start your wn board? SOunds like a good plan. if you need any help--let me know. As for

Cyric--you are correct: the fuck and his buddies have hit most the lower leverStart your wn board? SOunds like a good plan. if you need any help--let me know. As for Cyric--you are correct: the fuck and his buddies have hit most the lower level forums. GOllum

07/01/05:

LOL. good work. can you apply that talent of yours elsewhere if need be? GOllum

07/07/05:

gollumfun (06:20 PM) :
havent heard from you in a while. GOllum
Message was sent. User is Offline.
The message will be delivered when user goes Online.

07/15/05:

generous (03:53 PM) :
ok will hook you up sorry been tied up

07/24/05:

generous (02:30 AM) :
hey i'
generous (02:31 AM) :
ve got another idea. maybe we can work something out. partner says you haven't written him, nevermind that go ahead and write me directly generous@hush.com.. willing to give you 50% commission  i've got a partner handling everything easylivin@hush.com but here i can hook you up now before i gogot a lot going on, heading to airport few minwell maybe you can help me. my partner thinks $20 for classics, $30 for gold/prem, $40 platinum/business .. what do you think?

08/09/05:

generous (10:35 PM) :
k will mail u
gollumfun (06:54 PM) :
sonds good. Also--DO NOT email or respond to my mailvault account. it has been compromised. GOllum
Message was sent. User is Offline.
The message will be delivered when user goes Online.

08/17/05:

gollumfun2000> hey there
gollumfun2000> just checking in. I dont believe you told me what you are charging for
the dumps and such. also--i have customers coming up SOON


08/18/05:

gollumfun2000> ?
generoushush> test
generoushush> ah, you don't have gaim-encryption
gollumfun2000> test
gollumfun2000> nope. I use trillian. do i need to install gaim? works ok on windows?
generoushush> hey do you happen to know what can be done with natwest logins?
generoushush> gaim works great on windows, its what i'm using
generoushush> i mentioned that before
gollumfun2000> ok. on natwest-no idea
generoushush> gaim supports every chat protocol, etc.. its a lot like trillian actually
generoushush> i used to use trillian
gollumfun2000> ill get gaim up and running this evening
generoushush> but switched to gaim because it works on windows and linux and i have
bunch of unix friends
generoushush> ok cool
gollumfun2000> ok
generoushush> (i asked about natwest because i just intercepted like 2000+ logins, pins
etc.. but noticed the only info i am missing are expiration dates)
gollumfun2000> about to log n and see if we have a customer today for dumps.
generoushush> ok cool
gollumfun2000> goddamn. nice amount of logins
generoushush> its actually 2645 but i figure large amount of them will be bogus
generoushush> from a random sample...
generoushush> like half are "fuckyou" type entries
generoushush> anyway thats still a ton of logins
generoushush> anyway i'll just throw that in the "useless" pile
gollumfun2000> hehe. thanks much. gotta love the fucks that realize its a phish
generoushush> hey need anything in next hour or so, i'm going afk for errands
gollumfun2000> Doesnt look like it right now.
generoushush> ok cool
gollumfun2000> ill be here though. will advise asap
generoushush> k


08/22/05:

gollumfun2000> need 20 dumps. GOllum

gollumfun2000> ok

gollumfun2000> hey--and you never did give a price that you wanted to sell these things at

generoushush> no. basically have been saying "sell them for whatever you can" .. whatever market rates are i guess? it doesn't matter a lot.

gollumfun2000> ok.

gollumfun2000> ok. so need 20 now. payment for you via egold or wu?

generoushush> egold

generoushush> i'll find my acct number here in a sec

generoushush> oh, hey did you see the paste?

gollumfun2000> no--no paste here

generoushush> heh

generoushush> i pasted 20

gollumfun2000> growl

generoushush> are you using gaim?

gollumfun2000> nope. still not

generoushush> some of those other im clients strip out numbers etc

gollumfun2000> growl

gollumfun2000> wanna mail my way? detroitrocks@safe-mail.net

generoushush> yep mailing

gollumfun2000> ok

gollumfun2000> got em



U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*



*610 Federal Plaza*
*Central Islip, New York 11722*

August 21, 2008

*Attorney-Client Privileged*

**Via Facsimile at 202-406-5771**
Patrick Fitch
United States Secret Service
Office of Chief Counsel
1800 G Street, NW
Washington, D.C. 20223

      Re:   *Giannone v. United States Secret Service,*
               No. CV-08-2222 (Bianco, J.) (Wall, M.J.)

Dear Mr. Fitch:

        Enclosed please find the premotion conference letter requesting leave to file a motion for transfer of venue in this action. As we discussed, our office believes your agency should submit a letter to plaintiff informing him that all records have previously been provided to his attorneys, as the prior submission makes the defense of withholding on the basis of Exemption 7A problematic. Please provide me with a copy of the letter as soon as possible, as it may assist us in obtaining plaintiff's agreement to withdraw this action.

                Very truly yours,

                BENTON J. CAMPBELL
                UNITED STATES ATTORNEY

   By:    *Denise McGinn*
                DENISE MCGINN
                Assistant U.S. Attorney
                (631) 715- b2

B6, B7C

U.S. Attorney's office

B6, B7C

B6, B7C

Rule 16
Obligations

7A
Subject
207-0643
B6, B7C

B6, B7C

B6, B7C

Aust

B6,B7C

803-939-3000

Memo .ges turned over
to your attorney under
discovery and there is
not if... information

a document (letter reports)

CALLED CASE SA B6,B7C
B6,B7C on 3/11/08.
MAINTAINS CASE FILE
HAS SENSITIVE INFORMATION
GIANNONE SHOULD NOT HAVE
OR SEE.
B6,B7C

did we turn over docs
under discovery

can we get copy of the
Discovery rec'd.
• 9/3/08
Yes turned over docs
under discovery even
hard drives

3/11/08

B6,B7C

HIS CASE IS ON

APPEAL.

B6,B7C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| United States of America, | Cr. No. 3:06-1011-CMC |
| v. | |
| Jonathan Giannone, | **Order** |
| Defendant. | |

This matter is before the court on Jonathan Giannone's ("Giannone") Petition for Writ of Error *Coram Nobis*, asserting evidence withheld from him at trial resulted in his conviction despite his actual innocence. ECF No. 405. He requests the court vacate his conviction. The Government filed a response, asserting the Petition is untimely and, in the alternative, Giannone has not shown the alleged errors satisfy the "significant burden necessary for *coram nobis* relief." ECF No. 413 at 1. Giannone replied, requesting an evidentiary hearing in light of the factual disputes between the parties. ECF No. 419. He asserts the delay in bringing the petition should be "weighed against" the Government's withholding of evidence and asserts *coram nobis* traditionally had no time limits. Finally, Giannone filed a motion for leave to file supplemental material, consisting of information from a Netflix documentary regarding the scope of a hack of a relevant computer. ECF No. 420.[1]

**BACKGROUND**

The United States Secret Service conducted an online undercover investigation, known as "Operation Anglerphish," to identify persons using the internet to commit identity theft, credit card

---

[1] The motion for leave to file is granted.

fraud, and other fraud-related crimes. *United States v. Giannone*, 360 F. App'x 473, 476 (4th Cir. 2010). The operation specifically targeted an online community trafficking in personal information and engaged in criminal activity over the internet. An initial arrest was made of an individual known in that online community, who then began to cooperate in the investigation and serve as a confidential informant ("CI"). He operated online under his username "gollumfun," and the Secret Service monitored his computer usage with keystroke transcripts and real-time video of his computer screen.

Another member of the community, operating under the usernames Pit Boss 2600 and CIA INTEL, contacted the CI, offering to sell some "seriously good dumps," or data encoded on the magnetic strips of credit or debit cards. At first, the data transmitted was linked to inactive accounts, but Pit Boss 2600/CIA INTEL indicated he could sell the CI more numbers in the future.

On June 4, 2005, Pit Boss 2600 sold the CI 21 debit card numbers for $600, which was to be deposited in a Bank of America checking account. After the transfer of information, $600 was deposited into the account, from which Giannone withdrew $500. The Secret Service identified Giannone as Pit Boss 2600 and CIA INTEL based on his own emails and two witnesses who knew Giannone testified he used the Pit Boss 2600 name when chatting. Pit Boss 2600 made statements online to the CI that his American Express card number ended in 1001 and had been upgraded from gold to platinum status. Both Pit Boss 2600 and CIA INTEL referred to various domestic United States travels during chats. Bank records and flight records demonstrated Giannone actually made those trips. CIA INTEL indicated during an online chat he was also Pit Boss 2600.

The Secret Service arrested Giannone in New York. In 2006, Giannone was indicted in this District on three counts of wire fraud and two counts of aggravated identity theft. ECF No. 15. He

2

proceeded to trial and was found guilty on all counts. During the trial, Giannone argued Christopher Cutler (a defendant in a related case) was the actual person who committed the illegal acts charged in the Indictment, and he had been framed. Giannone created a transcript of a chat session the Government proved at trial to be fraudulent via testimony and documentary evidence. Giannone provided materially false information to the court and was enhanced for obstruction of justice.

Giannone was sentenced to 65 months' imprisonment, consisting of 41 months as to Counts 1, 3, and 4, and 24 months as to Counts 2 and 5, to run concurrently with each other but consecutively to Counts 1, 3, and 4; and three years' supervised release. Giannone appealed, and the Fourth Circuit remanded for resentencing, finding the imposition of a two-level sentencing enhancement under U.S.S.G. § 2B1.1(b)(10) constituted impermissible double counting. The court resentenced Giannone to 57 months, consisting of 33 months on Counts 1, 3, and 4; and 24 months on Counts 2 and 5, consecutive to Counts 1, 3, and 4.[2]

## STANDARD

"As a remedy of last resort, the writ of error coram nobis is granted only where an error is of the most fundamental character and there exists no other available remedy." *United States v. Akinsade*, 686 F.3d 248, 252 (4th Cir. 2012). The writ is narrowly limited to "extraordinary cases presenting circumstances compelling its use to achieve justice." *United States v. Denedo*, 556 U.S. 904, 911 (2009); *see also Carlisle v. United States*, 517 U.S. 416, 429 (1996) ("[I]t is difficult to

---

[2] Giannone has completed his custodial sentence and term of supervised release. In the ordinary course, his three-year term of supervision would have terminated in April 2014.

3

conceive of a situation in a federal criminal case today where a writ of *coram nobis* would be necessary or appropriate.").  A petitioner seeking this relief must show the following: "(1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character." *Akinsade*, 686 F.3d at 252; *see also United States v. Lesane*, 40 F.4th 191, 195-96 (4th Cir. 2022).

When a petition for writ of error *coram nobis* rests upon a failure to disclose information, the standard in *Brady v. Maryland*, 373 U.S. 83 (1963), is implicated. Under *Brady*, failure to produce evidence is a constitutional violation when the withheld evidence was (1) favorable to the defendant because it was either exculpatory or impeaching; (2) material to the defense such that prejudice results from the withholding; and (3) the prosecution had the materials and failed to disclose them. Material evidence, if disclosed, would have likely changed the result. The "reasonable probability" standard is satisfied if the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015).

## DISCUSSION

Giannone argues he "was convicted on evidence that he has now learned was not complete. Information withheld at this trial would have changed the outcome of that trial and requires the court to correct an injustice through the issuance of a writ of *coram nobis*." ECF No. 405 at 12. Via FOIA, Giannone received documents he asserts support his claims of innocence. He contends he has been diligent in pursuing his claim, but did not receive the information he sought from the Government until the February 2016 settlement of his FOIA litigation with the Secret Service and

4

United States Attorney, which "resulted in the production of thousands of documents." *Id.* at 13. Giannone claims he continues to suffer adverse consequences from his conviction, and the errors in his case were fundamental and should be corrected.

Specifically, he contends (1) the Government had a way to determine the identity of certain screennames via "trap and trace" technology, despite its assertion at trial it had no way of making an identification of a screenname at any given time; (2) the Secret Service possessed evidence of other people using Giannone's credit card and/or driver's license to rent cars, while the Government argued the travel records tied Giannone to the subject internet chats; (3) the Government possessed evidence another person used the bank account associated by the prosecution with Giannone at trial; and (4) the Government failed to disclose the computer utilized by the CI was hacked. *Id.* at 15-17; ECF No. 420. Giannone argues these *Brady* errors are of a fundamental nature because of their constitutional magnitude.

The Government opposes Giannone's petition, asserting it is untimely and should be dismissed. ECF No. 413. In the alternative, the Government contends the alleged errors, either alone or in combination, are not "of the most fundamental nature" and thus the petition should be denied for failure to satisfy the standard for relief. *Id.* at 1.

On reply, Giannone asserts he was convicted on the basis of chat logs the Government introduced and told the jury were reliable because they could not be manipulated, but this was a false premise. ECF No. 419 at 1. He contends the delay in filing should be considered against the Government's attempts to withhold the evidence sought from him. He also filed a supplement regarding a Netflix documentary with further information he alleges shows the computer hack of

5

the CI was more severe than the Government knew or represented at trial and thus the Government's evidence on that point cannot be trusted. ECF No. 420.

### 1. *Analysis*

#### a. *Timeliness*

The Government asserts this petition for writ of error *coram nobis* is untimely. Giannone contends when the claim is one for actual innocence, as his is, timeliness is not a bar to relief but instead can be relevant and should not bar relief if the petitioner is "clearly innocent." *Lesane*, 40 F.4th at 200-01.

Here, Giannone brings a claim for actual innocence. The court agrees a petition for writ of error *coram nobis* filed in August 2024, when he was released from custody in April 2011, is a significant delay. Although some of this time is explained by the FOIA litigation, it appears there was a near-seven-year period between when he received relevant records in February 2016 and when he retained counsel at the end of 2022.

The court agrees Fourth Circuit law does not place a heavy burden on petitioners bringing viable actual innocence claims. *Id.* at 201. However, as more fully explained below, the court is unwilling to say this is a "persuasive claim of actual innocence" as was confronted in *Lesane*. *Id.* ("[W]hen a coram nobis petitioner presents a persuasive claim of actual innocence, a failure to explain a lack of effort in seeking relief earlier can be relevant, but will not categorically preclude the writ. Moreover, if the petitioner is clearly innocent of the offense being challenged, untimeliness should not ordinarily bar relief."). As seen here, however, Petitioner is not "clearly innocent of the offense being challenged," and therefore *Lesane's* lenience regarding timeliness does not apply here.

6

Further, the court finds there were two periods of unnecessary and unjustified delay in this case. First, Giannone did not file his FOIA request until three years after he was released from custody. As his Petition relies on the documents received from the FOIA request, this is a material delay. In addition, there was a nearly seven-year delay between when Giannone received the records from his FOIA request in February 2016 and when he retained counsel to file the petition at the end of 2022.[3] He waited three years after receiving the records to make any objection, and at that point decided to file a complaint with the Office of Professional Responsibility ("OPR") instead of a request for relief from the court. After OPR informed him no action would be taken on his complaint, he again waited three more years to hire an attorney. Giannone gives no reason for this delay.

Based on these delays without justification, the court finds the Petition untimely. However, in an abundance of caution, it will proceed to consider and rule on the merits in the alternative.

      *b.* *Merits*

Regarding the merits, the Government does not appear to contest Giannone meets the first and third prong of the test for writ of error *coram nobis*: that a more usual remedy is not available and that adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III. Giannone was released from custody in 2011 and has completed his term of supervised release; accordingly, other avenues of challenging his conviction,

---

[3] This gives Giannone the benefit of the doubt for the time period between when he retained counsel and when the Petition was filed in August of 2024, which included several months of consultation between January and August 2024, in which Giannone's attorney and the Government attempted to resolve this claim.

7

such as under 28 U.S.C. § 2255, are not available to him. The Fourth Circuit's standard for adverse consequences is not a high bar. *Lesane*, 40 F.4th at 203. Giannone's contention that he is a convicted felon and suffers "significant collateral consequences and loss of rights that goes with that status" is unchallenged by the Government. The court finds the first and third prongs are sufficiently met.

However, the Government asserts Giannone fails to present an error of fundamental character and thus this petition does not warrant *coram nobis* relief. Giannone presents four pieces of evidence he alleges were exculpatory and withheld at trial, which "call the verdict into question." ECF No. 405 at 15.

### i. CIA INTEL Screen Name

First, Giannone alleges the Government had the ability to trace IP addresses via "ICQ trap and trace," and these records captured IP addresses linked to certain cities. Giannone asserts he had not been to many of these cities, and that list would have been critical information to disclose to him. The Government contends trap and trace records capture the incoming electronic information which identify the originating number or other signaling information "reasonably likely to identify the source of a wire or electronic communication." ECF No. 413 at 10. It asserts the trap and trace records therefore show the IP addresses of messages incoming to certain usernames, not the IP addresses from which messages were sent – in other words, the evidence shows locations of people who were messaging Giannone, not the locations from which his messages were sent. Accordingly, the Government argues the evidence of locations was neither favorable nor material, and would not have led to a different result at trial.

8

Giannone disagrees, arguing the Government has the trap and trace backwards – the list of relevant cities shows locations and IP addresses where communications originated. ECF No. 419 at 3-4. He asserts the list of IP addresses would have numerous ICQ identifiers if the information was related to other addresses chatting with the target ICQ, but it does not, so the list of IP addresses are ones from which the ICQ originated.  This is based on the notations made by law enforcement on the list.

Chapter 18, United States Code, § 3127, defines the terms used within that chapter. Section 3127(4) defines a trap and trace device as "a device or process which captures the *incoming* electronic or other impulses which identify the originating number. . . ." (emphasis added). A pen register, in contrast, means "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility *from which* a wire or electronic communication is transmitted." § 3127(3) (emphasis added). It thus appears a trap and trace device records incoming electronic signals identifying where the signal comes from when it goes into an ICQ. A pen register would record the signals leaving the ICQ.

The court has reviewed the ICQ trap and trace records produced in the appendix. ECF No. 405-1 at 1073-1074. The record evidence does not clarify which direction the signals are relayed – incoming or outgoing. Neither does it reveal whose ICQ was being traced – the CI's or Giannone's (or another target's). As it is Giannone's burden to show the evidence would be favorable and material, this showing is insufficient.  It is questionable whether the trap and trace evidence is favorable, and unlikely it is material. Accordingly, this is not an error of fundamental character that supports *coram nobis* relief.

9

ii. <u>Credit/Debit Card Usage</u>

Giannone next alleges the Government possessed evidence of other people using Giannone's credit card and/or driver's license to rent cars. At trial, the Government tied travel descriptions in chats with the CI to Giannone via rental car records showing he made the trips he discussed in the chat. However, Giannone asserts a document received in the FOIA records shows other people were using Giannone's VISA card to rent cars. ECF No. 405 (citing App. 1075-1084).

The Government contends Giannone provides no specific evidence establishing a different person used his VISA card to travel. Even if he had, the Government argues this does not call into question whether Giannone also used the VISA to travel, as the Government alleged at trial. It asserts Giannone had his VISA records at the time of trial and could have raised this issue previously, but failed to do so.

In reply, Giannone notes it was not his credit card records that would have been helpful, but the car rental records that were in the possession of the Government but not disclosed. These would have shown Giannone did not undertake the travel referenced in the chats, and he asserts this would have changed the outcome of the trial by revealing the "real world" events referenced in the chats were not tied to Giannone.

The record evidence shows Secret Service agents contacted Dollar Thrifty Automotive Group and received documentation of all Dollar Thrifty car rentals associated with Giannone's New York Driver's License number, ranging from June 2, 2005, to July 16, 2006. ECF No. 105-1 at 1077. The agent again contacted Dollar Thrifty and received documentation of two car rentals using Giannone's VISA number, one for May 16, 2005 – May 18, 2005; and the other for

10

November 10, 2006 – November 14, 2006. *Id.* at 1077-78. The names of the people reserving these cars with Giannone's VISA number were redacted. *Id.*

Again, it is unclear based on the evidence submitted whether the car rental information tied to Giannone's credit card is favorable or material. He presents no evidence tending to show that this rental took place while he was elsewhere or that this particular rental was one the Government did not "match up" with the travel records from the chat, as he alleges occurred. With nothing more than two transactions under the VISA number with a redacted name, the court finds Giannone has failed to meet his burden to show this alleged error was of a fundamental nature.

### iii.  Bank Account Usage

Third, Giannone contends the Government was in possession of evidence showing another person used the bank account the prosecution claimed Giannone accessed. He claims withdrawals of money from that bank account were made in San Francisco, California on dates when he was not in that location.

The Government argues this claim is not supported by the record evidence cited by Giannone. Further, the account was controlled by Giannone and he had the account records to support this argument at trial.

Giannone acknowledges he mis-cited the appendix, and provides the information regarding the account in question in an exhibit to the reply. ECF No. 419-1. He asserts this shows a chat log with another target of the investigation was using the same bank account to collect money from the CI. He claims this evidence disputes the Government's contention at trial that "it had to be Giannone solely using the 'Auto Clinic' bank account." ECF No. 419 at 5.

Attached to Giannone's reply is a spreadsheet entitled "A&W AUTO CLINIC" that shows the credits, debits, and daily balance of an account opened in 2005. ECF No. 419-2 at 1. The rest of the exhibit is a chat between screennames "gollumfun" and "generous" that references payments on dates shown on the Auto Clinic account. Giannone argues there is an ATM withdrawal in San Francisco on July 11, 2005, but Giannone's bank records introduced at trial show a purchase and ATM withdrawal on the same day in New York. He asserts he could not be in both places, and this undermines the Government's position that he was the sole user of the Auto Clinic account.

However, it was not merely the Government's *position* Giannone was the sole user of the Auto Clinic account. The parties stipulated at trial Giannone was the true owner of Bank of America account ******2565 in the name of A&W Auto Clinic. ECF No. 145 at 153 (Trial tr.). Giannone and the Government further stipulated he withdrew $500 from an ATM in New York on June 7, 2006, and those funds were withdrawn from the Auto Clinic account. *Id.* These stipulations were signed by the Assistant United States Attorney, Giannone, and his attorney. *Id.*

Based on these stipulations, there was not a dispute at trial over who withdrew the $500, what account the funds were withdrawn from, and whose account it was. Accordingly, the Government's current contention that Giannone was in possession of his own bank records (which he admitted at trial included the Auto Clinic account) is correct. If Giannone was concerned with the withdrawal in San Francisco while he asserts he was in a different location, he could have raised that at trial. He failed to do so. As the spreadsheet of the Auto Clinic bank account was not any more favorable or material than the account documentation that would have been in Giannone's possession as the admitted owner of the account, the court finds the Government's alleged failure to turn it over was not an error of a fundamental nature.

12

iv.  <u>CI Computer Hack</u>

Finally, Giannone focuses on the hack of the CI's computer. He acknowledges he raised this issue in his motion for new trial just after his conviction, but asserts the Government's affidavit downplayed the scope of the hack and implied the hack would not have affected the integrity of the computer. ECF No. 405 at 18.

The Government argues there is no support this evidence related to the computer hack would have changed the jury's view of the evidence against Giannone. The Government notes Giannone raised the hacking issue in his previous motion, and the Secret Service agent averred Giannone's chat sessions with the CI were automatically and contemporaneously transcribed and video recorded. Also, it argues the hack took place two months after Giannone received the money in the transaction for which he was prosecuted.  Accordingly, the Government asserts, "[r]egardless of the scope of the hack or the hacker's capabilities, it could not have affected the videos and transcripts of the chats used as evidence." *Id.* at 13.

In reply, Giannone asserts the Government at trial introduced transcripts of the CI's internet chats and "repeatedly explained the computer was secure and the records could not have been tampered with." ECF No. 419 at 6. He now claims there was "clear evidence the computer used by the confidential informant . . . was not as secure as the prosecution represented to the jury." *Id.* He contends the computer documentation was used to convict him, and the Government claimed the "source (the undercover computer) was unimpeachable, [but] it turns out the opposite was true. The computer was not secure . . . this critical evidence would have significantly undermined the 'star witness' in this case." *Id.* at 7. Giannone also filed a notice of supplemental materials, including a Netflix documentary transcript. ECF No. 420. This transcript involves the CI and

13

Giannone discussing the hack of the Government computer and the now-known perpetrator, a famous hacker. Giannone alleges there "is now little doubt that a major breach of security occurred during the very time the Secret Service alleges its informant was messaging over the internet with Giannone. That breach of security runs directly counter to the Government's claims the computer was secure and the transcript of the internet chats were reliable." *Id.* at 3.

It appears undisputed the computer the CI was using was hacked at some point during the investigation, although Giannone disagrees it has been established the hack took place two months after the transaction at issue in his case. The scope of the hack may have been unknown at the time. However, Giannone does not allege any specific evidence against him was altered by the hack – he merely contends the computer was compromised. Beyond vague assertions, he does not explain how the hack altered the prosecution against him or how it called into question the evidence of internet chats. The program on the CI's computer recorded all activity on the computer, including chat logs, keystrokes, and websites visited. ECF No. 145 at 88-89 (Trial tr.) ("Now, while [CI] is chatting with people, every keystroke he touches and whatever is coming in on those chats is going to be automatically generated onto a text document through that program."). The Government also had a recording program installed on the computer that recorded everything happening on the computer screen and saved the recordings. *Id.* at 90. The Secret Service agent testified the CI did not have the ability to change what was generated by the computer, because the program ran "stealth mode," where a specific hot-key combination was required to access the program, and once the program began there was a password required to get the information generated. *Id.*

14

Even if an additional keystroke logger was placed on the CI's computer by the hacker, there is no evidence the hacker gained control of the programs used by the Secret Service to record the CI's ICQ chats or the recordings. The hacker stated he took control of email accounts and posted personal information, obtained from emails, on a Google group. ECF No. 405-1 at 1088. There is no indication he somehow interfered with the Secret Service programs or information attributed to Giannone. Accordingly, without more, Giannone has failed to show evidence of a hack that may or may not have occurred during the time Giannone was a target would be favorable or material. The court finds no fundamental error here.

**CONCLUSION**

The court finds the Petition should be dismissed as untimely. In the alternative, the court finds none of the grounds raised by Giannone rise to the level of an "error of the most fundamental character."[4] Accordingly, for the reasons above, Defendant's Petition for Writ of Error *Coram Nobis* (ECF No. 405) is **denied**.[5]

**IT IS SO ORDERED**.

s/Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
February 11, 2025

---

[4] Giannone's request for an evidentiary hearing is denied.

[5] As noted above, Giannone's motion for leave to consider supplemental material (ECF No. 420) is granted.

15

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | CRIMINAL ACTION NO. |
| *Plaintiff,* | 3:06-cr-01011-CMC |
| v. | **NOTICE OF APPEAL** |
| **JONATHAN GIANNONE**, | |
| *Defendant.* | |

The Defendant-Petitioner Jonathan Giannone respectfully notifies the Court and opposing counsel of his intent to appeal the Court's order denying his petition for a writ of error coram nobis to the United States Court of Appeals for the Fourth Circuit. The order was filed February 11, 2025, and this notice is timely under the Federal Rules.

Respectfully requested,

*s/ Joshua Snow Kendrick*
Joshua Snow Kendrick (9037)
KENDRICK & LEONARD, P.C.
7 Mills Ave. (29605)
P.O. Box 6938
Greenville, SC 29601
(864) 760-4000
Josh@KendrickLeonard.com

February 21, 2025
Greenville, South Carolina